UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIM. NO. 3:19-CR-00250 |
| | : | |
| v. | : | (JUDGE MARIANI) |
| | : | |
| MARTIN EVERS, | : | Electronically filed |
| Defendant | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Submitted By:

**DAVID J. FREED**
**United States Attorney**

*Michelle L. Olshefski*
**MICHELLE L. OLSHEFSKI**
**Assistant United States Attorney**

# TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Introduction............................................................................................1

Factual Background................................................................................4

Argument................................................................................................9

  A. Defendant has not established a reasonable expectation of privacy in the seizure of the electronic medical records ............................9

  B. The affidavit in support of the search warrant contained ample probable cause..............................................................................18

  C. The Affidavit contains no false material statements in reckless disregard for the truth; Law enforcement reasonably relied upon the search warrant in good faith....................................................34

Conclusion ...........................................................................................50

<u>CASES</u>

*California v. Ciraolo, 476 U.S. 207 (1986)* ............................................ 14

*DiNichola v. DiPaola, 25 F.Supp. 2d 630 (W.D.Pa. 1998)* ..................... 37

*Franks v. Delaware, 438 U.S. 154 (1978)* ...........35, 37, 38, 46, 47, 49, 50

*Illinois v. Gates, 462 U.S. 213 (1983)* ............................................. 22, 33

*Jones v. United States, 362 U.S. 257 (1960)* ........................................ *33*

*Katz v. United States, 389 U.S. 347 (1967)* ........................................ 14

*Lo-Ji Sales v. New York, Inc., 442 U.S. 319 (1979)* ............................... 38

*Mays v. City of Dayton, 134 F.3d 809 (6th Cir. 1998)* .......................... 37

*Ornelas v. United States, 517 U.S. 690 (1996)* ................................ 22, 23

*Rakas, v. Illinois, 439 U.S. 128 (1978)* ............................................. 9,12

*Rawlings v. Kentucky, 448 U.S. 98 (1980)* ............................................. 9

*Smith v. Maryland, 442 U.S. 735 (1979)* ............................................. 16

*United States v. Braddy, 722 F. App'x 231 (3d Cir. 2017)* ........ 39, 46, 49

*United States v. Colkley, 899 F.2d 297 (4th Cir. 1990)* ......................... 37

*United States v. Conley, 4 F.3d 1200 (3d Cir. 1993)* ............................. 23

*United States v. Cruz Jimenez, 894 F.2d 1 (1st Cir. 1990)* .................... 10

*United States v. Frost, 999 F.2d 737 (3d Cir. 1993)* ....................... 39, 49

*United States v. Hayes, 595 F.2d 258 (5th Cir. 1979)* ........................... 21

*United States v. Hodge, 246 F.3d at 308* ............................................... 24

*United States v. Hughes, 895 F.2d 1135 (6th Cir. 1990)* ...................... 21

*United States v. Irwin, 661 F.2d 1063 (5th Cir. 1981)* ......................... 21

*United States v. Jacobsen, 466 U.S. 109 (1984)* ................................... 15

*United States v. Leon, 468 U.S. 897 (1984)* ....................................... 2, 38

*United States v. Lovern, 590 F.3d 1095 (10th Cir. 2009)* ..................... 21

*United States v. Loy, 191 F.3d 360 (3d Cir.1999)* .................................. 23

*United States v. Segura-Baltazar, 448 F.3d 1281 (11th Cir. 2006)* ........ 9

*United States v. Sneed, 732 F.2d 886 (11th Cir. 1984)* ......................... 10

*United States v. Soule, 908 F.2d 1032 (1st Cir. 1990)* .......................... 10

*United States v. Williams, 3 F.3d 69 (3d Cir.1993)* ......................... 23, 24

# I.  Introduction

The defendant alleges that patient medical records were seized from 104 Bennett Avenue, Suite 2C, Milford, PA on August 6, 2019. They were not.  The patient medical records ultimately obtained by law enforcement were actually retrieved from a cloud-based electronic storage system owned and maintained by the defendant's employer, Bon Secours Charity Health System (BSCHS) Medical Group, P.C. Also, the defendant did not own or control the premises where he worked.  The same was also leased and controlled by the defendant's employer, BSCHS Medical Group, PC.  The defendant, in his employment capacity, was merely provided access to patient's medical records by his employer and only pursuant to a "Physician Employment Agreement," addressed more fully below.  The defendant, in his employment capacity, was merely provided access to the medical office in order to carry out his employment duties.

In his motion to suppress, the defendant first argues that the search warrant was based on insufficient probable cause.  He next argues that the affidavit in support of the warrant contains false statements in reckless disregard for the truth.  He does so incredibly

and presumably to persuade the Court to hold a hearing to which he is not entitled.

The defendant's motion fails for the following reasons. First and foremost, the defendant has not demonstrated a reasonable expectation of privacy in any of the seized electronic medical files. Thus, he lacks standing to challenge the search and seizure of electronic based evidence derived from the cloud based storage of his employer. Since the defendant cannot exercise the Fourth Amendment rights of others, his motion should summarily be dismissed.

Moreover, the affidavit in support of the search warrant contains ample probable cause to believe that the medical files identified for seizure would contain evidence of the defendant's unlawful prescribing of controlled substances. In addition, the defendant has failed to demonstrate that any law enforcement officer knowingly provided false information and/or acted in reckless disregard for the truth. The defendant's "private investigator" interviews, which were conducted long after the writing, authorizing, and execution of the search warrant, have nothing to do with what is contained in the four corners of the affidavit. As will be presented below, the Court will be fully apprised

via attached exhibits about the information known to law enforcement at the time of the affidavit; the truthfulness of what was contained in the affidavit; as well as the overwhelming lack of reckless disregard for the truth. What remains unclear is the method and means used by the defendant's for-hire private investigator to retain "favorable" reviews of the defendant's prescribing practices, which will also be addressed below as self-serving and irrelevant.

It is noted that in support of his motion to suppress, the defendant incredibly argues that the officers involved in the investigation are not physicians. Of course they are not. However, neither are the patients who received high doses of dangerous opioids in combination with other dangerous controlled substances from the defendant. This was an investigation. The trial has yet to occur.

For all of these reasons, the Court should deny the defendant's motion to suppress in its entirety without a hearing.

## I. Factual and Procedural Background

On August 28, 2019, a federal grand jury returned an indictment charging the defendant with two federal crimes. Count 1 charges a violation of 21 U.S.C. § 841(a)(1), the knowing and intentional distribution and dispensing of fentanyl, a Schedule II controlled substance to "K.D.," outside the usual course of professional practice and not for a legitimate medical purpose. Count 2 charges a violation of 21 U.S.C. § 841(a)(1), the knowing and intentional distribution and dispensing of methadone, a Schedule II controlled substance, and diazepam (Valium), a Schedule IV controlled substance, to "K.D.," outside the usual course of professional practice and not for a legitimate medical purpose, resulting in death. (Doc. 1).

K.D. was a 39-year-old woman who died on September 11, 2014. She had been "treated" with high doses of short and long acting opioid analgesics and had been demonstrated incapable of compliantly taking that class of drugs. K.D. took her medication in a manner that was indicative of loss of control over the use of the controlled substances. The medical records document that she underwent several episodes of inpatient treatment for "substance use disorder" and detoxification in

order to eliminate these drugs from her system.  The defendant was aware from the outset, through the efforts of K.D.'s family and through the medical records that K.D. suffered from opioid addiction and other aberrant drug use.  The defendant knew that K.D. was incapable of taking controlled substances in a controlled fashion.  He prescribed them to her anyway.  K.D. was a difficult patient who required time and attention.  The defendant used his prescription pad to move her along.[1] The defendant is criminally responsible for the death of K.D.

a.    *The Search Warrant*

On August 1, 2019, law enforcement agents of the Drug Enforcement Administration (DEA) applied to U.S. Magistrate Judge Karoline Mehalchick for a warrant to search for and seize an identified list of medical records and other related documents from the premises located at 104 Bennett Avenue, Suite 2C, Milford, PA.  (*See Def. Ex. E*) The search warrant identified the premises to be searched as a two-

---

[1] It is believed that pursuant to the defendant's employment contract with BSCHS, Medical Group, P.C., the defendant's income was, in part, based on performance bonuses which included the number of professional encounters, *i.e.*, number of patients seen.

story commercial building with exterior stone on the first floor, and beige siding with blue shutters on the second floor. (*See Def. Ex. C*).

When applying for the warrant, law enforcement officers submitted an affidavit to Magistrate Judge Mehalchick that set forth the probable cause for seizing medical records, which included cause to believe that the defendant was prescribing large quantities of controlled substances, in combination with additional other dangerous controlled substances, outside the usual course of professional practice and not for legitimate medical purposes. (*See Def. Ex. E*). The affidavit also stated that based on the training and experience of the affiant, he knew that the Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16 "State Board of Medicine, Subchapter F - Minimum Standards of Practice," Section 16.95 "Medical Records," requires physicians to maintain timely and complete medical records for at least 7 years from the date of the last medical service for the patient. The DEA requires that a physician maintain records at his/her office of his/her purchases, distributions, and prescriptions of controlled substances for a least two years. (*See Def. Ex. E, ¶ 17*). The affidavit then explains that the items listed in Attachment B of the warrant,

including medical records of the specified 69 individuals, contained evidence of the defendant's unlawful prescribing.

Before Diversion Investigator (DI) Gary E. Derr, II presented the search warrant, application, and affidavit to Magistrate Judge Mehalchick, the undersigned Assistant United States Attorney reviewed the documents. Magistrate Judge Mehalchick also reviewed the documents carefully. After completing her review, Magistrate Judge Mehalchick signed the warrant without expressing any concerns to DI Derr about the warrant's authorization for the search and seizure of medical records from the location of 104 Bennett Avenue, Suite 2C, Milford, PA. (*See Def. Exs. A, B & E*).

### b. *The Search and Seizure*

When law enforcement agents entered 104 Bennett Avenue, Suite 2C, Milford, PA on August 6, 2020, it was not clear whether the medical records identified for seizure would be paper files or electronic cloud-based files. However, after identifying themselves and their purpose, agents were immediately advised by a front office employee that all medical records were electronic, and that the agents should contact an individual by the name of Corey Deixler, Vice President of Physician

Services for BSCHS Medical Group, P.C. Corey Deixler was contacted from the scene and agents learned and confirmed that the electronic medical records (EMRs) subject to search and seizure were (1) cloud-based; (2) owned by BSCHS; (3) in the exclusive control of BSCHS Medical Group, P.C.; and not exclusively accessed by the defendant. Even the laptop used by the defendant at his employer's premises was owned and controlled by his employer, BSCHS.

Authority was given on August 6, 2019 by Corey Deixler for one of the office staff to download one particular EMR, and that EMR was seized that date. However, the additional EMRs subject to seizure as identified in the search warrant documents were not actually produced until sometime later when they were provided in electronic format directly from BSCHS Vice President, Corey Deixler.[2]

---

[2] It is noted that while the defendant's patient volume was approximately 800 patients, there were only 69 EMRs identified for seizure.

II.   **ARGUMENT**

    A.   **DEFENDANT HAS NOT ESTABLISHED A REASONABLE EXPECTATION OF PRIVACY IN THE SEIZURE OF THE ELECTRONIC MEDICAL RECORDS**

The defendant cannot prevail on his motion to suppress because he has not demonstrated that he has standing to bring this motion.  To establish standing to bring a Fourth Amendment challenge, a defendant must show that (1) he had a reasonable expectation of privacy in the property searched, and (2) he manifested a subjected expectation of privacy in that property.  *Rakas, v. Illinois*, 439 U.S. 128, 143 (1978).  As the Eleventh Circuit has held, "[t]he party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy." *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006).  The burden is on the defendant to prove his reasonable expectation of privacy in property owned and controlled by another entity.  *Rakas*, 439 U.S. at 30 n.1.[3]

_____

[3]   After *Rakas* and *Rawlings v. Kentucky,* 448 U.S. 98 (1980), it is incumbent upon the defendant to establish not only unlawful police conduct, but that the unlawful conduct intruded upon some legitimate expectation of privacy on the part of the defendant who challenges it. *Rawlings,* 448 U.S. at 104; *Rakas,* 439 U.S. at 131 n. 1 ("The proponent of a motion to suppress has the burden of establishing that his own

As an initial matter, the defendant has offered no evidence to establish standing to contest the warrants at all.  *See United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) (court may deny a defendant's motion to suppress if defendant fails to allege facts that, if proven, would require relief).

The defendant's motion does not include an explicit statement that he had ownership and exclusive control over the EMRs ultimately obtained in this investigation because he knows he did not.  The defendant's "Physician Employment Agreement" with BSCHS Medical Group, P.C. clearly and unequivocally informed the defendant that while he would be provided access to EMRs, he was not the owner of those records, nor did he maintain exclusive control over the electronic medical records.  (*See Sealed Govt Ex. 1, "Physician's Employment Agreement"*).

---

Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. Soule,* 908 F.2d 1032, 1034 (1st Cir. 1990). *See also United States v. Cruz Jimenez,* 894 F.2d 1, 5 (1st Cir. 1990) ("Demonstration of [a legitimate expectation of privacy] is a threshold standing requirement, and analysis cannot proceed further without its establishment.")

Government's Exhibit "1" shows that the defendant was a full time "employee" of the BSCHS Medical Group, P.C. The defendant entered into a "Physician Employment Agreement," effective as of October 1, 2009, as amended thereafter, which was in effect on August 6, 2019, the date the search warrant was executed. *Id.* The defendant was paid a salary as a full time employee and bonuses based upon volume of "professional contacts" (number of patients seen). *Id.* As evidenced in the "Agreement," Section 2.04, Records and Reports:

> (a)     Physician shall keep and *furnish to Employer* in a timely manner, accurate records of all services furnished under this Agreement. All records, charts, reports, and similar information and documents that are maintained in connection with the operation of the Medical Practice shall be the *exclusive property* of Employer and shall be subject to the *exclusive control of Employer*. Physician shall have *reasonable access* to such records, in accordance with applicable law, for inspection and photocopying.

(*See Sealed Govt Ex. 1, p. 4*) (emphasis added).

> (b)     Physician shall follow Employer's procedures for the timely completion of accurate records, reflecting the time spent furnishing the Physician's services.

> (c)     Physician shall cooperate with Employer in maintaining accurate, complete, up-to-date medical records (including electronic medical records) for all patients treated by Physician, in accordance with all applicable federal and State laws and regulations, including those applicable to Medicare, Medicaid,

11

Tricare and other federal health programs; and the bylaws, rules regulations, and policies of the Employer. In addition, Physician will comply with all applicable law and regulations concerning the confidentiality of medical records and medical record information. The *ownership and right of control of all reports, records, and supporting documents prepared by Physician belong to the Employer*; provided, Physician will have *access* to such reports, records, and supporting documents as authorized by Employer policies and the applicable law of the State of New York.

(*See Sealed Govt Ex. 1, p. 4-5*) (emphasis added).

The defendant cannot assert the Fourth Amendment rights of others; only a violation of his own Fourth Amendment rights may be raised. *Rakas,* 439 U.S. at 139-40. But in this case, the defendant has no "standing" or Fourth Amendment right to complain about the "search" of property owned and controlled by another, namely, his employer. *Id.* In fact, it was the defendant's employer, BSCHS, who actually leased the property located at 104 Bennett, Suite 2C, Milford, PA, and merely permitted the defendant to work at that location. (*See Sealed Govt Ex. 2, BSCHS Lease Agreement*).

Moreover, there was ultimately no search and seizure at the premises located at 104 Bennet Avenue, Suite 2C, in Milford, PA. The "seizure" occurred from BSCHS Medical Group, P.C.'s electronic cloud-based storage, and the "search" subsequently occurred once the EMRs

were provided to law enforcement as authorized by the defendant's employer, or directly from the hands of the defendant's employer via Corey Deixler. It is clear from the "Physician Employment Agreement" that the defendant was not the owner of any of the EMRs searched or seized. It is clear from the "Physician Employment Agreement" that the defendant was only provided reasonable access to the EMRs in the course of his employment. It is clear that the defendant did not exercise control over the EMRs. The records were not his property. The defendant was able to manipulate, change, and edit the EMRs in accordance with any medical services he provided, but upon doing so, the information was accessible to a multitude of other physicians who shared the defendant's employer, the BSCHS Medical Group, P.D. (*See Sealed Govt Ex. 3, Corey Deixler email further confirming access to BSCHS patient EMRs by <u>all</u> BSCHS physicians, as well as each of the BSCHS Hospitals*).

A classic search and seizure involves the invasion of the defendant's property rights by entering <u>private</u> <u>property</u>, and the invasion of his possessory rights by the seizure of his property found on the premises. But in this case, the defendant has no "standing" or

Fourth Amendment right to complain about the seizure and subsequent search of property where the EMRs were (1) cloud-based; (2) not owned by the defendant; (3) not controlled by the defendant; (4) not seized from the defendant; (5) not taken from property controlled by the defendant; and (6) not EMRs exclusively accessed by the defendant.

The defendant cannot assert a subjective or a reasonable expectation of privacy in records stored, owned, and controlled by his employer, where the defendant is only afforded reasonable access to the records from the employer's property (104 Bennett Ave., Suite 2C), and for which he is only provided access in order to carry out his duties and responsibilities as an "employee" of BSCHS Medical Group, P.C.  Since the defendant cannot claim that he enjoyed exclusive access to the EMRs owned and controlled by his employer, he cannot claim an expectation of privacy in the EMRs.

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (*quoting Katz v. United States*, 389 U.S. 347, 360, (1967)).  Courts answer this question through a two-part test, examining both subjective and

objective expectations of privacy. First, a court considers whether an individual has "manifested a subjective expectation of privacy in the object of the challenged search." *Id.* Clearly this defendant did <u>not</u> because he knowingly and voluntarily signed the "Physician Employment Agreement" indicating otherwise. (*See Sealed Govt Ex. 1*). Second, a court considers whether "society [is] willing to recognize that expectation as reasonable." *Id.*; *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (noting that a "search," for Fourth Amendment purposes, "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."). In this case, an expectation of privacy in personal communications is not the issue. Although the Fourth Amendment affords employees a reasonable expectation of privacy in the content of certain work-related communications and files, an employee's Fourth Amendment rights are subject to additional exceptions and limitations. This defendant did not enjoy any reasonable expectation of privacy vis-à-vis BSCHS Medical Group, P.C., in the EMRs or otherwise, as the defendant's employer owed, controlled, and directed the production of the EMRs, and could also independently consent to produce the identified EMRs, which it

did.  BSCHS Medical Group, PC., the defendant's employer, explicitly

held out to the defendant that (1) BSCHS owns the EMRs; (2) the EMRs

are the property of BSCHS, the employer; (3) it exercises "exclusive"

control over the EMRs; (4) it only provides the defendant "reasonable

access" to allow him to perform his employment duties.  (*See Sealed

Govt Ex. 1, p. 4-5*).  The defendant agreed to all of the terms and

conditions of the "Physician Employment Agreement."  He cannot now

claim that he enjoyed an expectation of privacy in EMRs which he

voluntarily agreed belonged to others and were controlled by others.

The defendant could have no reasonable expectation of privacy in

information he knows was owned, controlled, and exposed to others,

including other BSCHS Medical Group physicians, as well as staff

employees who would routinely "access" EMRs during the daily

business of seeing a patient.

The U.S. Supreme Court has "consistently held that a person has

no legitimate expectation of privacy in information he voluntarily turns

over to third parties" because that person "assume[s] the risk" that the

third party will convey this information to the police.  *Smith v.

Maryland*, 442 U.S. 735, 734-35 (1979).  This actually is more than just

BSCHS Medical Group, P.C. acting as a third party consenting to a search of records over which it had common authority. BSCHS has total authority. Accordingly, when the defendant knowingly and voluntarily entered into the employment agreement with BSCHS Medical Group, P.C., as described and detailed herein, he assumed the risk that the corporation would reveal to the police, upon demand, the EMRs. He did so at the time because it was in his financial interest to enter into the employment agreement. He should not be permitted now to pretend that the employment agreement did not and does not exist.

The defendant does not have standing to bring his motion to suppress and this Court should dismiss his efforts to suppress the evidence. In the event the Court disagrees, the Government responds herein to the defendant's additional complaints.

B. <u>THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT CONTAINED AMPLE PROBABLE CAUSE</u>

The defendant alleges that the affidavit in support of the search warrant lacked probable cause. To support his claim, the defendant alleges that as a threshold matter, in order to have probable cause to suspect unlawful prescribing by a physician holding a DEA registration, law enforcement <u>must</u> have evidence of a nefarious motive, such as, "sex

with a patient," "writing prescriptions with an expectation of a kickback of pills to feed his own addiction," or "charging per pill." (Doc. 69, p. 6-7). The defendant seems to allege that in addition to knowing about a motive, law enforcement must allege that motive in an affidavit of probable cause. Of course, that is not the law. As this Court is aware, "motive" for prescribing outside the usual course of professional practice and not for a legitimate medical purposes is not an element of 21 U.S.C. § 841(a)(1). While motive is relevant and admissible evidence at trial, it is not an element of the crime charged here, nor is it a prerequisite to suspecting a physician of unlawful activity.

The defendant also argues that the affidavit is lacking because law enforcement did not include specific medical conditions for patients whose medical records were identified for seizure. This argument is specious. Of course this information was mostly unknown to law enforcement. That was the point of the search. This was an "investigation." The defendant's argument carries little weight in light of what was known and what was included in the affidavit. One of the purposes of wanting to look at the medical records was to "investigate" suspected unlawful prescribing by the defendant, in light the entirety of

what is alleged in the affidavit, including the volume of narcotics and combinations of dangerous drugs being prescribed by the defendant. The defendant does not dispute the numbers.

Another specious argument made by the defendant is that the multiple overdose deaths coming out of his office were deemed "accidental" with one deemed a suicide. (Doc. 69, p. 9). From this, the defendant argues that these deaths should carry no weight in the mind of a law enforcement officer. The defendant is not charged with intentionally killing any patient. Most pharmaceutical drug overdoses are deemed accidental. Drug addicts do not intend to die – they intend to get high. As a physician, the defendant knows this. The question for law enforcement is whether the dead patients were lawfully prescribed the controlled substances by the defendant that ended up being the cause of their death. Regarding the suicide, the defendant subsequently acknowledged that he was aware of the patient's suicidal tendencies and kept her happy by prescribing more narcotics.

The defendant also attacks the information contained in the affidavit as reported from pharmacists tasked with filling prescriptions written by the defendant. The defendant argues that the pharmacists

are unreliable reporters because, "the pharmacist, like the DEA agents, do not know the history, treatment, tests, or findings of examinations of these patients." (Doc. 69, p. 10). This might be accurate to some extent. However, pharmacists do require a diagnosis code on prescriptions that order large quantities of high dosages of narcotics. Still, this was in "investigation."

More to the point, it is a critical red flag for law enforcement when concern about a physician's prescribing is brought to their attention by a pharmacist – a doctor of pharmacology. Significantly, and even more to the point of the defendant's knowledge of his own operation occurring outside the scope of a professional practice, is the fact that a pharmacist has a "corresponding responsibility" not to fill an invalid prescription. 21 C.F.R. 1306.04(a).[4] The regulations implementing the Controlled

---

[4] Title 21, Code of Federal Regulations, Section 1306.04(a) provides (emphasis added):

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, ***but a corresponding responsibility rests with the pharmacist who fills***

Substance Act expressly place a duty on pharmacists not to knowingly fill prescriptions issued outside the usual course of medical practice.[5]

Thus, while the responsibility for the proper prescribing and dispensing of controlled substances rests initially with the physician, *United States v. Hayes*, 595 F.2d 258, 261 (5th Cir. 1979), the regulation imposes a

---

*the prescription*. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

[5] *United States v. Lovern*, 590 F.3d 1095, 1102 (10th Cir. 2009); *see also United States v. Hughes*, 895 F.2d 1135, 1143 n.11 (6th Cir. 1990) (rejecting pharmacist's argument that he is free to fill any facially "valid" prescription issued by a licensed doctor because of the substantial evidence in that case that he knew the prescriptions were not issued in the usual course of medical practice); *United States v. Irwin*, 661 F.2d 1063, 1069 (5th Cir. 1981) ("[I]f an order purporting to be a prescription is not a prescription despite its appearance and, if the pharmacist knows that it was not issued in the usual course of professional treatment, both the person issuing the ostensible prescription and the person who knowingly fills it shall be subject to the penalties [of § 841(a).]"); *United States v. Hayes*, 595 F.2d 258, 261 (5th Cir. 1979) (holding a pharmacist has "the responsibility not to fill an order that purports to be a prescription but is not a prescription within the meaning of the statute because he knows that the issuing practitioner issued it outside the scope of medical practice").

"corresponding responsibility" upon the pharmacist who fills the prescription. 21 C.F.R. § 1306.04(a). When a pharmacist fills a prescription that he has reason to believe is not a "valid prescription," as that term is defined in the regulations, he is subject to the penalties of § 841. *Id.* Thus, reports from pharmacists are important and reliable for law enforcement when investigating unlawful prescribing practices of any doctor.

The law is well settled in this area. A judicial officer issuing a search warrant must "make a practical common-sense decision whether, given all the facts set forth in the affidavit . . . there is a fair probability that contraband or evidence will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause determination is twofold: first, a judge must determine the "historical facts," that is, the events leading up to the search; second, a judge must decide whether these historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

The Court of Appeals counsels that "[t]he supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993). "[S]tatements in an affidavit may not be read in isolation – the affidavit itself must be read as a whole." *Id.* at 1208.  Here, the affidavit of probable cause, when viewed in its entirety, provided sufficient grounds for Magistrate Judge Mehalchick to issue the warrant; a decision subject to great deference. *Ornelas*, 517 U.S. at 698-99; *Gates*, 462 U.S. at 236.

Further, the Supreme Court set forth a good faith exception to the warrant requirement in *United States v. Leon,* 468 U.S. 897 (1984). The *Leon* good faith exception provides that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Williams,* 3 F.3d 69, 74 (3d Cir.1993).  The question before a reviewing court is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Loy,* 191 F.3d 360, 367 (3d Cir.1999) (quoting *Leon,* 468 U.S. at 922 n. 23).  That an officer executes a search pursuant to a

search warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Hodge,* 246 F.3d at 308. However, the Third Circuit has recognized four situations, none of which are present here, in which an officer's reliance on a warrant would not be reasonable and would not trigger the exception:

(1)     when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2)     when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3)     when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or

(4)     when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents,* 307 F.3d at 146 (*quoting Williams,* 3 F.3d at 74 n. 4).

In support of the warrant application, the United States offered an affidavit of probable cause with attached photographs. (*See Def. Ex. C & E*). The affidavit in this case included, *inter alia*, the following:

- Relevant law enforcement experience of the affiant; (*See Def. Ex. E, ¶ 2*)

- The fact that the case against the defendant was initiated based on complaints made to the DEA involving the defendant prescribing large quantities of prescription narcotics outside the usual course of professional practice and without a legitimate medical purposes; *Id.* ¶ 5

- An explanation of the controlled substances at issue, including their purpose; classification; risk of abuse; risk of addiction; and potency; *Id.* ¶¶ 6-9

- Applicable laws pertaining to the Controlled Substances Act, the Code of Federal Regulations, and the Pennsylvania Code of Professional and Vocational Standards; *Id.* ¶¶ 10-17

- An October 2017 report to the DEA from Walgreens Drug Store (NY) referencing the defendant's prescribing of a large quantity of Oxycodone in a short period of time; when questioned, the defendant could not provide diagnosis codes to justify the prescriptions; *Id.* ¶ 18

- An October 2018 report to DEA from Jakris Pharmacy (NY) about one of the defendant's patients filling multiple prescriptions on multiple occasions for Schedule II controlled substances in both PA and NY, all confirmed to have been written by the defendant; *Id.* ¶19

- A May 2017 CW of PA Department of State complaint against the defendant alleging sexual misconduct, unprofessional conduct and improper prescribing (without criminal violations); *Id.* ¶ 23

- A November 2018 drug overdose of one of the defendant's patients from prescriptions issued by the defendant; *Id.* ¶ 20

- A February 2019 interview involving the overdose <u>death</u> of "MC," a patient reportedly addicted to prescription narcotics prescribed to her by the defendant; *Id.* ¶ 24; *See Sealed Govt Ex. 4.21;*

- A May 2019 interview with patient "JB," who reported that after

the defendant prescribed large quantities of narcotics to her over a period of time, she was having a difficult time "quitting cold turkey" after the defendant cut her off (subsequent to the defendant learning about the DEA investigation); "JB" reported that she was calling off from work because she was through withdrawal symptoms; *Id.* ¶ 25

- A May 2019 interview with patient 'GH," who reported that the defendant only performed cursory exams; and after prescribing large quantities of narcotics to him for a period of time, he became "dope sick" when the defendant cut him off; *Id.* ¶ 26

- A May 2019 interview with patient "GZ," who reported that he had been prescribed opioids by the defendant for a period of approximately 10 years, the defendant suddenly stopped and advised GZ that a new law prohibited him from prescribing the drugs; *Id.* ¶ 27

- A May 2019 interview with "DSJ," who reported that the defendant discharged her after she experienced an emergency room visit; she reported that the ER physician cautioned her about the amount of prescription drugs she was taking (prescribed to her by the defendant) and that she was at risk for an overdose; DSJ stated, "*He [the defendant] tried to kill me.*" *Id.* ¶ 28

- A May 2019 interview with "MA," who reported that the defendant had been prescribing narcotics for her for approximately 10 years and that he continued to prescribe her opioids throughout her pregnancy; she reported that when she gave birth, her child remained in a neonatal care unit for 29 days for issues related to his liver; when MA asked the defendant about her opioid addiction, the defendant told her she was already addicted; *Id.* ¶ 29

- During the investigation, agents received multiple reports of overdose deaths involving the following patients of the defendant who were all receiving large quantities of controlled substances from the defendant prior to their deaths; *Id.* ¶33

- "MC" – mixed toxicity death 2/11/19 (age 48) ¶ 33 (1)

- "JG" – mixed drug toxicity death 3/9/16 (age 61) ¶ 33 (2)

- "HW" – mixed drug toxicity death 2/5/15 (age 42) ¶ (3)

- "KD" – combined pharmacologic death 9/11/14 (age 39) ¶ (4)

- A November 2018 report from Price Chopper Pharmacy (PA) indicating that the defendant wrote two prescriptions for one patient for the same medication on the same date using two different DEA registration numbers; *d.* ¶ 34

- A November 2018 report from the Medicine Shoppe Pharmacy (NY) indicating that the defendant wrote multiple prescriptions for the same patient using both his NY and his PA DEA registration numbers; *Id.* ¶ 35

- A November 2018 report from Price Chopper Pharmacy (PA) confirming that the defendant wrote multiple monthly prescriptions for the same controlled substance for the same patient, using both his NY and his PA DEA registration numbers; upon this discovery, the defendant was advised that the pharmacy would no longer fill his prescriptions; *Id.* ¶ 36

- A December 2018 report from Walmart Pharmacy (PA) confirming that the defendant prescribed high dosages of opioids and benzodiazepines (Xanax) combinations; *Id.* ¶ 37

- A December 2018 report from Lord's Valley Village Pharmacy confirming that the defendant was prescribing excessive quantities of opioids to his patients; *Id.* ¶ 38

- A December 2018 report from CVS pharmacy (PA) confirming the combination of controlled substances for particular patients as prescribed by the defendant; *Id.* ¶39

Agents also relied on information derived from the Pennsylvania, New York, and New Jersey Prescription Drug Monitoring Programs (PDMP) in the respective states, and included that information about particular patients in the affidavit of probable cause.

All states, including the District of Columbia, currently utilize some form of electronic prescription drug monitoring database. The Prescription Drug Monitoring Program (PDMP) collects information on all filled prescriptions for controlled substances. A prescription drug monitoring report contains prescription data for all Schedule II through Schedule V controlled substances dispensed by pharmacies in the respective states. Pharmacies are required by law to report the patients name, the particular controlled substance and dosage dispensed, quantity dispensed, number of days supplied, prescribing physician's name, DEA registration number, and the dispensing pharmacy's name and DEA registration number. Data from the individual state databases is routinely admitted as evidence in federal

court where an individual is charged with prescribing or dispensing

controlled substances outside the usual course of professional practice.[6]

Pursuant to statutes in Pennsylvania, New Jersey, and New York,

individuals authorized to directly dispense controlled substances are

mandated by law to report certain information about each prescription

to their respective PDMP database.  Pennsylvania P.L. 2911, Act 191;

N.J.S.A. 45:1-45, *et. seq.*; N.Y.P.L. 2911, No. 191.  Failure to comply

with theses mandatory reporting requirements can result in civil

penalties, licensure suspensions, and disciplinary action.

---

[6]    A search for cases across the nation in which PDMP data was admitted at trial as reliable and relevant evidence yielded the following non-exhaustive list: *United States v. Fuhai Li*, (MDPA 3:16-CR-194) (Affirmed 7/9/20 19-1875); *United States v. Mirilishvili*, 2016 U.S. Dist. LEXIS 21268, *14–17 (SDNY 2016) (admitting New York PDMP records) ; *United States v. Lowe*, 14-cr-0055-LGS (SDNY) (admitting New York PDMP records); *United States v. Wiseberg*, 13-cr-00794-AT (SDNY) (admitting New Jersey PDMP records); *United States v. Boccone*, 11-cr-00592 (EDVA) (admitting Virginia PDMP records); *United States v. Kabov*, 15-cr-00511-DMG (CDCA) (admitting California PDMP records); *United States v. Garg*, 15-cr-0007-JAK (CDCA) (admitting California PDMP records); *United States v. Sun*, 14-cr-00157 (CDCA) (admitting California PDMP records); *United States v. Bamdad*, 08-cr-00506-GW (CDCA) (admitting California PDMP records); *United States v. Mikaelian*, 11-cr-00922-DDP (CDCA) (admitting California PDMP records); *United States v. Gabriel-Diaz*, 12-cr-00011-CJC (CDCA) (admitting California PDMP records); *United States v. Couch and Ruan* (admitting Alabama PDMP records; aff'd No. 17-12653, SDAL, 7/10/20).

Pennsylvania, New Jersey, and New York all have provisions in their statutes that permit law enforcement to request certain data already in their PDMP databases. In this case, agents requested and received PDMP data from Pennsylvania, New York and New Jersey. The data was relied on by agents and included in the affidavit of probable cause. The information raised multiple red flags for investigators for all of the following reasons:

> The defendant practices internal medicine and is employed by the BSCHS Medical Group located in Milford, PA; *See Def. Ex. E*, ¶ 40

> The defendant is <u>not</u> a pain management specialist/physician; the defendant practices family medicine; it is believed that the defendant's "pain management" patients constitute a small portion of his practice; yet, PDMP data showed that the defendant issued approximately 11,207 prescriptions for Schedule II controlled substances over a 42-month period (Nov. 2015 through May 2019); *Id.*

> The defendant issued prescriptions for Schedule II controlled substances every day, including Saturdays and Sundays; *Id.*

> The defendant did not have office hours on Saturday or Sunday yet PDMP data showed that the defendant wrote multiple prescriptions on weekends over a period of 42 months at times when the office was closed; *Id.*

> PDMP data showed that the defendant issued approximately 30,657 Schedule II dosages per month; the defendant is not a pain management specialist/physician; *Id.*

➢ PDMP data showed that a number of patients were issued multiple prescriptions by the defendant on the same date; filled the prescriptions at different pharmacies; and used both commercial insurance and "self-pay," which most pharmacies report as cash; "The practice of insurance and cash payments is indicative of insurance fraud and diversion." *Id.* ¶ 41

➢ PDMP data showed multiple patients were issued additional "early" prescriptions for controlled substances by the defendant; "A patient filling an early prescription is indicative of diversion and/or abuse." *Id.*

➢ PDMP data revealed relatively young patients receiving prescriptions from the defendant for high dosages and large quantities of controlled substances; *Id.*

➢ In addition to the above, other red flags were detected in the PDMP data, including patients who received multiple prescriptions from the defendant, on the same date, for the same controlled substances, in the same short acting form, (*i.e.* not an extended release formula with a short acting formula for breakthrough pain – but both short acting), in varying dosages, in large quantities, and in combinations with additional dangerous drugs, such as methadone and benzodiazepines; along with references to criminal histories of patients involving drug offenses/abuse; *Id.* ¶ 42, (1) through (64)

➢ Multiple overdose deaths; *Id.* ¶ 33.

Thus, federal agents had more than enough probable cause to seize identified medical records in order to investigate what was documented inside the files, and/or to have the medical files of the identified patients reviewed by a pain management specialist. As the

defendant has argued, the agents in this case are not trained physicians but they are trained and experienced investigators and can obviously detect red flags of criminal activity. The initial investigation provided probable cause to seized medical records in order to have a pain management specialist review the files.

In consideration of the above information, Magistrate Judge Mehalchick exercised sound judgment when issuing the requested search warrant, *i.e.*, that there was probable cause to believe that the defendant was prescribing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. The purpose of the affidavit is not proof beyond a reasonable doubt -- it is probable cause to take a closer look into the medical files.

While the Government understands that the defendant will continue to rely on his DEA registration as a shield for issuing prescriptions for controlled substances for whatever reason that he, "the physician," deems appropriate, but that is not the law. The law simply does not cater to the idiosyncrasies of individual physicians. It goes without saying how that mindset would lead to disastrous results.

In reviewing an affidavit such as the one here, this Court's role "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). As the deferential review of that decision is premised on the four corners of the affidavit, the defendant's motion to suppress based on "lacking" probable cause may be denied on this ground without an evidentiary hearing. The agents' investigative efforts yielded sufficient information supporting the conclusion that there was "a fair probability that contraband or evidence of a crime" would be found in the patient files. *Gates*, 462 U.S. at 238.

C. **THE AFFIDAVIT CONTAINS NO FALSE MATERIAL STATEMENTS IN RECKLESS DISREGARD FOR THE TRUTH; LAW ENFORCEMENT REASONABLEY RELIED UPON THE SEARCH WARRANT IN GOOD FAITH**

The defendant also contends that law enforcement included, "multiple false material statements knowingly and intentionally" in the affidavit of probable cause. (Doc. 69, p. 12). The defendant claims that DI Derr "spoke with" many of the patients "months before the DEA application," and then "intentionally" included "false statements" in the affidavit that are contrary to what the defendant alleges certain

patients told his private investigator long after the warrant was authorized. *Id.* p. 15. Under the façade of a legitimate accusation of misconduct by law enforcement, what the defendant is really trying to do is obtain a hearing to access discovery and testimony, which he is not entitled to at this time. He states as much in footnote 5 of Doc. 69, where he calls upon the Government to disclose discovery in the face of completely baseless and erroneous accusations. Actually, it is the defendant's for-hire private investigator who seemingly has made false statements.

However, to quash the false claims of the defendant, the Government attaches <u>under seal</u> each and every DEA-6 of all patients <u>actually</u> interviewed by law enforcement pre-affidavit. (*See Sealed Govt Ex. 4 – 4.21*) With respect to those patients "interviewed" by the defendant's private investigator long after the search warrant affidavit was authorized, the Government also attaches DEA-6 reports for some of those patients <u>under seal</u>. (*See Sealed Govt Ex. 5 – 5.20*). We do so with the caveat that the reports reveal suspect tactics employed by the defendant's private investigator during the "interviews," as well as false information conveyed to patients during the "interviews," more fully

discussed below.  The Government is left to wonder what exactly was conveyed to the patients interviewed by the defendant's private investigator.  The defendant has seemingly blessed his private investigator's tactics in an attempt to either distort the facts, or gain a hearing from the Court in a situation where he would otherwise not be entitled to such hearing.  Still, the defendant has failed to meet his burden of establishing a false statement or material omission made by DI Derr in the affidavit of probable cause, and thus is not entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

Initially, it is important to note that just like the defendant accused law enforcement of not being physicians while investigating and writing the affidavit in this case, nor are the patients who have been interviewed.  The identified patients are not pawns but are innocent and perhaps naïve.  It is not surprising that a patient might believe that the defendant was acting in the usual course of professional conduct because that patient would have no clue what that means.[7]  To

---

[7] Indeed, in a separate motion, (Doc. 54), the defendant claims that a Board Certified Anesthesiologist and Certified Pain Management Specialist, practicing for nearly 30 years, does not appreciate the meaning of the "usual course of professional conduct," and should be precluded from testifying.

any particular patient, it might mean that the defendant did not

sexually assault them or make sexual overtones toward them.  To

others, the usual course of professional conduct might mean that the

patient had no complaints about the type, dosage, combination, or

quantities of controlled substances prescribed to them by the defendant

because the drugs made them feel good.  The patient might not want to

say anything negative about the defendant for fear of no longer being

prescribed the drugs that make them feel good, never mind the fact that

the patient could be addicted to a drug that masks the pain and creates

an eternal addict.  To simply allege that multiple patients liked the way

the defendant treated them with exceedingly high dosages and

dangerous combinations of controlled substances really misses the

point.

It is also important to note that a probable cause affidavit need

not anticipate, set out or refute all possible defenses to apparent

criminal conduct.  Nor need they be investigated.[8]  On the contrary, "an

---

[8] The defendant argues that "false statements in reckless disregard for the truth" are included in the affidavit simply because law enforcement did not interview every single patient for every EMR that was seized - pre-seizure.  That argument has no merit.

affiant is not required to include in an affidavit of probable cause every piece of information gathered in the course of an investigation that might prove exculpatory. *See Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (underline rejecting inference that due process protections provided to defendants prior to trial under *Brady* applies to the warrant process under the guise of *Franks,* thereby entitled subject of a search warrant to disclosure of all potentially exculpatory information); *United States v. Colkley*, 899 F.2d 297, 302-03 (4th Cir. 1990) ("[A] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process. The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded.") *DiNichola v. DiPaola*, 25 F.Supp. 2d 630, 664 (W.D.Pa. 1998).

Furthermore, evidence need not be suppressed when law enforcement officials obtain the evidence through objective good faith reliance on a facially valid warrant that is later found to be invalid

because of insufficient probable cause. *See United States v. Leon*, 468 U.S. 897, 920 (1984). This good faith exception does not extend to cases where law enforcement officials have no reasonable grounds for believing that they are relying on a valid warrant. *Id.* at 922-23.

The Supreme Court has identified four scenarios where police reliance on a warrant is not objectively reasonable: 1) when the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; 2) when the magistrate failed to act in a neutral and detached manner; 3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or 4) when the warrant was so facially deficient that a reasonable officer could not have believed it to be valid. *See Franks*, 438 U.S. 154 at 155-56, 171-72 (1978); *Lo-Ji Sales v. New York, Inc.*, 442 U.S. 319, 326-28 (1979); *Leon*, 468 U.S. at 923.

Here, the defendant is claiming that U.S. Magistrate Judge Karoline Mehalchick issued the warrant in reliance on a deliberately and recklessly false affidavit. To obtain a hearing on such a claim, a defendant must "make 'a substantial preliminary showing' that (1) the warrant was based on a statement that was knowingly and

intentionally false or made with reckless regard for the truth, <u>and</u> (2) the allegedly false statement was necessary to the finding of probable cause." *United States v. Braddy*, 722 F. App'x 231, 235-36 (3d Cir. 2017) (unpublished). Particular to the defendant's claimed false statements, he "must show both that bad faith or reckless disregard existed on the part of the affiant," and that the affidavit would have failed to establish "probable cause if it had disclosed the information." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993). He falls short in both regards. (*See all Sealed Govt Ex. 4 – 4.21*).

First, the defendant has failed to meet his burden of establishing that DI Derr omitted information from the affidavit of probable cause in bad faith or with reckless disregard for the truth, based upon what DI Derr knew at the time of the affidavit. Probable cause affidavits routinely omit information gathered during investigations that are irrelevant to the purpose of the affidavit. This is precisely why such affidavits ordinarily include, as here, a statement by the affiant that he has "not included each and every fact known to me concerning this investigation, but have set forth only those facts relevant and necessary to establish probable cause. (*See Def. Ex. E, ¶ 3*). Further, the

defendant obviously is unaware at this stage of the proceedings who was interviewed pre-affidavit and who was interviewed subsequent thereto. This is extremely significant to rebut the defendant's claims that agents knowingly and intentionally included false statements in the affidavit in reckless disregard for the truth.

Here, the defendant cannot show that based upon the interviews attached in *Sealed Govt Ex. 4 – 4.21*, when compared with what is alleged in the affidavit, that law enforcement knowingly and intentionally included false statements in reckless disregard for the truth. The defendant's private investigator's <u>post</u> search warrant interviews do not, in any way, demonstrate falsity on the part of law enforcement. However, they do demonstrate some misleading statements and tactics on the part of the defendant's private investigator. Keeping in mind that the defendant does not yet possess *Jencks* material, so whatever the patients were shown, it was <u>not</u> their recorded interviews. Also keeping in mind that at the time of the affidavit, law enforcement did not possess any of the patients' medical records. That was the purpose of the search. It also appears that for the majority of the interviews, the patients were merely asked to sign a

"Declaration Under Oath," stating that the defendant was a good

doctor.[9]  Some examples of the foregoing follow:

➤ "MG" - patient identified in *Sealed Govt Ex. 5*:  This patient was **not interviewed prior to the search warrant**, but was apparently led to believe that agents reported false information about her to the court; this did not happen – she was **not** interviewed prior to the search warrant; it is unknown what "MG" was led to believe in terms of what the private investigator told her or showed her; the only information about "MG" in the affidavit is derived from PDMP data reported from the PA Department of State and/or PDMP data from the NY Department of Health; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "KD" – patient identified in *Sealed Govt Ex. 5.1*:  This patient was **not interviewed prior to the search warrant**, but was apparently led to believed that agents reported false information about her to the court; this did not happen – she was **not** interviewed prior to the search warrant; the only information about "KD" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

---

[9]  See attached copies of "DUOs" provided to DEA agents by patients, as utilized by the defendant's hired private investigator and filed under seal as *Government Exhibits 6 - 6.3*.  *Sealed Govt Ex. 6* is patient "JB."  She is discussed herein and refuted ¶ 9 of the DUO upon follow up with the DEA.  "JB" was also apparently told by the defendant's private investigator that the defendant was going to prison for 20 years.  *Sealed Govt Ex. 6.1* is patient "HM," discussed herein – only PDMP data included in the affidavit.  *Sealed Govt Ex. 6.2* is patient "RK," discussed herein – apparently told by the defendant's private investigator that the DEA "wrongfully presented" the case against the defendant, and by signing the DUO the case would be thrown out.  *Sealed Govt Ex. 6.3* is patient "GH," discussed herein – apparently confirmed all information included in the search warrant affidavit.

➢ "PV" – patient identified in *Sealed Govt Ex. 5.2.* This patient was **not interviewed prior to the search warrant**, but was apparently led to believed that she was signing something related to her "privacy rights"; the only information about "PV" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "TL" – patient identified in *Sealed Govt Ex. 5.3.* This patient was **not interviewed prior to the search warrant**, but was apparently led to believed that agents reported false information about her to the court (*i.e.,* she was apparently shown paperwork indicating that agents reported she had "*bad lungs from smoking*," which she claimed was not true); agents did not have "TL's" medical file pre-affidavit and therefore could not have known anything about her medical condition; moreover, the only information about "TL" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "WS" – this patient is identified in *Sealed Govt Ex. 5.4.* This patient was **not interviewed prior to the search warrant**; he reported that the only thing he knew about the case was what the defendant's private investigator told him; the only information about "WS" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "GH" – this patient is identified in *Sealed Govt Ex. 5.5.* This patient **was** interviewed prior to the search warrant; he stated he reported to the defendant's private investigator what he reported to DEA agents; his information is <u>not</u> helpful to the defendant but it is <u>not</u> included in the affidavit; (also see *Sealed Govt Ex. 4.13)*; the only information about "GH" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "HM" – this patient is identified in *Sealed Govt Ex. 5.6.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex. 4.19*); when she was interviewed by the defendant's private

investigator, she apparently was shown something and reported that it was incorrect; this is interesting because the only information about "HM" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "SV" – this patient is identified in *Sealed Govt Ex. 5.7.* This patient was **not interviewed prior to the search warrant**; apparently, "SV" confirmed certain information was correct and then signed something; the only information about "SV" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "CC" – this patient is identified in *Sealed Govt Ex. 5.8.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex. 4.18*); when she was interviewed by the defendant's private investigator, she apparently was shown something and said she read it and signed it; she reported knowing nothing about the case except for what the defendant's private investigator told her; the only information about "CC" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "RH" – this patient is identified in *Sealed Govt Ex.5.9.* This patient was **not interviewed prior to the search warrant**; the defendant's private investigator apparently told this patient that the DEA was making him out to "*look like a junkie,*" *Id.*; the only information about "RH" in the affidavit is derived from PDMP data reported from the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "RK" - this patient is identified in *Sealed Govt Ex. 5.10 and 5.11.* This patient was **not interviewed prior to the search warrant**; the defendant's private investigator apparently told this patient, "*that they were representing Dr. Evers and that the search warrant conducted by the DEA was wrongfully presented and by signing the DUO, the case against Dr. Evers would be thrown out,*" *Id.*; the only information about "RK" in the affidavit is derived from PDMP data

reported from the PA Department of State and/or PDMP data from the NY Department of Health; this patient would <u>not</u> sign the private investigator's paper; "RK" stated to the defendant's private investigator that the reason for his problems was because of the defendant; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "RP" – this patient is identified in *Sealed Govt Ex. 5.12.* This patient was **not interviewed prior to the search warrant**; the defendant's private investigator apparently led this patient to believe that he was signing paperwork that had something to do with the "Health Insurance Portability and Accountability Act" (HIPPA); this patient also reported that he believed the defendant's private investigator was representing the DEA; the only information about "RP" in the affidavit is derived from PDMP data reported by the PA Department of State; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "JB" – this patient is identified in *Sealed Govt Ex. 5.13.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex.4.7*); she is referenced in ¶ 25 of the affidavit; "JB" reported that the defendant's private investigator told her that she was signing the DUO because she did not get a copy of the report initially prepared by the DEA; the defendant's private investigator also apparently told "JB" that the defendant was going to go to jail for 20 years; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "PW" – this patient is identified in *Sealed Govt Ex. 5.14.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex. 4.2*); she was not approached by the defendant's private investigator and not asked to sign anything; the only information about "PW" in the affidavit is derived from PDMP data as reported by State of New Jersey; *(**Note**: No false statements in reckless disregard for the truth.)*

➤ "PG"- this patient is identified in *Sealed Govt Ex. 5.15.* This patient was **not interviewed prior to the search warrant**; as of September 23, 2020, she has not spoken to the defendant's private investigator; the

only information about "PG" in the affidavit is derived from PDMP data as reported by the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "KK" – this patient is identified in *Sealed Govt Ex. 5.16.* This patient was **not interviewed prior to the search warrant**; she has not been contacted or spoken to the defendant's private investigator; the only information about "KK" in the affidavit is derived from PDMP data as reported by the NY Department of Health; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "AW" – this patient is identified in *Sealed Govt Ex. 5.17.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex. 4.8*); she has not been contacted or spoken to the defendant's private investigator; the only information about "AW" in the affidavit is derived from PDMP data as reported by the NY Department of Health and the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "DC" – this patient is identified in *Sealed Govt Ex. 5.18.* This patient **was** **not interviewed prior to the search warrant**; he has not been contacted or spoken to the defendant's private investigator; the only information about "DC in the affidavit is derived from PDMP data as reported by the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "JF" – this patient is identified in *Sealed Govt Ex. 5.19.* This patient **was** **not interviewed prior to the search warrant**; he has not been approached by the defendant's private investigator and asked to sign anything; the only information about "JF in the affidavit is derived from PDMP data as reported by the PA Department of State; *(**Note***: *No false statements in reckless disregard for the truth.)*

➢ "FC" – this patient is identified in *Sealed Govt Ex. 5.20.* This patient **was** interviewed prior to the search warrant (*see Sealed Govt Ex. 4.5*); when approached by the defendant's private investigator, "FC" could not remember if he signed anything; the only information about "FC in the affidavit is derived from PDMP data as reported by the PA Department of State; however, when interviewed by law

enforcement, "FC" stated that he left the defendant's practice because he was addicted to opioids; *(**Note**: No false statements in reckless disregard for the truth.)*

As demonstrated above, in his efforts to persuade the Court to believe that the affidavit in support of the search warrant contains false statements in reckless disregard for the truth, he has wholly failed to do so. One simple read of the affidavit, along with the Government's exhibits, reveals not one single falsity, let alone statements in "reckless disregard for the truth. That alone is fatal to his request for a *Franks* hearing. The defendant has only offered the irrelevant and self-serving affidavit of his for-hire private investigator who offers that he spoke with "some" of the patients whose medical files were identified for seizure. The defendant's for-hire private investigator apparently misled some of those patients; did not talk to several of them; or persuaded them to sign some type of "Declaration Under Oath" that the defendant was a good doctor. The defendant's inclusion by reference of subsequent interviews fails to establish any bad faith on the part of DI Derr. *Cf. Braddy*, 722 F. App'x at 235-36 (finding that statements in affidavit inconsistent with statements found in other documents did not support

a finding of intentional or reckless disregard for the truth, and thus did not warrant a *Franks* hearing).

The defendant's efforts are irrelevant and completely miss the point. The defendant's efforts are merely an attempt to create the illusion of providing evidence in an irrelevant manner to cast doubt on the well-supported affidavit of probable cause, which was presented to, reviewed, and then signed and authorized by U.S. Magistrate Judge Karoline Mehalchick.

It is not the case that a probable cause affidavit must anticipate, set out or refute all possible defenses to apparent criminal conduct. Nor need they be investigated, as the defendant would have this Court believe. The self-serving efforts of the defendant's private investigator, incredible at times, are not plainly exculpatory evidence concealed from U.S. Magistrate Judge Mehalchick. The Government has attached all patient interviews that were conducted <u>prior</u> to the search warrant evidencing what information was known to agents. (*See Sealed Govt Ex. 4 – 4.21*). The Government further attaches an affidavit of DI Derr affirming that those patients referenced in *Sealed Govt Ex. 4 – 4.21* are the only patients approached and spoken to by law enforcement prior to

submitting the affidavit of probable cause in support of the search warrant.  (*See Sealed Govt Ex. 7*).

The affidavit in support of the search warrant was not intended to be used as proof beyond a reasonable doubt to convict the defendant. The affidavit of "probable cause" was intended to "investigate" and take a look into patients' medical records who were prescribed exceedingly high dosages of opioids for extended periods of time.  These efforts are even more worthy when one considers the number of overdose deaths of patients prescribed opioids and benzodiazepines by the defendant.  The Government is quite sure those patients who overdosed and died would likewise tell the defendant's private investigator that they were pleased with the controlled substances prescribed for them by the defendant.

Here, upon thorough review of all the exhibits attached, this Court should find no material omissions, and certainly no false statements included in the affidavit in reckless disregard for the truth.  The defendant is required to make a "substantial preliminary showing" that the (1) warrant was based on a statement that was knowingly and intentionally false or made with reckless disregard for the truth, and (2) the allegedly false statements were necessary to the finding of probable

cause. *Braddy*, 722 F. App'x at 235-36. Particular to the defendant's claimed omissions, he "must show both that bad faith or reckless disregard existed on the part of the affiant," and that the affidavit would have failed to established "probable cause if it had disclosed the information." *United States v. Frost*, 999 F.3d 737, 743 (3d Cir. 1003). Accordingly, the defendant has failed to meet his burden to warrant a *Franks* hearing, leaving the good faith exception a safe harbor upon any absence of sufficient probable cause.

## IV. Conclusion

In light of all of the above, the Government respectfully requests that this Honorable Court deny the defendant's motion to suppress evidence for all of the following reasons:

First and foremost, the defendant has no "standing" or Fourth Amendment right to complain about the seizure and subsequent search of property because the EMRs were (1) cloud based; (2) not owned by the defendant; (3) not controlled by the defendant; (4) not seized from the defendant; (5) not taken from property controlled by the defendant; and (6) not EMRs exclusively accessed by the defendant;

Second, the affidavit in support of the search warrant contains ample probable cause; and

Third, the defendant has failed to make a substantial showing that agents included false statements in the affidavit in reckless disregard for the truth and, therefore, no *Franks* hearing is necessary.

The defendant's efforts are merely an attempt to create the illusion of providing evidence in an irrelevant manner to cast doubt on the well-supported affidavit of probable cause, which was presented to, reviewed, and then signed and authorized by U.S. Magistrate Judge Karoline Mehalchick.

Respectfully submitted,

DAVID J. FREED
United States Attorney

By:  /s/ Michelle L. Olshefski
     MICHELLE L. OLSHEFSKI
Date:  November 4, 2020      Assistant U.S. Attorney

## Word Count

Counsel for the government hereby certifies that the word count of this brief is 11,020 words.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:CR-19-250 |
| | : | |
| v. | : | (JUDGE MARIANI) |
| | : | |
| MARTIN EVERS, | : | Electronically filed |
| Defendant | : | |

## CERTIFICATE OF SERVICE

I, Michelle L. Olshefski, Assistant United States Attorney, do hereby certify that this document, the Government's Brief in Opposition to the Defendant's Motion to Suppress Evidence, has been served on defense counsel, Patrick A. Casey, Esquire, by electronically filing through the ECF system.


Date: November 4, 2020

/s/ Michelle L. Olshefski
MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney