UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:19-CR-00250 |
| | : | |
| v. | : | (JUDGE MARIANI) |
| | : | |
| MARTIN EVERS, | : | Electronically filed |
| Defendant | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE EXPERT TESTIMONY

Submitted By:
DAVID J. FREED
United States Attorney

*Michelle L. Olshefski*
MICHELLE L. OLSHEFSKI
Assistant United States Attorney

# TABLE OF CONTENTS

Table of Authorities...................................................................................ii

Introduction..............................................................................................1

Background of Dr. Thomas' Expert Reports.............................................7

Legal Discussion .....................................................................................10

    **a. Methodology and Reliability** ........................................................11

    **b. Standard of Care** ........................................................................22

    **c. Expert Opinion – Ultimate Issue**................................................32

Conclusion ...............................................................................................43

## CASES

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ............................ 17

*Bourjaily v. United States*, 483 U.S. 171 (1987) ..................................... 6

*Daubert v. Merrell Dow Pharmaceuticals*,

      509 U.S. 579 (1993) ...............................4, 10, 17, 18, 19, 20, 21, 32

*First Union Nat. Bank v. Benham*, 423 F.3d 855 (8th Cir. 2005) ........ 28

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ............................. 17

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777 (3d Cir. 1996) ...... 19

*Iacobelli Construction, Inc. v. County of Monroe*,

      32 F.3d 19, 25 (2d Cir. 1994) ....................................................... 17

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) ....... 18

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) .................................. 7, 19

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................... 4, 7, 17

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ...................... 18, 20

*United States v. 14.38 Acres of Land Situated in Leflore County,*

      *Mississippi*, 80 F.3d 1074 (5th Cir. 1996) .................................... 20

*United States v. Bado*, EDPA No. 2:15-cr-37 (3d Cir. No. 17-2373) ..... 41

*United States v. Boettjer,* 569 F.2d 1078 (9th Cir.1978) ...................... 16

*United States v. Burrage*, 134 S.Ct. 881 (2014) ..................................... 36

*United States v. Chube II*, 538 F.3d 693 (7th Cir. 2008) ...................... 39

*United States v. Davis*, 397 F.3d 173 (3d Cir. 2005) ........................... 37

*United States v. Evans*, 272 F.3d 1069 (8th Cir. 2001) ....................... 21

*United States v. Feingold,* 454 F.3d 1001 (9th Cir.2006) ............... 15, 16

*United States v. Flowers*, 818 F.2d 464 (6th Cir. 1987) ....................... 13

*United States v. Fuhai Li*, No. 3:16-CR-00194 ......................................... 3

*United States v. Gonzales,* 307 F.3d 906 (9th Cir.2002) ...................... 38

*United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) .......................... 38

*United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013) .................... 41

*United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006) .......................... 41

*United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017) ........................... 39

*United States v. Li*, No. 19-1875 (3d Cir. April 14, 2020) ............... 4, 41

*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001) .......................... 20

*United States v. Maynard*, 278 Fed. Appx. 214 (3d Cir. 2008) ............ 15

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) ........................ 41

*United States v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) .................. 19, 21

*United States v. Mornan*, 413 F.3d 372 (3d Cir. 2005) ........................ 21

*United States v. Rogers*, 609 F.2d 834 (5th Cir. 1980) ........................ 41

*United States v. Schneider*, 704 F.3d 1287 (10th Cir. 2013) ............... 39

*United States v. Sun*, 2016 WL 7422714 ................................................ 40

*United States v. Tighe*, 551 F.2d 18 (3d Cir. 1977) ............................. 12

*United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995) ................ 11, 28

*United States v. Watson,* 260 F.3d 301 (3d Cir. 2001) ......................... 33

*United States v. Werther*, EDPA No. 2:11-cr-434 ............................ 4, 41

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005) ................... 38

# I.    Introduction

On August 28, 2019, a federal grand jury returned an indictment charging the defendant with two federal crimes.    Count 1 charges a violation of 21 U.S.C. § 841(a)(1), the knowing and intentional distribution and dispensing of fentanyl, a Schedule II controlled substance to "K.D.", outside the usual course of professional practice and not for a legitimate medical purpose.    Count 2 charges a violation of 21 U.S.C. § 841(a)(1), the knowing and intentional distribution and dispensing of methadone, a Schedule II controlled substance, and diazepam (Valium), a Schedule IV controlled substance, to "K.D.", outside the usual course of professional practice and not for a legitimate medical purpose, resulting in death. (Doc. 1).

K.D. was a 39-year-old woman who died on September 11, 2014. She had been "treated" with high doses of short and long acting opioid analgesics and had been demonstratedly incapable of compliantly taking that class of drugs.    K.D. took her medication in a manner that was indicative of loss of control over the use of the controlled substances.    The medical records document that she underwent several

1

episodes of inpatient treatment for "substance use disorder" and detoxification in order to eliminate these drugs from her system. The defendant was aware from the outset through the efforts of K.D.'s family and through the medical records that K.D. suffered from opioid addiction, and other aberrant drug use. The defendant knew that K.D. was incapable of taking controlled substances in a controlled fashion. He prescribed them to her anyway. K.D. was a patient who required time and attention. The defendant used his prescription pad to move her along.[1] The defendant is criminally responsible for the death of K.D.

The defendant now seeks to exclude from trial relevant and proper testimony from an eminently qualified pain management expert whose testimony will aid in the jury's assessment of whether the defendant's prescribing for K.D. just prior to her death was outside the usual course of professional practice and not for a legitimate medical purpose,

---

[1] It is believed that pursuant to the defendant's employment contract with Bon Secours Health System, the defendant's salary was, in part, based on performance bonuses which included the number of professional encounters, *i.e.*, number of patients seen.

resulting in her death.

The United States intends to present the expert testimony of Dr. Stephen M. Thomas, M.D. who is, in addition to his many professional accomplishments, a Diplomat of the American Board of Anesthesiology with a subspecialty Certification in Pain Medicine, and who is also a Certified Independent Medical Examiner. (*See Gov't Exhibit 1, Dr. Stephen Thomas Curriculum Vitae*). Dr. Thomas has been qualified as an expert in this very area in multiple federal and state courts, including multiple times within the Third Circuit. *Id.* Dr. Thomas was qualified as an expert in this very area in the Middle District of Pennsylvania by the late Honorable Richard A. Caputo in the matter of *United States v. Fuhai Li*, No. 3:16-CR-00194. The defense there sought to exclude Dr. Thomas' testimony for similar reasons offered here by the defendant, *i.e.,* Dr. Thomas' conclusions are not supported by sufficient facts or data; his conclusions are not the result of the use of reliable principles and methods; and Dr. Thomas did not reliably apply principles and methods. Judge Caputo rejected the attempt in *Li* to prevent Dr. Thomas from testifying; found him qualified as a medical

expert; and admitted his expert testimony at trial.[2]   The same result

should obtain here.   When Li pressed the issue on appeal, the Third

Circuit affirmed Judge Caputo's opinion regarding Dr. Thomas' expert

testimony and held:

> Dr. Thomas drew on his thirty years of experience as a pain
> management doctor to reach his conclusions. In addition, he based
> his testimony on reliable and generally accepted techniques—*i.e.*,
> numerous pain management medical studies, as well as state
> policies and regulations, such as the Federation of State Medical
> Boards Model Policy and the Pennsylvania Code.   As Dr. Thomas'
> testimony met the flexible *Daubert* factors for reliability and we
> give the District Court "considerable leeway in deciding in a
> particular case how to go about determining whether particular
> expert testimony is reliable," *Kumho Tire Co.*, 526 U.S. at 152, the
> Court did not abuse its discretion when it allowed Dr. Thomas to
> testify as an expert witness.

*United States v. Li*, No. 19-1875 (3d Cir. April 14, 2020).

In his motion to preclude the expert testimony of Dr. Thomas, the

defendant incredibly attacks the qualifications of Dr. Thomas.   The

defendant then argues that the methodology employed by Dr. Thomas is

unreliable.   The defendant also appears to not understand that

---

[2]   *See Gov't Exhibit 2, United States v. Fuhai Li*, MDPA No.
3:16-cr-194 (Doc. 126, *Daubert* Hearing Transcripts); *see also Gov't
Exhibit 3*, Dr. Thomas' opinions cited with approval by Judge Schiller in
his Memorandum denying post-verdict motions in *United States v.
Werther*, EDPA No. 2:11-cr-434 (Doc. 1657, p. 14-16).

admissibility of expert opinion on professional standards governing the practice of medicine is but one element of proof required in the prosecution of an illegal distribution case when a licensed health care professional (such as the defendant) is charged with distribution. Finally, the defendant raises points and objections to Dr. Thomas' testimony which are, perhaps, issues to raise with Dr. Thomas in cross-examination at trial, but provide no support for the wholesale preclusion of expert testimony. The defendant seemingly uses his defense arguments as a basis from which to argue for the preclusion of Dr. Thomas' testimony simply because he disagrees with Dr. Thomas' opinions. Further, his motion does not cite a single case in support of a ruling that the opinion is unnecessary or irrelevant.

The defendant appears to misunderstand the role of an expert report and wrongly seeks to limit relevant testimony based upon a very limited view of what constitutes a reliable opinion; what the ultimate issue in this case is; the role of a "valid" prescription; and a professional course of practice. The defendant's motion and brief, while citing to cases on Rule 702 of the Federal Rules of Evidence and expert

testimony generally, nonetheless minimizes the content of Dr. Thomas' reports that describe materials he reviewed, identifies the standards he applied and the methodology he used to arrive at the opinions he is prepared to give here. In short, after working through the defendant's word salad of complaints, it becomes clear the defendant objects to the expert opinion solely because it is contrary to his legal interests. The defendant's bases for his motion are transparently meritless and are without legal and factual support.

Additionally, the relief sought by this defense motion, *i.e.*, the wholesale bar to testimony with which the defendant disagrees, is inappropriate. The defendant's disagreement with Dr. Thomas' conclusions about the highly unprofessional and even dangerous prescribing the defendant undertook and oversaw for K.D. is an argument to be made to the jury regarding what weight his opinions should be given. Disagreement with the opinion should not prevent the opinion from being heard by the jury. Given that the very low preponderance of the evidence standard governs admissibility of expert opinion, see e.g., FRE 702 and 104(a); *Bourjaily v. United States*, 483

U.S. 171 (1987), this pretrial effort should be rebuffed and his motion denied.[3]

## II.    Background for Dr. Thomas' Expert Reports

During the course of the investigation into the defendant's prescribing practices, multiple deaths from the defendant's medical practice came to the attention of law enforcement.    K.D. was but one of those deaths.    K.D.'s medical file, along with other relevant information related to K.D.'s death, such as autopsy and toxicology reports, was obtained.    Dr. Thomas was subsequently retained to review the records for the purposes of offering an opinion as to the medical legitimacy of the prescribing of opioids and other controlled substances to K.D. by the defendant.

As a result of the request, Dr. Thomas authored two expert

---

[3]    Rule 702 has a "liberal policy of admissibility." Under it, "the process or technique the expert used in formulating the opinion [must be] reliable." *Id.* at 741. "[T]he standard for determining reliability is not that high." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) (internal quotation marks and citation omitted). Expert testimony may be based on one's personal knowledge or experience, and in those circumstances the District Court may inquire into whether the expertise is based on generally accepted methods and training. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999).

reports dated August 12, 2019 and September 7, 2020. The September report was authored after defense counsel not only called into question Dr. Thomas' medical opinions, but also his personal motives and agenda.[4] The Government has provided the defendant with both expert reports authored by Dr. Thomas wherein he offers opinions as to the validity of the prescriptions issued by the defendant to K.D. just prior to her death. (*See Gov't's Exhibits 4 and 5 – Expert Reports of Dr. Stephen Thomas – Filed Under Seal*). Despite the fact that Dr. Thomas is eminently qualified to offer opinions in this area, and despite the obvious relevance of his testimony, the defendant does not concede either.

In the initial report, Dr. Thomas details the methodology he employed in the assessment; the laws applicable to physicians licensed by the Commonwealth of Pennsylvania relied upon in reaching his conclusions; and he references his reliance on the expectations set forth in the Federation of State Medical Board "Model Policy on the Use of

---

[4] It is noted that Dr. Thomas' medical opinions were not called into question by a comparable pain management expert. It is further noted that the defendant is not a pain management expert. The defendant practiced in the field of internal medicine.

Opioid Analgesics in the Treatment of Chronic Pain," (2004, 2013), which have been adopted by the Pennsylvania State Board of Medicine. (*See Gov't Exhibit 2, p. 2*). Dr. Thomas also indicates that consideration was given to various publicized practice warnings issued prior to September 2014 by federal regulatory bodies, such as the Center for Disease Control (CDC) and the Food and Drug Administration (FDA). *Id.* Additionally, Dr. Thomas offered his opinions based upon his education and experience as a Board Certified Anesthesiologist with a subspecialty in Pain Management; a Diplomat of the American Board of Anesthesiology and Pain Medicine; a Fellow of Interventional Pain Practice; Certifications held in Controlled Substance Management, Coding Compliance and Practice Management, and as an Independent Medical Examiner; his more than 30 years as a practicing physician; as well as numerous highly regarded appointments, positions, certifications, lectures, publications, honors and awards. Moreover, Dr. Thomas has previously been qualified to testify as an expert in pain management in both federal and state courts throughout the country. (*See Gov't Exhibit 1*).

A close review of Dr. Thomas' reports evidences the thoroughness, specificity, and rationale for each conclusion reached. There is no question that Dr. Thomas could have written hundreds of pages about his review of the records, but that is not the purpose of an expert report. To be clear, the report is not by itself evidence, nor does the Government contemplate that the report will simply be provided to the jury. That would be contrary to the Federal Rules of Evidence in a criminal context. The purpose of the report is to give fair notice to the defendant about expert opinions, as is required by Rule 16. The report unquestionably complies with the Federal Rules of Criminal Procedure and is the basis for the expert opinion being offered pursuant to FRE 702.

III.  **Legal Discussion**

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 590 (1993), the Supreme Court held that scientific evidence is admissible in federal court if it is "reliable."[5] The Supreme Court expanded, not

_____

[5]  Reliability is not the only prerequisite for the admission of expert testimony. In addition, in order for an expert opinion to be admitted under Rule 702, the court must be satisfied by a preponderance of the evidence that the expert is qualified, and that the

restricted the admissibility of expert opinions under Rule 702 by keeping with the Supreme Court's view of the "liberal thrust" of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony. The Court explained the reliability test as requiring "more than subjective belief or unsupported speculation." 509 U.S. at 590. The Court continued: "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.... But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- *i.e.*, 'good grounds,' based on what is known." *Id*.

### a. <u>*Methodology and Reliability*</u>

The actual written reports clearly demonstrate that the conclusions reached by Dr. Thomas are not subjective in nature. Rather, his methodology is based upon an understanding of what renders a prescription valid under the laws of the Commonwealth of

_____

opinion is relevant to the matter at issue and will be helpful to the trier of fact. *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995).

Pennsylvania and federal regulations, as well as his medical knowledge of chronic pain, controlled substances, and the interplay between the two.

The Controlled Substances Act (CSA) makes it unlawful "for any person knowingly or intentionally– to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C § 841(a)(1). There is an exception, however, for registered practitioners. *See* 21 U.S.C. § 822(b). Registered medical professionals, including doctors and pharmacists, are authorized to issue prescriptions for or otherwise dispense controlled substances provided they do so in compliance with the requirements of their registration. 21 U.S.C. § 822(b).[6]

---

[6] Issuing a prescription constitutes dispensing or distributing within the meaning of the statute. *See* 21 U.S.C. § 802 (10), (11). "[D]istribute' means to deliver (other than by administering or dispensing) a controlled substance or listed chemical." 21 U.S.C. § 802(11). "[D]ispense' means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10). A prescription "is the written representation of the drug and enables its possessor to claim physical custody and control over the drug prescribed." *United States v. Tighe*, 551 F.2d 18, 20 (3d Cir. 1977). "A person can violate 21 U.S.C. § 841(a)(1) without actually distributing the controlled substances, but

What the defendant fails to appreciate is the applicable standard

to be applied when a doctor no longer operates with the immunity

associated with a valid prescription.   If the prescription is not valid,

the defendant stands in the shoes of the stereotypical drug dealer on the

street.   In his report, Dr. Thomas articulates that standard and

specifically writes about where that standard is derived.   It is a

standard by which all physicians are guided.   It is but one element of

the crime charged.

As Dr. Thomas writes:   "I was provided with the medical records

in order to review the controlled substance prescribing behavior of Dr.

Martin Evers and the role that prescribing played in [K.D.'s] death."

(*See Exhibit 2, p. 1-2*).   "The methodology utilized in reaching the

determinations outline below involved the reading of all the available

materials, comparing the care described to that required by the federal

regulation , 21 C.F.R. § 1306-04 – Purpose of issue of prescription, the

primary guide used in reviewing the medical record."   *Id.*

Moreover, in his report Dr. Thomas clearly articulates the

_____

only by writing a prescription for their distribution." *United States v. Flowers*, 818 F.2d 464, 467 (6th Cir. 1987).

methodology he used in reaching his conclusions concerning the

defendant's prescribing behavior:

> The methodology utilized in reaching the determinations
> outlined below involved the reading of all the available
> materials, comparing the care described to that required by
> the federal regulation, 21 C.F.R. § 1306.04 - Purpose of
> issue of prescription, the primary guide used in reviewing
> the medical record. This regulation calls for the issuance of a
> controlled substances prescription for a "legitimate medical
> purpose." The legitimacy of the medical purpose is
> established by the legitimacy of the rationale supporting the
> prescription with deference to the risks and benefits of the
> controlled substances prescribed. The Pennsylvania
> Controlled Substances, Drugs, Device and Cosmetics Act
> provides additional guidance as to the legitimate medical
> purpose of a prescription for controlled substances in that
> the substance must be provided (1) in the usual course of the
> physician's professional practice, (2) within the scope of a
> doctor-patient relationship, and (3) in accordance with the
> accepted treatment principles of any responsible segment of
> the medical community. Under Pennsylvania statute and
> regulations, prescriptions provided outside of the usual
> course of professional practice, outside of the scope of the
> doctor-patient relationship, and/or not in accordance with
> the accepted treatment principles of any responsible
> segment of the medical community would be deemed not for
> a medically legitimate purpose. Additionally, Pennsylvania
> Code, Title 41, §16.92 outlines the documentation
> requirements for controlled substances for physicians in the
> Commonwealth. Furthermore, the prescribing behavior was
> compared to the expectations set forth in Federation of State
> Medical Board "Model Policy on the Use of Opioid Analgesics
> in the Treatment of Chronic Pain," (2004, 2013), which have
> been adopted by the Pennsylvania State Board of Medicine.

Consideration has also been given to various publicized practice warnings issued prior to September 2014 by federal regulatory bodies, such as the Center for Disease Control (CDC) and the Food and Drug Administration (FDA).

(*See Exhibit 2, p. 2*).

These are the foundations for the standard of care that are particularly relevant to the distribution and dispensing of controlled substances that were relied upon by Dr. Thomas in his review and assessment of the medical records, and from which he drew his conclusions.[7]   The expert reports of Dr. Thomas evidence a

---

[7]   The Third Circuit Court in *United States v. Maynard*, 278 Fed. Appx. 214, 219 (3d Cir. 2008) (not precedential), quoted approvingly the Ninth Circuit Court's reasoning in *United States v. Feingold,* 454 F.3d 1001, 1007 (9th Cir.2006) that "only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal ...... [Juries must] assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners.... Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a 'pusher' whose conduct is without a legitimate medical justification."   In *Feingold*, the Court upheld an expert witness' testimony that the defendant's practices failed to comply with "generally observed professional guidelines," including the failure to keep and maintain adequate medical records. 454 F.3d at 1005.   The Court in *Feingold* elaborated further:

Both the Supreme Court and this court have allowed juries

scientifically objective opinion based upon the practice of medicine, and specifically the practice of writing prescriptions for powerful opioid medications. When a practitioner issues prescriptions that are not valid, either to feed a patient's addiction, to cultivate a returning clientele, or to move along a difficult patient, that is not the practice of medicine. That is the criminal distribution of controlled substances.

---

to assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners. *See id.* at 126, 96 S.Ct. 335 (noting the practitioner's concession "that he did not observe generally accepted medical practices"); *United States v. Boettjer,* 569 F.2d 1078, 1081 (9th Cir.1978) (noting that the standard for criminal liability "itself imports considerations of medical legitimacy and accepted medical standards"). As we explained in *Boettjer,* evidence regarding the applicable standard of care is "not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose in [the practitioner's] prescription of controlled substances." 569 F.2d at 1082. Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a "pusher" whose conduct is without a legitimate medical justification. The district court therefore did not abuse its discretion in admitting evidence relating to the standard of care.

*Id.* at 1006-07.

As stated, *Daubert* expanded, not restricted, the admissibility of expert opinion under Rule 702 by keeping with the Supreme Court's view of the "liberal thrust" of the Federal Rules and their general approach of relaxing the traditional barriers to "opinion" testimony. *Id.* at 588, *quoting Beech Aircraft Corp. Rainey*, 488 U.S. 153, 169 (1988). Courts, and notably the Third Circuit, have been faithful to the Supreme Court's mandate to apply a liberal standard of admissibility under Rule 702. The Supreme Court's cases simply drew the line at what is colloquially referred to as "junk science," the attestations of purported experts without any reliable basis in fact or study. *Iacobelli Construction, Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994). *See General Electric Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (medical causation expert relied only on four epidemiological studies, which were either inconclusive or irrelevant to the pertinent issue); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 154 (1999) (tire expert purported to state opinion regarding cause of tire failure, based solely on a visual examination of questionable value, and without consideration of substantial evidence contrary to his view).

Apart from such extreme circumstances, the Third Circuit has often held that the reliability "standard is not that high." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994) (commonly referred to as "*Paoli II*").[8]  *Paoli II*, which presented a lengthy discussion of the *Daubert* standard in this Circuit, explained that the requirement of a showing of "reliability,"

> does not mean that plaintiffs have to prove their case twice --
> they do not have to demonstrate to the judge by a
> preponderance of the evidence that the assessments of their
> experts are *correct*, they only have to demonstrate by a
> preponderance of evidence that their opinions are reliable....
> *Daubert* states that a judge should find an expert opinion
> reliable under Rule 702 if it is based on "good grounds," *i.e.*,
> if it is based on the methods and procedures of science. A
> judge will often think that an expert has good grounds to
> hold the opinion that he or she does even though the judge
> thinks that the opinion is incorrect.... The grounds for the
> expert's opinion merely have to be good, they do not have to
> be perfect. The judge might think that there are good
> grounds for an expert's conclusion even if the judge thinks
> that there are better grounds for some alternative
> conclusion, and even if the judge thinks that a scientist's
> methodology has some flaws such that if they had been

---

[8]  This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

corrected, the scientist would have reached a different result.

*Id.* at 744.

The Rules Advisory Committee, in amending Rule 702 in 2000, expressly adopted the *Paoli II* explanation. In addition, furthering the rule's liberal policy of accepting expert testimony, the Committee explained that even expert testimony "not rely[ing] on anything like a scientific method" may be admissible, if "it is properly grounded, well-reasoned, and not speculative."[9]

Following *Paoli II*, the Third Circuit repeatedly emphasized the limited nature of the reliability measure. *See, e.g., United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004); *In re TMI Litigation*, 193 F.3d 613, 692 (3d Cir. 1999); *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 784 (3d Cir. 1996) ("The reliability requirement, however, should not be applied too strictly.... If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable.");

---

[9] The Third Circuit has relied on the 2000 Advisory Committee's note as "a useful consolidation of commentary and precedent" on the *Daubert* question. *United States v. Mitchell*, 365 F.3d 215, 234 n.14 (3d Cir. 2004).

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000).[10]

Finally, it must be added that the district court's discretion in determining whether to permit expert testimony extends to the court's decision regarding whether and to what extent to even evaluate the evidence at a separate hearing, and to the detail with which to express its decision.   The Third Circuit has repeatedly held that such matters lie within the district court's discretion, and that a court need not hold a hearing in every case nor provide any particular detail in its ruling.

For example, the *Mitchell* Court held that, given the clear admissibility of fingerprint analysis under the *Daubert* test, and the district court's considerable latitude in addressing a *Daubert* issue, a district court does not abuse its discretion by limiting a *Daubert*

---

[10]     *See also United States v. Mathis*, 264 F.3d 321, 340 (3d Cir. 2001) ("experts who apply reliable scientific expertise to juridically pertinent aspects of the human mind and body should generally, absent explicable reasons to the contrary, be welcomed by federal courts, not turned away."); 2000 Advisory Committee notes to Rule 702 ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.   *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.' *United States v. 14.38 Acres of Land Situated in Leflore County. Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).").

hearing to "novel challenges to the admissibility of latent fingerprint identification evidence -- or even dispensing with the hearing altogether if no novel challenge was raised." *Id.* at 246.   *See also United States v. Mornan*, 413 F.3d 372, 380-81 (3d Cir. 2005) ("There is no requirement that the District Court always hold a *Daubert* hearing prior to qualifying an expert witness ...."), *quoting United States v. Evans*, 272 F.3d 1069, 1094 (8th Cir. 2001).

In sum, the medical opinions expressed by Dr. Thomas in his reports reflect more than sufficient reliability under Rule 702 on the issues of "but for" causation and the defendant's medically indefensible prescribing practices vis-à-vis K.D.   Moreover, the methodology he employed in reaching those conclusions rests solidly upon widely accepted medical standards and guidelines on the use of opioids for the treatment of pain.   Dr. Thomas' expert medical opinions, therefore, should be admitted at trial.

**b.**   *Standard of Care*

The defendant talks much about the "standard of care" as if the phrase has some trademark or patented meaning and, but for the use of

the phrase, any expert report is unreliable and flawed. Perhaps that is the case in a civil context. In a criminal context, however, the concept of standard of care may be and is expressed in a multitude of ways. To be sure, Dr. Thomas' reports abundantly reference the basic medical standard (standard of care) the defendant was required to follow, including the guideposts he was supposed to use to ensure he was providing the appropriate standard of care. The guideposts relied upon and applied by Dr. Thomas are articulated in his reports, as detailed above. The excerpts will not be repeated here again. In addition to the articulation of the medical standards that guided and bound the defendant in his prescribing practices, when Dr. Thomas applied those standards to the defendant's prescribing to K.D., he wrote about the defendant's severe deviations. For example, Dr. Thomas writes:

> The patient, known to have bipolar disorder, known to have a substance abuse disorder, known to have personality disorder, known to by dysfunctional in the highest degree, known and previously documented to have Substance Use Disorder, had no choice but to rely upon the <u>duty of the physician to protect her from known potentially deadly treatments</u>. That failure to protect K.D. from a treatment specifically known to be potentially deadly and without specific benefit was Dr. Evers' and not that of K.D. But for the documented controlled substances prescribing that was

not in <u>accordance with the accepted treatment principles of any responsible segment of the medical community</u>, K.D. would not have died. Let me be clear – Dr. Evers had a duty not to kill her."

(See Exhibit 3, p. 3).

Dr. Thomas provides another example of the defendant's deviation

from the standard of care when he writes the following:

Dr. Evers' failure to follow <u>standard medical practice</u> did not absolve him of his duty to know what had happened with K.D. In the <u>standard medical model</u>, it is called "history taking." The available sources of information included the patient, who was according to every other medical source, quite willing to discuss her difficulties with them. It is impossible to believe that Dr. Evers would have been unable to elicit that history from K.D. The patient's mother, whom Dr. Evers has mentioned in the patient's record and who was living with the patient, was another source of information for him.[11] From the very outset of the medical record

[11] K.D.'s mother was interviewed prior to the indictment of the defendant. Her interview is documented and was provided to the defendant. K.D.'s mother reported that she attended K.D.'s first appointment with the defendant and advised the defendant that she wished to be kept apprised of what was being prescribed to K.D. because she told the defendant that K.D. had abused opioids in the past received from other doctors. K.D.'s mother reported that she returned to the defendant's office on multiple occasions to report that K.D. was abusing the opioid medications prescribed to her by the defendant. She reported that the defendant never responded to her concerns.

At the time of the July 2019 interview, it was learned that K.D.'s mother was suffering from stage IV cancer with a short life expectancy. Immediately following the indictment of the defendant, Government's

generated by Dr. Evers, knowledge of the patient's history of drug abuse and improper drug seeking was evident. On March 6, 2013, the day prior to the patient making telephone contact with Dr. Evers, K.D. was seen in the Emergency Department of Dr. Evers' hospital where the treating physician documented "chronic neck pain and substance addiction dependence." Despite that knowledge, Dr. Evers made no attempt to ascertain *in any manner whatsoever*, what the remainder of the patient's treatment had been relative to her drug use or abuse. Multiple other physicians and nurses documented the patient's history of substance abuse. Dr. Evers never documented it because he never asked. Even the insufficient medical record that Dr. Evers generated showed that he was aware that the patient was hospitalized both at Horsham Clinic and at First Hospital. If Dr. Evers did not know what the contents of those evaluations were, he did know at least some part of the recommendations, because he documented that he *knew* of them.

* * * * * * * ** * * * *

Given that he knew of her prior diagnoses of substance abuse, attempted detox, intoxication, sequelae of that intoxication (radial nerve palsy), Dr. Evers had a duty to know what K.D. had been taking prior to prescribing for her. Given her "terrible hospitalization," knowing that K.D. was

---

counsel advised defense counsel of the need to obtain the testimony of K.D.'s mother prior to her death to preserve it for trial. Shortly before the end of 2019, Government's counsel again requested that defense counsel agree to immediately secure the deposition of K.D.'s mother as she was in the hospital and would soon pass. While defense counsel agreed to take the deposition of K.D.'s mother, he advised that a multitude of records from various sources first had to be secured, which took some time. Records could not be secured in time and K.D.'s mother passed away in January 2020.

out of control <u>required only the standard medical model</u> be applied to her condition.   Dr. Evers decided not to.   His prescribing for a drug dependent individual was for her psychologic condition and not for somatic pain.   She had not been comfortable or stable or functional when on high-dose opioids.   There was no reason to believe that she would be if the doses returned.   In doing so, he offered to a drug dependent individual doses of medication that were dangerous on their face and therefore not for a medically legitimate purpose in the usual course of professional practice.

* * * * * * * ** * * * *

And, once again, I would note that [defense counsel] provided the evidence that she was relatively naïve, because she was on a "low dose" at the time of discharge, but after discharge, before seeing Dr. Evers, she was on *no* Methadone and by the time she saw Dr. Evers, her Methadone levels would have been 0 or close to 0 – we do not know what they were precisely because Dr. Evers <u>did not perform within the standard medical model for dispensing opioids</u>.   He did not obtain the history; he did not do a physical examination; he did not perform urine drug screening.   He did not determine what her level of tolerance was, as was his duty.   He disconnected himself from the <u>accepted treatment principles of any responsible segment of the medical community</u> and in doing so his actions directly were causal in [K.D.'s] death.

(*See Exhibit 3, p. 4-5*) (emphasis added).

In this case, Dr. Thomas offers in his reports that he has relied, in part, on Pennsylvania Code, Title 41 Pa. Code, §16.92, which applies to the prescribing and administering of controlled substances by medical doctors in Pennsylvania.   He has written that he has relied, in part, on

the Federation of State Medical Board "Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain," (2004, 2013), which have been adopted by the Pennsylvania State Board of Medicine. Consideration has also been given to various publicized practice warnings issued prior to September 2014 by federal regulatory bodies, such as the Center for Disease Control (CDC) and the Food and Drug Administration (FDA). Dr. Thomas has written that these codes provide the guidance as to the established acceptable standard of care in the medical profession generally and, in particular, for those engaged in the practice of medicine in the Commonwealth of Pennsylvania. While Dr. Thomas' reports indicate that these codes alone do not prove that the defendant prescribed the controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, the codes that guide the standard of care are surely relevant to that determination. The defendant's argument on this issue is baseless. He is merely playing semantics.

The defendant's remaining arguments provide no basis to preclude the testimony of Dr. Thomas at trial under an umbrella of "reliability."

Such arguments go to the weight of the testimony and not the admissibility of Dr. Thomas' testimony.   For example, the defendant claims that Dr. Thomas failed to consider post-mortem redistribution. The defendant can cross-examine Dr. Thomas, the forensic pathologist, as well as the toxicologist about any perceived failures regarding post-mortem distribution.   However, the topic does not provide a legal or factual basis to preclude the testimony of Dr. Thomas.

Another example involves Dr. Thomas' alleged failure to consider a "differential diagnosis."   Again, such perceived failure can provide much fodder for the cross-examination of Dr. Thomas but the issue does not provide a legal or factual basis to preclude his expert testimony.   It is not within the province of the court to examine the relative merits or strength of Dr. Thomas' testimony or assertions; that is ultimately left to the jury.   Rather, the district court must make a "preliminary assessment" of Dr. Thomas' testimony and is permitted to determine only whether such testimony is "helful[] to the trier of fact." *United States v. Velasquez*, 64 F.3d 844, 849-50 (3d Cir. 2005) (internal quotation marks omitted).   As the United States Court of Appeals for

the Eighth Circuit has explained:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005).

However, with regard to the defendant's argument that Dr. Thomas did not undertake all steps that are performed in an ideal differential diagnosis or exclude all other possible causes for the death of K.D., he was not required to do so. In that vein, however, "there will be some cases in which a physician can offer a reliable differential diagnosis without examining the patient, looking at medical records, taking a medical history, and performing laboratory tests."[12]   *Paoli II*,

---

[12]   The Third Circuit concluded that "sometimes differential diagnosis can be reliable with less than full information." *Id.* at 759. By way of example, the Third Circuit stated "imagine a patient who comes in with medical records that include x-rays showing a fractured arm and who tells the doctor that he hurt the arm in a biking accident; the doctor could reliably conclude that the patient had a fractured arm caused by a biking accident even without physically examining the patient or taking a medical history. The biking accident is so much more likely to have been the cause of the fracture than anything else that there is no need to examine alternatives." *Id.* at 759-60.

35 F.3d at 761.   Accordingly, a differential diagnosis is generally reliable even where the doctor "engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes [unless] the doctor offered no good explanation as to why his or her conclusion remained reliable."   *Id*. at 760.

Here, Dr. Thomas has opined that "but for" the defendant's prescriptions of methadone and diazepam written by the defendant and issued by him to K.D. within 48 hours of her death, K.D.'s untimely death would not have occurred.   "Dr. Evers prescribed controlled substances to her in a manner not consistent with the accepted treatment principles of any responsible segment of the medical community."   (*See Exhibit 2, p. 4-5*).   Dr. Thomas reviewed K.D.'s medical records; rehabilitation records; hospital records; the coroner's report; K.D.'s autopsy report; the associated toxicology report; the interview of K.D.'s mother; the interview of the defendant; and the Prescription Drug Monitoring Report (PDMP) for K.D. -- all of which consists of thousands of pages of information.   This was more information that Dr. Thomas would typically have available to him

when making a life-saving diagnosis in his practice of medicine, or in his capacity as a certified independent medical examiner in determining cause of death. This is not a case, as the defendant would have the court believe, of Dr. Thomas acting in a vacuum and opining about K.D.'s cause of death by only determining whether the defendant's prescriptions were issued in the usual course of professional practice and not for a legitimate medical purpose. Dr. Thomas reached opinions by being able to scientifically rule out other causes of death other than the mixture and quantity of the controlled substances found in her body, as did the pathologist at autopsy.[13] In addition to the scientific information relied upon by Dr. Thomas, he drew on his thirty years of experience as a pain management doctor and anesthesiologist to reach his conclusions. Collectively, Dr. Thomas concluded within a reasonable degree of medical certainty that "but for" the ingestion of the controlled substances unlawfully prescribed to her by the defendant,[14]

_____

[13] In addition, the toxicologist who analyzed K.D.'s body fluids will be a witness for the Government at trial to testify as to the science behind the process and conclusions reached within a reasonable degree of scientific certainty.

[14] "Unlawful" because in Dr. Thomas' opinion, the prescriptions

methadone and diazepam, K.D. would not have died.   In this regard,

Dr. Thomas' testimony is reliable and based on generally accepted

techniques – *i.e.*, numerous pain management medical studies, as well

as state policies and regulations, such as the Federation of State

Medical Boards Model Policy and the Pennsylvania Code.   In this

regard, Dr. Thomas' testimony is important in aiding the jurors with

respect to two decisions that they will need to make at trial:   (1)

whether the prescriptions issued by the defendant to K.D. for

methadone and diazepam were written within the usual course of

professional practice and for a legitimate medical purpose, and (2)

whether K.D. suffered death as a result of ingesting the controlled

substances prescribed to her by the defendant.   Whether the defendant

knowingly and intended to do so, is another question for the jury based

upon the entirety of the Government's case, and the defense presented

at trial.   Whether or not the cause of K.D's death was the mixture of

controlled substances prescribed to her by the defendant is another

---

issued to K.D. by the defendant within 48 hours of her death, were
written outside the usual course of professional practice and not for a
legitimate medical purpose.

question for the jury based upon the testimony of additional witnesses, including a forensic pathologist and toxicologist. Dr. Thomas' proposed testimony unquestionably meets the flexible *Daubert* factors for reliability.

### c. *Expert Opinion – Ultimate Issue*

As a another basis to preclude the testimony of Dr. Thomas, the defendant argues that it is impermissible for Dr. Thomas to opine that the prescriptions issued by the defendant to K.D. within 48 hours of her death were written outside the usual course of professional practice and not for a legitimate medical purpose. The defendant argues that such opinion is the "ultimate legal conclusion" and must be precluded. (Doc. 65, p. 12). The defendant is incorrect on the law and the facts.

As a general rule, an expert witness may state an opinion regarding the ultimate issue in the case. Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). The one exception, unique to criminal cases, is that Rule 704(b) prohibits an expert from stating an opinion as to whether the defendant did or did not have the mental state or condition constituting

an element of the crime charged or of a defense thereto.  *United States v. Watson,* 260 F.3d 301, 308 (3d Cir. 2001).   Nevertheless, "[e]xpert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony."   *Watson*, 260 F.3d at 308 (internal citations and quotations omitted).

As explained herein, the only mechanism that separates a licensed medical practitioner who prescribes controlled substances from the stereotypical drug dealer on the street is a "valid" prescription.   When a practitioner issues prescriptions that are not valid -- that is not the practice of medicine – that is drug dealing of the illegal kind.   That is the essence of the defendant's criminal behavior in this case.

Under the law, licensed doctors may issue prescriptions for controlled substances for legitimate patients who have a medical need for the drugs.   Title 21, Code of Federal Regulations, § 1306.04, governing the issuance of prescriptions provides:

[A] prescription for a controlled substance to be effective
must be issued for a legitimate medical purpose by an
individual practitioner acting in the usual course of his
professional practice. The responsibility for the proper
prescribing and dispensing of controlled substances is upon
the prescribing practitioner, but a corresponding
responsibility rests with the pharmacist who fills the
prescription. An order purporting to be a prescription issued
not in the usual course of professional treatment or in
legitimate and authorized research is not a prescription
within the meaning and intent of section 309 of the Act [21
U.S.C. 829] and the person knowingly filling such a
purported prescription, as well as the person issuing it, shall
be subject to the penalties provided for violations of the law
relating to controlled substances.

Title 21, United States Code, § 841(a)(1) makes it a crime to

knowingly and intentionally distribute a controlled substance other

than in the usual course of professional practice and for a legitimate

medical purpose.   "An order purporting to be a prescription issued not

in the usual course of professional treatment or in legitimate and

authorized research is not a prescription within the meaning and intent

of section 309 of the Act (21 U.S.C. § 829) and the person knowingly

filling such a purported prescription, as well as the person issuing it,

shall be subject to the penalties provided for violations of the provisions

of law relating to controlled substances."   Title 21, Code of Federal

Regulations § 1306.04(a).   Thus, proof that the prescriptions issued were not "valid" is but one element of the crimes charged against the defendant.

To establish a violation of 21 U.S.C. § 841(a)(1), the Government must prove the following elements beyond a reasonable doubt:

1.    the defendant distributed a controlled substance, that is, the controlled substances identified in the indictment;

2.    the defendant did so knowingly or intentionally;

3.    the distribution of the controlled substance to the particular victim identified in the indictment was issued outside the usual course of professional practice and not for a legitimate medical purpose; and

4.    the death of the victim identified in the indictment [Count 2] resulted[15] from the distribution.

In this case, a forensic pathologist and toxicologist will testify as to the cause of K.D.'s death, the victim identified in Count 2 of the indictment.   The defendant has mistaken Dr. Thomas' opinions as the

---

[15]    That is, that "but for" the ingestion of the drug distributed, death would not have resulted whether alone or in combination with other drugs.   *United States v. Burrage*, 134 S.Ct. 881 (2014).   In *Burrage*, the Supreme Court held that the "death results" provision of Section 841(b)(1) requires proof of but-for causation "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death."   *Id.* at 892.

only evidence of K.D.'s death as resulting from the controlled substances prescribed to her by the defendant. The pathologist and toxicologist will be testifying about the cause and manner of death, and the drugs detected in the blood and other fluids of K.D. Dr. Thomas will testify that the prescriptions issued by the defendant to K.D., confirmed in the toxicology and pathology to be the cause of K.D.'s death, were written outside the usual course of professional practice and without a legitimate medical purpose. The unlawful prescriptions are the first step in bringing the physician defendant under the criminal prohibitions of Title 21 U.S.C. § 841(a)(1). In this regard, Dr. Thomas' testimony is not objectionable.

This Court permits expert testimony which recounts the common practices of drug dealers, and states that the facts of the particular case are "consistent" with intentional drug trafficking, as long as the testimony does not draw the final conclusion for the jury. *See, e.g.*, *United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006) (finding that testimony by a narcotics expert that drug dealers are very likely to carry guns, and drug buyers almost never do, did not violate

704(b), but merely described the common general practices of drug dealers and was admissible under Rule 702); *United States v. Davis*, 397 F.3d 173, 177-79 (3d Cir. 2005) (an expert may testify that the circumstances in the case at issue are "consistent" with "intent to distribute," allowing the jury to then determine whether the defendant on trial had that intent).

"Rule 704(b) does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Hayat*, 710 F.3d 875, 901 (9th Cir. 2013) (internal citations and quotation marks omitted). In *Hayat*, the court found no violation of Rule 704(b) by expert testimony that the "kind of person" who would carry the note found in the defendant's wallet was "[a] person who is engaged in jihad," because the expert "never commented directly on [the defendant's] mental state." *Id.* at 901-02. *See also United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005) (upholding admission of

expert testimony that "[t]he person, individual, whoever possessed this [cocaine base], possessed it for the purposes of selling" because "the expert never directly commented on defendant's mental state, and the jury could have accepted his testimony and still infer that defendant was atypical") (emphasis deleted); *United States v. Gonzales,* 307 F.3d 906, 911 (9th Cir.2002) (holding expert testimony that a "person [who] was carrying those items [was carrying them] for the purpose of distributing the drugs" did not violate Rule 704(b) because "[e]ven if the jury believed the expert's testimony, the jury could have concluded that [the defendant] was not a typical or representative person, who possessed the drugs and drug paraphernalia involved").

Even if a jury credits the testimony of Dr. Thomas regarding the validity of the prescriptions, it does not compel the conclusion that the defendant intended to distribute the drugs outside the course of professional practice. *See United States v. Kohli*, 847 F.3d 483, 487, 491 (7th Cir. 2017) (upholding admission of expert doctor's testimony that defendant's prescriptions "offered no medical benefit and were in some cases simply 'inconceivable' from a clinical standpoint" as

"consistent with Rule 704(b))"; *United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013) (testimony by government's medical expert that "the documents evidence 'an intention to deceive and defraud the system'" and "this is a dishonest practice" did not impermissibly "profess to know . . .defendant's intent"); *United States v. Chube II*, 538 F.3d 693, 700 (7th Cir. 2008) (expert testimony "that no legitimate medical purpose justified the prescriptions in the files [the expert] reviewed" and, if there are enough "red flags, a doctor "knew or should have known that harm was being done with these prescriptions" did not "cross the line" to testify on defendant doctors' mental state).

Rule 704(a) clearly states that, "An opinion is not objectionable just because it embraces an ultimate issue." The exception found in Rule 704(b) is, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charge or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

Every circuit to address the issue in this context has held that

experts can render an opinion that a defendant acted outside the usual course of professional practice and without a legitimate medical purpose when issuing a prescription, so long as the expert does not opine on whether the defendant intended to so act.   For example:

- *United States v. Sun*, 2016 WL 7422714 (contrary to Sun's contention, the expert did not improperly opine about Sun's state of mind);

- *United States v. Chube*, 538 F.3d 693, 696-97 (7th Cir. 2008) (affirming testimony of two experts that "the prescribing [by the defendant] 'was not done consistent with the usual standards of medical practice' and thus was not done with a 'legitimate medical purpose,'" and that prescriptions "were issued 'outside the scope of medical practice, not for legitimate purposes;'" experts did not testify "on the ultimate legal question whether [the defendants] knowingly violated the law," as they focused on whether the defendants in fact violated medical standards and thus did "not go so far as to offer an opinion on the Doctors' subjective intent");

- *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) (affirming expert testimony that defendant "treated certain patients outside the course of legitimate medical practice" and that his "treatment of certain patients was either illegitimate or inappropriate," as "it is the extent and severity of departures from the professional norms that underpin a jury's finding of criminal violations");

- *United States v. Katz*, 445 F.3d 1023, 1032 (8th Cir. 2006) (affirming admission of expert medical testimony; experts opined that defendant failed to comply with professional standards and thus "did not testify regarding the subjective mental state of [the defendant] upon writing the prescriptions charged in the indictment.");

- *United States v. Joseph*, 709 F.3d 1082, 1089 (11th Cir. 2013) (expert testimony that, "based on [the expert's] review of the medical records maintained by the [defendants]" that they "dispensed or distributed the prescription drugs without a legitimate medical purpose and outside the usual course of professional practice");

- *United States v. Rogers*, 609 F.2d 834, 839 (5th Cir. 1980) (expert testimony admitted "that prescribing Valium in combination with other drugs shown to have been prescribed would be action other than for a legitimate medical purpose").[16]

Thus, though defendant argues that it is impermissible for a witness to provide "an opinion on an ultimate issue of law," it is and will be the province of the Court to instruct the jury as to the law. Clearly, Dr. Thomas has not and will not opine on whether the defendant intended to distribute controlled substances that resulted in the death of K.D. That is the ultimate issue in this case.

---

[16]    As stated above, Dr. Thomas has testified approvingly in District Courts within the Third Circuit on this precise issue on multiple occasions, including *United States v. Fuhai Li*, MDPA No. 3:16-cr-194 (3d Cir. No. 19-1875); *United States v. Werther*, EDPA No. 2:11-cr-434; *United States v. Bado*, EDPA No. 2:15-cr-37 (3d Cir. No. 17-2373).

## IV.  Conclusion

In light of the above, the Government respectfully requests that the Court deny the defendant's motion to preclude the expert testimony of Dr. Stephen Thomas.

Respectfully submitted,

DAVID J. FREED
United States Attorney

By:  /s/ Michelle L. Olshefski
MICHELLE L. OLSHEFSKI
Date:   November 4, 2020          Assistant U.S. Attorney

## Word Count

Counsel for the government hereby certifies that the word count of this brief is 7,497 words.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:CR-19-250 |
| | : | |
| v. | : | (JUDGE MARIANI) |
| | : | |
| MARTIN EVERS, | : | Electronically filed |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 4th day of November,

2020, I caused the foregoing response to be filed via ECF and that

counsel of record for the defendant is a filing user under the ECF

system to include the following:

/s/ Michelle L. Olshefski
Michelle L. Olshefski
Assistant U.S. Attorney