IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff            )
                                 )
        vs                       )    19-CR-250
                                 )
MARTIN EVERS,                    )
                                 )
            Defendant            )
_____ )


TRANSCRIPT OF PROCEEDINGS
*Daubert Hearing In Re: Dr.Stephen Thomas*
BEFORE THE HONORABLE ROBERT D. MARIANI
THURSDAY, MARCH 11, 2021; 10:30 A.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
    UNITED STATES ATTORNEY'S OFFICE
    By: Michelle Olshefski, Esq.
    Assistant United States Attorney
    P.O. Box 309
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

FOR THE DEFENDANT:
    MYERS, BRIER & KELLY, LLP
    By: Patrick A. Casey, Esq.
        Frank J. Brier, Esq.
        Suzanne Conaboy, Esq.
    425 Spruce Street
    Scranton, Pennsylvania  18503



Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

I N D E X

| Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Dr. Stephen Thomas | 7 | 74 | 117 | -- |

E X H I B I T     I N D E X

| For the Government: | Identified | Admitted |
|---|---|---|
| Exhibit No. 1 | 7 | 8 |
| Exhibit No. 10 | 24 | 27 |
| Exhibit No. 8 | 43 | 72 |
| Exhibit No. 5 | 44 | 72 |
| Exhibit No. 6 | 47 | 72 |
| Exhibit No. 4 | 48 | 72 |
| Exhibit No. 7 | 49 | 72 |
| Exhibit Nos. 2&3 | 66 | 72 |
| Exhibit No. 9 | 68,69,111 | 72 |

1    THE COURT: Good morning, everyone.

2    MS. OLSHEFSKI: Good morning, Your Honor.

3    MR. CASEY: Good morning.

4    MR. BRIER: Good morning, Your Honor.

5    THE COURT: This is the matter of United States v. Martin

6  Evers. In accordance with our telephone conference of Thursday,

7  March 4, we are here to receive evidence with respect to two of

8  the motions that have been filed on behalf of the Defendant.

9       The first is the Motion to Exclude the opinion and

10 testimony of Dr. Stephen Thomas; and the second is a Motion to

11 Suppress the search and seizure of 104 Bennett Avenue, Suite

12 3C, Milford PA on August 6th, 2019.

13      Ms. Olshefski, if you will recall, in our telephone

14 conference of March 4, we discussed the commencement of the

15 proceeding by your presentation of an offer of proof with

16 respect to Dr. Thomas, specifically, indicating the basis on

17 which you seek him to be qualified, and if qualified, the

18 opinion that he would render.

19     Are you prepared to submit that now?

20     MS. OLSHEFSKI: I am, Your Honor.

21     THE COURT: Please.

22     MS. OLSHEFSKI: Your Honor, the United States is offering

23 the expert testimony of Dr. Stephen Thomas to testify about the

24 events surrounding the death of Kristina Dame. Dr. Thomas has

25 authored two expert reports in this case, wherein, he has

00:01 1 written about Kristina Dame's medical history and events

00:01 2 leading up to her death and will be offered to testify about

00:02 3 what he has included in both of those expert reports.

00:02 4     He's being offered to testify about whether, in his medical

00:02 5 opinion, the prescriptions written by the Defendant, as alleged

00:02 6 in the indictment, were written in the usual course of

00:02 7 professional practice and for legitimate medical purposes.

00:02 8     He will be offered to testify about whether, in his medical

00:02 9 opinion, the prescriptions issued to Kristina Dame by the

00:02 10 Defendant and used by Kristina were the but-for cause of death

00:02 11 in this case.

00:02 12     Dr. Stephen Thomas, who is in the courtroom and will be

00:02 13 called to testify, in addition to his many professional

00:02 14 accomplishments, is a Diplomate of The American Board of

00:02 15 Anesthesiology with a subspecialty certification in Pain

00:02 16 Medicine. He's also a Certified Independent Medical Examiner.

00:02 17     Dr. Thomas has been qualified as an expert in this very

00:02 18 area, in multiple Federal and State Courts, including multiple

00:02 19 times within the Third Circuit.

00:02 20     Dr. Thomas was qualified as an expert in this very area in

00:03 21 the Middle District of Pennsylvania by the late Honorable A.

00:03 22 Richard Caputo in the matter of United States v. Fuhai Li.

00:03 23 The Defense there sought to exclude Dr. Thomas' testimony for

00:03 24 similar reasons that are offered here by this Defendant.

00:03 25     They allege that, first, Dr. Thomas is not qualified. They

00:03 1 allege that Dr. Thomas' conclusions are not supported by

00:03 2 sufficient facts or data. They allege that his conclusions are

00:03 3 not the result or the use of reliable principles and methods.

00:03 4 And that Dr. Thomas did not reliably apply principles and

00:03 5 methods to this case.

00:03 6     In Li, Judge Caputo rejected that same attempt and allowed

00:03 7 Dr. Thomas to testify. Judge Caputo found him qualified as a

00:03 8 medical expert and admitted his expert testimony at trial. In

00:03 9 that trial, Dr. Thomas testified that certain prescriptions

00:03 10 were not issued in the usual course of professional practice

00:04 11 and not for legitimate medical purposes. And in one case in

00:04 12 that trial, he opined as to the but-for cause of death.

00:04 13     When Li pressed that issue on appeal to the Third Circuit,

00:04 14 the Third Circuit affirmed Judge Caputo's opinion regarding

00:04 15 Dr. Thomas' expert testimony.

00:04 16     In another matter that is currently pending before this

00:04 17 district, before the Honorable Matthew W. Brann, captioned at

00:04 18 United States v. Raymond Kraynak, the Defense sought there to

00:04 19 preclude the testimony of Dr. Thomas, for reasons similar to

00:04 20 what this Defendant is doing and argues here. The Government

00:04 21 previously supplemented its response to the Motion to Preclude

00:04 22 with the memorandum opinion authored by Judge Brann denying

00:04 23 that motion, which was issued on November 9, 2020 approving the

00:04 24 expert testimony of Dr. Thomas, as to the validity of the

00:05 25 prescriptions at issue, not issued in the usual course of

00:05 1 professional practice and without legitimate medical purpose

00:05 2 and the but-for cause of death in that case.

00:05 3     Your Honor, I understand that this authority is not

00:05 4 binding -- either, Judge Caputo or Judge Brann's decisions are

00:05 5 not binding on Your Honor, but we argue that those decisions

00:05 6 are persuasive. And we also rely on the additional cases cited

00:05 7 in our response brief in support of the admission of

00:05 8 Dr. Thomas' testimony.

00:05 9     Your Honor, with that, I'm ready to proceed.

00:05 10     THE COURT: Who will be questioning here?

00:05 11     MR. BRIER: I will, Your Honor. Frank Brier on behalf of

00:05 12 Dr. Evers.

00:05 13     THE COURT: Mr. Brier, do you wish to make any statement

00:05 14 before we begin?

00:05 15     MR. BRIER: No, Your Honor. I understand that's argument,

00:05 16 it's not evidence. I'm prepared to proceed.

00:05 17     THE COURT: Very well. You can call your first witness.

00:06 18     MS. OLSHEFSKI: Thank you, Your Honor. The United States

00:06 19 calls Dr. Stephen Thomas.

00:06 20 S T E P H E N    T H O M A S, M. D. IS CALLED, AND HAVING

00:06 21 BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

00:06 22     THE CLERK: Please state your name and spell it for the

00:06 23 record.

00:06 24     THE WITNESS: My name is Stephen, S-T-E-P-H-E-N, Michael

00:06 25 M-I-C-H-A-E-L, Thomas, T-H-O-M-A-S, M.D.

00:06 1    THE CLERK: Thank you. Please be seated.

00:07 2    MS. OLSHEFSKI: Your Honor, the witness has a binder in

00:07 3 front of him, which includes exhibits that the United States

00:07 4 may refer Dr. Thomas to during the testimony.

00:07 5    The same binder has been provided to the Court, as well as

00:07 6 Defense counsel.

00:07 7    THE COURT: Thank you.

00:07 8    MS. OLSHEFSKI: Your Honor, may I stay at counsel table to

00:07 9 question?

00:07 10    THE COURT: Yes.

00:07 11                    DIRECT EXAMINATION

00:07 12 BY MS. OLSHEFSKI:

00:07 13 Q.    Good morning, Dr. Thomas.

00:07 14 A.    Good morning.

00:07 15 Q.    Please introduce yourself to Your Honor.

00:07 16 A.    I am Stephen Thomas, I'm a pain medicine physician.

00:07 17    THE COURT: Very pleased to meet you.

00:07 18 BY MS. OLSHEFSKI:

00:07 19 Q.    Dr. Thomas, there is a binder in front of you; correct?

00:07 20 A.    Yes.

00:07 21 Q.    Can you please turn to Government's Exhibit 1 in that

00:07 22 binder. And can you please let me know if you can identify

00:07 23 Government's Exhibit 1?

00:07 24 A.    Yes, it is my curriculum vitae.

00:07 25 Q.    Prior to coming in to court today, did you provide that

00:07 1 curriculum vitae to the United States?

00:07 2 A.    I did.

00:07 3 Q.    Is it a current and up-to-date curriculum vitae?

00:07 4 A.    Yes, it was last updated in October of 2020.

00:08 5      MS. OLSHEFSKI: Your Honor, I move for admission of

00:08 6 Government's Exhibit No. 1.

00:08 7      THE COURT: Any objection, Mr. Brier?

00:08 8      MR. BRIER: No objection, Your Honor.

00:08 9      THE COURT: Government's 1 is admitted.

00:08 10     (At this time Government's Exhibit No. 1 was admitted into

00:08 11      evidence.)

00:08 12 BY MS. OLSHEFSKI:

00:08 13 Q.    So Dr. Thomas, I'd like to go over some of what is

00:08 14 included in your curriculum vitae, okay. First of all, what

00:08 15 type of physician are you?

00:08 16 A.    I'm an anesthesiologist by training, with subspecialty

00:08 17 training in pain medicine. I am a pain medicine physician.

00:08 18 Q.    Are you licensed to practice medicine the Commonwealth of

00:08 19 Pennsylvania?

00:08 20 A.    I have been so since 1992.

00:08 21 Q.    Since 1992?

00:08 22 A.    Yes.

00:08 23 Q.    I want to start first talking about your education, okay,

00:08 24 your undergraduate education. Where did you go to college?

00:08 25 A.    Initially, I went to Slippery Rock State College, and I

00:08 1 took my degree from the Case Western Reserve University in

00:08 2 Cleveland, Ohio, majoring in Biology with minor concentrations

00:08 3 in Chemistry, Philosophy and Psychology.

00:08 4 Q.    And after graduating from college, what did you do next?

00:09 5 A.    I went to medical school at Stanford University School of

00:09 6 Medicine, where I obtained my M.D. in 1984. After medical

00:09 7 school, I did an internship at The Presbyterian University of

00:09 8 Pennsylvania Medical Center, followed by a residency in

00:09 9 anesthesiology at Johns Hopkins Hospital in Baltimore,

00:09 10 Maryland.

00:09 11     After completing my residency in anesthesiology, I did a

00:09 12 Fellowship in pain medicine and regional anesthesia, also, at

00:09 13 Johns Hopkins Hospital, where I was the Chief Resident in the

00:09 14 Department of Anesthesiology and Critical Care Medicine.

00:09 15 Q.    Let me just stop you there for a moment. You performed an

00:09 16 internship at the Presbyterian University of Pennsylvania

00:09 17 Medical Center; correct?

00:09 18 A.    Yes.

00:09 19 Q.    How long was that internship?

00:09 20 A.    It was one year, a rotating internship, including all

00:09 21 medical disciplines the old fashioned way.

00:09 22 Q.    The residency in anesthesiology at Johns Hopkins Hospital

00:10 23 in Baltimore, how long was that, and what did you do as a

00:10 24 resident in anesthesiology?

00:10 25 A.    It was an additional two years of specialty training in

1 Anesthesiology and Critical Care Medicine. It included

2 rotations in the division of anesthetics to geriatric

3 individuals, pediatrics, obstetrics and gynecology and general

4 and regional anesthetics for operative procedures.

5 Q.   When we talk about anesthetics and anesthesiology, what is

6 that?

7 A.   Anesthesiology is the subspecialty of medicine,

8 specifically, concerned with the provision of appropriate

9 surgical conditions, rendering patients insensible to pain,

10 during the course of operations, and their care in the critical

11 care setting post-operatively, during the periods of recovery

12 from anesthesia, as well as the care of trauma patients and

13 patients in labor and delivery, as well as pediatric patients.

14      It's a generalist specialty, specifically, concerning the

15 pharmacology, physiology and anatomy of the provision of

16 anesthetics.

17 Q.   That was two years?

18 A.   That was a two-year course?

19 Q.   You indicated that you were Chief Resident of The

20 Department of Anesthesiology and Critical Care Medicine. Did

21 you become Chief Resident during that residency?

22 A.   During my fellowship year, I was appointed Chief Resident.

23 Of the 75 residents in the program, four are selected for

24 various reasons of excellence in the department to become Chief

25 Resident. It is a middle management leadership position within

00:12   1    the department during the course of the year.

00:12   2    Q.    Now, at some point subsequent to that training, did you

00:12   3    find yourself in the military?

00:12   4    A.    Actually, I was planning -- since they paid for Stanford,

00:12   5    I went to -- I was on reserve duty in the Air Force, during the

00:12   6    course of my medical training, and then I owed four years of

00:12   7    active duty in the United States Air Force.

00:12   8    I was assigned to the Wright Patterson United States Air

00:12   9    Force Medical Center in Dayton, Ohio, where I was the Staff

00:12  10    Anesthesiologist. While there, I developed the first pain

00:12  11    medicine center for the central region of the Air Force, and

00:12  12    rose to the rank of Major and was the Assistant Chief of

00:12  13    Anesthesia Services while at Wright Patt. I was there for four

00:12  14    years.

00:13  15    Q.    After four years of serving in the military, what did you

00:13  16    do then?

00:13  17    A.    I obtained an Honorable Discharge first, then I returned

00:13  18    to my hometown of Pittsburgh, Pennsylvania, where I was Staff

00:13  19    Anesthesiologist and Pain Medicine Physician for Pittsburgh

00:13  20    Anesthesia Associates, a large anesthesia group covering,

00:13  21    approximately, seven hospitals in the Pittsburgh area.

00:13  22    Our main hospital was Mercy Hospital of Pittsburgh, where

00:13  23    I initially worked half in the operating room and half in the

00:13  24    pain medicine center training residents and providing

00:13  25    inpatient, outpatient and subspecialty pain medicine services

00:13 1 across multiple hospitals.

00:13 2 Q.   You were one of a group of physicians performing these

00:13 3 services?

00:13 4 A.   Yes, there were 40 anesthesiologists in the group and four

00:14 5 pain medicine physicians, so during that time, we provided both

00:14 6 inpatient consultation, as well as ran an outpatient clinic for

00:14 7 referrals to the pain medicine service.

00:14 8      We also provided services at the Healthsouth Harmarville

00:14 9 Rehabilitation Hospital, where we ran a multi-disciplinary

00:14 10 chronic pain and function restoration program, concentrating on

00:14 11 minimizing drug therapy, improving patient function, dealing

00:14 12 with their psychological issues and issues of addiction,

00:14 13 regarding their interaction with pain medicines, as well as

00:14 14 attempting to return injured workers to work.

00:14 15 Q.   How long did you do that, Dr. Thomas?

00:14 16 A.   I was with Pittsburgh Anesthesia Associates for eight

00:15 17 years, from 1992 until 2000.

00:15 18 Q.   So when you were involved in that large group, you

00:15 19 indicated that some of the services, anesthesia services, were

00:15 20 performed at a hospital, in addition to a clinic, inpatient and

00:15 21 outpatient.

00:15 22      How did you divide your time or what was the quantity

00:15 23 of -- how was your time divided?

00:15 24 A.   When I started, I did 50 percent O.R. anesthesia and 50

00:15 25 percent pain medicine, because they offered me a job with both,

00:15 1 and, at the time, that's what I wanted to do. Between 1992 and

00:15 2 1999, I gradually performed more and more pain medicine

00:15 3 services because of the demand and less and less operative

00:15 4 time.

00:15 5      And in about 1999, I realized that my partners didn't know

00:15 6 the dose of intrathecal baclofen for the treatment of spinal

00:16 7 spasticity, and I shouldn't have to try to remember everything

00:16 8 about anesthesia and pain medicine, so I began to devote 100

00:16 9 percent of my time to my pain medicine practice.

00:16 10      THE REPORTER: Excuse me. Can you repeat that medical term?

00:16 11      THE WITNESS: I'm sorry. I said my partners didn't know the

00:16 12 dose of intrathecal baclofen for the treatment of spinal

00:16 13 spasticity, therefore, I couldn't keep all the information

00:16 14 about anesthesia in my head, as well.

00:16 15 BY MS. OLSHEFSKI:

00:16 16 Q.   So since 1999, you have practiced exclusively in pain

00:16 17 medicine; correct?

00:16 18 A.   Yes.

00:16 19 Q.   Did you form a company, at that point, or did you form a

00:16 20 name for your practice?

00:16 21 A.   Well, once I decided to leave the anesthesia group to

00:16 22 concentrate on my practice, both in pain medicine and in

00:16 23 medical legal work, I formed the company Pain and Disability

00:16 24 Management Consultants, which was, initially, a small physician

00:17 25 group of three.

00:17  1    Over the course of the next three years, my partners

00:17  2  decided that they needed to have jobs, as opposed to running a

00:17  3  practice, and it became my solo private practice from 2002

00:17  4  through 2014.

00:17  5  Q.    Just for that period of time, 2002 to 2014, were you

00:17  6  treating patients hands on?

00:17  7  A.    Oh, yes, during that period, I was seeing a regular

00:17  8  outpatient clinic on a daily basis, from 2002 through 2014, as

00:17  9  well as doing some inpatient consultation at the hospitals

00:17  10  where I was on staff, functioning as a member of the hospital

00:17  11  staff and coverage staff for the pain medicine services, where

00:18  12  I -- at the hospitals where I worked, as well as admitting some

00:18  13  patients for those instances when they required inpatient

00:18  14  evaluation and treatment.

00:18  15  Q.    Now, I think you used the term, interventional pain

00:18  16  management.

00:18  17  A.    Yes.

00:18  18  Q.    Would you please explain to the Court what that means?

00:18  19  A.    The interventional portion of my practice was the

00:18  20  performance of injection therapy, nerve blocks and other

00:18  21  injections, as well as the implantation of, either, spinal

00:18  22  pumps, infusion devices that deliver medications directly to

00:18  23  the spinal cord and spinal cord stimulators. The implantation

00:18  24  of devices that send electrical nerve impulses to the spinal

00:19  25  cord and nerve roots, in order to minimize pain.

00:19  1      The interventional portion of our practice was,

00:19  2  approximately, half of our practice, the other portion of our

00:19  3  practice was the provision and management of rehabilitative

00:19  4  services and medication management for the treatment of chronic

00:19  5  pain.

00:19  6  Q.   Correct me if I'm wrong, but this was -- these were

00:19  7  multiple ways of attacking a patient's pain?

00:19  8  A.   Yes, the subspecialty of pain medicine is the garnering of

00:19  9  all of the possible mechanisms by which -- and therapeutics by

00:19  10  which we can diminish a patient's pain and improve their

00:19  11  function and improve their lives, and, therefore, it includes

00:19  12  interventions such as, injections, stimulators, pumps,

00:19  13  occasionally, a referral for operation and management of their

00:20  14  pain in the post-operative period.

00:20  15      It includes the monitoring and instruction of physical

00:20  16  therapists for function restoration, and it includes the

00:20  17  psychological support and/or referral of the patients for

00:20  18  helping them with the suffering that is the human condition of

00:20  19  chronic pain.

00:20  20      But at the same time, we manage the medications that we

00:20  21  use in the treatment of pain, trying to get the right medicine

00:20  22  to the right people in the right way.

00:20  23  Q.   Dr. Thomas, you're Board certified?

00:20  24  A.   I'm certified by The American Board of Anesthesiology. I

00:20  25  have a subspecialty certification in Pain Medicine. I've been

00:20 1 re-certified, now, three times over the course -- since my

00:21 2 initial certification. I'm a former Fellow of Interventional

00:21 3 Pain from the World Institute of Pain. I am a Certified

00:21 4 Independent Medical Examiner from the American Board of

00:21 5 Independent Medical Examiners, regarding the evaluation of

00:21 6 patients for independent assessment.

00:21 7 I have a Certificate of Competence in Controlled

00:21 8 Substances Management and Practice Management from the American

00:21 9 Board of Interventional Pain Physicians.

00:21 10 Q. Now, before I move on, you indicated that you have a

00:21 11 Certificate of Competence in the Management of --

00:21 12 A. Controlled substances.

00:21 13 Q. -- Controlled Substances. What does that mean?

00:21 14 A. Like all certifications, it's a pencil and paper test

00:21 15 after training, regarding the appropriate management of

00:22 16 controlled substances, in the treatment of chronic pain,

00:22 17 including the controlled substances at issue today, opioids, as

00:22 18 well as the management of anti-convulsants, sedatives,

00:22 19 hypnotics, drugs that make you sleepy, and other controlled

00:22 20 substances that may interact with -- in the chronic pain

00:22 21 setting.

00:22 22 Q. We often hear the term, pain medicine, alongside of, pain

00:22 23 management. Can you please distinguish those for us?

00:22 24 A. I call my specialty pain medicine because it is about the

00:22 25 diagnosis, primarily, and evaluation and long-term treatment of

00:22 1 patients with acute chronic and cancer pain. That is what I

00:22 2 think about, what I do. Pain management is the term that's

00:23 3 applied to the things we do, in order to interfere with pain

00:23 4 signals. It is a narrow part of what we do.

00:23 5     I don't call what I do pain management because it

00:23 6 concentrates too much on the doing and not enough on the

00:23 7 thinking about the overall problems of patients with pain.

00:23 8 Q.   Dr. Thomas, do you still see patients?

00:23 9 A.   I currently see independent medical examinations, I do not

00:23 10 have an active clinical practice. So I continue to see one to

00:23 11 four independent medical examinees for evaluation of their

00:23 12 ongoing treatment, primarily, in the Worker's Compensation

00:23 13 setting, at this point.

00:24 14 Q.   I also see on your curriculum vitae that you act as an

00:24 15 expert and consultant for The Pennsylvania Medical Society

00:24 16 Physician's Health Program. Is that correct?

00:24 17 A.   Yes.

00:24 18 Q.   What is that and what do you do as a consultant?

00:24 19 A.   The Physician's Health Program is a branch of the

00:24 20 Pennsylvania Medical Society, particularly concerned with the

00:24 21 treatment of impaired physicians, with the most common

00:24 22 impairment being addiction.

00:24 23     I have consulted with them in the evaluation of a number

00:24 24 of physicians and dentists with chronic pain who have become

00:24 25 impaired, secondary to their abuse and addiction to opioid

00:24 1 analgesics and other related drugs. So I've offered them

00:25 2 opinions about the fitness of that physician for return to duty

00:25 3 and treatment plans associated with the balance of managing

00:25 4 their chronic pain and their impairment and how to deal with

00:25 5 it.

00:25 6     Also, because of my long-term interest in the problem of

00:25 7 addiction, arising from the use of pain medicines, I am a

00:25 8 member of The American Society of Addiction Medicine and have

00:25 9 lectured on the balance between pain treatment and addiction.

00:25 10 Q.   I also see that you have acted or you continue to act as a

00:25 11 consultant for The Department of State Bureau of Professional

00:25 12 and Occupational Affairs. What is that?

00:25 13 A.   That has been in the evaluation of the prescribing of

00:25 14 physicians in the Commonwealth of Pennsylvania, but also the

00:26 15 State of Delaware. The administrative evaluation of physician

00:26 16 prescribing of controlled substances and whether or not they

00:26 17 were prescribed within the standard of care and within the

00:26 18 appropriate professional bounds for both the Commonwealth of

00:26 19 Pennsylvania, The Department of Medicine -- I'm sorry -- The

00:26 20 Bureau of Medicine, as well as Osteopathy.

00:26 21 Q.   What is that, Doctor?

00:26 22 A.   Doctors are either M.D.'s and are managed by the Board of

00:26 23 Medicine or D.O.'s, osteopaths, and they're managed by The

00:26 24 Board of Osteopathy. The standards for prescribing, however,

00:26 25 are the same.

00:26 1 Q.   On your curriculum vitae, Doctor, there is an indication
00:26 2 that you consult with the Attorney General's Office Medicaid
00:27 3 Strike Task Force and Drug Task Force for the Pennsylvania AG's
00:27 4 Office.
00:27 5 A.   Yes.
00:27 6 Q.   What do you do for them?
00:27 7 A.   It is similar to the work that I do for the Department of
00:27 8 Justice. Most of the cases I have reviewed for them have been
00:27 9 about these particular issues, has the prescribing been for a
00:27 10 medically legitimate purpose, in the usual course of
00:27 11 professional practice, when a patient -- I'm sorry -- when a
00:27 12 physician has been charged or being investigated for violations
00:27 13 of the Pennsylvania Controlled Substances Act, which applies at
00:27 14 a State level, as the Federal Controlled Substances Act applies
00:27 15 at a Federal level.
00:27 16 Q.   So I want to go back one step. When you consult for the
00:27 17 Department of State, regarding professional misconduct alleged
00:28 18 against physicians, are you, basically, reviewing what
00:28 19 physicians have done, in providing an opinion?
00:28 20 A.   Yes, I'm reviewing the medical record. Occasionally, there
00:28 21 are additional -- there's additional information from
00:28 22 investigation with which I'm provided that I will also take
00:28 23 into account in the evaluation of the physician's behavior,
00:28 24 but, primarily, it's about prescribing drugs that are used in
00:28 25 the treatment of pain, primarily, controlled substances.

00:28 1     However, the provision of non-controlled substances, under

00:28 2 certain circumstances, have been parts of the -- in the

00:28 3 evaluation, particularly, with respect to Medicare or Medicaid

00:28 4 fraud.

00:28 5 Q.   Now, when you engage in these types of investigations, as

00:29 6 you've just described, what do you perceive your duty to be?

00:29 7 A.   My duty is to pull back the veil that stands behind the

00:29 8 multi-syllabic words that we use in medicine, and to describe

00:29 9 to lay people, precisely, what is happening with the medicine,

00:29 10 in terms of the standards from inside of medical practice.

00:29 11     That is, to teach people about what medicine is, how

00:29 12 medicine should be normatively, how we should be practicing,

00:29 13 and to describe deviations, if any, from that north star.

00:29 14 Q.   I note there are numerous lectures identified on your

00:29 15 curriculum vitae. Have any of those lectures, specifically,

00:29 16 focused on the nature and prescribing of controlled substances?

00:30 17 A.   Most of them have, probably, 15 or 20. The issue of

00:30 18 controlled substances prescribing has persistently been a

00:30 19 problem throughout most of the 21st century, but, particularly,

00:30 20 beginning in the ops, about 2005 or so, the issue of controlled

00:30 21 substances prescribing and the overuse of medications became

00:30 22 progressively a problem.

00:30 23     So talking about how we use controlled substances and how

00:30 24 do we -- how should we not use controlled substances in various

00:30 25 patient populations, the addicted individual, the injured

00:30 1  worker, across the board, has been something that I've talked

00:30 2  about on a number of occasions. I've offered several trainings

00:31 3  to law enforcement to help them identify appropriate controlled

00:31 4  substances prescribing and to elucidate where the problems may

00:31 5  lie and what are the issues that could portend a problematic

00:31 6  prescriber.

00:31 7  Q.    And you identified law enforcement as being part of the

00:31 8  audience that you address. Who else would comprise the

00:31 9  audiences to whom you lecture?

00:31 10  A.    I've lectured to community organizations of only lay

00:31 11  people and those who are interested in the treatment of

00:31 12  addiction, I've lectured to medical organizations, giving grand

00:31 13  rounds at hospitals. So the expansion is broad from lay

00:31 14  individuals to medical organizations, as well as law

00:32 15  enforcement and anyone who is interested in the problem that

00:32 16  has been generated, identified by the CDC in 2011 as the opioid

00:32 17  epidemic.

00:32 18  Q.    So you're familiar with that term, an opioid epidemic?

00:32 19  A.    Yes.

00:32 20  Q.    Have you, in fact, lecture on, specifically, the opioid

00:32 21  epidemic?

00:32 22  A.    Yes, I have.

00:32 23  Q.    Have you, specifically, made presentations or lectured on

00:32 24  chronic pain?

00:32 25  A.    Yes, the issue of chronic pain is the reason that we found

00:32 1  it necessary to liberalize our use of controlled substances

00:32 2  and the balance between the treatment of the pain and the

00:32 3  treatment of the problems that occur with the increasing use of

00:32 4  any medical therapy has been a specific interest of mine.

00:33 5  Q.    Have you conveyed what you've learned in your knowledge to

00:33 6  your colleagues who do the same thing that you do, in terms of

00:33 7  lectures or presentations or teachings?

00:33 8  A.    Yes.

00:33 9  Q.    Now I also note that, on your curriculum vitae, you are a

00:33 10 certified -- you're certified as a DATA Waived Physician. Is

00:33 11 that correct?

00:33 12 A.    Yes, I am.

00:33 13 Q.    What does that mean?

00:33 14 A.    DATA or the Drug Addiction Treatment Act of 2000 allowed

00:33 15 physicians in the outpatient setting to treat addiction, which

00:33 16 had not had been allowed before. The treatment of addiction,

00:33 17 under the DATA waiver is, specifically, limited to Schedule 3

00:33 18 substances approved by the FDA for the outpatient treatment of

00:33 19 addiction, specifically, buprenorphine in its various forms.

00:34 20     The DATA Waived physician undergoes, at least, eight hours

00:34 21 of training and is allowed to prescribe buprenorphine for the

00:34 22 chronic treatment of the chronic disease of addiction in an

00:34 23 outpatient fashion.

00:34 24 Q.    You mentioned buprenorphine. Would that involve the use of

00:34 25 Methadone for treatment of addiction?

00:34   1   A.   No, it would not. Methadone is only allowed in the
00:34   2   outpatient treatment programs that are specifically licensed by
00:34   3   the Federal Government for that purpose. The prescription of
00:34   4   Methadone is allowed to physicians for the treatment of pain,
00:34   5   but not for the treatment of addiction, which would place it
00:34   6   outside of the usual course of professional practice, because
00:34   7   it would be beyond the licensing that we hold as providers.
00:35   8   Q.   So is there something unique about Methadone, compared to
00:35   9   the other opioids that you have learned that require special
00:35   10  training or special caution, when prescribing it?
00:35   11  A.   Beginning in 2007, the FDA placed a black box warning on
00:35   12  Methadone and warned that physicians should be especially
00:35   13  careful because there was a spike in the number of overdoses
00:35   14  associated with the use of Methadone, particularly, the 40
00:35   15  milligram diskette, which was removed from the market for
00:35   16  general distribution because of the nature of Methadone.
00:35   17       Methadone differs from all of the other opioids in our
00:35   18  rumentarium, our bag of tricks, in that, it is different in its
00:35   19  pharmacology from the other drugs. Pharmacology is divided into
00:36   20  pharmacokinetics and pharmacodynamics. The way in which the
00:36   21  drug moves through the body, pharmacokinetics, and
00:36   22  pharmacodynamics, the way the drug acts in the body
00:36   23  dynamically.
00:36   24       Methadone is the only long-acting opioid that is long
00:36   25  acting because of the way the body handles it. Because of that,

00:36 1 Methadone being a very potent drug, is more potent the more

00:36 2 that you take it, and that's different from every other drug of

00:36 3 the opioid-type, which is potent, at the time that you take it,

00:36 4 and stays at the same potency the more that you take it. It's

00:36 5 because Methadone builds up in the body, because it's not

00:36 6 eliminated, and, therefore, after a period of time, it is more

00:36 7 potent and more toxic than it would be when you first begin to

00:36 8 take the drug.

00:36 9 Q.    Now, prior to coming in to court, you talked about a black

00:37 10 box label on Methadone. Did you provide the Government with a

00:37 11 Methadone insert that is included in Methadone packages?

00:37 12 A.    Yes, it's the prescribing information for Methadone. This

00:37 13 one is, particularly, for the manufacturer of the brand name

00:37 14 Dolophine, but Methadone is Methadone, and it contains all of

00:37 15 the prescribing information that any practitioner prescribing

00:37 16 Methadone would be required to know.

00:37 17 Q.    So I want to, specifically, direct your attention to the

00:37 18 Government's Exhibit No. 10 that's in the binder in front of

00:37 19 you and ask you if you can identify what Exhibit No. 10 is?

00:37 20 A.    Exhibit No. 10 is the Roxane Laboratory prescribing

00:37 21 information for Dolophine, Methadone hydrochloride tablets.

00:37 22 Q.    So is this -- when someone is prescribed Methadone and

00:38 23 they walk away with a Methadone package, is this the insert

00:38 24 that we all get that is voluminous?

00:38 25 A.    Not exactly. The part at the back is the patient

00:38 1 information. This is the prescribing information that's in the
00:38 2 Physician's Desk Reference, the part that the doctor is
00:38 3 supposed to read.
00:38 4 Q.    So directing your attention to the first couple paragraphs
00:38 5 of Government Exhibit No. 10, you're familiar with what that
00:38 6 says; correct?
00:38 7 A.    Yes.
00:38 8 Q.    Could you read first paragraph for us, please?
00:38 9 A.    "Deaths. Cardiac and respiratory have been reported during
00:38 10 initiation and conversion of pain patients to Methadone
00:38 11 treatment from treatment with other opioid agonists. It is
00:38 12 critical to understand the pharmacokinetics of Methadone, when
00:38 13 converting patients from other opioids. See dosage
00:38 14 administration.
00:38 15        "Particular vigilance is necessary during treatment
00:38 16 initiation during conversion from one opioid to another and
00:39 17 during dose titration."
00:39 18 Q.    What is dose titration?
00:39 19 A.    That is, as you get to the right dose for the patient,
00:39 20 generally, the axiom is to start low and go slow. I
00:39 21 always -- dose titration, I compare it to salting of food. You
00:39 22 don't dump in a whole box of Morton's at the beginning, you
00:39 23 start at some and you add to taste.
00:39 24        The titration of medications is very similar. You start
00:39 25 with some, an amount that you know will not be too much, and

00:39 1 you gradually increase it, in order to get the best possible

00:39 2 effect for the patient, while minimizing side effects and

00:39 3 potential harm.

00:39 4 Q.    Read the second paragraph, please.

00:39 5 A.    "Respiratory depression is the chief hazard associated

00:39 6 with Methadone hydrochloride administration. Methadone's peak

00:39 7 respiratory depression effects typically occur later and

00:39 8 persists longer than its peak analgesic effects, particularly,

00:40 9 in the early dosing period.

00:40 10        "These characteristics can contribute to cases of

00:40 11 iatrogenic overdose, particularly, during treatment initiation

00:40 12 and dose titration."

00:40 13 Q.    So Dr. Thomas, is that what you previously testified to,

00:40 14 about the, what I'll call the half life of Methadone in the

00:40 15 body?

00:40 16 A.    Yes, that is, as Methadone is handled in the body, it

00:40 17 builds up, in terms of its dose, because the average half life

00:40 18 is about 24 hours, then, it takes about five days for most

00:40 19 people, but the half life may be longer, up to 56 hours in some

00:40 20 patients, so it will take even longer for them to get to the

00:40 21 maximal amount that will in their bodies at what's called

00:40 22 steady state.

00:40 23 Q.    Could you read the next paragraph, please?

00:40 24 A.    "In addition, cases of QT interval prolongation and

00:40 25 serious arrhythmias, torsades de pointes, have been observed in

00:41 1 treatment with Methadone. Most cases involve patients being

00:41 2 treated for pain with large multiple daily doses of Methadone,

00:41 3 although, cases have been reported in patients receiving

00:41 4 Methadone commonly used for maintenance treatment of opioid

00:41 5 addiction."

00:41 6 Q.   And the next one, please.

00:41 7 A.   "Methadone treatment for analgesic therapy in patients

00:41 8 with acute or chronic pain should only be initiated if the

00:41 9 potential analgesic or palliative care benefit of treatment

00:41 10 with Methadone is considered and outweighs the risk."

00:41 11 Q.   Now, you indicated that this Government's Exhibit No. 7 is

00:41 12 what the doctor should have and know before prescribing

00:41 13 Methadone?

00:41 14 A.   It is the most basic information regarding the drug.

00:41 15      MS. OLSHEFSKI: Your Honor, I'd move for admission of

00:41 16 Government's Exhibit No. 7.

00:41 17      THE COURT: 7?

00:41 18      MS. OLSHEFSKI: No. 10, I'm sorry.

00:41 19      THE COURT: Mr. Brier?

00:41 20      MR. BRIER: No objection, Your Honor.

00:42 21      THE COURT: Government 10 is admitted.

00:42 22      (At this time Government's Exhibit No. 10 was admitted

00:42 23       into evidence.)

00:42 24 BY MS. OLSHEFSKI:

00:42 25 Q.   If I were to use the term, Morphine Milligram Equivalents,

00:42 1 what is that?

00:42 2 A.    Morphine Milligram Equivalents refers to the fact that all

00:42 3 opioids act by the same mechanism. That mechanism is the

00:42 4 stimulation or agonism of new receptors, morphine receptors in

00:42 5 the brain and spinal cord. Thus, all opioids can be compared to

00:42 6 morphine, in order for us to compare drugs that have different

00:42 7 names and slightly different characteristics, in terms of their

00:42 8 potency.

00:42 9 Q.    So we have been talking about Methadone. Is there

00:42 10 something unique about Methadone, even when it comes to

00:42 11 equating it to morphine?

00:42 12 A.    Yes.

00:42 13 Q.    Tell us what that is.

00:42 14 A.    Methadone acutely, that is, the first time that you give

00:43 15 it in the short term, is roughly equivalent to Methadone during

00:43 16 the first day, so 10 milligrams of Methadone is roughly

00:43 17 equivalent to 10 milligrams of morphine.

00:43 18        Once one continues to dose Methadone, then, Methadone,

00:43 19 once in the chronic phase, is four times as potent as morphine

00:43 20 during its low dose treatment. So from 1 to 20 milligrams per

00:43 21 day, Methadone is approximately 4 times as potent as morphine,

00:43 22 and so we use a factor of 4 to convert Methadone milligrams to

00:43 23 milligrams of morphine equivalents.

00:43 24        So 10 milligrams of Methadone per day is roughly

00:43 25 equivalent to 40 milligrams of morphine per day. As we increase

00:43 1 the dose of Methadone, 20 to 60 is approximately eight times as

00:44 2 potent -- I'm sorry 20 to 40 is eight times as potent -- 40 to

00:44 3 60 is 10 times as potent, and over 60 milligrams of Methadone

00:44 4 per day, the factor of conversion is 12.

00:44 5 So 100 milligrams of Methadone per day is equivalent to

00:44 6 1200 milligrams of morphine equivalents.

00:44 7 Q. A day?

00:44 8 A. Per day, yes.

00:44 9 Q. I'm going to come back to talking about that in a moment,

00:44 10 but I want to get back to your experience.

00:44 11 Can you give us a sense of the types of patients that you

00:44 12 have predominantly treated over the 30 years of being a doctor?

00:44 13 A. Yes. Well, my experience with pain patients has been

00:44 14 fairly vast. I've worked with thousands of patients with

00:44 15 chronic pain, due to headache, neck pain, back pain, limb

00:45 16 injuries, neuropathic or nerve pain, spinal cord injuries,

00:45 17 multiple work injuries. The most injured person I ever saw was

00:45 18 electrocuted as a line man and one of his arms had come off, so

00:45 19 he had multiple injuries throughout his joints, bones, nerves

00:45 20 and spinal cord.

00:45 21 I have -- the most common -- with all physicians, common

00:45 22 things are common, so the most common pains in a pain medicine

00:45 23 center are back pain and headache, and so I've treated a lot of

00:45 24 back pain and headache. But the pains of degenerative disease

00:45 25 have also been part of my practice.

00:45  1    For a time, I treated a convent, so nuns live forever, and
00:45  2  they live cleanly, so their bodies simply break down, so I've
00:46  3  seen a lot of degenerative disease associated with joint, bone,
00:46  4  ligament and nerve problems.
00:46  5    I've treated neuropathic pain from diabetes postherpetic
00:46  6  neuralgia and the like. The pain of headache associated with
00:46  7  high pressure hydrocephalus, headache associated with migraine,
00:46  8  headache associated with trauma and concussion. So all of the
00:46  9  mechanisms by which pain can occur. Cancer pain, as well, have
00:46  10  been part of the patient population that I've treated over the
00:46  11  years.
00:46  12  Q.    That would be over, approximately, 30 years?
00:46  13  A.    Yes.
00:46  14  Q.    And we're talking thousands and thousands?
00:46  15  A.    Yes.
00:46  16  Q.    Can you put a number on the patients that you have
00:46  17  actually provided care for?
00:46  18  A.    Tens of thousands.
00:46  19  Q.    I want to talk to you, now, about when you're asked to
00:47  20  provide expert opinions, such as in this case, okay?
00:47  21  A.    Yes.
00:47  22  Q.    When you're asked to provide expert services, do you rely
00:47  23  on your training that you have just described?
00:47  24  A.    Yes.
00:47  25  Q.    And do you rely on the experience as a medical doctor,

00:47 1 pain medicine doctor that you've just described?

00:47 2 A.    Yes.

00:47 3 Q.    Now, have you previously testified in courts of law as an

00:47 4 expert, in one or more of the various aspects of your medical

00:47 5 career?

00:47 6 A.    I have.

00:47 7 Q.    Have you previously testified as an expert in criminal

00:47 8 cases?

00:47 9 A.    I have.

00:47 10 Q.    Would that be both in State Court and Federal Court?

00:47 11 A.    That is correct, both in Pennsylvania, Delaware and Ohio.

00:47 12 Q.    Have you previously testified as an expert in civil cases?

00:47 13 A.    Yes.

00:47 14 Q.    Would that be in similar -- in Pennsylvania or any other

00:48 15 jurisdiction?

00:48 16 A.    Yes.

00:48 17 Q.    Now, in the cases -- in civil cases, have you testified

00:48 18 for both the Plaintiff and Defendant?

00:48 19 A.    Yes.

00:48 20 Q.    In criminal cases, have you testified for both the

00:48 21 Prosecution and the Defendant?

00:48 22 A.    I've only testified for the Prosecution. I've been

00:48 23 retained by the Defense on two occasions and rendered opinions

00:48 24 but was not called to testify.

00:48 25 Q.    And I see on your curriculum vitae that you act as a

00:48 1 consultant or have acted as a consultant for Cuyahoga

00:48 2 County -- Federal -- I'm sorry, the Public Defender's Office in

00:48 3 Cuyahoga County?

00:48 4 A.    Yes, I was retained as an expert for a physician who was

00:48 5 charged with prescribing not for a medically legitimate purpose

00:48 6 in the usual course of professional practice, and I rendered an

00:48 7 opinion but was not called to testify.

00:49 8 Q.    That was for the Defendant?

00:49 9 A.    That was for the Defense, yes.

00:49 10 Q.    Cuyahoga County is located where?

00:49 11 A.    In Cleveland, Ohio.

00:49 12 Q.    The nature of the testimony that you've provided in your

00:49 13 career, has it involved pain medicine -- your expert opinions

00:49 14 -- have those opinions involved pain medicine?

00:49 15 A.    Pain medicine or anesthesia.

00:49 16 Q.    Has it involved the cause of death, when pain medicine is

00:49 17 involved?

00:49 18 A.    Yes, on several occasions.

00:49 19 Q.    Has your expert opinions, have they involved addiction

00:49 20 from time to time?

00:49 21 A.    Yes, they have.

00:49 22 Q.    And has there ever been a time in a Court of Law when you

00:49 23 have been deemed unqualified to testify in these areas?

00:49 24 A.    Never.

00:49 25 Q.    One more question on that issue. Have you previously been

00:49 1 qualified as an expert to testify in a case such as this, where
00:49 2 you're being asked to opine about the propriety of lawfulness
00:50 3 -- not lawfulness -- but whether or not prescriptions are
00:50 4 issued in the usual course of professional practice for
00:50 5 legitimate medical purposes?
00:50 6 A.   Yes, repeatedly.
00:50 7 Q.   And also involving a but-for cause of death standard in
00:50 8 those cases, have you testified to that?
00:50 9 A.   Yes, I have.
00:50 10 Q.   Okay, I want to talk to you about the approach that you
00:50 11 took in this case. Specifically, can you advise the Court what
00:50 12 you were specifically asked to do in this case?
00:50 13 A.   I was provided with multiple records, and I was asked to
00:50 14 evaluate whether or not the prescriptions that were written to
00:50 15 Kristina Dame were written for a medically legitimate purpose
00:50 16 in the usual course of professional practice. That standard is
00:50 17 the standard by which the prescriptions must be evaluated.
00:50 18      As you noted, in civil cases, the standard is different
00:51 19 because it's about the standard of care. From a medical point
00:51 20 of view, would a physician -- would a responsible physician act
00:51 21 in a certain manner.
00:51 22      Particularly, in the Commonwealth of Pennsylvania, the
00:51 23 standard for whether or not a prescription is provided for a
00:51 24 medically legitimate purpose in the usual course of
00:51 25 professional practice is defined. Medicine is a regulated

00:51 1 industry and physicians are responsible for knowing those

00:51 2 regulations and definitions. In Pennsylvania, a prescription

00:51 3 must be written in good faith, within the scope of the

00:51 4 doctor-patient relationship and in accordance with the accepted

00:51 5 treatment principles of any responsible segment of the medical

00:51 6 community.

00:51 7 And that standard is the standard by which I would

00:51 8 evaluate a prescription written by a physician in the

00:51 9 Commonwealth.

00:51 10 Q. In fact, is that a standard that you have been held to

00:52 11 throughout your entire career?

00:52 12 A. Absolutely.

00:52 13 Q. So you were asked to do that. Did you, in fact, do that?

00:52 14 A. Yes.

00:52 15 Q. So I'm going to talk to you for a moment but the records

00:52 16 that you reviewed, regarding Kristina Dame. Do you recall off

00:52 17 the top of your head or can you give us a sense of your

00:52 18 recollection of what you reviewed?

00:52 19 A. I immediately turned to my -- I've reviewed a lot of

00:52 20 records about Ms. Dame. I reviewed a separate set for my first

00:52 21 report and then reviewed a larger set that was -- that included

00:52 22 the first set for my second report.

00:52 23 Q. Okay, so let's start with the actual -- Kristina's actual

00:52 24 medical file from the Defendant Martin Evers. Did you review

00:52 25 that medical file?

00:52 1    A.    I did.

00:52 2    Q.    And did you review the autopsy report related to

00:53 3    Kristina's death?

00:53 4    A.    I did.

00:53 5    Q.    Did you review the toxicology report associated with

00:53 6    Kristina Dame's death?

00:53 7    A.    Yes.

00:53 8    Q.    Did you review medical records that were provided by the

00:53 9    coroner in certain office notes, at the time of Kristina's

00:53 10   death, which was September 11, 2014?

00:53 11   A.    I did.

00:53 12   Q.    Did you look at and review prescriptions that were

00:53 13   prescribed to Kristina Dame by the Defendant?

00:53 14   A.    Yes.

00:53 15   Q.    Did you review an interview that was conducted by the DEA

00:53 16   Agent of Kristina's mother Margaret Dame?

00:53 17   A.    Yes.

00:53 18   Q.    Did you review an interview of the Defendant, at the time

00:53 19   of a search warrant and/or arrest?

00:53 20   A.    I reviewed the transcript, initially, and later I watched

00:54 21   a video of the interview.

00:54 22   Q.    Now, we're going to talk a little bit more in a moment

00:54 23   about the PDMP report. In this case, did you review the

00:54 24   Prescription Drug Monitoring Report for Kristina Dame?

00:54 25   A.    I did.

00:54 1 Q.    Do you have a recollection of reviewing hospital records

00:54 2 from Wayne Memorial Hospital?

00:54 3 A.    I reviewed those later.

00:54 4 Q.    But you did review them?

00:54 5 A.    Yes.

00:54 6 Q.    How about hospital records from First Valley Hospital for

00:54 7 Kristina Dame?

00:54 8 A.    First Health.

00:54 9 Q.    How about records from the Horsham Clinic?  Do you recall

00:54 10 reviewing those?

00:54 11 A.    Yes, I do.

00:54 12 Q.    Did you review any hospital records from Bon Secours?

00:54 13 A.    Yes, I did.

00:54 14 Q.    How about Geisinger Hospital records for Kristina Dame?

00:54 15 Did you review those?

00:54 16 A.    I did.

00:54 17 Q.    Did you review the Pennsylvania State Police reports

00:54 18 regarding Kristina's death?

00:54 19 A.    I did.

00:54 20 Q.    Did you, also, have an opportunity to review photographs

00:54 21 of the scene of Kristina's death?

00:55 22 A.    I did.

00:55 23 Q.    Can you give us a sense of the volume of pages of records

00:55 24 that you have reviewed, prior to reaching opinions and/or

00:55 25 conclusions?

00:55 1  A.    It would be, at least, 7 or 8,000 pages of records.

00:55 2  Q.    So let's talk about the approach that you took or what I

00:55 3  will refer to as your methodology.

00:55 4  A.    Yes.

00:55 5  Q.    Do you have a methodology that you follow, when you're

00:55 6  asked to do what you were asked to do in this case?

00:55 7  A.    I do.

00:55 8  Q.    Can you please explain that approach or methodology to the

00:55 9  Court?

00:55 10 A.    Well, the most important thing is to not miss anything, so

00:55 11 I read, virtually, all of the record, except where -- because

00:55 12 of the nature of medical records, they tend to be very

00:55 13 repetitive, so a lot of it is page-turning, but paying

00:56 14 particular attention to those instances where the physicians

00:56 15 made direct entries of, either, observations of the patient or

00:56 16 recommendations, relative to the patient's care.

00:56 17        Putting that into a chronological pattern, in order to

00:56 18 determine which of the things that were recommended or observed

00:56 19 by physicians occurred in what order, because that order

00:56 20 becomes important, and to the extent possible, attempting to

00:56 21 determine what parts of her care that was provided in the

00:56 22 necessary fragmented nature of the current U.S. medical system

00:56 23 was communicated from doctor to doctor, in order to know what

00:56 24 the information base upon which the Defendant was making

00:57 25 decisions and whether or not that was adequate for the

1   decisions made.

2       Additionally, determining over the course of time how the

3   patient was responding to treatment and were there observations

4   made both by the Defendant and by other physicians that would

5   allow a clear reckoning of her overall condition.

6       Included in there because of the nature of the care was

7   whether or not information was being provided to the Defendant

8   from other sources that would allow him to have a fulsome view

9   of the patient's condition.

10       Part of that evaluation is based upon my training,

11   experience and knowledge of the drugs involved and the

12   diagnoses, both psychological, as well as -- which

13   psychological diagnoses are medical -- but psychological and

14   physical, in terms of determining what that patient would look

15   like and what things would be expected to be occurring with

16   her, in the usual course of professional practice.

17       Then, taking all of that information, in terms of history,

18   physical examination, diagnostic data, consultation and the

19   temporal arrangement of those, comparing those, first, to the

20   standard treatment protocols, which are determined by the

21   various guidelines and regulations that physicians follow or

22   physicians should follow, in the provision of medical care, and

23   trying to make a determination about, A, Is the treatment first

24   within the standard guideline package, that is, if a physician

25   were to follow all of the guidelines, that would be putative

00:59 1 evidence that the prescribing was for a medically legitimate

00:59 2 purpose in the usual course of professional practice, because

00:59 3 it would be virtually impossible to be within the safe harbor

00:59 4 of the guidelines and not be prescribing for a medically

00:59 5 legitimate purpose.

00:59 6 Secondarily, if the guidelines are not followed then to

00:59 7 what extent does that occur? Because there are simple mistakes

00:59 8 which are expected. There are omissions or commissions which

01:00 9 are unexpected but simply bad medicine. There are occurrences

01:00 10 that occur that are negligent, but even that would not be not

01:00 11 for a medically legitimate purpose in the usual course of

01:00 12 professional practice.

01:00 13 In order to make the determination that the prescribing is

01:00 14 not for a medically legitimate purpose in the usual course of

01:00 15 professional practice, the behavior must be so far from the

01:00 16 center line of what we should do, as to be unrecognizable as

01:00 17 the practice of medicine.

01:00 18 And it is then and only then that I would make that

01:00 19 determination.

01:00 20 Q. So I want to talk to you about -- well, did you do all

01:00 21 that in this case?

01:00 22 A. Yes.

01:00 23 Q. So let's talk about the -- some of the authorities that

01:00 24 you relied on, as you're working your way through those

01:01 25 thousands and thousands of pages, okay. Are there different

01:01  1  categories of authorities that you rely on, as support for your

01:01  2  knowledge and opinions in reaching conclusions?

01:01  3  A.    Yes.

01:01  4  Q.    Okay, and what are the different kinds of categories?

01:01  5  A.    I think, first, there are the -- the plain statement of

01:01  6  the law that governs the practice of medicine. It is not a

01:01  7  legal opinion to understand that a prescription must be written

01:01  8  for a medically legitimate purpose in the usual course of

01:01  9  professional practice as being the standard by which I would be

01:01  10 evaluating any physician's behavior in this context.

01:01  11       Further, it's not a legal opinion, but the standard that

01:01  12 the Pennsylvania Controlled Substances Act describes what that

01:01  13 is for patients in the Commonwealth of Pennsylvania and using

01:01  14 that to evaluate the behavior.

01:02  15       Then, I would turn to the administrative sources,

01:02  16 particularly, the PA code 15.92, which -- Title 21 15.92, which

01:02  17 states the prescribing, dispensing and administering of

01:02  18 prescriptions and what is expected of a physician,

01:02  19 administratively, in the course of performing that activity.

01:02  20       Then, I think I would turn, then, to more medical sources

01:02  21 but that still tend to be administrative. For example, the

01:02  22 Federation of State Medical Boards Model Policy For Use of

01:02  23 Opioids in the Treatment of Chronic Pain. That document has

01:02  24 been updated multiple times. It was first published in 1998,

01:02  25 updated in 2004 and then in 2013 and using those sequential

01:03 1 updates, as part of the temporal overlay in time during which

01:03 2 the prescribing occurred.

01:03 3 Because, virtually, all of the records that I -- the

01:03 4 records here with Ms. Dame, the 2013 model policy was utilized,

01:03 5 using the descriptions in the model policy of what the

01:03 6 physician should do, and, in fact, what are the areas in which

01:03 7 The Federation of State Medical Boards of which Pennsylvania is

01:03 8 a signatory had described problematic prescribing by

01:03 9 physicians, in order to alert physicians as to what we should

01:03 10 be doing, at that point, that was not as clearly outlined in

01:03 11 the 2004 model policy.

01:04 12 Then, the CDC guidelines, which I did not apply to Ms.

01:04 13 Dame but to other patients that I have reviewed, because the

01:04 14 CDC guidelines were not published until March of 2016, and,

01:04 15 therefore, a physician would not be responsible for the CDC

01:04 16 guidelines in the evaluation of their prescribing behavior,

01:04 17 even though, some of the information that is in the CDC

01:04 18 guidelines was being put into the milieu of our prescribing

01:04 19 over the period between 2013 and 2016.

01:04 20 Additionally, I used the medical literature, the medical

01:04 21 literature that, initially, allowed and encouraged physicians

01:04 22 to liberalize their prescribing. The consensus statement on The

01:05 23 Use of Opioids in the Treatment of Chronic Pain published by

01:05 24 The American Pain Society and The American Academy of Pain

01:05 25 Medicine in 1996 represented a C-change in the way in which we

01:05 1  prescribe opioid analgesics, but then the warnings from the FDA

01:05 2  that came, particularly, in 2004 and 2007, with the declaration

01:05 3  of opioid epidemic in 2011, is part of the back-drop for

01:05 4  utilizing the medical information.

01:05 5      And, particularly, the guidelines published by The

01:05 6  American Pain Society and an article by Dr. Roger Chou in 2009,

01:05 7  also, represents the underlying medical basis of the evaluation

01:05 8  of the center line of opioid prescribing, that is, the

01:05 9  normative practice of how we should prescribe opioids.

01:06 10     I think it's important to say that the guidelines,

01:06 11  however, are mostly descriptive and encourage a certain

01:06 12  normative behavior. Very rarely do the guidelines say, Don't do

01:06 13  "X". They imply not to do "X" because they say do "Y", and if

01:06 14  you do "Y", you won't do "X". But very rarely is anything in

01:06 15  medical practice laid out to say, A doctor should never do "X",

01:06 16  "Y" or "Z".

01:06 17     So the guidelines are not directly related to the

01:06 18  determination of whether or not prescribing is for a medically

01:06 19  legitimate purpose in the usual course of professional

01:06 20  practice, that is, actually, a judgment based upon how far from

01:06 21  the guidelines and the normative practice the prescribing is.

01:07 22  Q.  I'm just going to go through some of those authorities

01:07 23  that you identified in a lit bit more detail. But before I do

01:07 24  that, everything that you've just described, has it been your

01:07 25  practice, in rendering expert opinions, to rely on all of

01:07  1  those?

01:07  2  A.    It has been my practice in rendering expert opinions and

01:07  3  my practice in writing thousands of prescriptions to rely upon

01:07  4  those.

01:07  5  Q.    You mentioned medical associations and medical boards. In

01:07  6  Pennsylvania, particularly, is there -- I think you mentioned a

01:07  7  code, The Pennsylvania Code in Pennsylvania that provides

01:07  8  guidelines for physicians?

01:07  9  A.    Yes.

01:07  10  Q.    So is that true?

01:07  11  A.    Yes, it is.

01:07  12  Q.    So I want to direct your attention to, specifically,

01:07  13  Government's Exhibit No. 8 in the binder in front of you.

01:08  14  A.    Yes, Title 49, 1692.

01:08  15  Q.    Are you familiar with that part of the Pennsylvania Code

01:08  16  identified as prescribing, administering and dispensing

01:08  17  controlled substances?

01:08  18  A.    Yes.

01:08  19  Q.    Again, this is -- these are guidelines in this part of the

01:08  20  Pennsylvania Code that you routinely rely on; correct?

01:08  21  A.    Yes.

01:08  22  Q.    And, in particular, what is this Pennsylvania Code Section

01:08  23  16.92, which is Title 49, what does it advise physicians that

01:08  24  they should do?

01:08  25  A.    When I read the 1692, I basically hear the code saying,

01:08 1 Make sure you practice medicine, when you're giving out

01:09 2 controlled substances, because harm can occur. It says we

01:09 3 should initially evaluate the patient with history and

01:09 4 physical. It says that we should re-evaluate the patient at

01:09 5 intervals to make sure that the medication we're giving them is

01:09 6 causing -- is doing good and not doing harm.

01:09 7     It says we should counsel patients about the pros and cons

01:09 8 of the medication. And this is particularly true with

01:09 9 controlled substances and opioids, because these are, at the

01:09 10 very least, they are habituating and, at worst, they are

01:09 11 addictive. And that we should keep medical records that say

01:09 12 what is -- what have we been trying to do with the medication

01:09 13 and what do we see as the effect of the medication.

01:09 14     And have we done those things, in terms of instructing the

01:09 15 patient and giving them directions about how to use the drug

01:09 16 that will make it most effective. And that we should comply

01:10 17 with the current standards in prescribing the drugs.

01:10 18 Q.    And, particularly, particular to this case, did you, in

01:10 19 fact, rely on that section of the Pennsylvania Code titled,

01:10 20 Prescribing, Administering and Dispensing Controlled

01:10 21 Substances, Section 1692, in reaching the opinions and

01:10 22 conclusions that you reached in this case?

01:10 23 A.    Yes, it is background information.

01:10 24 Q.    Are you familiar with the Title 21 CFR Section 1306.04,

01:10 25 and that is Government's Exhibit No. 5?

01:10 1  A.    Yes, I am.

01:10 2  Q.    What is that?

01:10 3  A.    That is the purpose of issuing a prescription, it is the

01:10 4  description that the prescription must be issued for a

01:10 5  medically legitimate purpose in the usual course of

01:10 6  professional practice.

01:10 7  Q.    So this is a Code of Federal Regulations that is informing

01:11 8  a practitioner about what the requirements are for a

01:11 9  prescription to be valid. Would that be accurate?

01:11 10  A.    That is correct.

01:11 11  Q.    Can you just, please, read the first section, which is

01:11 12  Subsection A of Title 21 -- I'm sorry -- 21 CFR Section

01:11 13  1306.04?

01:11 14  A.    "A. A prescription for controlled substance to be

01:11 15  effective must be issued for a legitimate medical purpose by an

01:11 16  individual practitioner acting in the usual course of his

01:11 17  professional practice. The responsibility for the proper

01:11 18  prescribing and dispensing of controlled substances is upon the

01:11 19  prescribing practitioner, but a corresponding responsibility

01:11 20  rests with the pharmacist who fills the prescription.

01:11 21      "An order purporting to be a prescription issued not in

01:11 22  the usual course of professional treatment or in legitimate and

01:11 23  authorized research is not a prescription within the meaning

01:11 24  and intent of the section. A person knowingly fulfilling a

01:12 25  purported prescription, as well as the person issuing it, shall

01:12 1  be subject to the penalties provided for violations of the

01:12 2  provisions of law relating to controlled substances."

01:12 3  Q.    Now, I see the words, corresponding responsibility, when

01:12 4  talking about pharmacists. Can you explain that to us, please?

01:12 5  A.    In the practice of medicine, the issuing of a prescription

01:12 6  to a patient occurs in a particular setting, and that setting

01:12 7  is a triad, which involves the prescribing physician, the

01:12 8  issuing pharmacist and the patient who is the end user.

01:12 9      While the physician is responsible for the decision-making

01:12 10 in determining that a prescription should be issued, the

01:12 11 pharmacist has a responsibility to use his knowledge, training

01:13 12 and, indeed, observations of the patient, in order to alert the

01:13 13 physician, from time to time, of things that the physician may

01:13 14 or may not know.

01:13 15     And the patient bears a responsibility, although, not at

01:13 16 the same level of professionalism as the physician and the

01:13 17 pharmacist, to alert the physician and the pharmacist to things

01:13 18 that the physician or pharmacist may or may not know.

01:13 19     It is in that triad, which is not -- in which all parties

01:13 20 are a part, but which the professional responsibilities lie

01:13 21 with the physician and the pharmacist, in terms of the level of

01:13 22 knowledge training, education and understanding of the

01:13 23 underlying pharmacology that is required, in order to

01:14 24 legitimize the prescription of a controlled substance.

01:14 25 Q.    Did you rely on this particular section of the CFR

01:14 1 identified in Government's Exhibit No. 5 in reaching the

01:14 2 opinions and conclusions that you reached in this case?

01:14 3 A.    This is the gold standard, this is the standard by which

01:14 4 the opinion must be based or it would not be valid.

01:14 5 Q.    I want to direct your attention, now, to Government's

01:14 6 Exhibit No. 6. Are you familiar with what Government's Exhibit

01:14 7 No. 6 is?

01:14 8 A.    Yes.

01:14 9 Q.    And is it correct that you have in front of you Title 21

01:14 10 United States Code Section 829 titled, Prescriptions?

01:14 11 A.    Yes.

01:14 12 Q.    If you go to the second page of Government No. 6, you see

01:15 13 Subsection E2, Subsection 2 on the second page, where it says,

01:15 14 As used in this subsection?

01:15 15 A.    Yes.

01:15 16 Q.    Okay. Is this another area of the title -- is this a

01:15 17 definitional area of Section 829 of Title 21, which, again,

01:15 18 defines a valid prescription?

01:15 19 A.    Yes, it does. It alerts the physician as to what the

01:15 20 requisite parameters for the issuance of a valid prescription

01:15 21 is.

01:15 22 Q.    Under Title 21 Section 829, how is a valid prescription

01:15 23 defined?

01:15 24 A.    Again, it's repeated that it's issued for a legitimate

01:15 25 medical purpose in the usual course of professional practice,

01:15  1  and that the practitioner has conducted an in-person -- at

01:15  2  least, one in-person examination of the patient or they're a

01:16  3  covering practitioner, which would be a person who is, instead

01:16  4  of the physician, covering for their practice.

01:16  5  Q.    So would you agree with me that this is a definitional

01:16  6  section of that title?

01:16  7  A.    It is.

01:16  8  Q.    Did you rely, also, on this section in Government's

01:16  9  Exhibit No. 6 in reaching the opinions and conclusions that you

01:16  10  reached in this case?

01:16  11  A.    Yes.

01:16  12  Q.    I want to direct your attention to one more part of

01:16  13  Pennsylvania direction, which is found at Government's Exhibit

01:16  14  4. And in Government's Exhibit 4, are you familiar with Chapter

01:16  15  25 of the Controlled Substance Drugs, Devices and Cosmetics Act

01:16  16  the Commonwealth of Pennsylvania?

01:16  17  A.    Yes.

01:16  18  Q.    And does this particular act also define what a valid

01:17  19  prescription is?

01:17  20  A.    Yes.

01:17  21  Q.    So once -- I'd ask that you turn to the next page of

01:17  22  Government's Exhibit 4 Section 25.52, where it says, Purpose.

01:17  23  Do you see that?

01:17  24  A.    Yes.

01:17  25  Q.    And could you please read the subsection A?

01:17 1 A.    "A. A prescription for controlled substance must be issued

01:17 2 for a legitimate medical purpose by a licensed practitioner in

01:17 3 the usual course of professional practice. The responsibility

01:17 4 for proper prescribing of controlled substances is upon the

01:17 5 practitioner, but a corresponding responsibility rests with the

01:17 6 pharmacist who dispenses the medication and interprets the

01:17 7 directions of the prescriber to the patient."

01:17 8 Q.    So would you agree with me this is a definitional section

01:17 9 of the purpose of a prescription under Pennsylvania -- under

01:17 10 the Pennsylvania drug laws?

01:17 11 A.    Yes.

01:17 12 Q.    We previously went over how the CFR defines a valid

01:18 13 prescription; correct?

01:18 14 A.    That is correct.

01:18 15 Q.    Under Federal law.

01:18 16 A.    Yes.

01:18 17 Q.    And did you rely on Chapter 25 and, particularly, Section

01:18 18 2552, in reaching your opinions and conclusions in this case?

01:18 19 A.    That is the definition that I used.

01:18 20 Q.    Now, you mentioned another policy, and I'm going to direct

01:18 21 your attention to Government's Exhibit No. 7. I think you

01:18 22 talked about the state medical boards.

01:18 23 A.    Yes.

01:18 24 Q.    You spent some time talking about revisions and updates,

01:18 25 and the most recent one being in 2013; is that correct?

01:18 1  A.    The most recent one to which I referred in this case, the

01:18 2  most recent one is actually in 2019.

01:18 3  Q.    So do you recognize what Government's Exhibit No. 7 is?

01:18 4  A.    Yes.

01:19 5  Q.    What is it?

01:19 6  A.    It is The Federation of State Medical Board's Model Policy

01:19 7  on Use of Opioid Analgesics and Treatment of Chronic Pain,

01:19 8  revised July 2013.

01:19 9  Q.    You indicated that Pennsylvania -- the Commonwealth of

01:19 10 Pennsylvania is a signatory to this policy. What did you mean

01:19 11 by that?

01:19 12 A.    That is -- The Federation of State Medical Boards is a

01:19 13 group that is comprised of the state medical boards of the

01:19 14 various states and municipalities and territories of the United

01:19 15 States, and 49 -- not all of the states are signatories to The

01:19 16 Federation of State Medical Board's Model Policy, Pennsylvania

01:19 17 is one of the states that is part of that organization.

01:19 18 Q.    What does that mean to be a signatory?

01:19 19 A.    It means that they've adopted the guidelines, as part of

01:20 20 their medical board policy. The State Medical Board -- the

01:20 21 Pennsylvania Medical Board initially sent out, in 1998, a copy

01:20 22 of the model policy, and then in about 2009, they mailed to

01:20 23 every practicing physician in the Commonwealth a book called

01:20 24 Responsible Opioid Prescribing, and they have been part

01:20 25 of -- this is part of the background guidance from the

01:20 1 Pennsylvania State Medical Board.

01:20 2 Q.    Now, did you rely on the model policy on the use of opioid

01:21 3 analgesics in the treatment of chronic pain in reaching your

01:21 4 opinions and conclusions in this case?

01:21 5 A.    Yes, it is one of the -- it is the guidance for

01:21 6 appropriate prescribing, and it highlights areas of difficulty

01:21 7 in opioid prescribing for physicians of which physicians would

01:21 8 be aware.

01:21 9 Q.    These guidelines in the definitional sections of certain

01:21 10 codes, both in Pennsylvania and under the Federal realm, in

01:21 11 your view, do they cater to the idiosyncrasies of physicians or

01:21 12 are they objective? Are they allowed to cater to the

01:21 13 idiosyncrasies of any particular physician?

01:22 14 A.    Well, no, to the extent that medicine is a scientific

01:22 15 practice, then, we must take the data that we gain through both

01:22 16 experimentation, observation and experience and apply that to

01:22 17 the treatment of patients. With respect to the prescribing of

01:22 18 opioid analgesics, this has become part of the data of the

01:22 19 public health milieu of the United States.

01:22 20 Q.    What do you mean by that?

01:22 21 A.    At the point at which we began to have the wave of opioid

01:22 22 overdoses, leading to the declaration by Centers for Disease

01:22 23 Control that we have a public health problem, which they

01:22 24 labeled an opioid epidemic because of the high rate of use of

01:22 25 the drugs, the high rate of complications in use of the drugs,

01:23 1 the harms associated with the high dose -- with the use of high

01:23 2 dose opioids, that was so wide spread -- had become so wide

01:23 3 spread that it impacts upon the public health.

01:23 4 Indeed, over the course of the last decade, we have seen

01:23 5 the life expectancy of people in America fall, in part, related

01:23 6 to deaths associated with the use of controlled substances.

01:23 7 That is a public health problem.

01:23 8 And that public health problem is translated into both the

01:23 9 guidance from the state medical board and the alerts to

01:23 10 physicians that the iatrogenic part, the part for which we, as

01:23 11 physicians, are responsible, is within our control and that we

01:23 12 must, first, do no harm.

01:23 13 Q.   In your opinion, Dr. Thomas, what is the hall mark, in

01:24 14 your opinion, of practicing or issuing prescriptions, within

01:24 15 the usual course of professional practice and for legitimate

01:24 16 medical purposes?

01:24 17 A.   Yes. To be able to identify that process, because it is

01:24 18 not a point determination, it is a process, it is;

01:24 19 Has the physician taken appropriate history? Asked the

01:24 20 patient the questions that are necessary, in order to determine

01:24 21 whether or not the use of a controlled substance is

01:24 22 appropriate? Has the physician gathered the information that

01:24 23 comes in the form of physical examination, to determine whether

01:25 24 or not the use of a controlled substance could be beneficial to

01:25 25 the patient and what the effectiveness or lack thereof is of

01:25  1  the medication on the patient?

01:25  2  Has the physician appropriately observed those things that

01:25  3  would be expected to be impacted by the use of the drug, in

01:25  4  order to determine whether or not the drug is causing harm.

01:25  5  So, for example, in high dose opioid treatment, if someone

01:25  6  is taking a lot of drug, I expect them to look like they're

01:25  7  taking a lot of drug, and, therefore, I need to be watching

01:25  8  for, Are they intoxicated? How do they walk? What are the hall

01:25  9  marks of problematic drug use?

01:25  10  Further, Has the physician, particularly, in the period at

01:25  11  hand, have they conducted satisfactory pharmacovigilance? By

01:26  12  that is, are you being careful with the drug? Being careful

01:26  13  with a controlled substance includes prescribing to the

01:26  14  patients so that they don't have too much drug on hand and

01:26  15  regularly, based upon the prescription.

01:26  16  It includes the occasional occurrence of a pill count.

01:26  17  When the patient is using the drugs appropriately,

01:26  18  occasionally, counting to make sure they are using what they're

01:26  19  instructed to use and not using more than that. And the only

01:26  20  way to determine that is to have them bring in their pills and

01:26  21  you count them.

01:26  22  From time to time, depending upon the risk stratification

01:26  23  of the patient, that is, some people and some drugs are riskier

01:26  24  than other people and other drugs. So high doses of Methadone

01:26  25  are riskier than low doses of oxycodone.

01:27 1    People who have a history of substance abuse, overdose,

01:27 2 drug-seeking behavior or treatment for any of those things are

01:27 3 high risk patients and, therefore, must be observed more

01:27 4 frequently.

01:27 5    Among the clinical observations, as well as laboratory

01:27 6 observations, is urine drug screening. Testing to see, Does the

01:27 7 patient have the expected drug in their system with the absence

01:27 8 of unexpected drugs? Urine drug screening provides objective

01:27 9 evidence of the appropriate use of the drug by the patient and

01:27 10 the appropriate non-use of the drug by the patient.

01:27 11    A urine drug screen is not a test that one passes or

01:27 12 fails. A urine drug screen provides objective evidence that is

01:27 13 either expected, the drug that the physician is prescribing is

01:28 14 present, it's presents in reasonable quantities, without

01:28 15 adulterants and is regularly present, and the drugs that the

01:28 16 patient is not prescribed are not present or it's unexpected.

01:28 17 Either of those things is not true.

01:28 18 Q.    Now, in staying in that same line of approach that you

01:28 19 have just testified to, how important is patient selection and

01:28 20 individualized care? Are you familiar with those terms?

01:28 21 A.    Absolutely.

01:28 22 Q.    So could you please tell us what they are and how

01:28 23 important they are?

01:28 24 A.    So every article that I've read in the last 20 years,

01:28 25 regarding the use of opioids for the treatment of chronic pain,

01:28 1 has contained a sentence that says, The use of opioids in the

01:29 2 treatment of non-cancer pain is controversial. There is no

01:29 3 clear evidence that these drugs are safe and effective for that

01:29 4 purpose, or something to that effect.

01:29 5      Therefore, the axiom that some things work for some people

01:29 6 some time is always applied to the use of these drugs. Being

01:29 7 assured that a patient is appropriate for the use of the drug,

01:29 8 achieves the expected effect, that is, that there is a decrease

01:29 9 in pain intensity and increase in their function that is

01:29 10 documented and that occurs with a reasonable dose of the drug,

01:29 11 such that harm is not expected to occur.

01:29 12      It is, basically, the process of plucking the rose and

01:29 13 leaving the thorns. Because we know with these drugs that the

01:29 14 higher the dose, the more likely the harm. The longer the use

01:30 15 the more likely the harm.

01:30 16      And if the patient is poorly selected, that is, someone

01:30 17 who will not take the medications appropriately, who will abuse

01:30 18 the medications, who has psychological difficulties with

01:30 19 impulse control, which represent risk factors for non-medical

01:30 20 use of the drug, all of those things increase the likelihood of

01:30 21 harm, and anything that increases the likelihood of harm

01:30 22 requires the physician to be more vigilant, more careful, and

01:30 23 to minimize that potential harm, because everything about the

01:30 24 practice and the public health information and the data that we

01:30 25 have about the use of these drugs suggests that that is the

01:30 1 appropriate thing to do.

01:30 2 Q.   So if you were to approach a patient's file and all you

01:30 3 knew, right from the start -- if all you saw, right from the

01:31 4 start, was high doses of opioids, as you would interpret high

01:31 5 doses of opioids to be, over a long period of time, in your

01:31 6 view, would that be -- would that cause you to look further?

01:31 7 A.   Yes, and, in fact, doses greater than 19 milligrams of

01:31 8 morphine equivalents is the initial point at which one begins

01:31 9 to look further, and certainly, with doses greater than 200

01:31 10 milligrams of morphine equivalents, we know that the patient,

01:31 11 over the course of a 3 to 5 year period, has a three percent

01:31 12 chance of death, and, therefore, is, on its face, it is a risky

01:31 13 endeavor.

01:31 14     It should occur rarely, and, particularly, if it were

01:31 15 occurring frequently, that would increase the likelihood that

01:31 16 the prescribing was inappropriate at best.

01:32 17 Q.   Now, when you are asked to determine the legitimacy of

01:32 18 prescribing, do you rely on whether or not a patient says, "I

01:32 19 liked what the doctor was prescribing for me"?

01:32 20 A.   No, that's not a medical standard. Drug-liking is a -- it

01:32 21 is a medical term, it is the term that we use for, if we give a

01:32 22 patient a drug in a blinded fashion, how many people,

01:32 23 particularly, those who have substance use disorder, will say,

01:32 24 "I like that drug".

01:32 25     A patient liking what they are getting is not a medical

01:33 1 standard for determining legitimacy, the determination of

01:33 2 legitimacy is based upon the practice of medicine, adequate

01:33 3 history, adequate physical examination, appropriate

01:33 4 pharmacovigilance and responding to the information that the

01:33 5 physician gains about whether or not to write the next

01:33 6 prescription.

01:33 7 Because if one doesn't do adequate history, physical

01:33 8 examination, pharmacovigilance, testing, diagnosis, and one

01:33 9 ignores the information gained, such that you're giving a drug

01:33 10 to a patient who should not have it, based upon the practice of

01:33 11 medicine that has preceded it, then, that prescription is not

01:33 12 for a medically legitimate purpose in the usual course of

01:33 13 professional practice, because it ignores the accepted

01:33 14 treatment principles of any responsible segment of the medical

01:34 15 community.

01:34 16 Q.   What is risk mitigation in the prescribing of controlled

01:34 17 substances?

01:34 18 A.   We know risk, generally, is the probability of loss, the

01:34 19 probability of a bad outcome. So how do we minimize the

01:34 20 probability of a bad outcome for a patient who is prescribed

01:34 21 controlled substances?

01:34 22 We do that by patient selection. We determine whether or

01:34 23 not there are things about this patient that we know beforehand

01:34 24 that would increase the likelihood of a bad outcome, a history

01:34 25 of personal substance abuse, a history of alcohol abuse, heavy

01:34 1 cigarette smoking, other -- multiple other chronic diseases. A

01:35 2 history of depression, anxiety or other psychological disorder

01:35 3 are all things that increase the risk before the physician ever

01:35 4 lays pen to paper, and all of those things are laid out in the

01:35 5 literature regarding the prescribing of controlled substances

01:35 6 on a chronic basis. And the drug, there's also risk inherent in

01:35 7 the drug.

01:35 8        So as we have said, Methadone is riskier than other

01:35 9 opioids because of its unique pharmacology. And higher doses

01:35 10 are riskier than lower doses, so those are things that we can

01:35 11 know before the fact.

01:35 12        After-the-fact risk mitigation is in that realm that I

01:35 13 called pharmacovigilance. Urine drug screening, pill counts,

01:35 14 and later, the prescription drug monitoring program of the

01:36 15 Pennsylvania -- of the Pennsylvania Department of Health. That

01:36 16 was not applied -- that particular circumstance was not applied

01:36 17 to my evaluation of Kristina Dame, because, in 2013 and 2014,

01:36 18 physicians did not have direct access to The Prescription Drug

01:36 19 Monitoring Program. Physicians did not gain direct access to

01:36 20 The Prescription Drug Monitoring Program until late 2015, and

01:36 21 it became a requirement, prior to writing a benzodiazepine or

01:36 22 opioid prescription in January of 2017.

01:36 23 Q.   Even though a physician didn't have direct access to the

01:36 24 Prescription Drug Monitoring Program in 2014, was the drug

01:36 25 monitoring program for Controlled II substances available in a

01:37 1 database in Pennsylvania in 2014?

01:37 2 A.    It was.

01:37 3 Q.    And does the fact that a physician can't access or could

01:37 4 not access the PDMP directly from his desk in 2014, does it

01:37 5 alter any of the previous guidelines or literature or policies

01:37 6 that you have talked about, in terms of a physician's

01:37 7 responsibility, when prescribing controlled substances?

01:37 8 A.    No, it simply limits what we can reasonably presume that a

01:37 9 physician knew, as a matter of fact.

01:37 10 Q.    So could a physician simply ask a patient, What drugs are

01:37 11 you taking?

01:37 12 A.    That would be expected.

01:37 13 Q.    What if a patient says, I'm not going to release my prior

01:37 14 medical records to you, before you treat me. Have you been

01:38 15 confronted with that, in your practice and experience? Is that

01:38 16 typical?

01:38 17 A.    It would be exceedingly atypical, but it would be a red

01:38 18 flag on fire. If a patient is unwilling to provide you with the

01:38 19 information about their prior treatment, particularly, with

01:38 20 controlled substances, the only reason that I could imagine

01:38 21 that occurring is that there's something that the patient

01:38 22 doesn't want the physician to know.

01:38 23      Physicians are knowledge workers. Ignorance is not bliss

01:38 24 in this profession. If one did not know, then, one would have

01:38 25 to act as if that lack of knowledge represents knowledge of the

01:38 1 worst case scenario. Because, otherwise, all of the risk is in

01:38 2 acting as if one knows. As my first teacher of medicine John

01:39 3 Thomas taught me, He who knows not and knows not that he knows

01:39 4 not is dangerous.

01:39 5 Q.   And, in fact, one of the authorities that you have

01:39 6 testified to, being a part of the Pennsylvania Code 49 Section

01:39 7 1692, part of that prescribing and dispensing would be to

01:39 8 obtain prior medical records?

01:39 9 A.   Yes, and that is, also, in the Federation of State Medical

01:39 10 Board's Model Policy.

01:39 11 Q.   Now, in this case, you've testified that you had the

01:39 12 benefit of reading a report of an interview with Kristina

01:39 13 Dame's mother, that would be Margaret Dame; correct?

01:39 14 A.   Yes.

01:39 15 Q.   Was that, at all, informative to you, in reaching the

01:39 16 opinions and conclusions that you reached?

01:39 17 A.   It was another data point that allowed me to understand

01:40 18 the circumstances in which the doctor was prescribing.

01:40 19 Q.   Are you familiar with the term, differential diagnosis?

01:40 20 A.   Yes.

01:40 21 Q.   Can you please tell us what it means?

01:40 22 A.   Differential diagnosis is the list that the physician

01:40 23 develops, when confronted with a patient. We rarely know

01:40 24 absolutely, from the first time we see a patient, precisely,

01:40 25 everything that is going on. The differential diagnosis is,

01:40 1 Here are the things that could be going on, given the

01:40 2 presentation of the patient that I have in front of me.

01:40 3 Q. Is it a fairly typical tool that's used in medicine?

01:40 4 A. Yes.

01:40 5 Q. And can they -- a differential diagnosis also be used to

01:41 6 determine the cause of death?

01:41 7 A. Yes.

01:41 8 Q. Or, let's say, the cause of an unintended death?

01:41 9 A. Yes.

01:41 10 Q. Did you use a differential diagnosis in this case, in

01:41 11 evaluating the records that were provided to you, in reaching

01:41 12 an opinion regarding the cause of death in this case?

01:41 13 A. Yes.

01:41 14 Q. Can you explain to us how you did that?

01:41 15 A. Ms. Dame presented with a sudden -- with an unexpected

01:41 16 death in a particular set of clinical circumstances. And just

01:41 17 as the coroner who performed the postmortem did not reach a

01:41 18 final diagnosis until after toxicology, it was the entirety of

01:42 19 the presentation that I used in determining the cause of death

01:42 20 with the but-for condition.

01:42 21 Ms. Dame had a history that was well-documented in the

01:42 22 medical record of substance use, substance abuse and pain

01:42 23 complaints associated with that as a means of obtaining further

01:42 24 substances. And that was throughout the time that she was under

01:42 25 Dr. Evers' care.

01:42  1    When she was found dead, the postmortem revealed no

01:42  2  obvious cause of death, in terms of a hemorrhage or trauma or

01:43  3  other internal organ dysfunction, but it did have an important

01:43  4  physical finding, and that is, when the -- at the postmortem,

01:43  5  there was frothiness in the mouth, and when he cut the lung,

01:43  6  there was copious pulmonary edema fluid.

01:43  7    What that tells one is that, when the patient died, there

01:43  8  was a lot of fluid in the lungs, and that is consistent with

01:43  9  the deaths that occur when people become apneic, stop

01:43  10  breathing, and, occasionally, try to breathe against a closed

01:43  11  glottis, that is breathing in when your throat is closed off,

01:43  12  because that produces negative pressure in the chest and pulls

01:43  13  fluid into the lungs. It is a common thing to occur in

01:43  14  anesthetics, in fact, or post-aesthetically, when patients are

01:44  15  awakening, and you have to guard for it. But that's important

01:44  16  information.

01:44  17    Then, when one obtains the toxicology, the toxicology

01:44  18  showed that she had levels of drug in her blood, both a

01:44  19  sedative hypnotic nordiazepam and Methadone, that were within

01:44  20  the range that could produce both unconsciousness and closing

01:44  21  of the airway, such as to provide a mechanism of death. She,

01:44  22  incidentally, had a level of doxepin in her blood, as well,

01:44  23  that would not have been directly contributory to her death, in

01:44  24  the absence of the other drugs.

01:44  25    And thus, given the history, the postmortem examination

01:44 1  and the toxicology occurring in the setting of a patient who

01:45 2  was treated in the way that Mrs. Dame was, that is, a patient

01:45 3  who had been weaned off of opioid analgesics, between her last

01:45 4  prescription from Dr. Evers of Methadone in July and her

01:45 5  prescription of Methadone from Dr. Evers in September, she had

01:45 6  gotten progressively lower doses of Methadone, to the extent

01:45 7  that by the time he gave her her last prescription, she was,

01:45 8  essentially, free of the drug.

01:45 9       So in that circumstances, a patient with a history of

01:45 10 substance abuse, a patient who had loss of control, secondary

01:45 11 to multiple risk factors associated with her use of the drugs,

01:45 12 who had been weaned to reinstate her tolerance to the drugs,

01:45 13 who died in a manner that was determined by the coroner to not

01:46 14 be from other causes, had a level of drug in her blood,

01:46 15 particularly, Methadone and nordiazepam, an active metabolite

01:46 16 of diazepam, the drug that is in Valium, which Dr. Evers had

01:46 17 also prescribed, that those things, along with her postmortem

01:46 18 examination and the manner of prescribing, led me to the

01:46 19 conclusion that but for the prescription of Methadone, 360 10mg

01:46 20 tablets, to a patient who was relatively opioid naive, given to

01:46 21 her weaning over the course of two months, that Ms. Dame would

01:46 22 not have died.

01:46 23 Q.   You mentioned that -- you mentioned the diazepam and the

01:46 24 Methadone that was in the toxicology. I just want to speak to

01:47 25 you, generally, about -- can you speak to the risk or increased

01:47 1 risk, when you have an opioid like Methadone and then you add a

01:47 2 benzodiazepine, is there an increased risk, and if so, how

01:47 3 much?

01:47 4 A.   It is a problematic practicing of medicine that provides

01:47 5 opioids and benzodiazepines to patients, given that both the

01:47 6 prescribing information for the opioid and the prescribing

01:47 7 information for the benzodiazepine and the medical literature

01:47 8 of the past 30 years, all state that these drugs are

01:47 9 potentially hazardous when they are used together.

01:47 10      They are especially hazardous when they are used together

01:47 11 in patients who do not exhibit adequate control of their

01:47 12 medication-taking behavior. We know that because of their

01:48 13 varied mechanisms, Methadone and the opioids acting in the

01:48 14 lower portion of the brain where breathing occurs, while the

01:48 15 benzodiazepines and other sedatives act in the higher part of

01:48 16 the brain where consciousness occurs, that, by blocking one and

01:48 17 then the other, you enhance their effects, particularly, if

01:48 18 consciousness is lost, and the airway is no longer protected.

01:48 19      The degree to which they increase the risk is actually

01:48 20 only measured after the fact, so we know that in 30 percent of

01:48 21 the cases in which opioid overdose is known to be the cause of

01:48 22 death, benzodiazepines occur. Because of their very mechanisms,

01:48 23 they clearly enhance the risk of death or overdose or

01:48 24 intoxication or any of the other harms that occur with the use

01:48 25 of opioids, falls, accidents and other injuries.

01:49 1    But by itself, the co-administration of the benzodiazepine

01:49 2 is risky, it may be negligent, but because it is widespread, it

01:49 3 is not itself not for a medically legitimate purpose in the

01:49 4 usual course of professional practice, unless it's demonstrated

01:49 5 that it's problematic for the patient.

01:49 6 Q.   We talked about the but-for cause of death. In particular,

01:49 7 in this case, based upon your training, your experience and

01:49 8 consideration of the records that you reviewed, and in

01:49 9 consideration of everything that you've testified to here

01:49 10 today, were you able to reach an opinion regarding the cause of

01:49 11 death of Kristina Dame?

01:49 12 A.   Yes, it was clear, and I agreed with the coroner, that it

01:49 13 was mixed drug toxicity. It is called mixed drug toxicity

01:49 14 because there was more than one drug involved. The primary drug

01:50 15 being involved in her cause of death was Methadone, and that

01:50 16 because of the mechanism of death and what the postmortem

01:50 17 showed and a secondary cause was the presence of the

01:50 18 nordiazepam.

01:50 19 Q.   Now, you've also talked a lot about the validity of the

01:50 20 prescriptions and what a valid prescription is, in terms of the

01:50 21 medical practitioner issuing it. Did you reach an opinion in

01:50 22 this case about the whether or not the prescriptions that are

01:50 23 identified in the indictment in this case were issued by the

01:50 24 Defendant in the usual course of professional practice and for

01:50 25 legitimate medical purposes?

01:50 1  A.   Yes, I reached an opinion, and I believe they were not.

01:50 2  Q.   Okay, and the opinion about the legitimacy of the

01:50 3  prescriptions, as well as the but-for cause of death, did you

01:51 4  include those opinions in your reports, which are identified as

01:51 5  Government's Exhibit Nos. 2 and 3? And if you could refer to

01:51 6  Exhibits Nos. 2 and 3, please.

01:51 7       And just for purposes of the record, can you first

01:51 8  identify Government's Exhibit No. 2?

01:51 9  A.   It is a report that I authored on August 12, 2019, United

01:51 10 States Department of Justice v. Martin Evers, M.D.

01:51 11 Q.   And Government's Exhibit No. 3?

01:51 12 A.   It is a report that I authored on September 7, 2020,

01:51 13 similarly labeled.

01:51 14 Q.   The opinions that you have just testified to, have you

01:51 15 included those opinions in your reports?

01:51 16 A.   Yes.

01:51 17 Q.   Now, in terms of the but-for cause of death, can

01:51 18 you -- specifically talking about your background, your

01:51 19 training and your experience as an anesthesiologist -- does

01:52 20 that background and experience advance your opinions in this

01:52 21 case, especially, when you're asked to render an opinion as to

01:52 22 cause of death?

01:52 23 A.   Yes.

01:52 24 Q.   Can you explain to the Court how does that?

01:52 25 A.   The drugs which we are discussing, opioids and sedative

01:52 1  hypnotics, are the cornerstone of anesthetic management. An

01:52 2  anesthetic -- I'm sorry. My dad used to tease me that the

01:52 3  reason I liked anesthesia was because I could dangle people

01:52 4  over the chasm and then snatch them back.

01:52 5      An anesthetic is a controlled overdose. I have overdosed

01:52 6  tens of thousands of patients deliberately and managed them

01:52 7  after that occurred. I also, in treating patients, observed

01:53 8  multiple overdoses. I've observed patients who have overdosed

01:53 9  on Methadone in therapeutic concentrations. A patient, who I

01:53 10 remember right now, who, when she was at 20 milligrams of

01:53 11 Methadone twice a day, she was fine, at 30 milligrams, she

01:53 12 stopped breathing.

01:53 13     My experience with these drugs is, frankly, at that region

01:53 14 where patients overdose, where I've watched it happen

01:53 15 repeatedly and managed them through it. So when I read what is

01:53 16 happening here and I look at the blood levels and I look at the

01:53 17 combinations, those are not dissimilar to my experience as an

01:53 18 anesthesiologist, but, in fact, they are -- they have been part

01:53 19 of my practice in outpatient medicine, in terms of minimizing

01:54 20 those risks to my own patients.

01:54 21     It is certainly within the realm of all of my practice,

01:54 22 over the course of the past 35 years that I draw from, and I

01:54 23 base it upon the scientific principles of the practice of

01:54 24 medicine that I've gleaned over that time.

01:54 25 Q.   Now, Dr. Thomas, are you aware of any change in the law

01:54 1  that occurred in 2018, 2019 or thereafter that prohibited

01:54 2  physicians from prescribing opioids?

01:54 3  A.    None. The standards of practice -- frankly, the standards

01:54 4  of practice in that period were relatively stable. There had

01:54 5  been no particular changes since the introduction of the CDC

01:55 6  guide of 2016.

01:55 7  Q.    Now, you mentioned the CDC, so I want to just refer your

01:55 8  attention to one last exhibit, which is Government's Exhibit

01:55 9  No. 9 in the binder. You talked about MME's, the Morphine

01:55 10 Milligram Equivalents, and at one point, you were talking about

01:55 11 a Morphine Milligram Equivalency of, I think you said, about

01:55 12 1100 or 1200 a day. Do you recall that?

01:55 13 A.    Um-hum.

01:55 14 Q.    Are there -- has the CDC issued recommendations for

01:55 15 Morphine Milligram Equivalents per day that are considered safe

01:55 16 and advisories about exceeding the safe limits that you're

01:55 17 familiar with?

01:55 18 A.    The CDC Guideline states that the best dose is the lowest

01:55 19 dose that the patient can tolerate that is consistent with

01:55 20 analgesia and improved function for the shortest period of

01:56 21 time. They identify several inflection points of risk.

01:56 22     Between 1 and 20 milligrams of Morphine equivalence is

01:56 23 deemed the safest level of risk. There is an increased risk

01:56 24 between 20 milligrams and 50 milligrams, but there's also

01:56 25 evidence that, even in chronic non-cancer pain, there's a

01:56 1 modest increase in effectiveness in that range.

01:56 2     Up to 19 milligrams, there is another inflection point in

01:56 3 risk, but there's, also, a lack of any evidence in the medical

01:56 4 literature at greater than 19 milligrams of Morphine

01:56 5 equivalence of an improvement in efficacy, in terms of an

01:56 6 improvement in both pain intensity and function.

01:56 7     At 200 milligrams is the next inflection point, where we

01:56 8 see -- 200 milligrams of Morphine equivalence -- where we see a

01:56 9 clear inflection point, in terms of another increase in risk,

01:57 10 with the risk of death increasing to more than 32 over the

01:57 11 course of three to five years.

01:57 12 Q.   That would be at 200 Morphine milligram equivalencies and

01:57 13 more?

01:57 14 A.   Yes.

01:57 15 Q.   Even at more than 20 Morphine milligram equivalencies a

01:57 16 day, there's a risk?

01:57 17 A.   Yes, the risk begins to increase for all harms associated

01:57 18 with the drug, not just the risk of overdose and death, but the

01:57 19 risk of falls, fractures, endocrinopathies, that is,

01:57 20 suppression of the pituitary gland, and other harms associated

01:57 21 with the drug.

01:57 22 Q.   Can you take a look at Government Exhibit No. 9 and tell

01:57 23 us if you recognize that?

01:57 24 A.   I do.

01:57 25 Q.   And is this the directives or what you just testified to

01:57 1  about the risks and the MME's of greater than 20 per day, does
01:57 2  this Exhibit No. 9 speak to that?
01:57 3  A.    Yes.
01:57 4  Q.    Did you rely on information such as this, provided by the
01:58 5  CDC, in reaching the opinions that you reached in this case?
01:58 6  A.    Yes.
01:58 7  Q.    Now, do those same MME's and that guidance apply to, let's
01:58 8  say, someone who is dying of cancer and who is in hospice?
01:58 9  A.    No.
01:58 10 Q.    Why?
01:58 11 A.    The CDC in their guidelines of March 2019, specifically,
01:58 12 state that it is applied to chronic non-cancer pain, which has
01:58 13 different mechanisms and underlying fundamentals than chronic
01:58 14 cancer pain.
01:58 15      Cancer pain, I always -- I describe as -- the difference
01:58 16 between chronic non-cancer pain and cancer pain is, chronic
01:58 17 non-cancer pain is a pebble in your shoe. Chronic cancer pain
01:58 18 is someone with a knife cutting into your foot. The
01:58 19 invasiveness, the metastases, the changing nature of the
01:59 20 underlying tumor makes cancer pain exceedingly different, and
01:59 21 frequently, the issue of duration of life makes a very big
01:59 22 difference because most people with back pain do not die of
01:59 23 back pain, while we may be dealing with end of life
01:59 24 circumstances in patients with cancer.
01:59 25      So there are very different, both morally,

01:59 1 philosophically, physiologically types of pain syndromes than

01:59 2 the problem of non-cancer pain that we're talking about when we

01:59 3 discuss these issues. And, in fact, when I review cases like

01:59 4 this, if I see a patient who has cancer pain who is included, I

01:59 5 will exclude them, because I would have to use a totally

01:59 6 different set of paradigms, in order to evaluate that

01:59 7 prescribing.

02:00 8 Q.    Having said all of that, Dr. Thomas, in the opinions that

02:00 9 you have expressed from the stand, as well as in your reports,

02:00 10 can you tell us whether or not you hold those opinions to a

02:00 11 reasonable degree of medical certainty?

02:00 12 A.    I hold each and every opinion that I have expressed within

02:00 13 a reasonable degree of medical certainty.

02:00 14     MS. OLSHEFSKI: Your Honor, at this time, I would move

02:00 15 admission of Government's Exhibit Nos. 2 and 3, No. 2 being

02:00 16 Dr. Thomas' April 12, 2019 report, No. 3 being Dr. Thomas'

02:00 17 September 7, 2020 report.

02:00 18     THE COURT: Any objection to Government's 2 and 3?

02:00 19     MR. BRIER: No objection, Your Honor.

02:00 20     MS. OLSHEFSKI: Your Honor, I would also move for admission

02:00 21 of the authorities relied upon in Government's Exhibit 4, which

02:01 22 is Title 28 Pennsylvania Code Chapter 25; Exhibit No. 5, which

02:01 23 is 21 CFR 1306.04; Exhibit No. 6, which is Title 21 United

02:01 24 States Code Section 829 defining Prescriptions; Exhibit No. 7,

02:01 25 which is the Model Policy on Use of Opioid Analgesics and the

02:01 1 Treatment of Chronic Pain; Exhibit No. 8, which is Title 49

02:01 2 Pennsylvania Code Section 1692 defining Prescribing,

02:01 3 Administering and Dispensing of Controlled Substances;

02:01 4 Government's Exhibit No. 9, which is the CDC Opioid Guidance in

02:01 5 terms of MME's, which was just referenced by Dr. Thomas, and

02:01 6 then Exhibit No. 10, I think that's already been admitted, that

02:01 7 is the Methadone package insert.

02:01 8     THE COURT: Mr. Brier, any objection to any of those

02:01 9 exhibits identified?

02:01 10     MR. BRIER: No objection, Your Honor.

02:02 11     THE COURT: All right, Government's 2, 3, 4, 5, 6, 7, 8, 9

02:02 12 and 10 are admitted.

02:02 13     (At this time Government's Exhibit Nos. 2-9 were admitted

02:02 14      into evidence.)

02:02 15     MS. OLSHEFSKI: Your Honor, for purposes of the Daubert

02:02 16 hearing, the Government has no further questions on direct for

02:02 17 Dr. Thomas.

02:02 18     THE COURT: Let's take 15 minutes and then we can continue.

02:02 19     (At this time a recess was taken.)

02:20 20     THE COURT: Counsel, I understand there's an issue you'd

02:20 21 like to discuss with me before we proceed any further?

02:20 22     MR. CASEY: Yes, Your Honor. I'd appreciate a few minutes.

02:20 23     Procedurally, we have for the search warrant issue, both

02:20 24 probable cause and Franks, we have witnesses coming from out of

02:20 25 the area, about an hour out of the area, some of them are

02:20 1 disabled, some of them are people with families, and so we

02:20 2 would propose to the Court, instead of proceeding to the

02:20 3 probable cause section and having Diversion Investigator Derr

02:20 4 testify, we get to those who have come in to testify regarding

02:20 5 the Franks matter, and so they would follow the expert

02:20 6 testimony here, with one exception, there's one person on

02:20 7 standing that the Government wishes to call.

02:20 8 So, simply put, we're apprising the Court of what we would

02:21 9 suggest the appropriate order to be for calling witnesses, and

02:21 10 then secondarily -- or not secondarily -- but, also, the

02:21 11 Assistant U.S. Attorney wanted to broach with the Court, I

02:21 12 think, the relevancy issue or admissibility issue, with respect

02:21 13 to some of the witnesses. I won't make her argument, Judge,

02:21 14 I'll sit tight on that.

02:21 15 THE COURT: Am I to understand that you want to conduct

02:21 16 this particular aspect of the other suppression motion before

02:21 17 we return to Dr. Thomas?

02:21 18 MR. CASEY: No, Your Honor, this would follow Dr. Thomas.

02:21 19 THE COURT: All right, let's see where we are, after we

02:21 20 conclude the Daubert hearing, and we can talk about these

02:21 21 things, but I think it's a bit premature. We have a lot to do

02:21 22 here, right now, and I'm reluctant to spend any more time on

02:21 23 it. So with that, Mr. Brier, you can cross-examine.

02:22 24 MR. BRIER: Thank you, Your Honor. Frank Brier, on behalf

02:22 25 of Dr. Martin Evers.

CROSS EXAMINATION

BY MR. BRIER:

Q.    Good afternoon, Doctor. How are you?

A.    Good afternoon. How are you?

Q.    Good, thanks. You've been up there a little while, and we have just taken a short break, so we're going to go forward if you're ready. Are you ready?

A.    Certainly.

Q.    Doctor, you went over with counsel for the Government your curriculum vitae. Do you have a copy in front of you there?

A.    I do.

Q.    You testified on direct examination, Doctor, that that was a current copy of your curriculum vitae; is that correct?

A.    Yes.

Q.    And you, during the course of your professional career, from time to time, you update that and keep that as a complete list of your professional activities; correct?

A.    Yes.

Q.    And, Doctor, in there, you indicate that you were a resident in Anesthesiology and a Fellow in Pain Medicine and Regional Anesthesiology. We covered that; correct?

A.    That is correct.

Q.    You mentioned on direct examination, during your residency, that you were involved in Critical Care Medicine, but you were not doing a residency in Critical Care Medicine;

02:23 1 correct?

02:23 2 A.    No, I was doing a residency in Anesthesiology, and part of

02:23 3 Anesthesiology, particularly, at Hopkins, is Critical Care

02:23 4 Medicine, because we are the department or were the Department

02:23 5 of Anesthesiology and Critical Care Medicine.

02:23 6 Q.    Correct. My question was, simply, it wasn't a residency in

02:23 7 Critical Care Medicine, you rotated through various

02:23 8 subspecialties as an anesthesiologist, during your residency;

02:23 9 correct?

02:23 10 A.    Including Critical Care, yes.

02:23 11 Q.    Including Labor and Delivery; correct?

02:23 12 A.    Yes.

02:23 13 Q.    Doctor, you testified on direct examination that from 2000

02:23 14 to the present, you're CEO and President of Pain and Disability

02:23 15 Management Consultants PC in Pittsburgh; correct?

02:23 16 A.    Yes.

02:23 17 Q.    Doctor, what percentage of your current practice is

02:23 18 medical/legal?

02:24 19 A.    90 to 95.

02:24 20 Q.    90 to 95 percent in court?

02:24 21 A.    Actually, it would be 100 percent if you include the

02:24 22 Worker's Compensation and the patients I see for Worker's

02:24 23 Compensation and personal injury evaluations.

02:24 24 Q.    For disability evaluations for Worker's Comp, you're not

02:24 25 treating those patients, you're just evaluating them; correct?

02:24 1 A.    That is correct, I no longer have a current clinical

02:24 2 practice.

02:24 3 Q.    You haven't had an active clinical practice of medicine

02:24 4 since June 30 of 2014; correct?

02:24 5 A.    That is correct.

02:24 6 Q.    So for the past seven years, you've been engaged 100

02:24 7 percent of your time in medical/legal reviews; is that correct?

02:24 8 A.    Six and a half.

02:24 9 Q.    I'm sorry, I didn't mean to talk over you.

02:24 10 A.    Six and a half, yes.

02:24 11 Q.    Well, it be seven June 30th of this year; correct?

02:24 12 A.    Correct.

02:24 13 Q.    You testified on direct examination a number of times

02:24 14 about the presentations that you have done in court in

02:25 15 medical/legal analysis and expert opinions, and you testified

02:25 16 that on, at least, two occasions, you reviewed cases on behalf

02:25 17 of Defendants in criminal matters, but they did not call you as

02:25 18 a witness; correct?

02:25 19 A.    Yes.

02:25 20 Q.    So the only times that you have attended court to testify

02:25 21 in criminal matters, you've always been on behalf of the

02:25 22 prosecution; correct?

02:25 23 A.    That is correct.

02:25 24 Q.    In fact, you have three open current cases with the

02:25 25 prosecution, I think, in the Middle District; is that correct?

02:25 1 A.   I can only think of two right now, but there are other

02:25 2 things that I read that are not ripe.

02:25 3 Q.   And you testified earlier that you're a Certified

02:25 4 Independent Medical Examiner, and that Board that certifies

02:25 5 Independent Medical Examiners, that's really a certification

02:25 6 that you hold so that you can do these medical/legal IME

02:26 7 reviews; correct?

02:26 8 A.   No, I could do them without it, I do it, in order to

02:26 9 demonstrate my competency in doing them.

02:26 10 Q.   Fair enough. So you can still do them, even if you're not

02:26 11 Board certified in IME's, but you got that as an added

02:26 12 credential; correct?

02:26 13 A.   Yes.

02:26 14 Q.   But you're not a medical examiner in the sense that a

02:26 15 pathologist is a medical examiner?

02:26 16 A.   I am not. I tried to make that plain.

02:26 17 Q.   During the period of time before June 30 of 2014, when you

02:26 18 were, actually, clinically, treating patients, you were not in

02:26 19 a community-based primary care practice, correct, you were in

02:26 20 this pain specialty practice?

02:26 21 A.   I've never been a primary care physician.

02:26 22 Q.   You're not Board certified as a primary care physician;

02:26 23 correct?

02:26 24 A.   No.

02:26 25 Q.   You never had privileges as a primary care physician;

02:26  1  correct?

02:26  2  A.    No.

02:26  3  Q.    That is correct, you have not?

02:27  4  A.    That is, no, I have not.

02:27  5  Q.    You never completed any residency in primary care?

02:27  6  A.    I have not.

02:27  7  Q.    You had mentioned on direct examination, Doctor, that you

02:27  8  have a Competency Certification in Controlled Substance

02:27  9  Management. Did I read that correctly?

02:27  10  A.    That is correct.

02:27  11  Q.    And that was in 2008; correct?

02:27  12  A.    Yes.

02:27  13  Q.    You've not re-certified or you've not re-established that

02:27  14  credential?

02:27  15  A.    I have not. The drugs have not changed.

02:28  16  Q.    Well, the practice has changed, you've talked about that

02:28  17  on multiple occasions today, since 1996, when they started

02:28  18  giving opioids for chronic pain, through 2011, when there was

02:28  19  this, as you said, cornerstone change -- I'm sorry -- 2011;

02:28  20  correct?

02:28  21  A.    Yes.

02:28  22  Q.    So the medications haven't changed, Doctor, but the way

02:28  23  the medications are used have changed; isn't that correct?

02:28  24  A.    Yes, and I remain current with that.

02:28  25  Q.    You're a member of the American Medical Association;

02:28 1  correct?

02:28 2  A.    Among other institutions, yes.

02:28 3  Q.    You're familiar with their model guidelines, and you would

02:28 4  not be giving expert testimony in an area or specialty on which

02:28 5  you have not had substantial practice; correct?

02:28 6  A.    That is correct. And controlled substances is just that

02:28 7  area for me.

02:28 8  Q.    Controlled substances; correct?

02:28 9  A.    Yes.

02:28 10 Q.    Not primary care?

02:28 11 A.    I have not testified as the primary care, I've testified

02:28 12 as to the standard for any physician practicing in the United

02:29 13 States or the Commonwealth of Pennsylvania.

02:29 14 Q.    We understand, but from your review of the records, you

02:29 15 know that Dr. Marty Evers was a primary care community-based

02:29 16 physician; correct?

02:29 17 A.    Yes. And the standards for primary care physicians in the

02:29 18 prescription of controlled substances is precisely the same as

02:29 19 it is for any physician in the prescription of controlled

02:29 20 substances.

02:29 21 Q.    Doctor, you also gave us a list of your publications. You

02:29 22 have two publications, one is dated 2015 and one is dated 1988;

02:29 23 correct?

02:29 24 A.    That is correct.

02:29 25 Q.    So with the exception of those two publications, you have

02:29 1  no other publications on any of the subjects that we're talking

02:29 2  about today?

02:29 3  A.    I have not published, no.

02:29 4  Q.    So, for example, you have no peer-reviewed publications on

02:30 5  drug death investigations?

02:30 6  A.    That is correct.

02:30 7  Q.    You have no peer-reviewed publications on the manner of

02:30 8  death?

02:30 9  A.    That is correct.

02:30 10 Q.    You have no peer-reviewed publications, Doctor, on

02:30 11 opioid-related deaths; correct?

02:30 12 A.    As you noted, I have two publications. They are listed.

02:30 13 Q.    Well, we have talked about a lot on direct examination,

02:30 14 and these subjects came up, so I just want to ask you if you

02:30 15 have any peer-reviewed evidence-based publications anywhere

02:30 16 that I don't know about, on any of the subjects that we have

02:30 17 talked about, Doctor?

02:30 18 A.    No.

02:30 19 Q.    You do not have any publications on comprehensive death

02:30 20 investigations; correct?

02:30 21 A.    Correct.

02:30 22 Q.    You have no publications on opioid death with Long QT

02:30 23 Syndrome; correct?

02:30 24 A.    Correct.

02:30 25 Q.    That's a cardiology issue, isn't it, Long QT Syndrome?

02:30 1 A.   It's a cardiology issue that, certainly, is one that
02:30 2 physicians prescribing Methadone must be aware.
02:30 3 Q.   Sure, but it's a cardiac issue, it's an arrhythmia;
02:31 4 correct?
02:31 5 A.   If the prescriber is prescribing Methadone, they must be
02:31 6 aware of it.
02:31 7 Q.   Sure, and you mentioned that on your direct examination as
02:31 8 something to be aware of if you're prescribing Methadone. But
02:31 9 you have no publications on Sudden Death or Long QT Syndrome or
02:31 10 cardiac arrhythmias, related to Methadone administration;
02:31 11 correct?
02:31 12 A.   No, I've simply observed it, and I'm passing on the
02:31 13 information that I've read about it.
02:31 14 Q.   Doctor, you have no publications on volatile organic
02:31 15 solvent inhalation, do you?
02:31 16 A.   No.
02:31 17 Q.   You read the pathology report in this case and you read
02:31 18 the medical records in this case, and you know that Kristina
02:31 19 Dame had a chronic problem with solvent inhalation; correct?
02:31 20 A.   Yes.
02:31 21 Q.   It's mentioned in many places in her records and in the
02:31 22 police reports; correct?
02:31 23 A.   That is correct.
02:31 24 Q.   It's also mentioned in the postmortem; correct?
02:31 25 A.   Yes, it is.

02:31 1 Q.    Doctor, in your practice, I'm sure, seven years ago, when
02:31 2 you were treating patients, you treated patients who, also,
02:32 3 were treating with anti-depressants; correct?
02:32 4 A.    Yes.
02:32 5 Q.    You also would see patients who were on antibiotics;
02:32 6 correct?
02:32 7 A.    Yes.
02:32 8 Q.    But your primary focus was the pain medication; correct?
02:32 9 A.    No.
02:32 10 Q.    You would have to incorporate those other things into the
02:32 11 treatment of the individual patient; correct?
02:32 12 A.    Well, some of those, I would prescribe. For example,
02:32 13 anti-depressants are first line agents for neuropathic pain and
02:32 14 are anticonvulsants.
02:32 15 Q.    What about antibiotics?
02:32 16 A.    Antibiotics are not.
02:32 17 Q.    So you wouldn't prescribe antibiotics?
02:32 18 A.    I would prescribe antibiotics if it were necessary for a
02:32 19 condition with which the patient presented to me.
02:32 20 Q.    But that wouldn't be a normal or standard part of your
02:32 21 practice in pain medicine, would it? You would refer the
02:32 22 patient back to their primary care physician; correct?
02:32 23 A.    Well, actually, when I was performing implantations and
02:32 24 patients presented with wound infections, I would frequently
02:32 25 provide them with antibiotics or if a patient presented to me

02:32  1  and they had a need for antibiotic, I would begin the

02:33  2  prescription and then refer them to a primary care or to

02:33  3  another physician, but antibiotics are part of the practice of

02:33  4  medicine.

02:33  5  Q.    Understood. Thank you for that clarification. I was

02:33  6  thinking -- I wasn't thinking of the interventional part of

02:33  7  your pain practice, where you do implants and injections;

02:33  8  correct?

02:33  9  A.    That is correct.

02:33  10  Q.    Doctor, have you ever done an autopsy?

02:33  11  A.    Yes.

02:33  12  Q.    You've done autopsies, yourself?

02:33  13  A.    I have not done an autopsy since 1983, but yes, I've done

02:33  14  20 autopsies.

02:33  15  Q.    So you did autopsies during your training?

02:33  16  A.    Yes.

02:33  17  Q.    But you never had privileges as a pathologist at a

02:33  18  hospital?

02:33  19  A.    No.

02:33  20  Q.    You were never in the Department of Pathology in a

02:33  21  hospital?

02:33  22  A.    No.

02:33  23  Q.    You never had privileges as a toxicologist in a hospital?

02:33  24  A.    No.

02:33  25  Q.    You never practiced as a toxicologist?

02:33  1  A.    No.

02:33  2  Q.    You never had a Fellowship or residency training as a

02:33  3  toxicologist?

02:33  4  A.    That is correct.

02:33  5  Q.    And, in fact, in this case, Doctor, you had to call the

02:33  6  toxicologist and ask him what he meant by the SA's. You put

02:34  7  that in your report, isn't that right?

02:34  8  A.    I asked him for clarification, yes.

02:34  9  Q.    Do you have notes from that conversation, Doctor?

02:34 10  A.    I do not.

02:34 11  Q.    So you called Dr. Coyer, in this case, and you asked him

02:34 12  what part of his report meant, but you didn't write any notes

02:34 13  down or provide us that in your report; correct?

02:34 14  A.    That is correct. I put the evidence of it in my report, as

02:34 15  I mentioned.

02:34 16  Q.    Did you ever call Dr. Ross and talk to him? He was the

02:34 17  forensic pathologist that did the autopsy.

02:34 18  A.    I did not call the forensic pathologist that did the

02:34 19  autopsy.

02:34 20  Q.    Are you familiar with term, autolysis, Doctor?

02:35 21  A.    Yes.

02:35 22  Q.    You have no publications on autolysis; correct?

02:35 23  A.    No.

02:35 24  Q.    Are you familiar, Doctor, with postmortem redistribution?

02:35 25  A.    I am.

02:35 1 Q.   You have no publications or lectures on postmortem

02:35 2 redistribution, do you?

02:35 3 A.   I do not.

02:35 4 Q.   Do you know, in this case, Doctor, from where they drew

02:35 5 the blood that was the subject of the exam?

02:35 6 A.   I believe it's noted as femoral, but right now, I cannot

02:35 7 tell you, at this moment, without referring back to the

02:35 8 findings.

02:35 9 Q.   We'll come back to that. You believe it was femoral?

02:35 10 A.   At this moment, I do not know.

02:35 11 Q.   So we'll come back to that. Do you know how long she was

02:35 12 dead, before they did the blood draw?

02:35 13 A.   I noted it, but I cannot tell you from memory. And, in

02:35 14 fact, the precise time of death is not known, as she was

02:36 15 unattended.

02:36 16 Q.   Right, so there was a time of death that was official that

02:36 17 was about 7 a.m., but the last time she had been seen alive was

02:36 18 about 9:00 the night before. Does that sound right to you?

02:36 19 A.   That is correct.

02:36 20 Q.   Between 9 p.m. and 7 a.m. we don't know how long she was

02:36 21 dead in that period of time; correct?

02:36 22 A.   That is correct.

02:36 23 Q.   Doctor, are you familiar with lividity?

02:36 24 A.   Yes.

02:36 25 Q.   Did you notice or is anywhere mentioned in, either, the

02:36  1  State Police report or the postmortem report that the body had

02:36  2  lividity or rigor mortis?

02:36  3  A.    Yes, it was mentioned she was in rigor and she had

02:36  4  posterior lividity.

02:36  5  Q.    Lividity, meaning, that she had been sitting in that chair

02:36  6  long enough to form lividity on her backside; correct?

02:36  7  A.    That was the report, yes.

02:36  8  Q.    You said a minute ago, Doctor, that you did autopsies back

02:36  9  during your training. What percentage of your practice in

02:36  10  Pittsburgh was dedicated to performing postmortem examinations

02:37  11  or autopsies?

02:37  12  A.    Zero, obviously.

02:37  13  Q.    Doctor, what's evidence-based medicine?

02:37  14  A.    Evidence-based medicine is the attempt to practice

02:37  15  medicine, in accordance with the best available evidence, based

02:37  16  upon a grading of that evidence from the randomized controlled

02:37  17  clinical trial to expert opinion and consensus.

02:37  18  Q.    So if I understand you correctly -- and forgive me, I'm a

02:37  19  layperson -- you said, earlier, you translate into layperson.

02:37  20  Evidence-based medicine -- and you can correct me if I'm wrong

02:37  21  -- is the practice of medicine based on peer-reviewed studies

02:38  22  of clinical outcomes; correct?

02:38  23  A.    No.

02:38  24  Q.    What is it? You tell me.

02:38  25  A.    It is the practice of medicine, based upon the best

02:38  1  available information, with a grading of that information from
02:38  2  randomized double-blind placebo-controlled clinical trials to
02:38  3  the least of that information, which is direct observation by
02:38  4  individuals.
02:38  5      So all of that is still evidence, we simply attempt to use
02:38  6  the best evidence available for any given purpose to which we
02:38  7  need to apply it.
02:38  8  Q.   Okay, so and the evidence is deemed weak or strong,
02:38  9  depending on where that evidence is coming from; correct?
02:38  10 A.   Yes.
02:38  11 Q.   And the clinical studies, especially, the double-blind
02:38  12 random clinical studies, they're considered strong evidence,
02:38  13 correct, anecdotal evidence would be a little weaker; correct?
02:38  14 A.   That is correct.
02:38  15 Q.   Doctor, you testified on direct examination, very briefly,
02:39  16 about a CDC Guidelines from 2016. But we can all agree we're
02:39  17 talking about 2014 in all of these questions; correct?
02:39  18 A.   That is correct.
02:39  19 Q.   So, you know, even according to the AMA Guidelines, you
02:39  20 should apply the standards that apply, at the time of the
02:39  21 event; correct?
02:39  22 A.   That is what I said on direct.
02:39  23 Q.   And the guidelines are guidelines, they're not -- I don't
02:39  24 think the practice of medicine has evolved, yet, to the point
02:39  25 where it's a recipe or cookie-cutter approach, where you just

02:39 1  look up the patient and it tells you what to do, correct,
02:39 2  there's still medical judgment involved?
02:39 3  A.    That is what I said on direct.
02:39 4  Q.    And, in fact, you said, when you review cases, you look at
02:39 5  the sources of law, and you look at the records and you apply
02:39 6  your judgment, training and experience to those sources;
02:39 7  correct?
02:39 8  A.    I didn't understand the first thing you said. Sources of
02:39 9  law?
02:39 10 Q.    Well, you talked about the CFR, the PA Code, you look at
02:40 11 those as part of your methodology, and then you look at the
02:40 12 records and you apply this judgment that you have to make an
02:40 13 opinion; correct?
02:40 14 A.    Yes.
02:40 15 Q.    So the guidelines are really structured for physicians to
02:40 16 understand what would be, I guess, a general application to the
02:40 17 clinical presentation, but we can't have guidelines that
02:40 18 anticipate every conceivable clinical scenario; correct?
02:40 19 A.    No, guidelines do not anticipate every conceivable
02:40 20 scenario, however, they give us general direction for normative
02:40 21 physician behavior, relative to a particular area.
02:40 22 Q.    Right, they give us general guidelines, right, and that's
02:40 23 what they're called?
02:40 24 A.    Yes.
02:40 25 Q.    Doctor, in this case -- and you went over it in your

02:41 1 direct examination -- you authored two reports; correct?

02:41 2 A.   Yes.

02:41 3 Q.   August 12 of 2019 and September 7, 2020; correct?

02:41 4 A.   That is correct.

02:41 5 Q.   And when you're doing those reports, Doctor, it's your

02:41 6 practice to be inclusive and comprehensive as you can with

02:41 7 those reports, as to inform the folks of the basis, the

02:41 8 methodology and foundation of your opinion; correct?

02:41 9 A.   Yes.

02:41 10 Q.   In fact, Doctor, you would agree with me you want to

02:41 11 review the records so you get the clearest possible picture of

02:42 12 the clinical scenario; correct?

02:42 13 A.   I review the records that are available and always

02:42 14 conclude by saying that, if additional information becomes

02:42 15 available that would impact my opinion, I will respond to it.

02:42 16 Q.   All right, but that wasn't exactly what my question was,

02:42 17 Doctor, and I apologize if I didn't ask it clearly.

02:42 18     My question was, you would prefer to have all of the

02:42 19 records, so that you get the clearest possible picture of the

02:42 20 events that you're opining about; correct?

02:42 21 A.   I would prefer to know everything, and then I would know

02:42 22 everything. However, the limitations of any review are what's

02:42 23 available, at the time, and if any additional information would

02:42 24 change that, then, I would incorporate it, when provided.

02:42 25 Q.   Doctor, again, I apologize if I'm not asking the question

02:42 1 clearly. I can ask it again.

02:42 2 You want to have as much of the records as you possibly

02:43 3 can to have the foundation for your opinion; correct? You want

02:43 4 to have all of the --

02:43 5 A. You're asking me about -- what you're asking me is what

02:43 6 would I desire, and what I desire is irrelevant. What I had is

02:43 7 what I had, what I responded to is what I was given. What I

02:43 8 want is never part of the process.

02:43 9 Q. Doctor, you were expressly critical of Dr. Evers for not

02:43 10 availing himself of all of the records. Did you avail yourself

02:43 11 of all of Doctor's records, before you opined on your first

02:43 12 report?

02:43 13 A. I availed myself of all the records that I had, and the

02:43 14 difference between my criticism of Dr. Evers for not availing

02:43 15 himself of the records is that I was not treating a live person

02:43 16 in front of me.

02:43 17 Q. Well, we'll get to that in a minute. But you got the

02:43 18 records that were sent to you by the Government; correct?

02:43 19 A. That's what I had.

02:43 20 Q. You didn't go out and find those records, yourself, you

02:43 21 relied on the Government to provide you with the records that

02:44 22 you reviewed, when you authored your first report; correct?

02:44 23 A. Of course, I relied upon the Government, because I have no

02:44 24 right to the records, other than the ones that they gave me.

02:44 25 Q. Right, so if you got an incomplete set of records from the

02:44 1 Government, that came from the Government, that's not your

02:44 2 doing; correct?

02:44 3 A.    That is correct.

02:44 4 Q.    When you do a peer-reviewed journal entry, as you have

02:44 5 done two, one of the things you would do, I would imagine, is

02:44 6 you would list all of the materials that you reviewed, so that

02:44 7 when the peer reviewers are looking at your process and your

02:44 8 outcomes, they know the specific foundations of the material

02:45 9 you reviewed; correct?

02:45 10 A.    That's not correct.

02:45 11 Q.    How would that not be correct, Doctor?

02:45 12 A.    Well, one of the articles was peer-reviewed in

02:45 13 anesthesiology, the other was an editorial. So what one would

02:45 14 do is submit the paper along with bibliography, and the

02:45 15 bibliography would represent the information that was preceding

02:45 16 it and would be footnoted in the actual text of the article.

02:45 17 Q.    Fair enough. So you have one peer-reviewed article in

02:45 18 anesthesia; correct?

02:45 19 A.    Yes.

02:45 20 Q.    In that article, I would imagine, you listed for the

02:45 21 reviewer the information, the sources of the information you

02:45 22 relied on in forming or writing your article; correct?

02:45 23 A.    We wrote the abstract and gave them the bibliography that

02:45 24 was footnoted in the text.

02:45 25 Q.    And you would do the same thing in authoring an expert

02:45 1 report, correct, you would try to convey, in fact, you do, you

02:45 2 say, records reviewed, in the first paragraph of your first

02:45 3 report, you list them up; correct?

02:46 4 A.   I list the records reviewed, in order to state what I had

02:46 5 available, yes. I did not detail each and every record

02:46 6 reviewed, because that would make the report both unreadable

02:46 7 and 100 pages.

02:46 8 Q.   Doctor, you listed some medical records. You listed that

02:46 9 you reviewed the coroner's report, autopsy and toxicology

02:46 10 report, medical records from the coroner, medical records from

02:46 11 Dr. Evers' office. Did I read that correctly?

02:46 12 A.   Yes.

02:46 13 Q.   You have the medical records from Dr. Evers's office, for

02:46 14 some reason, these are in the reverse order. March 6 of 2013 to

02:46 15 September 9 of 2014; correct?

02:46 16 A.   That is correct.

02:46 17 Q.   So you did, in that specific instance, list out exactly

02:46 18 what you reviewed; correct?

02:46 19 A.   Right, but, for example, I grouped medical records from

02:47 20 Dr. Evers' office in a date range, but yes, that's what I

02:47 21 reviewed.

02:47 22 Q.   You, actually, gave us the dates of those office visits;

02:47 23 correct?

02:47 24 A.   Yes. The inclusive range not the interval range.

02:47 25 Q.   Understood. Doctor, when you treated patients in your

02:47 1 clinical practice, when you had an active clinical practice,

02:47 2 prior to 2014, and you prescribed for them pain medication in a

02:47 3 variety of scenarios, I believe you talked about palliative

02:47 4 pain and cancer pain and chronic pain and acute pain and nerve

02:47 5 pain and somatic pain, all of those scenarios, when you did

02:47 6 that, all of your patients -- and this is going to sound like a

02:47 7 stupid question -- all of those patients were alive; correct?

02:47 8 A.    Until some of them died, yes.

02:48 9 Q.    Right, and you said, in fact, you made a joke about it,

02:48 10 you were able to dangle them over the grave and pull them back;

02:48 11 correct?

02:48 12 A.    There, I'm referring, specifically, to general anesthesia.

02:48 13 Q.    Specifically, to general anesthesia, in the OR, when you

02:48 14 put somebody under; correct?

02:48 15 A.    Yes, which represents part of my clinical experience with

02:48 16 drug overdose.

02:48 17 Q.    When you talk about treating patients like that, I mean,

02:48 18 the point is, you bring them back and they're alive; correct?

02:48 19 What I'm getting at is that, in your active clinical practice

02:48 20 of medicine, it wasn't a normal part of your routine -- or

02:48 21 maybe you can correct me -- that you would deal with patients

02:48 22 who had passed away?

02:48 23 A.    No, but in the course of providing anesthetics, I had

02:48 24 three intraoperative deaths.

02:48 25 Q.    I'm sorry to hear that. I'm not getting at that, but I'm

02:48 1 getting at the point is, Doctor, you answered earlier that you

02:48 2 don't do autopsies, you're not a pathologist?

02:49 3 A.   That's correct.

02:49 4 Q.   When you see patients, they're alive; correct?

02:49 5 A.   Correct.

02:49 6 Q.   I'm sorry, that's the way I should have asked it in the

02:49 7 first place. And when they're alive, they're metabolizing that

02:49 8 medication that you gave them oftentimes; correct?

02:49 9 A.   That is correct.

02:49 10 Q.   And when they're dead, there's a different process going

02:49 11 on; correct?

02:49 12 A.   Yes, there are a number of things that occur, at the time

02:49 13 of death, that change the distribution of the compartments.

02:49 14 Q.   Right, and it changes the distribution of the drugs that

02:49 15 are found on blood tests; correct?

02:49 16 A.   That is correct.

02:49 17 Q.   Time affects that, as well; correct?

02:49 18 A.   That is correct.

02:49 19 Q.   And the puncture point, where the blood is drawn from,

02:49 20 whether it's drawn from the superior vena cava or whether it's

02:49 21 drawn from the femoral source or whether it's drawn from a

02:49 22 popliteal source would have effect on what those values are;

02:49 23 correct?

02:49 24 A.   It would have an effect upon the point estimate, yes.

02:49 25 Q.   So it would be important to you, Doctor, as an

02:49 1 anesthesiologist or a pain medicine doctor who is reviewing a

02:49 2 postmortem to know the point that the pathologist drew the

02:50 3 blood from, correct, the anatomical point?

02:50 4 A.   Not exactly, no. While it could make a difference, in

02:50 5 terms of the point estimate, the issue of the number, that is,

02:50 6 whether or not we're using the toxicology, because, as I

02:50 7 pointed out, we don't use a toxicology as a separate

02:50 8 determinant, we use it as part of the overall determination.

02:50 9    So the number, simply, in fact, given the clinical

02:50 10 setting, need only be in the range of reported numbers for that

02:50 11 particular drug, in order for it to be, more likely than not,

02:50 12 that it is producing the effects that are seen, particularly,

02:50 13 when we are doing that in the setting of a mixed drug

02:50 14 intoxication like that of nordiazepam and Methadone.

02:51 15 Q.   Now, I'm not sure I understood all of that, Doctor. My

02:51 16 question is, simply, would it make a difference in the value

02:51 17 that's returned, for the blood value of the drug you're looking

02:51 18 at, in this case, Methadone, depending on the source of the

02:51 19 blood draw anatomically; correct?

02:51 20 A.   The blood draw, if we were to draw them separately or

02:51 21 simultaneously from different sites may be different. However,

02:51 22 for the purpose for which that number is being used, in terms

02:51 23 of determining whether or not the patient had a toxic quantity

02:51 24 of the drug in their blood, at the time death, that particular

02:51 25 point estimate is precisely that.

02:51 1     Do I believe that at every point in her body, at the time

02:51 2 of death, that Kristina Dame had a Methadone concentration of

02:51 3 180 nanograms per milliliter? No. I'm sure that it was

02:51 4 different at different points.

02:51 5     Do I believe that that particular number, 180 nanograms

02:52 6 per milliliter, was the same at the moment that she ceased to

02:52 7 respire, as it was at the time that the blood was drawn? No.

02:52 8 Because that's not the way it works, because there are things

02:52 9 that cause flux in the concentration.

02:52 10     But the real issue is, given that the reported

02:52 11 concentrations in patients who have died from single-drug

02:52 12 intoxication with Methadone is between 60 and 300 -- I'm

02:52 13 sorry -- 3100, she is within the range. She, additionally, has

02:52 14 the presence of nordiazepam. She, additionally, has no other

02:52 15 indication of any other lethal event. She has that occurring in

02:52 16 the setting of a patient who has her history and the

02:52 17 prescribing that has occurred.

02:52 18     That is the manner by which I determined the but-for

02:52 19 cause, not by, simply, the single number of 180 nanograms per

02:53 20 milliliter.

02:53 21 Q.    Can you give us that reference range again for what could

02:53 22 be toxic with Methadone?

02:53 23 A.    It has been reported between 60 nanograms per mill and

02:53 24 3100.

02:53 25 Q.    And that depends, in part, on the drug tolerance of the

02:53 1 patient; correct?

02:53 2 A.   It depends upon the clinical setting.

02:53 3 Q.   You would agree with me, Doctor, that if the -- why don't

02:53 4 you explain to the Court, Doctor, if you can, what autolysis

02:53 5 is.

02:53 6 A.   Autolysis is the process by which cells break down through

02:53 7 enzymatic processes and release their contents into their

02:53 8 environment which equivalates with the blood compartment.

02:53 9 Q.   So the blood is drawn after the patient has been dead for

02:53 10 God knows how many hours in this case, if the blood is drawn

02:53 11 from the superior vena cava, that could have -- return a higher

02:53 12 value, due to autolysis, than if it was drawn peripherally;

02:54 13 correct? Or should I defer to Dr. Ross?

02:54 14 A.   There can be a higher level, from various aspects,

02:54 15 however, for the purpose of the determination of whether or not

02:54 16 she died from mixed drug intoxication, of which Methadone was a

02:54 17 substantive part, it makes no difference.

02:54 18 Q.   Doctor, you would agree with me that patients who have a

02:54 19 blood value of 180 nanograms per milliliter can go about their

02:54 20 daily functions at that level, can't they, depending upon their

02:54 21 tolerance to the drug?

02:54 22 A.   Yes, and, in fact, that value can be seen as a therapeutic

02:54 23 value in patients who have been gradually raised to it, but it

02:54 24 is certainly a toxic value in patients who have been rapidly

02:55 25 raised to it.

02:55 1 Q.   A very low value could be a toxic value to me, if I'm a

02:55 2 first-time user; correct?

02:55 3 A.   I didn't hear the last part.

02:55 4 Q.   A very low amount of Methadone could be toxic to anyone

02:55 5 who is a first-time user who is completely naive to the drug;

02:55 6 correct?

02:55 7 A.   Right.

02:55 8 Q.   But if someone is tolerant to the drug and they've been

02:55 9 having the drug over some time, in this case -- strike that. If

02:55 10 they've been having the drug over some time, they can develop a

02:55 11 tolerance to it, so they can have higher blood values of

02:55 12 Methadone and yet still function; correct?

02:55 13 A.   Yes, and importantly, that does not apply to her.

02:55 14 Q.   I'm sure you've seen that in your practice, Doctor, isn't

02:55 15 that true? You've seen people with higher Methadone levels go

02:55 16 about their daily function?

02:55 17 A.   If the amount is raised gradually, that can occur.

02:55 18 However, deaths have been known to occur at relatively low

02:55 19 doses of Methadone, between 30 and 40 milligrams per day. In

02:55 20 fact, in Methadone maintenance institutions, the most common

02:55 21 time during which that overdose death will occur is at about 50

02:56 22 milligrams per day.

02:56 23      So it depends upon the direction and the magnitude of the

02:56 24 change. That vector is very important in making that

02:56 25 determination.

02:56 1 Q. And it's very broad?

02:56 2 A. Yes, and, therefore, must be interpreted in terms of the

02:56 3 clinical history of the individual patient.

02:56 4 Q. Doctor, have you supplied us with any citations in your

02:56 5 report that would support what you're saying about that 180

02:56 6 nanograms per milligram being a fatal dose?

02:56 7 Do you have any peer-reviewed documents, peer-reviewed

02:56 8 studies, evidence-based studies anywhere cited in your report

02:56 9 that would support that assertion?

02:56 10 A. I did not cite it in my report.

02:56 11 Q. Well, the answer is, no, then, correct, Doctor?

02:56 12 A. I did not cite it in my report.

02:57 13 Q. Yet, you knew the purpose of this report was to inform us

02:57 14 and to inform the Court what you were doing here, correct, and

02:57 15 you failed to cite the specific -- you say you have one -- the

02:57 16 specific peer-reviewed, evidence-based study that's going to

02:57 17 tell us that if Dr. Evers gives a patient 180 milligrams, what

02:57 18 amounts to 180 nanograms per milligram of Methadone, that

02:57 19 patient is going to die?

02:57 20 A. Not that the patient is going to die, but the patient is

02:57 21 at risk for death, and it's in her medical record, it's in her

02:57 22 autopsy in the Toxicology section.

02:58 23 Q. While we're talking about toxicology, Doctor, it just

02:58 24 gives a value not a range to give the 180 nanograms, as you

02:58 25 said, per millimeter; correct?

02:58 1 A.    It does give a range for the values which have been

02:58 2 observed at death.

02:58 3 Q.    So that's 60 to 3100; correct?

02:58 4 A.    Yes.

02:58 5 Q.    Blood Methadone concentrations average 280 nanograms per

02:58 6 milliliter in 59 victims of fatal Methadone overdose.

02:58 7 A.    Average is a central tendency.

02:58 8 Q.    So average is 260 nanograms per milliliter; correct?

02:58 9 That's in the toxicology report.

02:58 10 A.    Yes, and that's also single drug, not mixed. Continue.

02:59 11 Thank you.

02:59 12 Q.    Doctor, you'd also notice that, on her urine screen, there

02:59 13 was fentanyl; correct?

02:59 14 A.    Yes.

02:59 15 Q.    When you talked to Dr. Coyer who is the toxicologist who

02:59 16 actually did this study, and you talked to him on the telephone

02:59 17 and asked him about the study -- and, Doctor, this should be in

02:59 18 front of you. Do you have the toxicology report and postmortem?

02:59 19 A.    I do not.

02:59 20 Q.    There should be a binder up there, Doctor. It's Page 0057.

02:59 21 A.    There is no binder here. Okay, yes.

03:00 22 Q.    Doctor, are you there on the toxicology report dated

03:00 23 12/8/14 signed by Dr. Coyer?

03:00 24 A.    12/25/14.

03:00 25 Q.    9/25/14.

03:00 1  A.   I'm sorry, 9/25/14.

03:00 2  Q.   That's correct. The signature date at the bottom, Doctor,

03:00 3  is 12/8/14.

03:00 4  A.   Okay, yes.

03:01 5  Q.   On Page 4 of your report, Doctor, you state -- I'll read

03:01 6  it to you if you have a copy there.

03:01 7  A.   I have it.

03:01 8  Q.   "While the toxicology report stated that multiple over 400

03:01 9  drugs were screened, the precise findings were not clear.

03:01 10 Given the absence of a list of negative findings, I contacted

03:01 11 the testing laboratory for procedural verification."

03:01 12      Did I read that correctly?

03:01 13 A.   Yes.

03:01 14 Q.   I think, when we're talking about this, there is the

03:01 15 footnote at bottom of Dr. Coyer's toxicology report, where it

03:01 16 says, "The resulting data", and on the third line down, "is

03:01 17 compared to an extensive spectral library of over 400 of the

03:01 18 most commonly found illicit and prescription drugs."

03:01 19      Did I read that correctly?

03:01 20 A.   That's correct.

03:01 21 Q.   So what did Dr. Coyer tell you that meant?

03:01 22 A.   That all the things that were not reported were negative.

03:02 23 Q.   I'm sorry, say that again.

03:02 24 A.   Everything that was not reported as positive was negative.

03:02 25 Q.   But only as opposed to what's been tested against that

03:02 1 library of 400 chemicals; correct?

03:02 2 A.   Yes.

03:02 3 Q.   So did Dr. Coyer tell you, for example, that if there was

03:02 4 fentanyl in her system that was not in that spectral library,

03:02 5 it wouldn't show up on that test; correct?

03:02 6 A.   That was -- that's a common drug of abuse that would have

03:02 7 been tested, which was why it was tested in her urine.

03:02 8 Q.   It showed up in her urine from the fentanyl from the

03:02 9 patch; correct?

03:02 10 A.   Presumably.

03:02 11 Q.   There was no patch on her body, according to the

03:02 12 postmortem; correct?

03:02 13 A.   Some.

03:02 14 Q.   But she had -- she didn't have a patch on her body, but

03:02 15 she had fentanyl in her urine; correct?

03:02 16 A.   I would have to look at the --

03:02 17     THE COURT: Just a moment, sir.

03:03 18     MS. OLSHEFSKI: I'm going to object, at this point, only

03:03 19 because this is a Daubert hearing, and we're supposed to be

03:03 20 challenging the qualifications, the methodology, the

03:03 21 reliability, and the fit of expert testimony in this case. This

03:03 22 is not the trial, and to attack the substance and the

03:03 23 credibility of opinions in this way is not appropriate for a

03:03 24 Daubert hearing.

03:03 25     MR. BRIER: Your Honor, under Rule 702, I'm allowed to

03:03 1  check his methodology and the foundations for the information

03:03 2  that he provided. And he's authored two expert reports, the

03:03 3  Government went through the basis and foundation, as they saw

03:03 4  it, and I'm allowed to challenge it. Specifically, under 702,

03:03 5  Your Honor, I'm allowed to challenge the quality -- I'm sorry

03:03 6  -- the expert's scientific, technical and other specialized

03:03 7  knowledge that will help the trier of fact understand the

03:03 8  evidence, including the information that is the reliable

03:04 9  foundation, whether there's a reliable foundation for the

03:04 10 report.

03:04 11     So my question gets to, Doctor --

03:04 12     THE COURT: Just a moment. I didn't rule on anything.

03:04 13     MR. BRIER: I'm sorry, Your Honor, I meant to say -- my

03:04 14 question was to Your Honor, and I said, Doctor, out of force of

03:04 15 habit.

03:04 16     THE COURT: I'm going to give you some leeway, but Ms.

03:04 17 Olshefski is correct, you're not trying this case to me.

03:04 18 Surely, you all understand that.

03:04 19     MR. BRIER: Understood, Your Honor.

03:04 20     THE COURT: You can certainly inquire into his methodology,

03:04 21 and you can certainly inquire into what facts were in his

03:04 22 possession upon which he based his opinion or opinions, but I

03:04 23 am not going to allow this to be turned into a mini-trial on

03:04 24 his ultimate believability before the jury.

03:04 25     So be guided by that. And if you think that's happening,

03:04 1 Ms. Olshefski, you object. Let's go.

03:05 2          MR. BRIER: Thank you, Your Honor.

03:05 3 BY MR. BRIER:

03:05 4 Q.    Doctor, in the report that you authored, you indicated

03:05 5 that -- I'll move on, Your Honor.

03:05 6          You indicated that, on the second page, Doctor, first full

03:05 7 paragraph, it says;

03:05 8          "The earliest documentation that I have available,

03:05 9 regarding Dr. Martin Evers, an internist, care of Ms. Dame was

03:05 10 dated March 20, 2013." Did I read that correctly?

03:05 11 A.    Yes.

03:05 12 Q.    Doctor, are you aware of any documentation of office

03:05 13 visits prior to March 20 of 2013?

03:06 14 A.    That was the first office note. There were papers in her

03:06 15 file as early as March 6, 2013.

03:06 16 Q.    So that was the first office visit she had with Dr. Evers,

03:06 17 according to your review of the records, Doctor, was March 20,

03:06 18 2013; correct?

03:06 19 A.    Yes, there were some other contact with his office as

03:06 20 early as March 6, 2013.

03:06 21 Q.    And, then, Doctor, a year later, in September 2020, you

03:06 22 authored a supplemental report, and you indicated that you had

03:06 23 reviewed additional documentation; correct?

03:06 24 A.    Yes.

03:06 25 Q.    Doctor, turn to the binder in front of you, if you would,

03:07 1  to Page 64568.

03:07 2  A.    Yes.

03:07 3  Q.    Do you want to identify that for the record, please?

03:07 4  A.    This appears to be an office note from Dr. -- it's an

03:07 5  office note, I don't know who it's from, because there is no

03:08 6  signature, but it's dated 10/11/2012, and it says she comes in

03:08 7  to establish care.

03:08 8  Q.    That says, "Kristina came in to establish care. Her

03:08 9  medical issues include chronic back pain." Correct?

03:08 10  A.    Yes. Did you want me to read it?

03:08 11  Q.    No, I'm going to ask you, did Dr. Evers take a subjective

03:08 12  history from the patient?

03:08 13  A.    Did Dr. Evers do this? I don't see his signature.

03:08 14  Q.    I can get you a page that has the signature line on it.

03:08 15  A.    Okay.

03:08 16  Q.    64506.

03:09 17  A.    Okay, yes, this appears to be from Dr. Evers, yes.

03:09 18  Q.    Office note from Dr. Evers for Kristina Dame; correct?

03:09 19  A.    Yes.

03:09 20  Q.    You were not provided that for your initial review;

03:09 21  correct?

03:09 22  A.    No, I've never seen it before.

03:09 23  Q.    Did Dr. Evers do an assessment of the patient?

03:10 24  A.    There is a brief assessment, yes.

03:10 25  Q.    Did he review old hospital available data, going back to

03:10 1  2012, including imaging and labs?

03:10 2  A.    Actually, it appears that he reviewed hospitalizations

03:10 3  going back to 2009 for detoxification from opioids and

03:10 4  benzodiazepines and labs, yes.

03:10 5  Q.    Doctor, turn the page to 64567. Can you identify that for

03:10 6  the record, please?

03:10 7  A.    This is an office note from Dr. Evers, date of service

03:11 8  November 8, 2012.

03:11 9  Q.    Was that provided to you by the Government for your

03:11 10 review?

03:11 11 A.    No, I have not seen this before.

03:11 12 Q.    That's a SOAP note, correct, that's what doctors call

03:11 13 them, Subjective Objective Assessment and Plan; correct?

03:11 14 A.    Yes.

03:11 15 Q.    He takes her vital signs, notes her medications; correct?

03:11 16 A.    Yes.

03:11 17 Q.    You'll note she was on Morphine and Valium, at that time;

03:11 18 correct?

03:11 19 A.    Yes.

03:11 20 Q.    She was also receiving MS Contin and Lyrica and Santyl,

03:11 21 which is a topical cream for a skin lesion; correct?

03:11 22 A.    MS Contin is Morphine, and Morphine, Lyrica, Valium.

03:11 23 Q.    I'm sorry, the Morphine is listed there, correct, I read

03:11 24 that.

03:11 25 A.    Yes, and MS Contin is Morphine, so she was receiving high

03:11 1  dose Morphine --

03:12 2  Q.   And Valium and Lyrica?

03:12 3  A.   Valium and Lyrica, yes.

03:12 4  Q.   Doctor, turn the page to 64566. Can you identify that for

03:12 5  the record?

03:12 6  A.   This is an office note from 12/4/2012.

03:12 7  Q.   Was that provided to you by the Government for your expert

03:12 8  review?

03:12 9  A.   I have not seen this before.

03:12 10 Q.   That's a SOAP note for Kristina Dame in Dr. Evers' office;

03:12 11 correct?

03:12 12 A.   Yes.

03:12 13 Q.   Doctor, turn the page. 64565. Identify that for the

03:12 14 record, please.

03:12 15 A.   It's another progress note from 24 days later.

03:12 16 Q.   That's a SOAP note; correct?

03:12 17 A.   Yes.

03:12 18 Q.   Six lines down in the first paragraph, you can read along

03:13 19 with me;

03:13 20       "Pain medication is now adequate, but she is not sleeping

03:13 21 well."

03:13 22       Is that an assessment of the effectiveness of the pain

03:13 23 medication she was receiving at that point?

03:13 24 A.   Yes.

03:13 25 Q.   Doctor, turn the page to 64564. Could you identify that

03:13 1 for the record, please?

03:13 2 A.   Another progress note from date of service January 15,

03:13 3 2013.

03:13 4 Q.   And that's for Kristina Dame from Dr. Evers?

03:13 5 A.   That is correct.

03:13 6 Q.   Was that provided to you by the Government for your expert

03:13 7 review?

03:13 8 A.   I have not seen it before.

03:13 9 Q.   It documents that she was in the Emergency Department;

03:13 10 correct?

03:13 11 A.   I didn't understand the question.

03:13 12 Q.   I'm sorry. Third paragraph down, Doctor. It documents that

03:13 13 Dr. Evers said she was in the Emergency Department because of

03:14 14 excessive urination and inconsistent urination; correct?

03:14 15 A.   Yes.

03:14 16 Q.   And he notes there what her labs are; correct?

03:14 17 A.   Yes.

03:14 18 Q.   Doctor, turn the page to 64563. Can you identify it for

03:14 19 the record, please?

03:14 20 A.   January 22, 2013. It is a progress note that details that,

03:14 21 "Her pain medications are allegedly adequate. She's on high

03:14 22 dose oxycodone, Valium, Lyrica, Santyl and trazodone. She has

03:14 23 had two falls injuring her left ankle."

03:14 24 Q.   That's a SOAP note for Kristina Dame in Dr. Evers' office

03:14 25 one week after the last visit; correct?

03:15 1    A.    That is correct.

03:15 2    Q.    Was that provided to you by the Government?

03:15 3    A.    I have not seen it before. As I stated, the first progress

03:15 4    note I had was 3/20.

03:15 5    Q.    Doctor, turn the page. Page 64562.

03:15 6    A.    Yes, another progress note dated February 19, 2013.

03:15 7    Q.    So this is three weeks later, she's in his office again;

03:15 8    correct?

03:15 9    A.    Yes.

03:15 10   Q.    She has a psoriatic lesion and he orders Prednisone, a

03:15 11   steroid; correct?

03:15 12   A.    That is correct.

03:15 13   Q.    He palpates her abdomen for tenderness and he notes she

03:15 14   has a lesion along her C-section scar on her abdomen; correct?

03:15 15   A.    That is correct.

03:15 16   Q.    Did you have that note, Doctor, before you opined your

03:15 17   expert opinion about Dr. Evers' treatment of Kristina Dame?

03:15 18   A.    I did not.

03:16 19   Q.    Going back to the first note of October 11, 2012, it notes

03:16 20   in there at the bottom, Doctor, last paragraph. It says;

03:16 21       "She has an MRI that shows she has a cyst, a syrinx."

03:16 22   Could you explain what a syrinx is?

03:16 23   A.    A syrinx is a collection of cerebral spinal fluid that

03:16 24   occurs in the central canal of the spinal cord. Cerebral spinal

03:16 25   fluid bathes the spinal cord and is generated inside the

1 ventricles or spaces of the brain. The central canal of the

2 spinal cord is normally very small. If there's a blockage to

3 the outflow of cerebral spinal fluid which flows through it and

4 through areas that dump the cerebral spinal fluid into the

5 veins, the pressure builds up, and you get a collection of

6 spinal fluid called a syrinx that compresses the nerves

7 surrounding it.

8 Q.    And that's an objective imaging finding that would support

9 that she has a lesion in her spinal cord, correct, or, at

10 least, adjacent to her spinal cord?

11 A.    Yes, I noted that she had a diagnosis of syringomyelia.

12 Q.    Doctor, if you go back up to the first paragraph under,

13 Available Old Data, last paragraph -- I'm sorry, last sentence.

14 It says;

15      "Urine drug screen with benzodiazepines, opioids,

16 tricyclics, pregnancy test negative."

17      You'd agree with me, Doctor, that's documentation in

18 Dr. Evers' chart of a urinalysis report?

19 A.    That is a documentation that someone else did a urine drug

20 screen, yes.

21 Q.    Yes, and he put that in his review, in the first visit the

22 patient was in his office; correct?

23 A.    That is correct. In fact, that was noted in my report that

24 other physicians have performed urine drug screens.

25 Q.    Doctor, you had testified earlier about the Morphine

03:19 1 equivalency of Methadone; correct?

03:19 2 A.   I did.

03:19 3 Q.   And you gave us the chart that was in the CDC Guidelines;

03:19 4 correct?

03:19 5 A.   Yes.

03:19 6 Q.   I believe that the Government moved that exhibit into

03:19 7 evidence.

03:19 8     Methadone -- on Government Exhibit 9, Page 2 -- they give

03:19 9 a range from 1 to 80 milligrams a day for their Morphine

03:19 10 equivalency conversion factors; correct?

03:19 11 A.   That's from 1 to 80 milligrams of Morphine equivalence per

03:19 12 day at 1 to 20 milligrams of Methadone.

03:19 13 Q.   Right below that, it says;

03:20 14     "Dose conversions are estimates and cannot account for all

03:20 15 individual differences in genetics and pharmokinetics."

03:20 16 Correct?

03:20 17 A.   Absolutely.

03:20 18 Q.   Doctor, do you recall testifying in the Dr. Li case?

03:20 19 A.   Dr. who?

03:20 20 Q.   Dr. Li.

03:20 21 A.   Yes.

03:20 22 Q.   You testified the way you're testifying today, you were

03:20 23 under oath and in the courtroom; correct?

03:20 24 A.   Yes.

03:20 25 Q.   In fact, I believe it was Judge Mariani; correct?

A.    No, it was not, it was Judge Caputo.

Q.    My mistake. In that case -- and I could show you if you want to see it -- you said the Methadone multiplier for a conversion is 4.5.

A.    Yes.

Q.    And that it builds up in the body. Do you stand by that?

A.    At lower doses, that's the straight line conversion. It does not take into account higher doses of Methadone, that's correct.

Q.    And it doesn't take into account the variability with different patients; correct?

A.    It does not, it is an estimate.

Q.    Doctor, your initial report dated August of 2019, you had testified -- I'm sorry -- you wrote that Ms. Dame was opioid naive; correct?

A.    That is correct.

Q.    And then, after reviewing more of her records, you amended that to say she was relatively opioid naive; correct?

A.    That's true.

Q.    Could you explain to me, Doctor, where you got the term, relatively opioid naive?

A.    From English. Ms. Dame had been opioid tolerant during the period of continuous prescription of Methadone, as much as 160 milligrams per day, from Dr. Evers. After Ms. Dame left Dr. Evers' care in early July of 2014 and went to First

03:23  1  Hospital, she was weaned from the -- from Methadone, initially,

03:23  2  and in that time, from July 1 through January -- I'm

03:23  3  sorry -- September 3, she obtained three prescriptions from

03:23  4  physicians who were not Dr. Evers. One for 84 tablets, one for

03:23  5  36 tablets, and the last for seven tablets.

03:23  6      The prescription she obtained for seven tablets was

03:23  7  written on -- one moment please -- was written a week prior to

03:24  8  the prescription she got from Dr. Evers, and, in fact, she was

03:24  9  administered five milligrams of Methadone at Horsham Clinic as

03:24  10  her last dose prior to the prescription that she got from

03:24  11  Dr. Evers, and that was, at least, four days prior to his

03:24  12  seeing her.

03:24  13      That means that she had been without Methadone for four

03:24  14  days, after having been weaned from 150 milligrams down to 5

03:24  15  milligrams. If we take into account that last seven tablet, 70

03:25  16  milligrams, over the course of the last 10 days, then, she

03:25  17  would have been getting, roughly, in the last week, about 8

03:25  18  milligrams of Methadone per day, if we average it over that

03:25  19  period, not including any periods of complete abstinence.

03:25  20      Relative to her Methadone tolerance at 160 milligrams, she

03:25  21  was relatively opioid naive. She had been weaned over a

03:25  22  prolonged period, and one would expect that, physiologically,

03:25  23  her opioid tolerance would be quite low. That's what I mean by

03:25  24  relatively.

03:25  25  Q.  Well, isn't the half life of Methadone variable, as well,

03:25 1 in terms of with the conversion on the Morphine units is

03:25 2 variable, depending on the patient?

03:25 3 A.    It is.

03:25 4 Q.    So what you said, her last dose of Methadone was just four

03:26 5 days before --

03:26 6    MS. OLSHEFSKI: Objection, Your Honor. I think we're

03:26 7 getting into an area of testing the credibility of Dr. Thomas'

03:26 8 opinions.

03:26 9    THE COURT: Sustained.

03:26 10 BY MR. BRIER:

03:26 11 Q.    Doctor, it would be important to your analysis when her

03:26 12 last dose of opioids was; correct?

03:26 13 A.    It would be -- I'm not sure I would say it was important,

03:26 14 it is a particular data point. I think, because we are talking

03:26 15 about orders of magnitude, the precise moment of her last dose

03:26 16 is not.

03:26 17 Q.    Do you have any peer-reviewed or any evidence-based

03:26 18 documentation that you can cite to that tells us, specifically,

03:26 19 what the half life is of Methadone in these circumstances?

03:27 20 A.    In Ms. Dame?

03:27 21 Q.    Yes.

03:27 22 A.    The half life of Methadone is always referred to in a

03:27 23 range, with the longest half life being, that's reported in the

03:27 24 literature, being about 56 hours, with the shortest half life

03:27 25 in some patients who are so-called rapid accelerators being as

03:27 1 short as eight hours. Beyond that, I do not know. The general

03:27 2 observable half life in most patients tends to be in the range

03:27 3 of 24 hours.

03:27 4    However, because we are talking about orders of magnitude

03:27 5 difference in dosing, that is not an appreciably important

03:27 6 fact, in terms of my overall analysis.

03:27 7 Q.   Doctor, when you reviewed the Pennsylvania State Police

03:27 8 report to form your opinion, when you reviewed the coroner's

03:27 9 report to form your opinion, when you reviewed Dr. Evers'

03:28 10 records, you reviewed the photographs we heard about on direct

03:28 11 examination, where did you learn, Doctor, that the Methadone

03:28 12 that was in Kristina Dame's system, on autopsy, was the

03:28 13 Methadone that came from Dr. Evers?

03:28 14 A.   From the prescribing.

03:28 15 Q.   There was a prescription bottle in the photograph;

03:28 16 correct?

03:28 17 A.   I believe so, yes.

03:28 18 Q.   How many pills were out of it?

03:28 19 A.   I can't tell you.

03:28 20 Q.   Can you tell me whether it was relatively full?

03:28 21 A.   At this moment, I cannot tell you.

03:28 22 Q.   Did you see any Pennsylvania State Police inventory where

03:28 23 a pill count was done on the bottle that was found with

03:28 24 Kristina Dame?

03:28 25 A.   It's 8,000 pages. I think that there was, but I cannot

03:29  1  tell you that for a fact at this very moment.

03:29  2  Q.    You think there was a pill count, but you don't recall?

03:29  3        MS. OLSHEFSKI: Objection, Your Honor.

03:29  4        THE WITNESS: I'm unsure.

03:29  5        THE COURT: Just a moment. When an objection is raised,

03:29  6  stop, please.

03:29  7        THE WITNESS: I'm sorry, sir.

03:29  8        MS. OLSHEFSKI: Same reason, Your Honor. He's attacking the

03:29  9  credibility of Dr. Thomas, and that's not the purpose of this

03:29  10  hearing. I'm sorry, he's attacking the credibility of the

03:29  11  opinion of Dr. Thomas.

03:29  12        THE COURT: Sustained.

03:29  13  BY MR. BRIER:

03:29  14  Q.    Doctor, you testified at length, on direct examination,

03:29  15  about the but-for causation of the death of Kristina Dame;

03:29  16  correct?

03:29  17  A.    That is correct.

03:29  18  Q.    In there, I'm asking you, simply, where did you put

03:29  19  together the prescription from Dr. Evers with the Methadone

03:29  20  that was in her system on the postmortem? Did you infer it?

03:30  21  A.    Given the pattern of prescribing and the way in which Ms.

03:30  22  Dame used it, yes, I inferred it, particularly, given that the

03:30  23  last administered Methadone was from Horsham Clinic.

03:30  24        MR. BRIER: That's all I have, Your Honor.

03:30  25        THE COURT: Do you have redirect, Ms. Olshefski?

03:30  1      MS. OLSHEFSKI: Just a few questions, Your Honor.

03:30  2                    REDIRECT EXAMINATION

03:30  3  BY MS. OLSHEFSKI:

03:30  4  Q.    Dr. Thomas, based upon the assessment notes that the

03:30  5  Defense went over with you, June, October, November of '12,

03:30  6  prior to March of '13, does that, in any way, change your

03:30  7  opinion?

03:30  8  A.    No, because, while I had problems with the overall dosing

03:30  9  and the approach, those were not the time -- that was not the

03:30  10 time frame during which I found the prescribing not for a

03:30  11 medically legitimate purpose in the usual course of

03:30  12 professional practice. It's the end of the time frame, not the

03:30  13 beginning.

03:30  14 Q.    Okay. And, specifically, directing your attention to Page

03:31  15 64506, which was addressed by Defense counsel, under Available

03:31  16 Old Data. Do you see that?

03:31  17 A.    Yes.

03:31  18 Q.    Is it correct that --

03:31  19       MR. BRIER: Your Honor, I object. This witness has already

03:31  20 admitted, under oath, that these were not part of his expert

03:31  21 reports and not part of his review. So why we're going through

03:31  22 them, now, is, I think, the Government's attempt to bolster his

03:31  23 credibility, when it's exactly what her objection was a minute

03:31  24 ago.

03:31  25       MS. OLSHEFSKI: Your Honor, he's the one that brought this

03:31 1 up and directed Dr. Thomas' attention to it, and conveniently

03:31 2 skipped over significant parts, leaving an impression that

03:31 3 needs to be addressed here.

03:31 4     MR. BRIER: Your Honor, I addressed what was skipped over

03:31 5 pretty well, I believe.

03:31 6     THE COURT: You can address your questions to what you

03:31 7 thought was skipped over and then move on, because everybody is

03:31 8 moving past the target of a Daubert hearing, and I'm not going

03:32 9 to allow it. Go ahead.

03:32 10     MS. OLSHEFSKI: Just two points, Your Honor.

03:32 11 BY MS. OLSHEFSKI:

03:32 12 Q.   Dr. Thomas, do you see, under Available Old Data, June 20,

03:32 13 2012?

03:32 14 A.   Yes.

03:32 15 Q.   It reads, "Hospitalization because of drug withdrawal."

03:32 16 A.   Yes.

03:32 17 Q.   And based upon what you're seeing there, does that change

03:32 18 your opinion, at all?

03:32 19 A.   No, because, in fact, the Available Old Data section was

03:32 20 present in other notes that I did review, because the

03:32 21 computerized medical record repeats it over and over, so I was

03:32 22 aware that Dr. Evers was aware of her hospitalizations for drug

03:32 23 withdrawal and her hospitalizations for fractures after fall

03:32 24 and her hospitalizations for detoxification from opioids and

03:32 25 benzodiazepines.

03:32  1  Q.   Then, right down from there, September 2, 2009, a few

03:32  2  years prior.

03:32  3       "Hospitalization for detoxification from opiates and

03:33  4  benzodiazepine."

03:33  5       Did you come across that in your historical review of

03:33  6  Kristina Dame?

03:33  7  A.   Yes.

03:33  8  Q.   Did it contribute to your opinion in this case?

03:33  9  A.   Yes.

03:33  10      MS. OLSHEFSKI: Thank you. Nothing further, Judge.

03:33  11      THE COURT: Mr. Brier?

03:33  12      MR. BRIER: Nothing further, Your Honor.

03:33  13      THE COURT: Thank you, Dr. Thomas. You can step down.

03:33  14      THE WITNESS: Thank you, Your Honor.

03:33  15      THE COURT: Ms. Olshefski, does the Government propose to

03:33  16  offer any additional witnesses in this matter?

03:33  17      MS. OLSHEFSKI: Not for the Daubert hearing, Your Honor.

03:33  18      THE COURT: I take it, Mr. Brier, that you have no

03:33  19  witnesses in connection with the Daubert hearing?

03:33  20      MR. BRIER: Correct, Your Honor.

03:33  21      THE COURT: All right, now, we're going to try to move from

03:33  22  the Daubert issue, unless there's some reason either counsel

03:33  23  wants to further address it, which I'm not hearing, we will

03:33  24  move to the Motion to Suppress, with respect to Bennett Avenue.

03:33  25      There was some logistical issue we needed to talk about

03:34  1  that I deferred until the Daubert hearing was over. This might

03:34  2  be an appropriate time to hear both counsel as to what the

03:34  3  issue is and what your positions are on it.

03:34  4      MS. OLSHEFSKI: If I may, Your Honor.

03:34  5      THE COURT: Sure.

03:34  6      MS. OLSHEFSKI: So if we're moving into the attack on the

03:34  7  Affidavit of Probable Cause and, specifically, the Franks

03:34  8  portion, Attorney Casey suggested putting on witnesses first,

03:34  9  before the Government's witness establishes probable cause. The

03:34 10  Government objects to any of these witnesses taking the stand

03:34 11  to testify what they purport to testify to for our purposes

03:34 12  here today, Your Honor, and this is why.

03:34 13      This is a Franks hearing. So pursuant to Franks v.

03:34 14  Delaware, the purpose of a Franks hearing is to present

03:34 15  evidence that false statements were intentionally and

03:34 16  recklessly included in the Affidavit of Probable Cause or

03:34 17  reckless disregard for those false statements or omissions were

03:35 18  recklessly and intentionally omitted from the affidavit that

03:35 19  were known to the affiant, at the time.

03:35 20      What the Defense purports to put up are witnesses

03:35 21  consistent with the oaths that have been provided under seal to

03:35 22  the Court and consistent with certain interview statements that

03:35 23  were presented to the Government yesterday afternoon. Those

03:35 24  witness statements refer to witnesses that were never

03:35 25  interviewed, prior to the affidavit being written and

authorized and the search being executed in this case. So

that's not the purpose of a Franks hearing, Your Honor.

The argument from the Defense is these are exculpatory, and it was incumbent upon DEA to go out and interview all of these witnesses to find out, to search for Brady information, before writing and submitting the affidavit in this case. And that's just not the law.

So 21 witnesses were interviewed, prior to the authorization and execution of this search warrant. If the Defense wants to bring in any one of those 21 witnesses and purport to show that Agent Derr intentionally and recklessly omitted information that would make a difference in the affidavit, then, he has the right to do that.

But what he's purporting to do is do bring in witnesses, never interviewed, who are going to say Dr. Evers prescribed in the usual course of professional practice, at all times the prescribing was appropriate. I think he's wonderful. That is what he is purporting to do, and pursuant to the interview statements I received yesterday, that's what they're going to testify to.

And that's not the law, Your Honor. And what I would say is, this is not a Brady, this is not application of Brady, when we're talking about a Franks hearing, and I would refer to United States v. Colkley, which is a Fourth Circuit case, which is kind of a hallmark case that many cases go back to and refer

03:37 1  to, when this is an issue referring to omissions. I will also

03:37 2  say that these cases that I'm going to cite refer to cases

03:37 3  where a Franks hearing wasn't even granted, because this is not

03:37 4  the law. So, in Colkley, the Fourth Circuit concluded that;

03:37 5     "The Defendant failed to show the officer intentionally

03:37 6  misled the magistrate, when he applied for a warrant and

03:37 7  omitted information from his affidavit."

03:37 8     In that case, the officer did not include information that

03:37 9  six eyewitnesses were unable to identify the Defendant in a

03:37 10  photo line up. That was omitted. The officer relied on a height

03:38 11  description from one witness but did not include contradictory

03:38 12  information obtained from another witness, stating the

03:38 13  assailant was shorter than the Defendant.

03:38 14     The Fourth Circuit rejected the Plaintiff's argument that

03:38 15  the Fourth Amendment requires the affiant to include all

03:38 16  potentially exculpatory evidence.

03:38 17     And in this case, it was evidence known to the affiant.

03:38 18  What they purport to do is to claim these omissions were

03:38 19  intentionally and recklessly made by Agent Derr. He didn't

03:38 20  interview them.

03:38 21     The Court went on to say;

03:38 22     "The rule would place an extraordinary burden on law

03:38 23  enforcement officers who might have to follow up and include in

03:38 24  a warrant affidavit every hunch and detail of an investigation

03:38 25  in the futile attempt to prove the negative proposition that no

03:38 1 potential exculpatory evidence had been excluded. It would

03:38 2 perforce result in perniciously prolix affidavits that would

03:38 3 distract police officers from more important duties and render

03:39 4 the magistrate's determination of probable cause unnecessarily

03:39 5 burdensome.

03:39 6     "In addition, a broad duty of inclusion would turn every

03:39 7 arrest or search into a warrant contest. Such consequences

03:39 8 would, in turn, discourage reliance on the warrants, a result

03:39 9 the Supreme Court has stated should be avoided in shaping the

03:39 10 Fourth Amendment Doctrine."

03:39 11     That is United States v. Colkley, Your Honor, and that

03:39 12 cite is 899 F2d. 297, it's a 1990 Fourth Circuit case.

03:39 13     Another case that relied on Colkley, Your Honor, is

03:39 14 Mauricia Harrington Wall v. The City of Monroe, this is a 2020

03:39 15 case out of the Western District of North Carolina. It's cited

03:39 16 at 2020 WL 6153086. And the Court in this case relied on

03:40 17 Colkley and other Supreme Court precedent in saying that;

03:40 18     "Although, an officer may not disregard readily available

03:40 19 exculpatory evidence of which he is aware, the failure to

03:40 20 pursue a potentially exculpatory lead is not sufficient to

03:40 21 negate probable cause. Reasonable law enforcement officers are

03:40 22 not required to exhaust every potentially exculpatory lead or

03:40 23 resolve every doubt of a suspect's guilt before probable cause

03:40 24 is established. Probable cause does not require an officer to

03:40 25 be certain that subsequent prosecution of the arrest will be

03:40 1 successful."

03:40 2     This Court also said;

03:40 3     "Recognizing the decision not to pursue given

03:40 4 investigative leads is but one of the circumstances we will

03:40 5 consider in determining the reasonableness of an officer's

03:40 6 decision to obtain an arrest warrant. The weight of such

03:40 7 circumstances will, of course, vary widely depending upon the

03:41 8 nature of the leads."

03:41 9     Again, this is referring to information that the Plaintiff

03:41 10 in this case argued that law enforcement had a duty to go out

03:41 11 and search. Just like in this case what the Defense is saying,

03:41 12 Had the magistrate judge known about all these other witnesses

03:41 13 that weren't interviewed that say, I think the prescribing of

03:41 14 Dr. Evers was appropriate, the decision would have been

03:41 15 different. And they have to say that it was intentionally and

03:41 16 recklessly, and the law is, known to law enforcement officers.

03:41 17     So to equate this to Brady, that he should have gone out

03:41 18 and searched for -- this isn't even Brady information, because

03:41 19 they're not qualified witnesses to say that, I think Dr. Evers

03:41 20 was wonderful and that he prescribed appropriately for me. In

03:41 21 fact, pre-trial, the Defense filed motions to preclude

03:41 22 Dr. Thomas from being able to say that, a Board certified

03:41 23 anesthesiologist.

03:41 24     Pre-trial, the Defendant filed motions to preclude

03:41 25 pharmacists from making that determination. And pre-trial, if

03:42 1 there's another witness out there, anywhere, that the

03:42 2 Government purports to put on the stand, they're not qualified.

03:42 3 So, now, to put this on now -- and I think he's thinking

03:42 4 that the law is different because he's a doctor and because

03:42 5 he's not a drug dealer on the street, and that's simply not the

03:42 6 case, Your Honor. And I can go on and cite more cases, and I

03:42 7 will cite them for the record.

03:42 8 United States v. Locklear, which is 2012 Westlaw 5845459

03:42 9 out of the Eastern District of North Carolina in 2012. The

03:42 10 District Court -- four eye witnesses were interviewed and said

03:42 11 the Defendant possessed a firearm. The Defendant claimed that,

03:42 12 had the detective interviewed four additional witnesses, the

03:42 13 opinion would have been different, and they would have said

03:42 14 that the Defendant didn't possess a firearm.

03:42 15 The District Court, in rejecting to grant -- refused to

03:42 16 even grant a Franks hearing and said;

03:42 17 "Interviewing every potential witness to a crime is not

03:42 18 required in a PC, Probable Cause Affidavit. Courts do not

03:43 19 require an officer applying for a search warrant to interview

03:43 20 every potential witness to a crime."

03:43 21 I have more, United States v. Slizewski, which is 809 F3d.

03:43 22 382, the Seventh Circuit in 2016. Again, the Defendant said the

03:43 23 District Court aired by not giving me a Franks hearing because

03:43 24 the officer omitted exculpatory evidence. And the Seventh

03:43 25 Circuit, again, reiterated that that's not the law. The Court

03:43 1 held that the officers are not expected to be attuned with

03:43 2 every potential, every potential exculpatory piece of evidence

03:43 3 out there against the Defendant. As long as there's probable

03:43 4 cause in the affidavit, the Defense can't show recklessly made

03:43 5 or false statements, then, that's what the Court needs to focus

03:43 6 on.

03:43 7 So I would argue that if he wants to bring in witnesses,

03:43 8 Judge, that were interviewed, and that the information is

03:43 9 relevant, if they're going to say Agent Derr lied, that's one

03:44 10 thing, but to bring in all of these people that say, I think

03:44 11 Dr. Evers was wonderful, not qualified, not relevant, and it's

03:44 12 not the law.

03:44 13 MR. CASEY: So, Judge, we have briefed the issue of Franks,

03:44 14 the Government has just issued a recitation of citations, none

03:44 15 of which relate to what's before the Court, which is an

03:44 16 evidentiary issue. The Court is the finder of fact and the

03:44 17 finder of law here. The Court will evaluate and make its own

03:44 18 decision as to what's admissible and what's relevant to its

03:44 19 decision, number one.

03:44 20 Number two, the Defense has asserted and will prove today

03:44 21 that the Government affirmatively lied in the Affidavit of

03:44 22 Probable Cause, which was tendered to the United States

03:44 23 Magistrate Judge to obtain a search warrant. We would show that

03:44 24 the Government was in reckless disregard for the truth. We will

03:44 25 do that by calling witnesses who will review those facets of

03:45 1 the Affidavit of Probable Cause that relate to their name and

03:45 2 their information, and they will testify as to why that is not

03:45 3 truthful information.

03:45 4 And if the Court thinks that the Defense is astray of

03:45 5 what's relevant, I'm sure the Defense will be promptly notified

03:45 6 as to the relevance of the utility to the Court of the evidence

03:45 7 that we wish to adduce today. We have not summoned dozens of

03:45 8 witnesses, we have tried to address the categories of

03:45 9 misrepresentations by the Government, so they are somewhat

03:45 10 representative.

03:45 11 These are people who have traveled over an hour, many of

03:45 12 them are elderly or disabled, some are from young families. We

03:45 13 would like to get on with the testimony and invite the

03:45 14 Government to interpose their objection to the testimony as

03:45 15 they see fit.

03:46 16 THE COURT: All right, let's speak for a moment about the

03:46 17 purpose of this Franks hearing. We all understand the focus on

03:46 18 Mr. Derr who is the Affiant in this case. We agree; right?

03:46 19 MS. OLSHEFSKI: Yes, Your Honor.

03:46 20 MR. CASEY: Correct, Your Honor.

03:46 21 THE COURT: And the contention by the Defendant is that Mr.

03:46 22 Derr, in preparing the affidavit that led to issuance of the

03:46 23 search warrant for the Bennett Avenue property included

03:46 24 knowingly false and materially false statements that, were they

03:46 25 excised from the Affidavit of Probable Cause, would be liable.

03:46 1 Isn't that what we're looking at here?

03:46 2     MS. OLSHEFSKI: Yes, Your Honor.

03:46 3     MR. CASEY: That is correct, Your Honor.

03:46 4     THE COURT: Now, from my perspective, I need to hear Mr.

03:47 5 Derr. I'm not comfortable, and I don't think it's prudent for

03:47 6 me to hear persons who may have relevant testimony, may not, I

03:47 7 don't know, but before I can even determine that, I need to

03:47 8 hear Mr. Derr's testimony and I need to hear your cross

03:47 9 examination of him, so that I can, at least, identify what

03:47 10 portions of his testimony you maintain were materially

03:47 11 knowingly false and make my own determination as to his

03:47 12 credibility as he testifies.

03:47 13     Only then, if I determine you should be allowed to present

03:47 14 additional witnesses, am I in a position to see whether that's

03:47 15 necessary. If I don't do it this way and I do it backwards,

03:48 16 it's not going to allow me to apply Franks and all of its

03:48 17 progeny properly.

03:48 18     So I expect that you're going to call Mr. Derr now, are

03:48 19 you not?

03:48 20     MS. OLSHEFSKI: Your Honor, there's a standing issue, so we

03:48 21 do have one brief witness on standing.

03:48 22     MR. CASEY: Judge, we have standing witnesses, as well. So

03:48 23 I think that, given the Court's expression, I think we respect

03:48 24 that and I think we should get on with Mr. Derr and get to the

03:48 25 less significant issues or less significant witnesses to

03:48 1 follow, since it's not a requisite that we get through those.

03:48 2 THE COURT: Well, the standing issue, obviously, as I said

03:48 3 in our telephone conference, is just part of the overall Fourth

03:48 4 Amendment analysis I have to conduct. For economy of use of our

03:49 5 time, if you're telling me that you have extensive testimony on

03:49 6 standing, well, then, maybe we should put that later. But if

03:49 7 it's something we can dispose of relatively quickly, I'd rather

03:49 8 do that.

03:49 9 MS. OLSHEFSKI: Your Honor, we do have a witness here from

03:49 10 Connecticut that traveled here last night, he is our witness on

03:49 11 standing. It's the Government's position that the Defendant

03:49 12 does not have standing to object to these medical records. They

03:49 13 weren't his, he didn't own them, he couldn't prevent them from

03:49 14 being turned over.

03:49 15 THE COURT: I understand the Government's position, and I

03:49 16 understand -- at least, I think I understand -- that the whole

03:49 17 purpose of the presentation of testimony will be to show that

03:49 18 your assertions are correct.

03:49 19 But, again, this is just a matter of how we do this most

03:49 20 efficiently. It's 20 to 3 in the afternoon, I'm willing to stay

03:49 21 here all night if you want to get it done, but it's just a

03:49 22 question of how we proceed. How many witnesses do you have on

03:50 23 standing?

03:50 24 MR. CASEY: Three, Judge.

03:50 25 THE COURT: You have three. How many do you have?

03:50 1     MS. OLSHEFSKI: I have one. I don't think this witness will

03:50 2 be long, Your Honor, and then I can go right into --

03:50 3     THE COURT: Well, let's take care of the standing issue,

03:50 4 since we're going to be staying here.

03:50 5     MR. CASEY: Well, Judge, if I may, just because I'm very

03:50 6 concerned about I have so many people, some in really difficult

03:50 7 conditions, it was a monumental task to get them here today. If

03:50 8 we could get her standing witness out of the way and go to Mr.

03:50 9 Derr, and then I'll call --

03:50 10     THE COURT: Do you have an objection to that approach?

03:50 11     MS. OLSHEFSKI: I'm sorry, what was that?

03:50 12     MR. CASEY: The Court is not going to rule on standing

03:50 13 today, the Court is going to receive its information on

03:50 14 standing. Do you want to call your witness on standing, call

03:50 15 him, we'll be done with him, then, we will move to Mr. Derr,

03:50 16 and then I'll call my standing witnesses --

03:51 17     MS. OLSHEFSKI: I'm sorry, but he has to be cross-examined

03:51 18 before you call those witnesses.

03:51 19     THE COURT: Of course.

03:51 20     MR. CASEY: Yes, direct and cross-examine him.

03:51 21     MS. OLSHEFSKI: That was the plan, I think.

03:51 22     THE COURT: I think what Mr. Casey is suggesting is that

03:51 23 his standing witnesses would not follow your standing witness.

03:51 24     MR. CASEY: Exactly.

03:51 25     THE COURT: And instead, once we complete the examination

03:51  1  of your standing witness, we would proceed to Mr. Derr. So if

03:51  2  that's an acceptable way to approach it, let's do that.

03:51  3      MS. OLSHEFSKI: Fine, Judge.

03:51  4      THE COURT: Let's take a break. Regulations require that

03:51  5  the witness box be cleaned, so we'll take five minutes.

03:51  6      (At this time a brief recess was taken.)

04:21  7      (The following took place in the conference room.)

04:21  8      THE COURT: I wanted to talk to you all about the posture

04:21  9  of this particular motion. Franks requires that there be a

04:21  10 preliminary finding that would then entitle the Defendant to

04:21  11 the hearing. And it seems as though we may have skipped over

04:21  12 that particular requirement, because I haven't written on

04:21  13 whether or not you're entitled to a Franks hearing nor have I

04:21  14 made a preliminary finding that you are entitled to one.

04:21  15     So that raises the question of whether today is an

04:21  16 appropriate day to hold the kind of hearing that I think all of

04:21  17 you were contemplating. Because, right now, it appears as

04:22  18 though we're ready to do an actual Franks hearing, with cross

04:22  19 examination of Mr. Derr, and then other testimony that, at

04:22  20 least, from the standpoint of what you've told me, would

04:22  21 attempt to show that his statements in the affidavit are

04:22  22 materially and knowingly false.

04:22  23     But I've never made the initial determination that a

04:22  24 Franks hearing is warranted, and, in fact, I don't think, under

04:22  25 Franks, which I've just had an opportunity to review, that the

04:22  1  Defendant has given me affidavits or other proof that would
04:22  2  serve as a threshold basis for my determining that a Franks
04:22  3  hearing is necessary.
04:22  4      So there's a couple ways to approach this, and it's going
04:22  5  to require that you tell me what you want to do. One is to
04:23  6  allow me to make a determination of whether or not you have
04:23  7  made a preliminary -- the requisite preliminary showing that a
04:23  8  Franks hearing is warranted here. If that were the case, we
04:23  9  would not be taking testimony today in the manner in which we
04:23  10 just discussed, other than on the standing issue.
04:23  11     The other -- and I'll turn to you, Michelle -- the other
04:23  12 is to assume that a preliminary showing has been made and to go
04:23  13 forward with this hearing and hear testimony as to whether or
04:23  14 not there is anything materially false and knowingly false in
04:23  15 the affidavit.
04:23  16     So I regard this as an important point because Franks and
04:23  17 the case law under it is very specific in indicating you must
04:24  18 make a preliminary showing before you get a Franks hearing.
04:24  19     MR. CASEY: Judge, may I speak?
04:24  20     THE COURT: Sure.
04:24  21     MR. CASEY: In this case, we are not arguing that the
04:24  22 Defense -- that the Government has a burden to search Brady
04:24  23 material and give a balanced view, we are simply saying that
04:24  24 when presenting, say -- I'll give an actual example -- the
04:24  25 information of Dennis Braun who is listed in the Affidavit of

04:24  1  Probable Cause. The Government has intentionally misrepresented

04:24  2  the doctor-patient relationship in that information, and they

04:24  3  have put into the Affidavit of Probable Cause affirmative false

04:24  4  information. And we have obtained, pursuant to Franks v.

04:24  5  Delaware, 48 declarations under oath from each of those

04:24  6  witnesses. It's not all the people listed in the affidavit, but

04:24  7  it's over 40.

04:25  8      THE COURT: And those you filed under seal with me?

04:25  9      MR. CASEY: Yes. So the quantum of evidence of the false

04:25 10  representations made by the Government, I would argue to the

04:25 11  Court, is an abundance of evidence justifying a Franks hearing.

04:25 12      THE COURT: May I interrupt you?

04:25 13      MR. CASEY: Yes.

04:25 14      THE COURT: And I understand your position, that you have

04:25 15  given me what you believe is a more than adequate basis to

04:25 16  determine that a Franks hearing is necessary. I'm simply saying

04:25 17  to all of you, I haven't made, on the record anywhere, a

04:25 18  determination as to that.

04:25 19      MR. CASEY: I agree with you, Your Honor.

04:25 20      MS. OLSHEFSKI: So, Your Honor, what Pat is referring to in

04:25 21  those oaths, for most of those patients that he's referring, we

04:25 22  see 69 files. There are, probably, maybe, I don't know, six

04:26 23  specific witnesses, patients that are individually spoken about

04:26 24  in the affidavit, and then the only information after that

04:26 25  about the other files of patients is PDMP data, high doses,

04:26 1  extended period of time.

04:26 2      When they submitted these oaths, where they had their

04:26 3  witnesses sign off, I believe it was a professional practice,

04:26 4  legitimate medical purposes, the caveat is it mischaracterizes

04:26 5  my treatment. They're not saying those numbers are wrong,

04:26 6  they're saying, It mischaracterizes my treatment.

04:26 7      So that is not a false statement, that is not disregard

04:26 8  for the truth. Those numbers are directly from the PDMP and

04:26 9  their witnesses are saying, I'm not saying I wasn't taking

04:26 10 those drugs, but they're mischaracterized. Falsely represents

04:26 11 Dr. Evers' care of me. And that's not a false statement, that's

04:27 12 their opinion, but that's not a false statement.

04:27 13     So that was the Government's issue. When we filed our

04:27 14 responses to all these motions and went to the lengths we went

04:27 15 to to attach DEA-6's to talk about -- to point the Court in

04:27 16 specific portions of DEA-6's, I was shocked that the next day

04:27 17 we had a hearing scheduled, because, quite frankly, I knew you

04:27 18 hadn't had time to make that decision, because you were in

04:27 19 trial with Phil Caraballo.

04:27 20     THE COURT: I was.

04:27 21     MS. OLSHEFSKI: So I was a little shocked, to tell you the

04:27 22 truth, but I think the Court, and the Government's position

04:27 23 would be to, please, make a decision on whether a Franks

04:27 24 hearing is necessary at this point, based upon all the

04:27 25 information that's there. Because there's a lot there.

04:27 1    MR. CASEY: Judge, if I may, I understand that the

04:27 2  Government has the impression that the Defense is only taking

04:28 3  issue with the proportionality of information, meaning, that

04:28 4  the Government's recitation of the prescriptions is a

04:28 5  misrepresentation of the entire treatment between the doctor

04:28 6  and the patient, that's not what it's limited to. I'll give you

04:28 7  an example, proffer, of the first witness that they will hear

04:28 8  from.

04:28 9    This witness was interviewed by the Drug Enforcement

04:28 10  Administration, Mr. Derr, himself, and she explained how she

04:28 11  was treated by the doctor, her course of treatment, his

04:28 12  examination, vital signs, all of that process, and then, at the

04:28 13  end of the interview, she said, Dr. Evers is a good doctor, and

04:28 14  she insisted that they put that down. None of that information

04:28 15  is in the Affidavit of Probable Cause.

04:28 16    MS. OLSHEFSKI: Doesn't have to be, Pat.

04:28 17    MR. CASEY: Which means that they intentionally misled the

04:29 18  magistrate judge about the relationship between that lady who

04:29 19  they interviewed and the characterization that they gave. Now,

04:29 20  I understand that the Government wants to sit back and say, No

04:29 21  harm, no foul, we just put in the pharmacy information. But

04:29 22  that's not what the whole affidavit is about.

04:29 23    The Affidavit of Probable Cause is a reasonable belief

04:29 24  that a crime is being committed by Martin Evers, and that

04:29 25  there's a reasonable likelihood that the fruits of that crime

04:29  1  would be found at his address. To find that a physician is

04:29  2  outside the usual course, they have to say he's prescribing

04:29  3  outside the usual course. That's the intent of the information

04:29  4  they put there.

04:29  5      When they have, themselves, interviewed the patient and

04:29  6  misrepresented the information, that's the epitome of, at a

04:30  7  minimum, reckless disregard for the truth or actual false

04:30  8  statements, which I think the Court should hear from. And the

04:30  9  Court can determine whether -- as we go through the witnesses,

04:30  10  whether it's something the Court wishes to hear.

04:30  11      THE COURT: If the Government wants me to make the required

04:30  12  preliminary showing, then, I think that's what I have to do.

04:30  13      MS. OLSHEFSKI: I would ask you to do that, Your Honor.

04:30  14      THE COURT: I don't know that I'm, at all, comfortable

04:30  15  ruling from the bench on that. I don't think that's the

04:30  16  appropriate thing to do here. Both sides have raised

04:30  17  significant points in their own -- in support of their

04:30  18  respective positions, I don't want to, in the interest of

04:31  19  simply concluding this matter, make a decision that's less than

04:31  20  well thought out, and that is simply the basis of some

04:31  21  consideration, now, leading to a bench ruling. I think that's a

04:31  22  mistake.

04:31  23      Now, if counsel has a different view and really wants to

04:31  24  go forward with this, I can do that, but I would suggest, I

04:31  25  would suggest that we adhere to what I consider to be the

04:31 1 accepted approach, which is that I make a determination based

04:31 2 on the affidavits that have been given to me as to whether you

04:31 3 have now shown me you're entitled to a Franks hearing and look

04:31 4 at the information that both of have you given me, rather than

04:31 5 ignoring that preliminary obligation and going right into what

04:32 6 is clearly a Franks hearing.

04:32 7     So that's my -- my intention is to do it by the book, so

04:32 8 to speak, which means that, to the extent that this particular

04:32 9 motion can be dealt with in parts, we can certainly hear the

04:32 10 standing issue today.

04:32 11     MR. CASEY: Your Honor, I'd rather not do that, to be

04:32 12 honest with you.

04:32 13     THE COURT: That's fine. But no preliminary determination

04:32 14 was made by me. I think it warrants an opinion rather than a

04:32 15 bench ruling. It isn't -- I don't take this lightly, obviously,

04:32 16 and I think that's what has to be done.

04:32 17     When we had our telephone conference, I viewed it as a

04:33 18 discussion about the suppression hearing nature of your motion,

04:33 19 but I did not take into account the need for this preliminary

04:33 20 determination.

04:33 21     MR. CASEY: If I may, Judge, at the risk of going against

04:33 22 the wave of authority here, I don't know -- I would argue to

04:33 23 the Court that it need not issue a separate opinion, it could

04:33 24 hear arguments of counsel, and I could proffer, there are

04:33 25 several witnesses here, and if the Court were comfortable

04:34 1 making a bench ruling, then, so be it. If the Court were not,

04:34 2 after hearing that information, comfortable making a bench

04:34 3 ruling, then, I understand, and we could await the Court's

04:34 4 ruling.

04:34 5      MS. OLSHEFSKI: The problem with that, Your Honor, from the

04:34 6 Government's perspective, is, he only gets that opportunity if

04:34 7 you grant him a Franks hearing, so that evidence should never

04:34 8 be before the Court, unless there is a Franks hearing.

04:34 9      MR. CASEY: That's not true. I can submit and I have

04:34 10 submitted 48 declarations under oath, testimony before the

04:34 11 Court --

04:34 12      MS. OLSHEFSKI: The Court has them.

04:34 13      MR. CASEY: -- substantiating guidance from Franks v.

04:34 14 Delaware, the procedure to do so. I have witnesses here for

04:34 15 whom I could make a proffer to the Court, in the presence of

04:35 16 the witness, so that the Court has a more fulsome understanding

04:35 17 of the magnitude of the falsifications by the Government in the

04:35 18 Affidavit of Probable Cause. It's another level of support.

04:35 19      These people traveled in here, some have babysitters, some

04:35 20 have medical appointments they've missed, some don't have the

04:35 21 capacity to drive themselves or have spouses. Some are

04:35 22 disabled.

04:35 23      MS. OLSHEFSKI: But that's not a basis to hear testimony,

04:35 24 Pat.

04:35 25      MR. CASEY: It's evidence for the Court to consider.

04:35 1    THE COURT: Well, I'm looking at an opinion of my own in
04:35 2  another matter where we wrote;
04:36 3    "The preliminary showing a Defendant must make is no light
04:36 4  burden and puts the Defendant to task by requiring some offer
04:36 5  of proof that materially false statements were recklessly or
04:36 6  intentionally made."
04:36 7    Citation to United States v. Darby. Then it continues.
04:36 8    "More specifically, a Defendant must allege with
04:36 9  specificity what was false in the affidavit, must provide
04:36 10 proof, must allege that the Affiant had a culpable state of
04:36 11 mind and must allege that the remaining information is
04:36 12 insufficient to support a finding of probable cause."
04:36 13   It continues on about;
04:36 14   "Conclusory allegations of untruthfulness are insufficient
04:36 15 to meet this burden. Defendant must provide an offer of proof
04:36 16 contradicting the Affiant, such as sworn or otherwise reliable
04:36 17 statements from witnesses", citing to United States v. Yokshan,
04:36 18 a Third Circuit 431 Federal Appendix 170, a 2011 case. And, in
04:37 19 fact, Franks itself make the very same statement in almost the
04:37 20 same language.
04:37 21   So it seems to me that I need to make a preliminary
04:37 22 determination, based on your affidavits, as to whether or not
04:37 23 you've established your right to a Franks hearing. I think to
04:37 24 do it any other way would be error, and I'm sorry for the
04:37 25 inconvenience that might arise as a consequence of this, due to

04:37 1 the people who are here, but I'm not prepared to deviate from

04:37 2 what the Franks decision itself indicates, as well as the cases

04:37 3 that I've cited in other opinions.

04:37 4     So, now, if you want to take testimony on the issue of

04:37 5 standing, you've got those people here today, I'm happy to hear

04:37 6 that. That's entirely up to you, if you want to do it at

04:37 7 another other, and all of this at once, we'll do that, as well.

04:37 8     MR. CASEY: I'd rather do it at another time, Your Honor.

04:37 9     MS. OLSHEFSKI: That's fine.

04:38 10     MR. CASEY: I do have a request of the Court that I be

04:38 11 permitted to collect some of the information that these

04:38 12 witnesses would have provided today to the Court and provide

04:38 13 that as an affidavit, in addition to that which has already

04:38 14 been submitted.

04:38 15     THE COURT: You can submit affidavits, I think you're

04:38 16 entitled to do that. In light of the circumstances, if you

04:38 17 think there's affidavits that you can put together in short

04:38 18 order, yes, fine.

04:38 19     As far as concluding for today, I don't know whether you

04:38 20 want to go back in to court to allow me to indicate what we

04:38 21 have done, would that be your approach?

04:38 22     MR. CASEY: That would be very helpful, Judge.

04:38 23     THE COURT: Okay, let's do that.

04:38 24     MR. CASEY: Thank you, Your Honor.

04:38 25     MS. OLSHEFSKI: Thank you, Your Honor.

04:38 1      (Discussion concluded in conference room.)

04:47 2      THE COURT: Mr. Casey, in support of your request for a

04:47 3  Franks hearing, would you state for the record the number of

04:47 4  affidavits that you have submitted in support of that request?

04:47 5      MR. CASEY: Yes, Your Honor. 48 declarations under oath

04:48 6  from witnesses, over 40 of whom were identified in the search

04:48 7  warrant to establish probable cause for the search of the

04:48 8  doctor's office.

04:48 9      THE COURT: Ms. Olshefski, earlier in this hearing, you

04:48 10  indicated that, in response to that -- and I think it's in your

04:48 11  memorandum, as well -- you submitted affidavits.

04:48 12      MS. OLSHEFSKI: Your Honor --

04:48 13      THE COURT: Actually, you submitted the DEA-6's, did you

04:48 14  not?

04:48 15      MS. OLSHEFSKI: The DEA-6's, as well as the affidavit of

04:48 16  Agent Derr, with a list of the patients that were actually

04:48 17  interviewed pre-affidavit.

04:48 18      THE COURT: All right. I've taken this time, as counsel

04:48 19  knows, to consult the decision in Franks, which is the basis

04:48 20  for the type of hearing that we need to hold here, and what

04:48 21  Franks requires is a preliminary finding by me, as the Judge

04:48 22  assigned to this case, based on the affidavits you've given me,

04:49 23  Mr. Casey, and any rebuttal that you provided, Ms. Olshefski,

04:49 24  and that preliminary finding has not been made by me.

04:49 25      Under Franks, a preliminary finding of that nature is

04:49 1 required before a Franks hearing may be held. And I'll just

04:49 2 briefly quote from the Supreme Court's decision in Franks,

04:49 3 where they say;

04:49 4     "We hold that when the Defendant makes a substantial

04:49 5 preliminary showing that a false statement knowingly and

04:49 6 intentionally or with reckless disregard for the truth was

04:49 7 included by the affiant in the warrant affidavit, and if the

04:49 8 allegedly false statement is necessary to the finding of

04:49 9 probable cause, the Fourth Amendment requires that a hearing be

04:49 10 held at the Defendant's request.

04:49 11     "In the event that, at that hearing, the allegations of

04:50 12 perjury or reckless disregard is established by the Defendant,

04:50 13 by a preponderance of the evidence, and with the affidavit's

04:50 14 false material set to one side, the affidavit's remaining

04:50 15 content is insufficient to establish probable cause, the search

04:50 16 warrant must be voided and the fruits of the search excluded,

04:50 17 to the same extent as if probable cause was lacking on the face

04:50 18 of the affidavit."

04:50 19     That is the decision in Franks quoted verbatim, and the

04:50 20 preliminary finding that would entitle your client to a Franks

04:50 21 hearing is something I must make, and as a matter of the Franks

04:50 22 decision, we cannot proceed to an evidentiary hearing unless I

04:50 23 make that preliminary finding first, and I haven't done that.

04:50 24     So for that reason, we cannot proceed today to hold the

04:50 25 Franks evidentiary hearing that you are seeking. So what I will

04:51 1 do is I will make -- I will review the materials you've

04:51 2 submitted, you've indicated, I think, that you wish to submit

04:51 3 something else as well.

04:51 4     MR. CASEY: Yes, if I may, Judge, I don't want to interrupt

04:51 5 you. So a number of the witnesses that were here today, I would

04:51 6 get affidavits to supplement the record. I suspect I could get

04:51 7 that done within 30 days, Your Honor. And I appreciate the

04:51 8 Court's consideration that a number of these witnesses came

04:51 9 from over an hour away and have interrupted their families and

04:51 10 stuff, that's on me, and I'll collect that information and

04:51 11 submit it to the Court for the Court's evaluation.

04:51 12     I have one other argument, but I'll pause here until then.

04:51 13     THE COURT: Ms. Olshefski, do you have any objection to

04:51 14 that approach?

04:51 15     MS. OLSHEFSKI: No, Your Honor. Perhaps, the Government

04:52 16 would have an opportunity to respond?

04:52 17     THE COURT: Sure. But, again, the point here is the law

04:52 18 requires, before I proceed to have the Franks hearing that the

04:52 19 Defendant is seeking, I must make a preliminary finding that

04:52 20 there is a basis to do so, that has not been done by me, and I

04:52 21 can't omit a step in the process, even though, by not omitting

04:52 22 it, there's some inconvenience, obviously, to everyone involved

04:52 23 in the proceeding.

04:52 24     I'm sorry, Mr. Casey, you were about to say something?

04:52 25     MR. CASEY: I know the Court knows this, but there is also

04:52 1 a facet -- although, the Franks dominates the interest and it

04:52 2 is the decision that has to be made for efficiency of testimony

04:52 3 -- there is also a probable cause argument, like a traditional

04:52 4 suppression issue, but if Diversion Investigator Derr is going

04:53 5 to testify it's more efficient for judicial resources to have

04:53 6 that done and Franks decided, either it's in or it's out, we

04:53 7 would know the scope of the examination.

04:53 8     As the Court alluded to earlier, you've got to hear from

04:53 9 the case agent first, and then the Court can be informed as to

04:53 10 how to proceed.

04:53 11     THE COURT: I think, should a Franks hearing, ultimately,

04:53 12 be held, that holding that along with the traditional inquiry

04:53 13 into probable cause would be the appropriate way to proceed.

04:53 14     MS. OLSHEFSKI: Your Honor, I would agree with that, and I

04:53 15 would also agree that Your Honor has to make the decision

04:53 16 whether or not there is probable cause, sufficient probable

04:53 17 cause, based upon everything that has been submitted in support

04:53 18 of false statements, as well, in addition to the Franks

04:53 19 hearing.

04:53 20     THE COURT: That's certainly true. Mr. Casey has asked for

04:53 21 30 days to submit his affidavits.

04:53 22     MS. OLSHEFSKI: No problem with that, Judge.

04:53 23     THE COURT: Do you need additional time to submit anything?

04:53 24     MS. OLSHEFSKI: I would request, like, 14 days subsequent

04:54 25 to that.

04:54 1    THE COURT: Fine. Now, the last issue before, I believe, we

04:54 2 can adjourn for the day is whether you wish to submit --

04:54 3 returning to the Daubert issue -- whether you intend to submit

04:54 4 any further briefing on that?

04:54 5    MS. CONABOY: Yes, Your Honor. If we could submit that at

04:54 6 the same time, within 30 days.

04:54 7    THE COURT: Sure. Ms. Olshefski?

04:54 8    MS. OLSHEFSKI: The Government does not believe that

04:54 9 further briefing on the Daubert issue is necessary, however, if

04:54 10 the Defense submits something, the Government would like to

04:54 11 respond within 14 days.

04:54 12    THE COURT: All right. And both requests are granted.

04:54 13 Before we close, is there anything else that we need to discuss

04:54 14 to keep this case on track?

04:54 15    MR. CASEY: Not from the Defense, Judge. Thank you.

04:54 16    MS. OLSHEFSKI: No, Your Honor. Thank you.

04:54 17    THE COURT: All right. Thank you, counsel, for your

04:54 18 assistance and input in this matter. We will proceed as we have

04:55 19 outlined here. Thank you.

04:55 20    (At this time the proceedings were adjourned.)

21

22

23

24

25

C E R T I F I C A T E

    I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

                S/Kristin L. Yeager
                KRISTIN L. YEAGER, RMR,CRR
                Official Court Reporter

REPORTED BY:

    KRISTIN L. YEAGER, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box 5
    Scranton, Pennsylvania  18501

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

**'**

**'12** [1] - 117:5
**'13** [1] - 117:6

# 0

**0057** [1] - 100:20

# 1

**1** [11] - 7:21, 7:23, 8:6, 8:9, 8:10, 28:20, 68:22, 111:9, 111:11, 111:12, 113:2
**10** [14] - 24:18, 24:19, 24:20, 25:5, 27:18, 27:21, 27:22, 28:16, 28:17, 28:24, 29:3, 72:6, 72:12, 113:16
**10/11/2012** [1] - 105:6
**100** [5] - 13:8, 29:5, 75:21, 76:6, 92:7
**104** [1] - 3:11
**10:30** [1] - 1:10
**10mg** [1] - 63:19
**11** [3] - 1:10, 35:10, 109:19
**1100** [1] - 68:12
**12** [4] - 29:4, 66:9, 71:16, 89:3
**12/25/14** [1] - 100:24
**12/4/2012** [1] - 107:6
**12/8/14** [2] - 100:23, 101:3
**1200** [2] - 29:6, 68:12
**1306.04** [3] - 44:24, 45:13, 71:23
**14** [2] - 144:24, 145:11
**15** [3] - 20:17, 72:18, 108:2
**15.92** [2] - 40:16
**150** [1] - 113:14
**16.92** [1] - 43:23
**160** [2] - 112:23, 113:20
**1692** [5] - 43:14, 43:25, 44:21, 60:7, 72:2
**170** [1] - 139:18
**180** [8] - 96:3, 96:5, 96:19, 97:19, 99:5, 99:17, 99:18, 99:24
**18501** [1] - 146:19
**18503** [3] - 1:15, 1:19, 1:25
**19** [4] - 56:7, 69:2, 69:4, 109:6
**19-CR-250** [1] - 1:5

# 2

**2** [10] - 47:13, 66:5, 66:6, 66:8, 71:15, 71:18, 72:11, 111:8, 119:1
**2-9** [1] - 72:13
**20** [17] - 20:17, 28:20, 29:1, 29:2, 54:24, 67:10, 68:22, 68:24, 69:15, 70:1, 83:14, 104:10, 104:13, 104:17, 111:12, 118:12, 129:20
**200** [4] - 56:9, 69:7, 69:8, 69:12
**2000** [3] - 12:17, 22:14, 75:13
**2002** [3] - 14:3, 14:5, 14:8
**2004** [3] - 40:25, 41:11, 42:2
**2005** [1] - 20:20
**2007** [2] - 23:11, 42:2
**2008** [1] - 78:11
**2009** [4] - 42:6, 50:22, 106:3, 119:1
**2011** [5] - 21:16, 42:3, 78:18, 78:19, 139:18
**2012** [6] - 106:1, 106:8, 109:19, 118:13, 125:8, 125:9
**2013** [15] - 40:25, 41:4, 41:19, 49:25, 50:8, 58:17, 92:14, 104:10, 104:13, 104:15, 104:18, 104:20, 108:3, 108:20, 109:6
**2014** [14] - 14:4, 14:5, 14:8, 35:10, 58:17, 58:24, 59:1, 59:4, 76:4, 77:17, 87:17, 92:15, 93:2, 112:25
**2015** [2] - 58:20, 79:22
**2016** [5] - 41:14, 41:19, 68:6, 87:16, 125:22
**2017** [1] - 58:22

# 2

**2018** [1] - 68:1
**2019** [3] - 3:12, 50:2, 66:9, 68:1, 70:11, 71:16, 89:3, 112:13
**2020** [8] - 5:23, 8:4, 66:12, 71:17, 89:3, 104:21, 123:14, 123:16
**2021** [1] - 1:10
**21** [11] - 40:16, 44:24, 45:12, 47:9, 47:17, 47:22, 71:23, 121:8, 121:10
**21st** [1] - 20:19
**22** [1] - 108:20
**235** [2] - 1:14, 1:24
**24** [2] - 26:18, 107:15, 115:3
**25** [3] - 48:15, 49:17, 71:22
**25.52** [1] - 48:22
**2552** [1] - 49:18
**260** [1] - 100:8
**28** [2] - 71:22, 146:6
**280** [1] - 100:5
**297** [1] - 123:12

# 3

**3** [11] - 22:17, 56:11, 66:5, 66:6, 66:11, 71:15, 71:16, 71:18, 72:11, 113:3, 129:20
**3/20** [1] - 109:4
**30** [11] - 29:12, 30:12, 64:8, 64:20, 67:11, 76:4, 77:17, 98:19, 143:7, 144:21, 145:6
**300** [1] - 96:12
**309** [1] - 1:14
**30th** [1] - 76:11
**3100** [3] - 96:13, 96:24, 100:3
**32** [1] - 69:10
**35** [1] - 67:22
**36** [1] - 113:5
**360** [1] - 63:19
**382** [1] - 125:22
**3C** [1] - 3:12

# 4

**4** [10] - 3:7, 3:14, 28:21, 28:22, 48:14, 48:22, 71:21, 72:11, 101:5
**4.5** [1] - 112:4
**40** [8] - 12:4, 23:14, 28:25, 29:2, 98:19, 133:7, 141:6

# 4

**400** [3] - 101:8, 101:17, 102:1
**425** [1] - 1:18
**431** [1] - 139:18
**48** [3] - 133:5, 138:10, 141:5
**49** [5] - 43:14, 43:23, 50:15, 60:6, 72:1

# 5

**5** [7] - 44:25, 47:1, 56:11, 71:22, 72:11, 113:14, 146:18
**50** [4] - 12:24, 68:24, 98:21
**56** [2] - 26:19, 114:24
**5845459** [1] - 125:8
**59** [1] - 100:6

# 6

**6** [9] - 47:6, 47:7, 47:12, 48:9, 71:23, 72:11, 92:14, 104:15, 104:20
**60** [6] - 29:1, 29:3, 96:12, 96:23, 100:3
**6153086** [1] - 123:16
**64506** [2] - 105:16, 117:15
**64562** [1] - 109:5
**64563** [1] - 108:18
**64564** [1] - 107:25
**64565** [1] - 107:13
**64566** [1] - 107:4
**64567** [1] - 106:5
**64568** [1] - 105:1
**69** [1] - 133:22
**6th** [1] - 3:12

# 7

**7** [13] - 27:11, 27:16, 27:17, 37:1, 49:21, 50:3, 66:12, 71:17, 71:24, 72:11, 85:17, 85:20, 89:3
**70** [1] - 113:15
**702** [2] - 102:25, 103:4
**75** [1] - 10:23
**753** [1] - 146:6

# 8

**8** [5] - 43:13, 72:1, 72:11, 106:8, 113:17
**8,000** [2] - 37:1, 115:25
**80** [2] - 111:9, 111:11

# 8

**809** [1] - 125:21
**829** [4] - 47:10, 47:17, 47:22, 71:24
**84** [1] - 113:4
**899** [1] - 123:12

# 9

**9** [9] - 5:23, 68:9, 69:22, 70:2, 72:4, 72:11, 85:20, 92:15, 111:8
**9/25/14** [2] - 100:25, 101:1
**90** [2] - 75:19, 75:20
**95** [2] - 75:19, 75:20
**9:00** [1] - 85:18

# A

**A.M** [1] - 1:10
**a.m** [2] - 85:17, 85:20
**abdomen** [2] - 109:13, 109:14
**able** [4] - 52:17, 65:10, 93:10, 124:22
**above-mentioned** [1] - 146:8
**absence** [3] - 54:7, 62:24, 101:10
**absolutely** [4] - 34:12, 54:21, 60:24, 111:17
**abstinence** [1] - 113:19
**abstract** [1] - 91:23
**abundance** [1] - 133:11
**abuse** [8] - 17:25, 54:1, 55:17, 57:25, 61:22, 63:10, 102:6
**Academy** [1] - 41:24
**accelerators** [1] - 114:25
**acceptable** [1] - 131:2
**accepted** [3] - 34:4, 57:13, 137:1
**access** [5] - 58:18, 58:19, 58:23, 59:3, 59:4
**accidents** [1] - 64:25
**accomplishments** [1] - 4:14
**accordance** [3] - 3:6, 34:4, 86:15
**according** [4] - 87:19, 102:11, 104:17
**account** [6] - 19:23, 111:14, 112:8, 112:10, 113:15, 137:19

**accurate** [1] - 45:9
**achieves** [1] - 55:8
**Act** [5] - 19:13, 19:14, 22:14, 40:12, 48:15
**act** [8] - 17:14, 18:10, 28:3, 31:25, 33:20, 48:18, 59:25, 64:15
**acted** [2] - 18:10, 32:1
**acting** [5] - 23:24, 23:25, 45:16, 60:2, 64:13
**active** [6] - 11:7, 17:10, 63:15, 76:3, 93:1, 93:19
**activities** [1] - 74:17
**activity** [1] - 40:19
**acts** [1] - 23:22
**actual** [6] - 34:23, 91:16, 131:18, 132:24, 136:7
**acute** [3] - 17:1, 27:8, 93:4
**acutely** [1] - 28:14
**add** [2] - 25:23, 64:1
**added** [1] - 77:11
**addicted** [1] - 20:25
**Addiction** [2] - 18:8, 22:14
**addiction** [14] - 12:12, 17:22, 17:25, 18:7, 18:9, 21:12, 22:15, 22:16, 22:19, 22:22, 22:25, 23:5, 27:5, 32:19
**addictive** [1] - 44:11
**addition** [6] - 4:13, 12:20, 26:24, 123:6, 140:13, 144:18
**additional** [11] - 6:6, 9:25, 19:21, 89:14, 89:23, 104:23, 119:16, 125:12, 128:14, 144:23
**additionally** [4] - 38:2, 41:20, 96:13, 96:14
**address** [5] - 21:8, 118:6, 119:23, 127:8, 136:1
**addressed** [3] - 117:15, 118:3, 118:4
**adduce** [1] - 127:7
**adequate** [8] - 37:25, 57:2, 57:3, 57:7, 64:11, 107:20, 108:21, 133:15
**adhere** [1] - 136:25
**adjacent** [1] - 110:10
**adjourn** [1] - 145:2
**adjourned** [1] - 145:20
**administered** [2] -

113:9, 116:23
**Administering** [2] - 44:20, 72:3
**administering** [2] - 40:17, 43:16
**Administration** [4] - 25:14, 26:6, 65:1, 81:10
**Administration** [1] - 135:10
**administrative** [3] - 18:15, 40:15, 40:21
**administratively** [1] - 40:19
**admissibility** [1] - 73:12
**admissible** [1] - 126:18
**admission** [5] - 6:7, 8:5, 27:15, 71:15, 71:20
**admitted** [9] - 5:8, 8:9, 8:10, 27:21, 27:22, 72:6, 72:12, 72:13, 117:20
**admitting** [1] - 14:12
**adopted** [1] - 50:19
**adulterants** [1] - 54:15
**advance** [1] - 66:20
**advise** [2] - 33:11, 43:23
**advisories** [1] - 68:16
**aesthetically** [1] - 62:14
**Affairs** [1] - 18:12
**affects** [1] - 94:17
**affiant** [4] - 120:19, 122:15, 122:17, 142:7
**Affiant** [3] - 127:18, 139:10, 139:16
**Affidavit** [11] - 120:7, 120:16, 125:18, 126:21, 127:1, 127:25, 132:25, 133:3, 135:15, 135:23, 138:18
**affidavit** [19] - 120:18, 120:25, 121:6, 121:13, 122:7, 122:24, 126:4, 127:22, 131:21, 132:15, 133:6, 133:24, 135:22, 139:9, 140:13, 141:15, 141:17, 142:7, 142:18
**affidavit's** [2] - 142:13, 142:14
**affidavits** [11] - 123:2,

132:1, 137:2, 139:22, 140:15, 140:17, 141:4, 141:11, 141:22, 143:6, 144:21
**affirmatively** [1] - 126:21
**affirmed** [1] - 5:14
**after-the-fact** [1] - 58:12
**afternoon** [4] - 74:3, 74:4, 120:23, 129:20
**AG's** [1] - 19:3
**Agent** [5] - 35:16, 121:11, 122:19, 126:9, 141:16
**agent** [1] - 144:9
**agents** [1] - 82:13
**ago** [3] - 82:1, 86:8, 117:24
**agonism** [1] - 28:4
**agonists** [1] - 25:11
**agree** [11] - 48:5, 49:8, 87:16, 89:10, 97:3, 97:18, 110:17, 127:18, 133:19, 144:14, 144:15
**agreed** [1] - 65:12
**ahead** [1] - 118:9
**aided** [1] - 1:22
**Air** [4] - 11:5, 11:7, 11:8, 11:11
**aired** [1] - 125:23
**airway** [2] - 62:21, 64:18
**alcohol** [1] - 57:25
**alert** [3] - 41:9, 46:12, 46:17
**alerts** [2] - 47:19, 52:9
**alive** [5] - 85:17, 93:7, 93:18, 94:4, 94:7
**allegations** [2] - 139:14, 142:11
**allege** [6] - 4:25, 5:1, 5:2, 139:8, 139:10, 139:11
**alleged** [2] - 4:5, 19:17
**allegedly** [2] - 108:21, 142:8
**allow** [7] - 38:5, 38:8, 103:23, 118:9, 128:16, 132:6, 140:20
**allowed** [13] - 5:6, 22:14, 22:16, 22:21, 23:1, 23:4, 41:21, 51:12, 60:17, 102:25, 103:4, 103:5, 128:13
**alluded** [1] - 144:8

**almost** [1] - 139:19
**alongside** [1] - 16:22
**alter** [1] - 59:5
**AMA** [1] - 87:19
**amended** [1] - 112:17
**Amendment** [4] - 122:15, 123:10, 129:4, 142:9
**AMERICA** [1] - 1:3
**America** [1] - 52:5
**American** [9] - 4:14, 15:24, 16:4, 16:8, 18:8, 41:24, 42:6, 78:25
**amount** [4] - 25:25, 26:21, 98:4, 98:17
**amounts** [1] - 99:18
**analgesia** [1] - 68:20
**analgesic** [3] - 26:8, 27:7, 27:9
**Analgesics** [2] - 50:7, 71:25
**analgesics** [5] - 18:1, 42:1, 51:3, 51:18, 63:3
**analysis** [4] - 76:15, 114:11, 115:6, 129:4
**anatomical** [1] - 95:3
**anatomically** [1] - 95:19
**anatomy** [1] - 10:15
**AND** [1] - 6:20
**anecdotal** [1] - 87:13
**Anesthesia** [3] - 11:13, 11:20, 12:16
**anesthesia** [13] - 9:12, 10:12, 11:20, 12:19, 12:24, 13:8, 13:14, 13:21, 32:15, 67:3, 91:18, 93:12, 93:13
**anesthesiologist** [6] - 8:16, 66:19, 67:18, 75:8, 95:1, 124:23
**Anesthesiologist** [2] - 11:10, 11:19
**anesthesiologists** [1] - 12:4
**Anesthesiology** [10] - 4:15, 9:14, 10:1, 10:20, 15:24, 74:20, 74:21, 75:2, 75:3, 75:5
**anesthesiology** [7] - 9:9, 9:11, 9:22, 9:24, 10:5, 10:7, 91:13
**anesthetic** [3] - 67:1, 67:2, 67:5
**anesthetics** [6] - 10:2, 10:4, 10:5, 10:16, 62:14, 93:23

**ankle** [1] - 108:23
**answer** [1] - 99:11
**answered** [1] - 94:1
**anti** [3] - 16:18, 82:3, 82:13
**anti-convulsants** [1] - 16:18
**anti-depressants** [2] - 82:3, 82:13
**antibiotic** [1] - 83:1
**antibiotics** [7] - 82:5, 82:15, 82:16, 82:17, 82:18, 82:25, 83:3
**anticipate** [2] - 88:18, 88:19
**anticonvulsants** [1] - 82:14
**anxiety** [1] - 58:2
**apneic** [1] - 62:9
**apologize** [2] - 89:17, 89:25
**appeal** [1] - 5:13
**Appendix** [1] - 139:18
**application** [2] - 88:16, 121:22
**applied** [6] - 17:3, 55:6, 58:16, 70:12, 122:6
**applies** [2] - 19:13, 19:14
**apply** [12] - 5:4, 41:12, 51:16, 70:7, 87:7, 87:20, 88:5, 88:12, 98:13, 128:16, 146:22
**applying** [1] - 125:19
**appointed** [2] - 10:22, 146:5
**appointments** [1] - 138:20
**appreciably** [1] - 115:5
**appreciate** [2] - 72:22, 143:7
**apprising** [1] - 73:8
**approach** [13] - 33:10, 37:2, 37:8, 54:18, 56:2, 87:25, 117:9, 130:10, 131:2, 132:4, 137:1, 140:21, 143:14
**appropriate** [20] - 10:8, 16:15, 18:18, 21:3, 51:6, 52:19, 52:22, 54:9, 54:10, 55:7, 56:1, 57:3, 73:9, 102:23, 120:2, 121:17, 124:14, 131:16, 136:16, 144:13

**appropriately** [4] - 53:2, 53:17, 55:17, 124:20
**approved** [1] - 22:18
**approving** [1] - 5:23
**April** [1] - 71:16
**area** [11] - 4:18, 4:20, 11:21, 47:16, 47:17, 72:25, 79:4, 79:7, 88:21, 114:7
**areas** [4] - 32:23, 41:6, 51:6, 110:4
**argue** [4] - 6:5, 126:7, 133:10, 137:22
**argued** [1] - 124:10
**argues** [1] - 5:20
**arguing** [1] - 132:21
**argument** [6] - 6:15, 73:13, 121:3, 122:14, 143:12, 144:3
**arguments** [1] - 137:24
**arise** [1] - 139:25
**arising** [1] - 18:7
**arms** [1] - 29:18
**arrangement** [1] - 38:19
**arrest** [4] - 35:19, 123:7, 123:25, 124:6
**arrhythmia** [1] - 81:3
**arrhythmias** [2] - 26:25, 81:10
**article** [6] - 42:6, 54:24, 91:16, 91:17, 91:20, 91:22
**articles** [1] - 91:12
**AS** [1] - 6:21
**aspect** [1] - 73:16
**aspects** [2] - 31:4, 97:14
**assailant** [1] - 122:13
**asserted** [1] - 126:20
**assertion** [1] - 99:9
**assertions** [1] - 129:18
**assessment** [5] - 16:6, 105:23, 105:24, 107:22, 117:4
**Assessment** [1] - 106:13
**assigned** [2] - 11:8, 141:22
**assistance** [1] - 145:18
**Assistant** [3] - 1:13, 11:12, 73:11
**associated** [14] - 18:3, 23:14, 26:5, 30:3, 30:6, 30:7, 30:8,

35:5, 52:1, 52:6, 61:23, 63:11, 69:17, 69:20
**Associates** [2] - 11:20, 12:16
**Association** [1] - 78:25
**associations** [1] - 43:5
**assume** [1] - 132:12
**assured** [1] - 55:7
**astray** [1] - 127:4
**attach** [1] - 134:15
**attack** [2] - 102:22, 120:6
**attacking** [3] - 15:7, 116:8, 116:10
**attempt** [5] - 5:6, 86:14, 87:5, 117:22, 122:25, 131:21
**attempting** [2] - 12:14, 37:20
**attended** [1] - 76:20
**attention** [10] - 24:17, 25:4, 37:14, 43:12, 47:5, 48:12, 49:21, 68:8, 117:14, 118:1
**Attorney** [4] - 1:13, 19:2, 73:11, 120:8
**ATTORNEY'S** [1] - 1:12
**attuned** [1] - 126:1
**atypical** [1] - 59:17
**audience** [1] - 21:8
**audiences** [1] - 21:9
**August** [4] - 3:12, 66:9, 89:3, 112:13
**authored** [9] - 3:25, 5:22, 66:9, 66:12, 89:1, 90:22, 103:2, 104:4, 104:22
**authoring** [1] - 91:25
**authorities** [5] - 39:23, 40:1, 42:22, 60:5, 71:21
**authority** [2] - 6:3, 137:22
**authorization** [1] - 121:9
**authorized** [2] - 45:23, 121:1
**Autolysis** [1] - 97:6
**autolysis** [4] - 84:20, 84:22, 97:4, 97:12
**autopsies** [6] - 83:12, 83:14, 83:15, 86:8, 86:11, 94:2
**autopsy** [8] - 35:2, 83:10, 83:13, 84:17, 84:19, 92:9, 99:22,

115:12
**avail** [1] - 90:10
**Available** [4] - 110:13, 117:15, 118:12, 118:19
**available** [11] - 58:25, 86:15, 87:1, 87:6, 89:13, 89:15, 89:23, 92:5, 104:8, 105:25, 123:18
**availed** [1] - 90:13
**availing** [2] - 90:10, 90:14
**Avenue** [4] - 1:14, 3:11, 119:24, 127:23
**AVENUE** [1] - 1:24
**average** [5] - 26:17, 100:5, 100:7, 100:8, 113:18
**avoided** [1] - 123:9
**await** [1] - 138:3
**awakening** [1] - 62:15
**aware** [9] - 51:8, 67:25, 81:2, 81:6, 81:8, 104:12, 118:22, 123:19
**axiom** [2] - 25:20, 55:5

## B

**babysitters** [1] - 138:19
**back-drop** [1] - 42:3
**background** [4] - 44:23, 50:25, 66:18, 66:20
**backside** [1] - 86:6
**backwards** [1] - 128:15
**baclofen** [2] - 13:6, 13:12
**bad** [4] - 39:9, 57:19, 57:20, 57:24
**bag** [1] - 23:18
**balance** [3] - 18:3, 18:9, 22:2
**balanced** [1] - 132:23
**Baltimore** [2] - 9:9, 9:23
**base** [2] - 37:24, 67:23
**based** [27] - 38:10, 42:20, 47:4, 53:15, 57:2, 57:10, 65:7, 77:19, 79:15, 80:15, 86:13, 86:14, 86:15, 86:20, 86:21, 86:25, 99:8, 99:16, 103:22, 114:17, 117:4, 118:17, 134:24, 137:1, 139:22,

141:22, 144:17
**basic** [1] - 27:14
**basis** [2] - 3:16, 14:8, 42:7, 58:6, 89:7, 103:3, 132:2, 133:15, 136:20, 138:23, 141:19, 143:20
**bathes** [1] - 109:25
**bears** [1] - 46:15
**became** [3] - 14:3, 20:21, 58:21
**become** [6] - 10:21, 10:24, 17:24, 51:18, 52:2, 62:9
**becomes** [2] - 37:20, 89:14
**BEEN** [1] - 6:21
**BEFORE** [1] - 1:10
**beforehand** [1] - 57:23
**began** [2] - 13:8, 51:21
**begin** [3] - 6:14, 24:7, 83:1
**beginning** [4] - 20:20, 23:11, 25:22, 117:13
**begins** [2] - 56:8, 69:17
**behalf** [5] - 3:8, 6:11, 73:24, 76:16, 76:21
**behavior** [9] - 19:23, 39:15, 40:10, 40:14, 41:16, 42:12, 54:2, 64:12, 88:21
**behind** [1] - 20:7
**belief** [1] - 135:23
**believability** [1] - 103:24
**below** [1] - 111:13
**bench** [3] - 136:15, 136:21, 137:15, 138:1, 138:2
**beneficial** [1] - 52:24
**benefit** [2] - 27:9, 60:12
**Bennett** [3] - 3:11, 119:24, 127:23
**benzodiazepine** [5] - 58:21, 64:2, 64:7, 65:1, 119:4
**benzodiazepines** [6] - 64:5, 64:15, 64:22, 106:4, 110:15, 118:25
**best** [6] - 26:1, 56:16, 68:18, 86:15, 86:25, 87:6
**between** [15] - 13:1, 18:9, 22:2, 41:19,

63:3, 68:22, 68:24, 70:16, 85:20, 90:14, 96:12, 96:23, 98:19, 135:5, 135:18
**beyond** [2] - 23:7, 115:1
**bibliography** [3] - 91:14, 91:15, 91:23
**big** [1] - 70:21
**binder** [10] - 7:2, 7:5, 7:19, 7:22, 24:18, 43:13, 68:9, 100:20, 100:21, 104:25
**binding** [2] - 6:4, 6:5
**Biology** [1] - 9:2
**bit** [3] - 35:22, 42:23, 73:21
**black** [2] - 23:11, 24:9
**blind** [2] - 87:2, 87:11
**blinded** [1] - 56:22
**bliss** [1] - 59:23
**blockage** [1] - 110:2
**blocking** [1] - 64:16
**blocks** [1] - 14:20
**blood** [20] - 62:18, 62:22, 63:14, 67:16, 85:5, 85:12, 94:15, 94:19, 95:3, 95:17, 95:19, 95:20, 95:24, 96:7, 97:8, 97:9, 97:10, 97:19, 98:11, 100:5
**Board** [14] - 4:14, 15:23, 15:24, 16:4, 16:9, 18:22, 18:24, 50:20, 50:21, 51:1, 77:4, 77:11, 77:22, 124:22
**board** [3] - 21:1, 50:20, 52:9
**Board's** [3] - 50:6, 50:16, 60:10
**Boards** [3] - 40:22, 41:7, 50:12
**boards** [3] - 43:5, 49:22, 50:13
**bodies** [2] - 26:21, 30:2
**body** [11] - 23:21, 23:22, 23:25, 24:5, 26:15, 26:16, 86:1, 96:1, 102:11, 102:14, 112:6
**bolster** [1] - 117:22
**Bon** [1] - 36:12
**bone** [1] - 30:3
**bones** [1] - 29:19
**book** [2] - 50:23, 137:7
**bottle** [2] - 115:15,

115:23
**bottom** [3] - 101:2, 101:15, 109:20
**bounds** [1] - 18:18
**Box** [2] - 1:14, 146:18
**box** [4] - 23:11, 24:10, 25:22, 131:5
**Brady** [6] - 121:5, 121:22, 124:17, 124:18, 132:22
**brain** [4] - 28:5, 64:14, 64:16, 110:1
**branch** [1] - 17:19
**brand** [1] - 24:13
**Brann** [2] - 5:17, 5:22
**Brann's** [1] - 6:4
**Braun** [1] - 132:25
**break** [4] - 30:2, 74:6, 97:6, 131:4
**breathe** [1] - 62:10
**breathing** [4] - 62:10, 62:11, 64:14, 67:12
**brief** [4] - 6:7, 105:24, 128:21, 131:6
**briefed** [1] - 126:13
**briefing** [2] - 145:4, 145:9
**briefly** [2] - 87:15, 142:2
**BRIER** [22] - 1:16, 3:4, 6:11, 6:15, 8:8, 27:20, 71:19, 72:10, 73:24, 74:2, 102:25, 103:13, 103:19, 104:2, 104:3, 114:10, 116:13, 116:24, 117:19, 118:4, 119:12, 119:20
**Brier** [10] - 1:17, 6:11, 6:13, 8:7, 27:19, 72:8, 73:23, 73:24, 119:11, 119:18
**bring** [6] - 53:20, 93:18, 121:10, 121:14, 126:7, 126:10
**broach** [1] - 73:11
**broad** [3] - 21:13, 99:1, 123:6
**brought** [1] - 117:25
**builds** [4] - 24:5, 26:17, 110:5, 112:6
**buprenorphine** [3] - 22:19, 22:21, 22:24
**burden** [4] - 122:22, 132:22, 139:4, 139:15
**burdensome** [1] - 123:5

**Bureau** [2] - 18:11, 18:20
**but-for** [10] - 4:10, 5:12, 6:2, 33:7, 61:20, 65:6, 66:3, 66:17, 96:18, 116:15
**BY** [12] - 7:12, 7:18, 8:12, 13:15, 27:24, 74:2, 104:3, 114:10, 116:13, 117:3, 118:11, 146:15

### C

**C-change** [1] - 41:25
**C-section** [1] - 109:14
**CALLED** [1] - 6:20
**canal** [2] - 109:24, 110:1
**Cancer** [1] - 30:9
**cancer** [16] - 17:1, 55:2, 68:25, 70:8, 70:12, 70:14, 70:15, 70:16, 70:17, 70:20, 70:24, 71:2, 71:4, 93:4
**cannot** [7] - 85:6, 85:13, 111:14, 115:21, 115:25, 142:22, 142:24
**capacity** [1] - 138:21
**captioned** [1] - 5:17
**Caputo** [5] - 4:22, 5:6, 5:7, 6:4, 112:1
**Caputo's** [1] - 5:14
**Caraballo** [1] - 134:19
**cardiac** [3] - 25:9, 81:3, 81:10
**cardiology** [2] - 80:25, 81:1
**Care** [9] - 9:14, 10:1, 10:20, 74:24, 74:25, 75:3, 75:5, 75:7, 75:10
**care** [30] - 10:10, 10:11, 10:12, 18:17, 27:9, 30:17, 33:19, 37:16, 37:21, 38:6, 38:22, 54:20, 61:25, 77:19, 77:21, 77:22, 77:25, 78:5, 79:10, 79:11, 79:15, 79:17, 82:22, 83:2, 104:9, 105:7, 105:8, 112:25, 130:3, 134:11
**career** [4] - 31:5, 32:13, 34:11, 74:15
**careful** [4] - 23:13, 53:12, 55:22

**Carolina** [2] - 123:15, 125:9
**Case** [1] - 9:1
**case** [63] - 3:25, 4:11, 5:5, 5:11, 6:2, 30:20, 33:1, 33:11, 33:12, 35:23, 37:6, 39:21, 44:18, 44:22, 47:2, 48:10, 49:18, 50:1, 51:4, 60:1, 60:11, 61:10, 61:12, 65:7, 65:22, 65:23, 66:21, 70:5, 81:17, 81:18, 84:5, 84:11, 85:4, 88:25, 95:18, 97:10, 98:9, 102:21, 103:17, 111:18, 112:2, 119:8, 121:1, 121:6, 121:24, 121:25, 122:8, 122:17, 123:12, 123:13, 123:15, 123:16, 124:10, 124:11, 125:6, 127:18, 132:8, 132:17, 132:21, 139:18, 141:22, 144:9, 145:14
**cases** [23] - 6:6, 19:8, 26:10, 26:24, 27:1, 27:3, 31:8, 31:12, 31:17, 31:20, 33:8, 33:18, 64:21, 71:3, 76:16, 76:24, 88:4, 121:25, 122:2, 125:6, 140:2
**CASEY** [32] - 3:3, 72:22, 73:18, 126:13, 127:20, 128:3, 128:22, 129:24, 130:5, 130:12, 130:20, 130:24, 132:19, 132:21, 133:9, 133:13, 133:19, 135:1, 135:17, 137:11, 137:21, 138:9, 138:13, 138:25, 140:8, 140:10, 140:22, 140:24, 141:5, 143:4, 143:25, 145:15
**Casey** [7] - 1:17, 120:8, 130:22, 141:2, 141:23, 143:24, 144:20
**categories** [3] - 40:1, 40:4, 127:8
**cater** [2] - 51:11, 51:12

**causation** [1] - 116:15
**causes** [1] - 63:14
**causing** [2] - 44:6, 53:4
**caution** [1] - 23:10
**cava** [2] - 94:20, 97:11
**caveat** [1] - 134:4
**CDC** [14] - 21:16, 41:12, 41:14, 41:15, 41:17, 68:5, 68:7, 68:14, 68:18, 70:5, 70:11, 72:4, 87:16, 111:3
**ceased** [1] - 96:6
**cells** [1] - 97:6
**Center** [3] - 9:8, 9:17, 11:9
**center** [5] - 11:11, 11:24, 29:23, 39:16, 42:8
**Centers** [1] - 51:22
**central** [4] - 11:11, 100:7, 109:24, 110:1
**century** [1] - 20:19
**CEO** [1] - 75:14
**cerebral** [4] - 109:23, 109:24, 110:3, 110:4
**certain** [5] - 5:9, 20:2, 33:21, 35:9, 42:11, 51:9, 120:22, 123:25
**certainly** [9] - 56:9, 67:21, 74:8, 81:1, 97:24, 103:20, 103:21, 137:9, 144:20
**certainty** [2] - 71:11, 71:13
**certificate** [1] - 146:22
**Certificate** [2] - 16:7, 16:11
**Certification** [1] - 78:8
**certification** [4] - 4:15, 15:25, 16:2, 77:5
**certifications** [1] - 16:14
**Certified** [3] - 4:16, 16:3, 77:3
**certified** [5] - 15:23, 15:24, 16:1, 22:10, 77:11, 77:22, 78:13, 124:22
**CERTIFIED** [1] - 1:24
**certifies** [1] - 77:4
**certify** [2] - 146:6, 146:10
**certifying** [1] - 146:23
**CFR** [6] - 44:24, 45:12, 46:25, 49:12, 71:23, 88:10
**chair** [1] - 86:5

**challenge** [2] - 103:4, 103:5
**challenging** [1] - 102:20
**chance** [1] - 56:12
**change** [8] - 41:25, 67:25, 78:19, 89:24, 94:13, 98:24, 117:6, 118:17
**changed** [4] - 78:15, 78:16, 78:22, 78:23
**changes** [2] - 68:5, 94:14
**changing** [1] - 70:19
**Chapter** [3] - 48:14, 49:17, 71:22
**characteristics** [2] - 26:10, 28:7
**characterization** [1] - 135:19
**charged** [2] - 19:12, 32:5
**chart** [2] - 110:18, 111:3
**chasm** [1] - 67:4
**check** [1] - 103:1
**chemicals** [1] - 102:1
**Chemistry** [1] - 9:3
**chest** [1] - 62:12
**chief** [1] - 26:5
**Chief** [6] - 9:13, 10:19, 10:21, 10:22, 10:24, 11:12
**Chou** [1] - 42:6
**chronic** [29] - 12:10, 15:4, 15:19, 16:16, 16:20, 17:1, 17:24, 18:4, 21:24, 21:25, 22:22, 27:8, 28:19, 29:15, 51:3, 54:25, 58:1, 58:6, 68:25, 70:12, 70:13, 70:16, 70:17, 78:18, 81:19, 93:4, 105:9
**Chronic** [4] - 40:23, 41:23, 50:7, 72:1
**chronological** [1] - 37:17
**cigarette** [1] - 58:1
**Circuit** [10] - 4:19, 5:13, 5:14, 121:24, 122:4, 122:14, 123:12, 125:22, 125:25, 139:18
**circumstance** [1] - 58:16
**circumstances** [9] - 20:2, 60:18, 61:16, 63:9, 70:24, 114:19, 124:4, 124:7, 140:16

**citation** [1] - 139:7
**citations** [2] - 99:4, 126:14
**cite** [8] - 99:10, 99:12, 99:15, 114:18, 122:2, 123:12, 125:6, 125:7
**cited** [4] - 6:6, 99:8, 123:15, 140:3
**citing** [1] - 139:17
**City** [1] - 123:14
**civil** [3] - 31:12, 31:17, 33:18
**claim** - 122:18
**claimed** [1] - 125:11
**clarification** [2] - 83:5, 84:8
**cleaned** [1] - 131:5
**cleanly** [1] - 30:2
**clear** [5] - 38:5, 55:3, 65:12, 69:9, 101:9
**clearest** [2] - 89:17, 89:19
**clearly** [5] - 41:10, 64:23, 89:17, 90:1, 137:6
**CLERK** [2] - 6:22, 7:1
**Cleveland** [2] - 9:2, 32:11
**client** [1] - 142:20
**clinic** [3] - 12:6, 12:20, 14:8
**Clinic** [3] - 36:9, 113:9, 116:23
**clinical** [20] - 17:10, 54:5, 61:16, 76:1, 76:3, 86:17, 86:22, 87:2, 87:11, 87:12, 88:17, 88:18, 89:12, 93:1, 93:15, 93:19, 95:9, 97:2, 99:3
**clinically** [1] - 77:18
**close** [1] - 145:13
**closed** [2] - 62:10, 62:11
**closing** [1] - 62:20
**co** [1] - 65:1
**co-administration** [1] - 65:1
**Code** [13] - 43:7, 43:15, 43:20, 43:22, 44:19, 45:7, 47:10, 60:6, 71:22, 71:24, 72:2, 88:10, 146:6
**code** [3] - 40:16, 43:7, 43:25
**codes** [1] - 51:10
**Colkley** [5] - 121:24, 122:4, 123:11, 123:13, 123:17

**colleagues** [1] - 22:6
**collect** [2] - 140:11, 143:10
**collection** [2] - 109:23, 110:5
**college** [2] - 8:24, 9:4
**College** [1] - 8:25
**combinations** [1] - 67:17
**comfortable** [4] - 128:5, 136:14, 137:25, 138:2
**coming** [4] - 7:25, 24:9, 72:24, 87:9
**commencement** [1] - 3:14
**commissions** [1] - 39:8
**committed** [1] - 135:24
**common** - 17:21, 29:21, 29:22, 62:13, 98:20, 102:6
**commonly** [2] - 27:4, 101:18
**Commonwealth** [10] - 8:18, 18:14, 18:18, 33:22, 34:9, 40:13, 48:16, 50:9, 50:23, 79:13
**communicated** [1] - 37:23
**community** [5] - 21:10, 34:6, 57:15, 77:19, 79:15
**community-based** [2] - 77:19, 79:15
**Comp** [1] - 75:24
**company** [2] - 13:19, 13:23
**compare** [2] - 25:21, 28:6
**compared** [3] - 23:8, 28:5, 101:17
**comparing** [1] - 38:19
**compartment** [1] - 97:8
**compartments** [1] - 94:13
**Compensation** [3] - 17:12, 75:22, 75:23
**Competence** [2] - 16:7, 16:11
**competency** [1] - 77:9
**Competency** [1] - 78:8
**complaints** [1] - 61:23
**complete** [3] - 74:16, 113:19, 130:25
**completed** [1] - 78:5
**completely** [1] - 98:5

**completing** [1] - 9:11
**complications** [1] - 51:25
**comply** [1] - 44:16
**comprehensive** [2] - 80:19, 89:6
**compresses** [1] - 110:6
**comprise** [1] - 21:8
**comprised** [1] - 50:13
**computer** [1] - 1:22
**computer-aided** [1] - 1:22
**computerized** [1] - 118:21
**CONABOY** [1] - 145:5
**Conaboy** [1] - 1:18
**conceivable** [2] - 88:18, 88:19
**concentrate** [1] - 13:22
**concentrates** [1] - 17:6
**concentrating** [1] - 12:10
**concentration** [2] - 96:2, 96:9
**concentrations** [4] - 9:2, 67:9, 96:11, 100:5
**concerned** [3] - 10:8, 17:20, 130:6
**concerning** [1] - 10:14
**conclude** [2] - 73:20, 89:14
**concluded** [2] - 122:4, 141:1
**concluding** [2] - 136:19, 140:19
**conclusion** [1] - 63:19
**conclusions** [10] - 5:1, 5:2, 36:25, 40:2, 44:22, 47:2, 48:9, 49:18, 51:4, 60:16
**conclusory** [1] - 139:14
**concussion** [1] - 30:8
**condition** [5] - 15:18, 38:5, 38:9, 61:20, 82:19
**conditions** [2] - 10:9, 130:7
**conduct** [2] - 73:15, 129:4
**conducted** [3] - 35:15, 48:1, 53:11
**conference** [6] - 3:6, 3:14, 129:3, 131:7, 137:17, 141:1
**confronted** [2] -

59:15, 60:23
**Connecticut** [1] - 129:10
**connection** [1] - 119:19
**cons** [1] - 44:7
**consciousness** [2] - 64:16, 64:18
**consensus** [2] - 41:22, 86:17
**consequence** [1] - 139:25
**consequences** [1] - 123:7
**consider** [3] - 124:5, 136:25, 138:25
**consideration** [4] - 65:8, 65:9, 136:21, 143:8
**considered** [3] - 27:10, 68:15, 87:12
**consistent** [4] - 62:8, 68:19, 120:21, 120:22
**consult** [3] - 19:2, 19:16, 141:19
**consultant** [5] - 17:15, 17:18, 18:11, 32:1
**Consultants** [2] - 13:24, 75:15
**consultation** [3] - 12:6, 14:9, 38:18
**consulted** [1] - 17:23
**contact** [1] - 104:19
**contacted** [1] - 101:10
**contained** [1] - 55:1
**contains** [1] - 24:14
**contemplating** [1] - 131:17
**content** [1] - 142:15
**contention** [1] - 127:21
**contents** [1] - 97:7
**contest** [1] - 123:7
**context** [1] - 40:10
**Contin** [3] - 106:20, 106:22, 106:25
**continue** [4] - 17:10, 18:10, 72:18, 100:10
**continues** [3] - 28:18, 139:7, 139:13
**continuous** [1] - 112:23
**contradicting** [1] - 139:16
**contradictory** [1] - 122:11
**contribute** [2] - 26:10, 119:8
**contributory** [1] -

62:23
**Control** [1] - 51:23
**control** [5] - 52:11, 55:19, 63:10, 64:11, 146:23
**Controlled** [10] - 16:7, 16:13, 19:13, 19:14, 40:12, 44:20, 48:15, 58:25, 72:3, 78:8
**controlled** [39] - 16:12, 16:16, 16:17, 16:19, 18:16, 19:25, 20:1, 20:16, 20:18, 20:20, 20:23, 20:24, 21:3, 22:1, 43:17, 44:2, 44:9, 45:14, 45:18, 46:2, 46:24, 49:1, 49:4, 52:6, 52:21, 52:24, 53:13, 57:16, 57:21, 58:5, 59:7, 59:20, 67:5, 79:6, 79:8, 79:18, 79:19, 86:16, 87:2
**controversial** [1] - 55:2
**conveniently** [1] - 118:1
**convent** [1] - 30:1
**conversation** [1] - 84:9
**conversion** [7] - 25:10, 25:16, 29:4, 111:10, 112:4, 112:7, 114:1
**conversions** [1] - 111:14
**convert** [1] - 28:22
**converting** [1] - 25:13
**convey** [1] - 92:1
**conveyed** [1] - 22:5
**convulsants** [1] - 16:18
**cookie** [1] - 87:25
**cookie-cutter** [1] - 87:25
**copious** [1] - 62:6
**copy** [4] - 50:21, 74:10, 74:13, 101:6
**cord** [11] - 14:23, 14:25, 28:5, 29:16, 29:20, 109:24, 109:25, 110:2, 110:9, 110:10
**cornerstone** [2] - 67:1, 78:19
**coroner** [5] - 35:9, 61:17, 63:13, 65:12, 92:10
**coroner's** [2] - 92:9, 115:8

**correct** [200] - 7:19, 9:17, 13:17, 15:6, 17:16, 22:11, 25:6, 31:11, 43:20, 45:10, 47:9, 49:13, 49:14, 49:25, 60:13, 74:13, 74:17, 74:21, 74:22, 75:1, 75:6, 75:9, 75:11, 75:15, 75:25, 76:1, 76:4, 76:5, 76:7, 76:11, 76:12, 76:18, 76:22, 76:23, 76:25, 77:7, 77:12, 77:19, 77:23, 78:1, 78:3, 78:10, 78:11, 78:20, 78:23, 79:1, 79:5, 79:6, 79:8, 79:16, 79:23, 79:24, 80:6, 80:9, 80:11, 80:20, 80:21, 80:23, 80:24, 81:4, 81:11, 81:19, 81:22, 81:23, 81:24, 82:3, 82:6, 82:8, 82:11, 82:22, 83:8, 83:9, 84:4, 84:13, 84:14, 84:22, 85:19, 85:21, 85:22, 86:6, 86:20, 86:22, 87:9, 87:13, 87:14, 87:17, 87:18, 87:21, 88:1, 88:7, 88:13, 88:18, 89:1, 89:3, 89:4, 89:8, 89:12, 89:20, 90:3, 90:18, 90:22, 91:2, 91:3, 91:9, 91:10, 91:11, 91:18, 91:22, 92:1, 92:3, 92:15, 92:16, 92:18, 92:23, 93:7, 93:11, 93:14, 93:18, 93:21, 94:3, 94:4, 94:5, 94:8, 94:9, 94:11, 94:15, 94:16, 94:17, 94:18, 94:23, 95:3, 95:19, 97:1, 97:13, 98:2, 98:6, 98:12, 99:11, 99:14, 99:25, 100:3, 100:8, 100:13, 101:2, 101:20, 102:1, 102:5, 102:9, 102:12, 102:15, 103:17, 104:18, 104:23, 105:9, 105:18, 105:21, 106:12, 106:13, 106:15, 106:18, 106:21, 106:23, 107:11, 107:16, 108:5, 108:10, 108:14, 108:16,

108:25, 109:1, 109:8, 109:11, 109:12, 109:14, 109:15, 110:9, 110:22, 110:23, 111:1, 111:4, 111:10, 111:16, 111:23, 111:25, 112:9, 112:11, 112:15, 112:16, 112:18, 114:12, 115:16, 116:16, 116:17, 117:18, 119:20, 127:20, 128:3, 129:18, 146:7
**correctly** [6] - 78:9, 86:18, 92:11, 101:12, 101:19, 104:10
**corresponding** [3] - 45:19, 46:3, 49:5
**Cosmetics** [1] - 48:15
**counsel** [12] - 7:6, 7:8, 44:7, 72:20, 74:9, 117:15, 119:22, 120:2, 136:23, 137:24, 141:18, 145:17
**count** [4] - 53:16, 53:21, 115:23, 116:2
**counting** [1] - 53:18
**counts** [1] - 58:13
**County** [3] - 32:2, 32:3, 32:10
**couple** [2] - 25:4, 132:4
**course** [48] - 4:6, 5:10, 5:25, 10:10, 10:18, 11:1, 11:6, 14:1, 16:1, 19:10, 23:6, 32:6, 33:4, 33:16, 33:24, 38:2, 38:16, 39:2, 39:11, 39:14, 40:8, 40:19, 42:19, 45:5, 45:16, 45:22, 47:25, 49:3, 52:4, 52:15, 56:11, 57:12, 63:21, 65:4, 65:24, 67:22, 69:11, 74:15, 90:23, 93:23, 113:16, 117:11, 121:16, 124:7, 130:19, 135:11, 136:2, 136:3
**COURT** [74] - 1:1, 3:1, 3:5, 3:21, 6:10, 6:13, 6:17, 7:7, 7:10, 7:17, 8:7, 8:9, 27:17, 27:19, 27:21, 71:18, 72:8, 72:11, 72:18,

72:20, 73:15, 73:19, 102:17, 103:12, 103:16, 103:20, 114:9, 116:5, 116:12, 116:25, 118:6, 119:11, 119:13, 119:15, 119:18, 119:21, 120:5, 127:16, 127:21, 128:4, 129:2, 129:15, 129:25, 130:3, 130:10, 130:19, 130:22, 130:25, 131:4, 131:8, 132:20, 133:8, 133:12, 133:14, 134:20, 136:11, 136:14, 137:13, 139:1, 140:15, 140:23, 141:2, 141:9, 141:13, 141:18, 143:13, 143:17, 144:11, 144:20, 144:23, 145:1, 145:7, 145:12, 145:17
**court** [6] - 7:25, 24:9, 75:20, 76:14, 76:20, 140:20
**Court** [57] - 7:5, 14:18, 31:10, 32:22, 33:11, 37:9, 66:24, 73:2, 73:8, 73:11, 97:4, 99:14, 120:22, 122:21, 123:9, 123:16, 123:17, 124:2, 125:10, 125:15, 125:23, 125:25, 126:5, 126:15, 126:16, 126:17, 127:4, 127:6, 130:12, 130:13, 133:11, 134:15, 134:22, 136:8, 136:9, 136:10, 137:23, 137:25, 138:1, 138:8, 138:11, 138:12, 138:15, 138:16, 138:25, 140:10, 140:12, 143:11, 143:25, 144:8, 144:9, 146:3, 146:4, 146:14, 146:17, 146:17
**Court's** [5] - 128:23, 138:3, 142:2, 143:8, 143:11
**courtroom** [2] - 4:12, 111:23

**Courts** [1] - 4:18
**courts** [2] - 31:3, 125:18
**coverage** [1] - 14:11
**covered** [1] - 74:21
**covering** [3] - 11:20, 48:3, 48:4
**Coyer** [5] - 84:11, 100:15, 100:23, 101:21, 102:3
**Coyer's** [1] - 101:15
**cream** [1] - 106:21
**credential** [2] - 77:12, 78:14
**credibility** [6] - 102:23, 114:7, 116:9, 116:10, 117:23, 128:12
**crime** [4] - 125:17, 125:20, 135:24, 135:25
**criminal** [4] - 31:7, 31:20, 76:17, 76:21
**Critical** [9] - 9:14, 10:1, 10:20, 74:24, 74:25, 75:3, 75:5, 75:7, 75:10
**critical** [3] - 10:10, 25:12, 90:9
**criticism** [1] - 90:14
**cross** [5] - 73:23, 128:8, 130:17, 130:20, 131:18
**CROSS** [1] - 74:1
**cross-examine** [2] - 73:23, 130:20
**cross-examined** [1] - 130:17
**CRR** [1] - 1:23
**culpable** [1] - 139:10
**current** [8] - 8:3, 37:22, 44:17, 74:13, 75:17, 76:1, 76:24, 78:24
**curriculum** [11] - 7:24, 8:1, 8:3, 8:14, 17:14, 19:1, 20:15, 22:9, 31:25, 74:10, 74:13
**cut** [1] - 62:5
**cutter** [1] - 87:25
**cutting** [1] - 70:18
**Cuyahoga** [3] - 32:1, 32:3, 32:10
**cyst** [1] - 109:21

**D**

**D.O.'s** [1] - 18:23
**dad** [1] - 67:2
**daily** [4] - 14:8, 27:2,

97:20, 98:16
**Dame** [35] - 3:24, 4:9, 33:15, 34:16, 34:20, 35:13, 35:16, 35:24, 36:7, 36:14, 41:4, 41:13, 58:17, 60:13, 61:15, 61:21, 63:2, 63:21, 65:11, 81:19, 96:2, 104:9, 105:18, 107:10, 108:4, 108:24, 109:17, 112:14, 112:22, 112:24, 114:20, 115:24, 116:15, 116:22, 119:6
**Dame's** [4] - 4:1, 35:6, 60:13, 115:12
**dangerous** [1] - 60:4
**dangle** [2] - 67:3, 93:10
**Darby** [1] - 139:7
**Data** [4] - 110:13, 117:16, 118:12, 118:19
**data** [11] - 5:2, 22:14, 38:18, 51:15, 51:18, 55:24, 60:17, 101:16, 105:25, 114:14, 133:25
**DATA** [3] - 22:10, 22:17, 22:20
**database** [1] - 59:1
**date** [6] - 8:3, 92:20, 101:2, 106:7, 108:2, 146:9
**dated** [7] - 79:22, 100:22, 104:10, 105:6, 109:6, 112:13
**dates** [2] - 92:22, 146:9
**Daubert** [12] - 1:9, 72:15, 73:20, 102:19, 102:24, 118:8, 119:17, 119:19, 119:22, 120:1, 145:3, 145:9
**days** [11] - 26:18, 107:15, 113:11, 113:14, 113:16, 114:5, 143:7, 144:21, 144:24, 145:6, 145:11
**Dayton** [1] - 11:9
**de** [1] - 26:25
**DEA** [2] - 35:15, 121:4
**DEA-6's** [4] - 134:15, 134:16, 141:13, 141:15
**dead** [5] - 62:1, 85:12, 85:21, 94:10, 97:9

**deal** [2] - 18:4, 93:21
**dealer** [1] - 125:5
**dealing** [2] - 12:11, 70:23
**dealt** [1] - 137:9
**death** [45] - 3:24, 4:2, 4:10, 5:12, 6:2, 32:16, 33:7, 35:3, 35:6, 35:10, 36:18, 36:21, 56:12, 61:6, 61:8, 61:12, 61:16, 61:19, 62:2, 62:21, 62:23, 64:22, 64:23, 65:6, 65:11, 65:15, 65:16, 66:3, 66:17, 66:22, 69:10, 69:18, 80:5, 80:8, 80:19, 80:22, 85:14, 85:16, 94:13, 95:24, 96:2, 98:21, 99:21, 100:2, 116:15
**Death** [1] - 81:9
**deaths** [6] - 25:9, 52:6, 62:9, 80:11, 93:24, 98:18
**decade** [1] - 52:4
**decided** [3] - 13:21, 14:2, 144:6
**decision** [16] - 46:9, 124:3, 124:6, 124:14, 126:18, 126:19, 134:18, 134:23, 136:19, 140:2, 141:19, 142:2, 142:19, 142:22, 144:2, 144:15
**decision-making** [1] - 46:9
**decisions** [4] - 6:4, 6:5, 37:25, 38:1
**declaration** [2] - 42:2, 51:22
**declarations** [3] - 133:5, 138:10, 141:5
**decrease** [1] - 55:8
**dedicated** [1] - 86:10
**deemed** [3] - 32:23, 68:23, 87:8
**Defendant** [36] - 1:7, 3:8, 4:5, 4:10, 4:24, 5:20, 31:18, 31:21, 32:8, 34:24, 35:13, 35:18, 37:24, 38:4, 38:7, 65:24, 122:5, 122:9, 122:13, 124:24, 125:11, 125:14, 125:22, 126:3, 127:21, 129:11, 131:10,

132:1, 139:3, 139:4, 139:8, 139:15, 142:4, 142:12, 143:19
**DEFENDANT** [1] - 1:16
**Defendant's** [1] - 142:10
**Defendants** [1] - 76:17
**Defender's** [1] - 32:2
**Defense** [20] - 4:23, 5:18, 7:6, 31:23, 32:9, 117:5, 117:15, 120:20, 121:3, 121:10, 124:11, 124:21, 126:4, 126:20, 127:4, 127:5, 132:22, 135:2, 145:10, 145:15
**defer** [1] - 97:13
**deferred** [1] - 120:1
**define** [1] - 48:18
**defined** [2] - 33:25, 47:23
**defines** [2] - 47:18, 49:12
**defining** [1] - 71:24, 72:2
**definition** [1] - 49:19
**definitional** [4] - 47:17, 48:5, 49:8, 51:9
**definitions** [1] - 34:2
**degenerative** [2] - 29:24, 30:3
**degree** [4] - 9:1, 64:19, 71:11, 71:13
**Delaware** [5] - 18:15, 31:11, 120:14, 133:5, 138:14
**deliberately** [1] - 67:6
**deliver** [1] - 14:22
**delivery** [1] - 10:13
**Delivery** [1] - 75:11
**demand** [1] - 13:3
**demonstrate** [1] - 77:9
**demonstrated** [1] - 65:4
**Dennis** [1] - 132:25
**dentists** [1] - 17:24
**denying** [1] - 5:22
**department** [3] - 10:24, 11:1, 75:4
**Department** [12] - 9:14, 10:20, 18:11, 18:19, 19:7, 19:17, 58:15, 66:10, 75:4, 83:20, 108:9, 108:13

**depressants** [2] - 82:3, 82:13
**depression** [3] - 26:5, 26:7, 58:2
**Derr** [16] - 73:3, 121:11, 122:19, 126:9, 127:18, 127:22, 128:5, 128:18, 128:24, 130:9, 130:15, 131:1, 131:19, 135:10, 141:16, 144:4
**Derr's** [1] - 128:8
**describe** [3] - 20:8, 20:13, 70:15
**described** [5] - 20:6, 30:23, 31:1, 41:8, 42:24
**describes** [1] - 40:12
**description** [2] - 45:4, 122:11
**descriptions** [1] - 41:5
**descriptive** [1] - 42:11
**desire** [2] - 90:6
**Desk** [1] - 25:2
**desk** [1] - 59:4
**detail** [3] - 42:23, 92:5, 122:24
**details** [1] - 108:20
**detective** [1] - 125:12
**determinant** [1] - 95:8
**determination** [19] - 38:23, 39:13, 39:19, 42:18, 52:18, 57:1, 95:8, 97:15, 98:25, 123:4, 124:25, 128:11, 131:23, 132:6, 133:18, 137:1, 137:13, 137:20, 139:22
**determine** [13] - 37:18, 37:21, 52:20, 52:23, 53:4, 53:20, 56:17, 57:22, 61:6, 128:7, 128:13, 133:16, 136:9
**determined** [3] - 38:20, 63:13, 96:18
**determining** [8] - 38:2, 38:14, 46:10, 57:1, 61:19, 95:23, 124:5, 132:2
**detoxification** [3] - 106:3, 118:24, 119:3
**develop** [1] - 98:10
**developed** [1] - 11:10
**develops** [1] - 60:23
**deviate** [1] - 140:1
**deviations** [1] - 20:13

**devices** [2] - 14:22, 14:24
**Devices** [1] - 48:15
**devote** [1] - 13:8
**diabetes** [1] - 30:5
**diagnoses** [2] - 38:12, 38:13
**diagnosis** [9] - 16:25, 57:8, 60:19, 60:22, 60:25, 61:5, 61:10, 61:18, 110:11
**diagnostic** [1] - 38:18
**diazepam** [2] - 63:16, 63:23
**die** [3] - 70:22, 99:19, 99:20
**died** [6] - 62:7, 63:13, 63:22, 93:8, 96:11, 97:16
**difference** [8] - 70:15, 70:22, 90:14, 95:4, 95:16, 97:17, 115:5, 121:12
**differences** [1] - 111:15
**different** [21] - 23:18, 24:2, 28:6, 28:7, 33:18, 39:25, 40:4, 70:13, 70:20, 70:25, 71:6, 94:10, 95:21, 96:4, 112:11, 124:15, 125:4, 125:13, 136:23
**differential** [5] - 60:19, 60:22, 60:25, 61:5, 61:10
**differs** [1] - 23:17
**difficult** [1] - 130:6
**difficulties** [1] - 55:18
**difficulty** [1] - 51:6
**diminish** [1] - 15:10
**Diplomate** [1] - 4:14
**DIRECT** [1] - 7:11
**direct** [26] - 24:17, 37:15, 43:12, 47:5, 48:12, 49:20, 58:18, 58:19, 58:23, 72:16, 74:12, 74:23, 75:13, 76:13, 78:7, 80:13, 81:7, 87:3, 87:15, 87:22, 88:3, 89:1, 115:10, 116:14, 130:20, 146:23
**directed** [1] - 118:1
**directing** [2] - 25:4, 117:14
**direction** [3] - 48:13, 88:20, 98:23
**directions** [2] - 44:15, 49:7

**directives** [1] - 69:25
**directly** [5] - 14:22, 42:17, 59:4, 62:23, 134:8
**disability** [1] - 75:24
**Disability** [2] - 13:23, 75:14
**disabled** [3] - 73:1, 127:12, 138:22
**Discharge** [1] - 11:17
**disciplinary** [1] - 12:9
**disciplines** [1] - 9:21
**discourage** [1] - 123:8
**discuss** [3] - 71:3, 72:21, 145:13
**discussed** [2] - 3:14, 132:10
**discussing** [1] - 66:25
**discussion** [1] - 137:18
**Discussion** [1] - 141:1
**Disease** [1] - 51:22
**disease** [3] - 22:22, 29:24, 30:3
**diseases** [1] - 58:1
**diskette** [1] - 23:15
**disorder** [2] - 56:23, 58:2
**dispenses** [1] - 49:6
**dispensing** [4] - 40:17, 43:16, 45:18, 60:7
**Dispensing** [2] - 44:20, 72:3
**dispose** [1] - 129:7
**disregard** [7] - 120:17, 123:18, 126:24, 134:7, 136:7, 142:6, 142:12
**dissimilar** [1] - 67:17
**distinguish** [1] - 16:23
**distract** [1] - 123:3
**distribution** [3] - 23:16, 94:13, 94:14
**District** [11] - 4:21, 76:25, 123:15, 125:9, 125:10, 125:15, 125:23, 146:4, 146:17, 146:18
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 5:17
**Diversion** [2] - 73:3, 144:4
**divide** [1] - 12:22
**divided** [2] - 12:23, 23:19
**division** [1] - 10:2
**Doctor** [46] - 18:21, 19:1, 74:3, 74:12,

74:19, 78:7, 78:22, 80:10, 80:17, 81:14, 84:5, 84:9, 84:20, 84:24, 85:4, 85:23, 86:8, 89:5, 89:10, 89:17, 91:11, 94:1, 94:25, 95:15, 97:3, 97:4, 98:14, 99:11, 99:23, 100:17, 100:20, 101:2, 101:5, 103:11, 103:14, 104:6, 104:17, 104:21, 108:12, 109:16, 109:20, 110:17, 112:20, 114:11, 115:11, 116:14

**doctor** [48] - 25:2, 27:12, 29:12, 30:25, 31:1, 34:4, 37:23, 42:15, 56:19, 60:18, 74:9, 75:13, 75:17, 79:21, 82:1, 83:10, 86:13, 87:15, 88:25, 89:25, 90:9, 92:8, 92:25, 95:1, 97:18, 99:4, 100:12, 100:22, 104:4, 104:12, 104:25, 106:5, 107:4, 107:13, 107:25, 108:18, 109:5, 110:12, 110:25, 111:18, 112:13, 115:7, 125:4, 133:2, 135:5, 135:11, 135:13

**doctor's** [1] - 141:8
**Doctor's** [1] - 90:11
**doctor-patient** [1] - 34:4, 133:2
**doctors** [2] - 18:22, 106:12
**Doctrine** [1] - 123:10
**document** [1] - 40:23
**documentation** [6] - 104:8, 104:12, 104:23, 110:17, 110:19, 114:18
**documented** [2] - 55:10, 61:21
**documents** [3] - 99:7, 108:9, 108:12
**Dolophine** [2] - 24:14, 24:21
**dominates** [1] - 144:1
**done** [17] - 19:19, 44:14, 76:14, 83:10, 83:12, 83:13, 91:5, 115:23, 129:21,

130:15, 137:16, 140:21, 142:23, 143:7, 143:20, 144:6
**dosage** [1] - 25:13
**dose** [26] - 13:6, 13:12, 25:17, 25:18, 25:19, 25:21, 26:12, 26:17, 28:18, 28:20, 29:1, 52:1, 52:2, 53:5, 55:10, 55:14, 68:18, 68:19, 99:6, 107:1, 108:22, 111:14, 113:10, 114:4, 114:12, 114:15
**doses** [14] - 27:2, 53:24, 53:25, 56:4, 56:5, 56:7, 56:9, 58:9, 58:10, 63:6, 98:19, 112:7, 112:8, 133:25
**dosing** [3] - 26:9, 115:5, 117:8
**double** [2] - 87:2, 87:11
**double-blind** [2] - 87:2, 87:11
**doubt** [1] - 123:23
**down** [10] - 30:2, 84:13, 97:6, 101:16, 107:18, 108:12, 113:14, 119:1, 119:13, 135:14
**doxepin** [1] - 62:22
**dozens** [1] - 127:7
**Dr** [97] - 3:10, 3:16, 3:23, 3:24, 4:12, 4:17, 4:20, 4:23, 4:25, 5:1, 5:4, 5:7, 5:9, 5:15, 5:19, 5:24, 6:8, 6:12, 6:19, 7:4, 7:13, 7:19, 8:13, 12:15, 15:23, 17:8, 26:13, 42:6, 52:13, 61:25, 63:4, 63:5, 63:16, 67:25, 71:8, 71:16, 72:5, 72:17, 73:17, 73:18, 73:25, 79:15, 84:11, 84:16, 90:9, 90:14, 92:11, 92:13, 92:20, 97:13, 99:17, 100:15, 100:23, 101:15, 101:21, 102:3, 104:9, 104:16, 105:4, 105:11, 105:13, 105:17, 105:18, 105:23, 106:7, 107:10, 108:4, 108:13,

108:24, 109:17, 110:18, 111:18, 111:19, 111:20, 112:24, 112:25, 113:4, 113:8, 113:11, 114:7, 115:9, 115:13, 116:9, 116:11, 116:19, 117:4, 118:1, 118:22, 119:13, 121:15, 124:14, 124:19, 124:22, 126:11, 134:11, 135:13
**dr** [1] - 118:12
**Dr.Stephen** [1] - 1:9
**draw** [5] - 67:22, 85:12, 95:19, 95:20
**drawn** [8] - 94:19, 94:20, 94:21, 96:7, 97:9, 97:10, 97:12
**drew** [2] - 85:4, 95:2
**drive** [1] - 138:21
**drop** [1] - 42:3
**Drug** [7] - 19:3, 22:14, 35:24, 58:18, 58:20, 58:24, 135:9
**drug** [68] - 12:11, 23:21, 23:22, 24:1, 24:2, 24:8, 27:14, 44:15, 49:10, 53:3, 53:4, 53:6, 53:7, 53:9, 53:12, 53:14, 54:2, 54:6, 54:7, 54:8, 54:9, 54:10, 54:11, 54:12, 54:13, 55:7, 55:10, 55:20, 56:20, 56:22, 57:9, 58:6, 58:7, 58:13, 58:14, 58:24, 62:18, 63:8, 63:14, 63:16, 65:13, 65:14, 69:18, 69:21, 80:5, 93:16, 95:11, 95:13, 95:17, 95:24, 96:11, 96:25, 97:16, 97:21, 98:5, 98:8, 98:9, 98:10, 100:10, 102:6, 110:15, 110:19, 110:24, 118:15, 118:22, 125:5
**drug"** [1] - 56:24
**drug-liking** [1] - 56:20
**drug-seeking** [1] - 54:2
**drugs** [30] - 16:19, 18:1, 19:24, 23:19, 28:6, 38:11, 44:17, 51:25, 53:17, 53:23, 53:24, 54:8, 54:15,

55:3, 55:6, 55:13, 55:25, 59:10, 62:24, 63:11, 63:12, 64:8, 66:25, 67:13, 78:15, 94:14, 101:9, 101:18, 134:10
**Drugs** [1] - 48:15
**due** [3] - 29:15, 97:12, 139:25
**DULY** [1] - 6:21
**dump** [2] - 25:22, 110:4
**duration** [1] - 70:21
**during** [26] - 7:4, 10:10, 10:11, 10:21, 10:22, 11:1, 11:5, 12:5, 14:7, 25:9, 25:15, 25:16, 25:17, 26:11, 28:15, 28:20, 41:1, 74:15, 74:23, 75:8, 77:17, 83:15, 86:9, 98:21, 112:22, 117:10
**duties** [1] - 123:3
**duty** [7] - 11:5, 11:7, 18:2, 20:6, 20:7, 123:6, 124:10
**dying** [1] - 70:8
**dynamically** [1] - 23:23
**dysfunction** [1] - 62:3

## E

**E2** [1] - 47:13
**earliest** [1] - 104:8
**early** [4] - 26:9, 104:15, 104:20, 112:25
**Eastern** [1] - 125:9
**economy** [1] - 129:4
**edema** [1] - 62:6
**editorial** [1] - 91:13
**education** [3] - 8:23, 8:24, 46:22
**effect** [8] - 26:2, 44:13, 55:4, 55:8, 94:22, 94:24
**effective** [3] - 44:16, 45:15, 55:3
**effectiveness** [3] - 52:25, 69:1, 107:22
**effects** [5] - 26:2, 26:7, 26:8, 64:17, 95:12
**efficacy** [1] - 69:5
**efficiency** [1] - 144:2
**efficient** [1] - 144:5
**efficiently** [1] - 129:20
**eight** [5] - 12:16,

22:20, 29:1, 29:2, 115:1
**either** [9] - 6:4, 14:21, 18:22, 37:15, 54:13, 54:17, 85:25, 119:22, 144:6
**elderly** [1] - 127:12
**electrical** [1] - 14:24
**electrocuted** [1] - 29:18
**eliminated** [1] - 24:6
**elucidate** [1] - 21:4
**Emergency** [2] - 108:9, 108:13
**encourage** [1] - 42:11
**encouraged** [1] - 41:21
**end** [4] - 46:8, 70:23, 117:12, 135:13
**endeavor** [1] - 56:13
**endocrinopathies** [1] - 69:19
**Enforcement** [1] - 135:9
**enforcement** [7] - 21:3, 21:7, 21:15, 122:23, 123:21, 124:10, 124:16
**engage** [1] - 20:5
**engaged** [1] - 76:6
**English** [1] - 112:22
**enhance** [2] - 64:17, 64:23
**entire** [2] - 34:11, 135:5
**entirely** [1] - 140:6
**entirety** [1] - 61:18
**entitle** [2] - 131:10, 142:20
**entitled** [4] - 131:13, 131:14, 137:3, 140:16
**entries** [1] - 37:15
**entry** [1] - 91:4
**environment** [1] - 97:8
**enzymatic** [1] - 97:7
**epidemic** [5] - 21:17, 21:18, 21:21, 42:3, 51:24
**epitome** [1] - 136:6
**equate** [1] - 124:17
**equating** [1] - 28:11
**equivalates** [1] - 97:8
**equivalence** [4] - 68:22, 69:5, 69:8, 111:11
**equivalencies** [2] - 69:12, 69:15
**equivalency** [2] - 111:1, 111:10

**Equivalency** [1] - 68:11

**equivalent** [4] - 28:15, 28:17, 28:25, 29:5

**Equivalents** [4] - 27:25, 28:2, 68:10, 68:15

**equivalents** [4] - 28:23, 29:6, 56:8, 56:10

**error** [1] - 139:24

**especially** [4] - 23:12, 64:10, 66:21, 87:11

**Esq** [4] - 1:13, 1:17, 1:17, 1:18

**essentially** [1] - 63:8

**establish** [4] - 105:7, 105:8, 141:7, 142:15

**established** [4] - 78:13, 123:24, 139:23, 142:12

**establishes** [1] - 120:9

**estimate** [4] - 94:24, 95:5, 95:25, 112:12

**estimates** [1] - 111:14

**evaluate** [7] - 33:14, 34:8, 40:14, 44:3, 44:4, 71:6, 126:17

**evaluated** [1] - 33:17

**evaluating** [3] - 40:10, 61:11, 75:25

**evaluation** [14] - 14:14, 16:5, 16:25, 17:11, 17:23, 18:13, 18:15, 19:23, 20:3, 38:10, 41:16, 42:7, 58:17, 143:11

**evaluations** [2] - 75:23, 75:24

**event** [3] - 87:21, 96:15, 142:11

**events** [3] - 3:24, 4:1, 89:20

**EVERS** [1] - 1:6

**Evers** [35] - 3:6, 6:12, 34:24, 63:4, 63:5, 63:16, 66:10, 73:25, 79:15, 90:9, 90:14, 99:17, 104:9, 104:16, 105:11, 105:13, 105:17, 105:18, 105:23, 106:7, 108:4, 108:13, 112:24, 113:4, 113:8, 113:11, 115:13, 116:19, 118:22, 121:15, 124:14, 124:19, 126:11,

135:13, 135:24

**Evers'** [10] - 61:25, 92:11, 92:20, 107:10, 108:24, 109:17, 110:18, 112:25, 115:9, 134:11

**Evers's** [1] - 92:13

**evidence** [42] - 3:7, 6:16, 8:11, 27:23, 39:1, 54:9, 54:12, 55:3, 68:25, 69:3, 72:14, 80:15, 84:14, 86:13, 86:14, 86:15, 86:16, 86:20, 87:5, 87:6, 87:8, 87:9, 87:12, 87:13, 99:8, 99:16, 103:8, 111:7, 114:17, 120:15, 122:16, 122:17, 123:1, 123:19, 125:24, 126:2, 127:6, 133:9, 133:11, 138:7, 138:25, 142:13

**evidence-based** [7] - 80:15, 86:13, 86:14, 86:20, 99:8, 99:16, 114:17

**evidentiary** [3] - 126:16, 142:22, 142:25

**evolved** [1] - 87:24

**exactly** [6] - 24:25, 89:16, 92:17, 95:4, 117:23, 130:24

**exam** [1] - 85:5

**EXAMINATION** [3] - 7:11, 74:1, 117:2

**examination** [23] - 38:18, 48:2, 52:23, 57:3, 57:8, 62:25, 63:18, 74:12, 74:23, 75:13, 76:13, 78:7, 80:13, 81:7, 87:15, 89:1, 115:11, 116:14, 128:9, 130:25, 131:19, 135:12, 144:7

**examinations** [2] - 17:9, 86:10

**examine** [2] - 73:23, 130:20

**examined** [1] - 130:17

**examinees** [1] - 17:11

**Examiner** [3] - 4:16, 16:4, 77:4

**examiner** [2] - 77:14, 77:15

**Examiners** [2] - 16:5,

77:5

**example** [8] - 40:21, 53:5, 80:4, 82:12, 92:19, 102:3, 132:24, 135:7

**exceeding** [1] - 68:16

**exceedingly** [2] - 59:17, 70:20

**excellence** [1] - 10:24

**except** [1] - 37:11

**exception** [2] - 73:6, 79:25

**excessive** [1] - 108:14

**excised** [1] - 127:25

**Exclude** [1] - 3:9

**exclude** [2] - 4:23, 71:5

**excluded** [2] - 123:1, 142:16

**exclusively** [1] - 13:16

**exculpatory** [8] - 121:3, 122:16, 123:1, 123:19, 123:20, 123:22, 125:24, 126:2

**Excuse** [1] - 13:10

**executed** [1] - 121:1

**execution** [1] - 121:9

**exhaust** [1] - 123:22

**Exhibit** [36] - 7:21, 7:23, 8:6, 8:10, 24:18, 24:19, 25:5, 27:11, 27:16, 27:22, 43:13, 44:25, 47:1, 47:6, 48:9, 48:13, 48:14, 48:22, 49:21, 50:3, 66:5, 66:8, 66:11, 68:8, 69:22, 70:2, 71:15, 71:21, 71:23, 71:24, 72:1, 72:4, 72:6, 72:13, 111:8

**exhibit** [4] - 24:20, 64:11, 68:8, 71:22, 111:6

**Exhibits** [1] - 66:6

**exhibits** [2] - 7:3, 72:9

**expansion** [1] - 21:13

**expect** [3] - 53:6, 113:22, 128:18

**expectancy** [1] - 52:5

**expected** [10] - 38:15, 39:8, 40:18, 53:3, 54:7, 54:13, 55:8, 55:11, 59:12, 126:1

**experience** [13] - 29:10, 29:13, 30:25, 38:11, 51:16, 59:15, 65:7, 66:19, 66:20, 67:13, 67:17, 88:6,

93:15

**experimentation** [1] - 51:16

**expert** [32] - 3:23, 3:25, 4:3, 4:17, 4:20, 5:8, 5:15, 5:24, 17:15, 30:20, 30:22, 31:4, 31:7, 31:12, 32:4, 32:13, 32:19, 33:1, 42:25, 43:2, 73:5, 76:15, 79:4, 86:17, 91:25, 102:21, 103:2, 107:7, 108:6, 109:17, 117:20

**expert's** [1] - 103:6

**explain** [8] - 14:18, 37:8, 46:4, 61:14, 66:24, 97:4, 109:22, 112:20

**explained** [1] - 135:10

**expressed** [2] - 71:9, 71:12

**expression** [1] - 128:23

**expressly** [1] - 90:9

**extended** [1] - 134:1

**extensive** [2] - 101:17, 129:5

**extent** [6] - 37:20, 39:7, 51:14, 63:6, 137:8, 142:17

**extraordinary** [1] - 122:22

**eye** [1] - 125:10

**eyewitnesses** [1] - 122:9

**F**

**F2d** [1] - 123:12

**F3d** [1] - 125:21

**face** [2] - 56:12, 142:17

**facet** [1] - 144:1

**facets** [1] - 126:25

**fact** [37] - 21:20, 28:2, 34:10, 34:13, 41:6, 44:19, 56:7, 58:11, 58:12, 59:3, 59:9, 60:5, 62:14, 64:20, 67:18, 71:3, 76:24, 84:5, 85:14, 88:4, 89:10, 92:1, 93:9, 95:9, 97:22, 98:20, 103:7, 110:23, 111:25, 113:8, 115:6, 116:1, 118:19, 124:21, 126:16, 131:24,

139:19

**factor** [2] - 28:22, 29:4

**factors** [3] - 55:19, 63:11, 111:10

**facts** [2] - 5:2, 103:21

**failed** [2] - 99:15, 122:5

**fails** [1] - 54:12

**failure** [1] - 123:19

**fair** [2] - 77:10, 91:17

**fairly** [2] - 29:14, 61:3

**faith** [1] - 34:3

**fall** [2] - 52:5, 118:23

**falls** [3] - 64:25, 69:19, 108:23

**false** [21] - 120:15, 120:17, 126:5, 127:24, 128:11, 131:22, 132:14, 133:3, 133:9, 134:7, 134:11, 134:12, 136:7, 139:5, 139:9, 142:5, 142:8, 142:14, 144:18

**falsely** [1] - 134:10

**falsifications** [1] - 138:17

**familiar** [13] - 21:18, 25:5, 43:15, 44:24, 47:6, 48:14, 54:20, 60:19, 68:17, 79:3, 84:20, 84:24, 85:23

**families** [3] - 73:1, 127:12, 143:9

**far** [3] - 39:15, 42:20, 140:19

**fashion** [1] - 22:23, 56:22

**fashioned** [1] - 9:21

**fatal** [2] - 99:6, 100:6

**FDA** [3] - 22:18, 23:11, 42:1

**February** [1] - 109:6

**Federal** [10] - 4:18, 19:14, 19:15, 23:3, 31:10, 32:2, 45:7, 49:15, 51:10, 139:18

**Federation** [6] - 40:22, 41:7, 50:6, 50:12, 50:16, 60:9

**Fellow** [2] - 16:2, 74:20

**fellowship** [1] - 10:22

**Fellowship** [2] - 9:12, 84:2

**femoral** [3] - 85:6, 85:9, 94:21

**fentanyl** [4] - 100:13, 102:4, 102:8, 102:15

**few** [3] - 72:22, 117:1,

119:1
**file** [4] - 34:24, 34:25, 56:2, 104:15
**filed** [5] - 3:8, 124:21, 124:24, 133:8, 134:13
**files** [2] - 133:22, 133:25
**fills** [1] - 45:20
**final** [1] - 61:18
**finder** [2] - 126:16, 126:17
**findings** [3] - 85:8, 101:9, 101:10
**fine** [6] - 67:11, 131:3, 137:13, 140:9, 140:18, 145:1
**fire** [1] - 59:18
**firearm** [2] - 125:11, 125:14
**First** [2] - 36:6, 112:25
**first** [45] - 3:9, 4:25, 6:17, 8:14, 8:23, 11:10, 11:17, 24:7, 25:4, 25:8, 28:14, 28:16, 34:20, 34:22, 36:8, 38:19, 38:23, 40:5, 40:24, 45:11, 52:12, 60:2, 60:24, 66:7, 82:13, 88:8, 90:11, 90:22, 92:2, 94:7, 98:2, 98:5, 104:6, 104:14, 104:16, 107:18, 109:3, 109:19, 110:12, 110:21, 120:8, 135:7, 142:23, 144:9
**first-time** [2] - 98:2, 98:5
**fit** [2] - 102:21, 127:15
**fitness** [1] - 18:2
**five** [4] - 26:18, 69:11, 113:9, 131:5
**flag** [1] - 59:18
**flows** [1] - 110:3
**fluid** [8] - 62:6, 62:8, 62:13, 109:23, 109:25, 110:3, 110:4, 110:6
**flux** [1] - 96:9
**focus** [3] - 82:8, 126:5, 127:17
**focused** [1] - 20:16
**folks** [1] - 89:7
**follow** [9] - 37:5, 38:21, 38:22, 38:25, 73:5, 73:18, 122:23, 129:1, 130:23
**followed** [2] - 9:8,
39:6
**following** [1] - 131:7
**FOLLOWS** [1] - 6:21
**food** [1] - 25:21
**foot** [1] - 70:18
**footnote** [1] - 101:15
**footnoted** [2] - 91:16, 91:24
**FOR** [3] - 1:1, 1:12, 1:16
**force** [1] - 103:14
**Force** [6] - 11:5, 11:7, 11:9, 11:11, 19:3
**foregoing** [3] - 146:7, 146:10, 146:22
**forensic** [2] - 84:17, 84:18
**forever** [1] - 30:1
**forgive** [1] - 86:18
**form** [6] - 13:19, 52:23, 86:6, 115:8, 115:9
**formed** [1] - 13:23
**former** [1] - 16:2
**forming** [1] - 91:22
**forms** [1] - 22:19
**forth** [1] - 146:9
**forward** [3] - 74:6, 132:13, 136:24
**foul** [1] - 135:21
**foundation** [5] - 89:8, 90:3, 103:3, 103:9
**foundations** [2] - 91:8, 103:1
**four** [12] - 10:23, 11:6, 11:13, 11:15, 12:4, 17:11, 28:19, 113:11, 113:13, 114:4, 125:10, 125:12
**Fourth** [8] - 121:24, 122:4, 122:14, 122:15, 123:10, 123:12, 129:3, 142:9
**fractures** [2] - 69:19, 118:23
**fragmented** [1] - 37:22
**frame** [2] - 117:10, 117:12
**frank** [2] - 6:11, 73:24
**Frank** [1] - 1:17
**frankly** [3] - 67:13, 68:3, 134:17
**Franks** [50] - 72:24, 73:5, 120:7, 120:13, 120:14, 121:2, 121:23, 122:3, 125:16, 125:23, 126:13, 127:17, 128:16, 131:9,
131:13, 131:18, 131:24, 131:25, 132:2, 132:8, 132:16, 132:18, 133:4, 133:11, 133:16, 134:23, 137:3, 137:6, 138:7, 138:8, 138:13, 139:19, 139:23, 140:2, 141:3, 141:19, 141:21, 141:25, 142:1, 142:2, 142:19, 142:20, 142:21, 142:25, 143:18, 144:1, 144:6, 144:11, 144:18
**fraud** [1] - 20:4
**free** [1] - 63:8
**frequently** [4] - 54:4, 56:15, 70:21, 82:24
**front** [10] - 7:3, 7:19, 24:18, 43:13, 47:9, 61:2, 74:10, 90:16, 100:18, 104:25
**frothiness** [1] - 62:5
**fruits** [2] - 135:25, 142:16
**Fuhai** [1] - 4:22
**fulfilling** [1] - 45:24
**full** [2] - 104:6, 115:20
**fulsome** [2] - 38:8, 38:16
**function** [9] - 12:10, 12:11, 15:11, 15:16, 55:9, 68:20, 69:6, 98:12, 98:16
**functioning** [1] - 14:10
**functions** [1] - 97:20
**fundamentals** [1] - 70:13
**futile** [1] - 122:25

**G**

**gain** [2] - 51:15, 58:19
**gained** [1] - 57:9
**gains** [1] - 57:5
**garnering** [1] - 15:8
**gathered** [1] - 52:22
**Geisinger** [1] - 36:14
**general** [8] - 10:3, 23:16, 88:16, 88:20, 88:22, 93:12, 93:13, 115:1
**General's** [1] - 19:2
**generalist** [1] - 10:14
**generally** [2] - 25:20, 57:18, 63:25
**generated** [2] - 21:16, 109:25
**genetics** [1] - 111:15
**geriatric** [1] - 10:2
**given** [18] - 61:1, 62:25, 63:20, 64:5, 87:6, 90:7, 95:9, 96:10, 101:10, 116:21, 116:22, 124:3, 128:23, 132:1, 133:15, 137:2, 137:4, 141:22
**gland** [1] - 69:20
**gleaned** [1] - 67:24
**glottis** [1] - 62:11
**God** [1] - 97:10
**gold** [1] - 47:3
**GOVERNMENT** [1] - 1:12
**government** [1] - 27:21
**Government** [40] - 5:20, 23:3, 24:10, 25:5, 47:12, 69:22, 72:16, 73:7, 74:9, 90:18, 90:21, 90:23, 91:1, 103:3, 106:9, 107:7, 108:6, 109:2, 111:6, 111:8, 119:15, 120:10, 120:23, 125:2, 126:14, 126:21, 126:24, 127:9, 127:14, 132:22, 133:1, 133:10, 135:2, 135:20, 136:11, 138:17, 143:15, 145:8, 145:10
**Government's** [37] - 7:21, 7:23, 8:6, 8:10, 24:18, 27:11, 27:16, 27:22, 43:13, 44:25, 47:1, 47:5, 47:6, 48:8, 48:13, 48:14, 48:22, 49:21, 50:3, 66:5, 66:8, 66:11, 68:8, 71:15, 71:18, 71:21, 72:4, 72:11, 72:13, 117:22, 120:9, 129:11, 129:15, 134:13, 134:22, 135:4, 138:6
**government's** [1] - 8:9
**governs** [1] - 40:6
**grading** [2] - 86:16, 87:1
**gradually** [4] - 13:2, 26:1, 97:23, 98:17
**graduating** [1] - 9:4
**grand** [1] - 21:12
**grant** [3] - 125:15, 125:16, 138:7
**granted** [2] - 122:3, 145:12
**grave** [1] - 93:10
**greater** [4] - 56:7, 56:9, 69:4, 70:1
**group** [7] - 11:20, 12:2, 12:4, 12:18, 13:21, 13:25, 50:13
**grouped** [1] - 92:19
**guard** [1] - 62:15
**guess** [1] - 88:16
**guidance** [5] - 50:25, 51:5, 52:9, 70:7, 138:13
**Guidance** [1] - 72:4
**guide** [1] - 68:6
**guided** [1] - 103:25
**guideline** [1] - 38:24
**Guideline** [1] - 68:18
**Guidelines** [3] - 87:16, 87:19, 111:3
**guidelines** [26] - 38:21, 38:25, 39:4, 39:6, 41:12, 41:14, 41:16, 41:18, 42:5, 42:10, 42:12, 42:17, 42:21, 43:8, 43:19, 50:19, 51:9, 59:5, 70:11, 79:3, 87:23, 88:15, 88:17, 88:19, 88:22
**guilt** [1] - 123:23
**gynecology** [1] - 10:3

**H**

**habit** [1] - 103:15
**habituating** [1] - 44:10
**half** [14] - 11:23, 15:2, 26:14, 26:17, 26:19, 76:8, 76:10, 113:25, 114:19, 114:22, 114:23, 114:24, 115:2
**hall** [2] - 52:13, 53:8
**hallmark** [1] - 121:25
**hand** [2] - 53:11, 53:14
**handled** [1] - 26:16
**handles** [1] - 23:25
**hands** [1] - 14:6
**happy** [1] - 140:5
**harbor** [1] - 39:3
**harm** [12] - 26:3, 44:2, 44:6, 52:12, 53:4, 55:11, 55:14, 55:15, 55:21, 55:23, 135:21

**Harmarville** [1] - 12:8
**harms** [4] - 52:1, 64:24, 69:17, 69:20
**Harrington** [1] - 123:14
**HAVING** [1] - 6:20
**hazard** [1] - 26:5
**hazardous** [2] - 64:9, 64:10
**head** [2] - 13:14, 34:17
**headache** [6] - 29:15, 29:23, 29:24, 30:6, 30:7, 30:8
**Health** [4] - 17:16, 17:19, 36:8, 58:15
**health** [6] - 51:19, 51:23, 52:3, 52:7, 52:8, 55:24
**Healthsouth** [1] - 12:8
**hear** [18] - 16:22, 43:25, 93:25, 98:3, 120:2, 128:4, 128:6, 128:8, 132:13, 135:7, 136:8, 136:10, 137:9, 137:24, 138:23, 140:5, 144:8
**heard** [1] - 115:10
**hearing** [50] - 72:16, 73:20, 102:19, 102:24, 116:10, 118:8, 119:17, 119:19, 119:23, 120:1, 120:13, 120:14, 121:2, 121:23, 122:3, 125:16, 125:23, 127:17, 131:11, 131:13, 131:16, 131:18, 131:24, 132:3, 132:8, 132:13, 132:18, 133:11, 133:16, 134:17, 134:24, 137:3, 137:6, 137:18, 138:2, 138:7, 138:8, 139:23, 141:3, 141:9, 141:20, 142:1, 142:9, 142:11, 142:21, 142:22, 142:25, 143:18, 144:11, 144:19
**Hearing** [1] - 1:9
**heavy** [1] - 57:25
**height** [1] - 122:10
**held** [5] - 34:10, 126:1, 142:1, 142:10, 144:12

**help** [2] - 21:3, 103:7
**helpful** [1] - 140:22
**helping** [1] - 15:18
**hemorrhage** [1] - 62:2
**hereby** [1] - 146:6
**hereinbefore** [1] - 146:9
**high** [13] - 30:7, 51:24, 51:25, 52:1, 53:5, 53:24, 54:3, 56:4, 106:25, 108:21, 133:25
**higher** [8] - 55:14, 58:9, 64:15, 97:11, 97:14, 98:11, 98:15, 112:8
**highlights** [1] - 51:6
**himself** [3] - 90:10, 90:15, 135:10
**historical** [1] - 119:5
**history** [16] - 4:1, 38:17, 44:3, 52:19, 54:1, 57:3, 57:7, 57:24, 57:25, 58:2, 61:21, 62:25, 63:9, 96:16, 99:3, 105:12
**hold** [8] - 23:7, 71:10, 71:12, 77:6, 131:16, 141:20, 142:4, 142:24
**holding** [1] - 144:12
**hometown** [1] - 11:18
**honest** [1] - 137:12
**Honor** [75] - 3:2, 3:4, 3:20, 3:22, 6:3, 6:5, 6:9, 6:11, 6:15, 6:18, 7:2, 7:8, 7:15, 8:5, 8:8, 27:15, 27:20, 71:14, 71:19, 71:20, 72:10, 72:15, 72:22, 73:18, 73:24, 102:25, 103:5, 103:13, 103:14, 103:19, 104:2, 104:5, 114:6, 116:3, 116:8, 116:24, 117:1, 117:19, 117:25, 118:4, 118:10, 119:12, 119:14, 119:17, 119:20, 120:4, 120:12, 121:2, 121:21, 123:11, 123:13, 125:6, 127:19, 127:20, 128:2, 128:3, 128:20, 129:9, 130:2, 133:19, 133:20, 136:13, 137:11, 138:5,

140:8, 140:24, 140:25, 141:5, 141:12, 143:7, 143:15, 144:14, 144:15, 145:5, 145:16
**Honorable** [3] - 4:21, 5:17, 11:17
**HONORABLE** [1] - 1:10
**Hopkins** [4] - 9:9, 9:13, 9:22, 75:3
**Horsham** [3] - 36:9, 113:9, 116:23
**hospice** [1] - 70:8
**Hospital** [9] - 9:9, 9:13, 9:22, 11:22, 12:9, 36:2, 36:6, 36:14, 113:1
**hospital** [10] - 11:22, 12:20, 14:10, 36:1, 36:6, 36:12, 83:18, 83:21, 83:23, 105:25
**Hospitalization** [1] - 118:15
**hospitalization** [1] - 119:3
**hospitalizations** [4] - 106:2, 118:22, 118:23, 118:24
**hospitals** [5] - 11:21, 12:1, 14:9, 14:12, 21:13
**hour** [3] - 72:25, 127:11, 143:9
**hours** [7] - 22:20, 26:18, 26:19, 97:10, 114:24, 115:1, 115:3
**hum** [1] - 68:13
**human** [1] - 15:18
**hunch** [1] - 122:24
**hydrocephalus** [1] - 30:7
**hydrochloride** [2] - 24:21, 26:6
**hypnotic** [1] - 62:19
**hypnotics** [2] - 16:19, 67:1

## I

**iatrogenic** [2] - 26:11, 52:10
**identified** [10] - 20:14, 21:7, 21:16, 42:23, 43:16, 47:1, 65:23, 66:4, 72:9, 141:6
**identify** [14] - 7:22, 21:3, 24:19, 52:17, 66:8, 68:21, 105:3,

106:5, 107:4, 107:13, 107:25, 108:18, 122:9, 128:9
**idiosyncrasies** [2] - 51:11, 51:13
**ignorance** [1] - 59:23
**ignores** [2] - 57:9, 57:13
**ignoring** [1] - 137:5
**II** [1] - 58:25
**illicit** [1] - 101:18
**imagine** [3] - 59:20, 91:5, 91:20
**imaging** [2] - 106:1, 110:8
**IME** [1] - 77:6
**IME's** [1] - 77:11
**immediately** [1] - 34:19
**impact** [1] - 89:15
**impacted** [1] - 53:3
**impacts** [1] - 52:3
**impaired** [2] - 17:21, 17:25
**impairment** [2] - 17:22, 18:4
**implantation** [2] - 14:21, 14:23
**implantations** [1] - 82:23
**implants** [1] - 83:7
**imply** [1] - 42:13
**important** [14] - 37:10, 37:20, 42:10, 54:19, 54:23, 62:3, 62:15, 94:25, 98:24, 114:11, 114:13, 115:5, 123:3, 132:16
**importantly** [1] - 98:13
**impossible** [1] - 39:3
**impression** [2] - 118:2, 135:2
**improve** [2] - 15:10, 15:11
**improved** [1] - 68:20
**improvement** [2] - 69:5, 69:6
**improving** [1] - 12:11
**impulse** [1] - 55:19
**impulses** [1] - 14:24
**IN** [1] - 1:1
**in-person** [2] - 48:1, 48:2
**inappropriate** [1] - 56:16
**incidentally** [1] - 62:22
**include** [7] - 66:4, 75:21, 105:9, 122:8, 122:11, 122:15,

122:23
**included** [11] - 4:3, 8:14, 10:1, 24:11, 34:21, 38:6, 66:15, 71:4, 120:16, 127:23, 142:7
**includes** [6] - 7:3, 15:11, 15:15, 15:16, 53:13, 53:16
**including** [8] - 4:18, 9:20, 16:17, 75:10, 75:11, 103:8, 106:1, 113:19
**inclusion** [1] - 123:6
**inclusive** [2] - 89:6, 92:24
**incomplete** [1] - 90:25
**inconsistent** [1] - 108:14
**inconvenience** [2] - 139:25, 143:22
**incorporate** [2] - 82:10, 89:24
**increase** [11] - 26:1, 28:25, 55:9, 55:20, 56:15, 57:24, 58:3, 64:19, 69:1, 69:9, 69:17
**increased** [3] - 63:25, 64:2, 68:23
**increases** [1] - 55:21
**increasing** [2] - 22:3, 69:10
**incumbent** [1] - 121:4
**indeed** [2] - 46:12, 52:4
**Independent** [5] - 4:16, 16:4, 16:5, 77:4, 77:5
**independent** [3] - 16:6, 17:9, 17:11
**indicate** [2] - 74:19, 140:20
**indicated** [10] - 10:19, 12:19, 16:10, 27:11, 50:9, 104:4, 104:6, 104:22, 141:10, 143:2
**indicates** [1] - 140:2
**indicating** [2] - 3:16, 132:17
**indication** [2] - 19:1, 96:15
**indictment** [2] - 4:6, 65:23
**individual** [5] - 20:25, 45:16, 82:11, 99:3, 111:15
**individualized** [1] - 54:20

**individually** [1] - 133:23
**individuals** [3] - 10:3, 21:14, 87:4
**industry** [1] - 34:1
**infections** [1] - 82:24
**infer** [1] - 116:20
**inferred** [1] - 116:22
**inflection** [4] - 68:21, 69:2, 69:7, 69:9
**inform** [3] - 89:7, 99:13, 99:14
**information** [60] - 13:13, 19:21, 24:12, 24:15, 24:21, 25:1, 27:14, 37:24, 38:7, 38:17, 41:17, 42:4, 44:23, 52:22, 55:24, 57:4, 57:9, 59:19, 62:16, 64:6, 64:7, 70:4, 81:13, 87:1, 87:3, 89:14, 89:23, 91:15, 91:21, 103:1, 103:8, 121:5, 121:12, 122:7, 122:8, 122:12, 124:9, 124:18, 126:8, 127:2, 127:3, 130:13, 132:25, 133:2, 133:4, 133:24, 134:25, 135:3, 135:14, 135:21, 136:3, 136:6, 137:4, 138:2, 139:11, 140:11, 143:10
**informative** [1] - 60:15
**informed** [1] - 144:9
**informing** [1] - 45:7
**infusion** [1] - 14:22
**inhalation** [2] - 81:15, 81:19
**inherent** [1] - 58:6
**initial** [5] - 16:2, 56:8, 105:20, 112:13, 131:23
**initiated** [1] - 27:8
**initiation** [3] - 25:10, 25:16, 26:11
**injection** [1] - 14:20
**injections** [3] - 14:21, 15:12, 83:7
**injured** [3] - 12:14, 20:25, 29:17
**injuries** [5] - 29:16, 29:17, 29:19, 64:25
**injuring** [1] - 108:23
**injury** [1] - 75:23
**inpatient** [5] - 11:25, 12:6, 12:20, 14:9,
14:13
**input** [1] - 145:18
**inquire** [2] - 103:20, 103:21
**inquiry** [1] - 144:12
**insensible** [1] - 10:9
**insert** [3] - 24:11, 24:23, 72:7
**inside** [2] - 20:10, 109:25
**insisted** [1] - 135:14
**instance** [1] - 92:17
**instances** [2] - 14:13, 37:14
**instead** [3] - 48:3, 73:2, 130:25
**Institute** [1] - 16:3
**institutions** [2] - 79:2, 98:20
**instructed** [1] - 53:19
**instructing** [1] - 44:14
**instruction** [1] - 15:15
**insufficient** [3] - 139:12, 139:14, 142:15
**intend** [1] - 145:3
**intensity** [2] - 55:9, 69:6
**intent** [1] - 45:24, 136:3
**intention** [1] - 137:7
**intentionally** [10] - 120:15, 120:18, 121:11, 122:5, 122:19, 124:15, 133:1, 135:17, 139:6, 142:6
**interact** [1] - 16:20
**interaction** [1] - 12:13
**interest** [4] - 18:6, 22:4, 136:18, 144:1
**interested** [2] - 21:11, 21:15
**interfere** [1] - 17:3
**internal** [1] - 62:3
**internist** [1] - 104:9
**internship** [4] - 9:7, 9:16, 9:19, 9:20
**interpose** [1] - 127:14
**interpret** [1] - 56:4
**interpreted** [1] - 99:2
**interprets** [1] - 49:6
**interrupt** [2] - 133:12, 143:4
**interrupted** [1] - 143:9
**interval** [2] - 26:24, 92:24
**intervals** [1] - 44:5
**interventional** [4] - 14:15, 14:19, 15:1,
83:6
**Interventional** [2] - 16:2, 16:9
**interventions** [1] - 15:12
**interview** [10] - 35:15, 35:18, 35:21, 60:12, 120:22, 121:4, 121:18, 122:20, 125:19, 135:13
**interviewed** [11] - 120:25, 121:8, 121:15, 124:13, 125:10, 125:12, 126:8, 135:9, 135:19, 136:5, 141:17
**Interviewing** [1] - 125:17
**intoxicated** [1] - 53:8
**intoxication** [4] - 64:24, 95:14, 96:12, 97:16
**intraoperative** [1] - 93:24
**intrathecal** [2] - 13:6, 13:12
**introduce** [1] - 7:15
**introduction** [1] - 68:5
**invasiveness** [1] - 70:19
**inventory** [1] - 115:22
**investigated** [1] - 19:12
**investigation** [2] - 19:22, 122:24
**investigations** [3] - 20:5, 80:5, 80:20
**investigative** [1] - 124:4
**Investigator** [2] - 73:3, 144:4
**invite** [1] - 127:13
**involve** [2] - 22:24, 27:1
**involved** [12] - 12:18, 32:13, 32:14, 32:16, 32:17, 32:19, 38:11, 65:14, 65:15, 74:24, 88:2, 143:22
**involves** [1] - 46:7
**involving** [1] - 33:7
**irrelevant** [1] - 90:6
**IS** [1] - 6:20
**issuance** [2] - 47:20, 127:22
**issue** [36] - 5:13, 5:25, 16:17, 20:17, 20:20, 21:25, 32:25, 70:21, 72:20, 72:23, 73:12,
80:25, 81:1, 81:3, 95:5, 96:10, 119:22, 119:25, 120:3, 122:1, 126:13, 126:16, 128:20, 129:2, 130:3, 132:10, 134:13, 135:3, 137:10, 137:23, 140:4, 144:4, 145:1, 145:3, 145:9
**issued** [14] - 4:9, 5:10, 5:23, 5:25, 33:4, 45:4, 45:15, 45:21, 46:10, 47:24, 49:1, 65:23, 68:14, 126:14
**issues** [7] - 12:12, 19:9, 21:5, 71:3, 105:9, 128:25
**issuing** [6] - 45:3, 45:25, 46:5, 46:8, 52:14, 65:21
**itself** [4] - 65:1, 65:3, 139:19, 140:2

**J**

**January** [4] - 58:22, 108:2, 108:20, 113:2
**job** [1] - 12:25
**jobs** [1] - 14:2
**John** [1] - 60:2
**Johns** [3] - 9:9, 9:13, 9:22
**joint** [1] - 30:3
**joints** [1] - 29:19
**joke** [1] - 93:9
**journal** [1] - 91:4
**Judge** [22] - 5:6, 5:7, 5:14, 5:22, 6:4, 73:13, 111:25, 112:1, 119:10, 126:8, 126:13, 126:23, 129:24, 130:5, 131:3, 137:21, 140:22, 141:21, 143:4, 144:22, 145:15
**judge** [5] - 124:12, 128:22, 132:19, 135:1, 135:18
**judgment** [4] - 42:20, 88:2, 88:6, 88:12
**judicial** [1] - 144:5
**July** [4] - 50:8, 63:4, 112:25, 113:2
**June** [5] - 76:4, 76:11, 77:17, 117:5, 118:12
**jurisdiction** [1] - 31:15
**jury** [1] - 103:24

**Justice** [2] - 19:8, 66:10
**justifying** [1] - 133:11

**K**

**keep** [4] - 13:13, 44:11, 74:16, 145:14
**KELLY** [1] - 1:16
**kind** [2] - 121:25, 131:16
**kinds** [1] - 40:4
**knife** [1] - 70:18
**knowing** [1] - 34:1
**knowingly** [6] - 45:24, 127:24, 128:11, 131:22, 132:14, 142:5
**knowledge** [9] - 22:5, 38:11, 40:2, 46:11, 46:22, 59:23, 59:25, 103:7
**known** [7] - 64:21, 85:14, 98:18, 120:19, 122:17, 124:12, 124:16
**knows** [7] - 60:2, 60:3, 97:10, 141:19, 143:25
**Kraynak** [1] - 5:18
**KRISTIN** [4] - 1:23, 146:3, 146:13, 146:16
**Kristina** [26] - 3:24, 4:1, 4:9, 4:10, 33:15, 34:16, 35:6, 35:13, 35:24, 36:7, 36:14, 58:17, 60:12, 65:11, 81:18, 96:2, 105:8, 105:18, 107:10, 108:4, 108:24, 109:17, 115:12, 115:24, 116:15, 119:6
**Kristina's** [6] - 34:23, 35:3, 35:9, 35:16, 36:18, 36:21

**L**

**label** [1] - 24:10
**labeled** [2] - 51:24, 66:13
**Labor** [1] - 75:11
**labor** [1] - 10:13
**Laboratory** [1] - 24:20
**laboratory** [2] - 54:5, 101:11
**labs** [3] - 106:12, 106:4, 108:16

**lack** [3] - 52:25, 59:25, 69:3
**lacking** [1] - 142:17
**lady** [1] - 135:18
**laid** [2] - 42:15, 58:4
**language** [1] - 139:20
**large** [3] - 11:20, 12:18, 27:2
**larger** [1] - 34:21
**last** [23] - 8:4, 52:4, 54:24, 63:3, 63:7, 68:8, 85:17, 98:3, 108:25, 109:20, 110:13, 113:5, 113:10, 113:15, 113:16, 113:17, 114:4, 114:12, 114:15, 116:23, 129:10, 145:1
**late** [2] - 4:21, 58:20
**Law** [1] - 32:22
**law** [24] - 21:3, 21:7, 21:14, 31:3, 40:6, 46:2, 49:15, 67:25, 88:5, 88:9, 121:7, 121:21, 122:4, 122:22, 123:21, 124:10, 124:16, 125:4, 125:25, 126:12, 126:17, 132:17, 143:17
**lawfulness** [2] - 33:2, 33:3
**laws** [1] - 49:10
**lay** [3] - 20:9, 21:10, 21:13
**layperson** [2] - 86:19
**lays** [1] - 58:4
**lead** [2] - 123:20, 123:22
**leadership** [1] - 10:25
**leading** [3] - 4:2, 51:22, 136:11
**leads** [2] - 124:4, 124:8
**learn** [1] - 115:11
**learned** [2] - 22:5, 23:9
**least** [11] - 22:20, 37:1, 44:10, 48:2, 76:16, 87:3, 110:10, 113:11, 128:9, 129:16, 131:20
**leave** [1] - 13:21
**leaving** [2] - 55:13, 118:2
**lecture** [2] - 21:9, 21:20
**lectured** [4] - 18:9, 21:10, 21:12, 21:23

**lectures** [4] - 20:14, 20:15, 22:7, 85:1
**led** [2] - 63:18, 127:22
**leeway** [1] - 103:16
**left** [2] - 108:23, 112:24
**legal** [3] - 13:23, 40:7, 40:11
**legitimacy** [4] - 56:17, 57:1, 57:2, 66:2
**legitimate** [25] - 4:7, 5:11, 6:1, 19:10, 32:5, 33:5, 33:15, 33:24, 39:1, 39:5, 39:11, 39:14, 40:8, 42:19, 45:5, 45:15, 45:22, 47:24, 49:2, 52:15, 57:12, 65:3, 65:25, 117:11, 134:4
**legitimize** [1] - 46:24
**length** [1] - 116:14
**lengths** [1] - 134:14
**lesion** [4] - 106:21, 109:10, 109:14, 110:9
**less** [5] - 13:3, 128:25, 136:19
**lethal** [1] - 96:15
**level** [10] - 19:14, 19:15, 46:16, 46:21, 62:22, 63:14, 68:23, 97:14, 97:20, 138:18
**levels** [3] - 62:18, 67:16, 98:15
**Li** [5] - 4:22, 5:6, 5:13, 111:18, 111:20
**liable** [1] - 127:25
**liberalize** [2] - 22:1, 41:22
**library** [3] - 101:17, 102:1, 102:4
**licensed** [3] - 8:18, 23:2, 49:2
**licensing** [1] - 23:7
**lie** [2] - 21:5, 46:20
**lied** [2] - 126:9, 126:21
**life** [12] - 26:14, 26:17, 26:19, 52:5, 70:21, 70:23, 113:25, 114:19, 114:22, 114:23, 114:24, 115:2
**ligament** [1] - 30:4
**light** [2] - 139:3, 140:16
**lightly** [1] - 137:15
**likelihood** [5] - 55:20, 55:21, 56:15, 57:24, 135:25
**likely** [3] - 55:14,

55:15, 95:11
**limb** [1] - 29:15
**limitations** [1] - 89:22
**limited** [2] - 22:17, 135:6
**limits** [2] - 59:8, 68:16
**line** [9] - 29:18, 39:16, 42:8, 54:18, 82:13, 101:16, 105:14, 112:7, 122:10
**lines** [1] - 107:18
**list** [9] - 60:22, 74:17, 79:21, 91:6, 92:3, 92:4, 92:17, 101:10, 141:16
**listed** [7] - 80:12, 91:20, 92:8, 106:23, 132:25, 133:6
**lit** [1] - 42:23
**literature** [7] - 41:20, 41:21, 58:5, 59:5, 64:7, 69:4, 114:24
**live** [3] - 30:1, 30:2, 90:15
**lives** [1] - 15:11
**lividity** [4] - 85:23, 86:2, 86:4, 86:6
**Lividity** [1] - 86:5
**LLP** [1] - 1:16
**located** [1] - 32:10
**locklear** [1] - 125:8
**logistical** [1] - 119:25
**long-acting** [1] - 23:24
**long-term** [2] - 16:25, 18:6
**longest** [1] - 114:23
**look** [15] - 35:12, 38:14, 53:6, 56:6, 56:9, 67:16, 69:22, 88:1, 88:4, 88:5, 88:10, 88:11, 102:16, 137:3
**looking** [4] - 91:7, 95:17, 128:1, 139:1
**loss** [2] - 57:18, 63:10
**lost** [1] - 64:18
**low** [7] - 25:20, 28:20, 53:25, 98:1, 98:4, 98:18, 113:23
**lower** [4] - 58:10, 63:6, 64:14, 112:7
**lowest** [1] - 68:18
**lung** [1] - 62:5
**lungs** [2] - 62:8, 62:13
**Lyrica** [5] - 106:20, 106:22, 107:2, 107:3, 108:22

**M**

**M.D** [3] - 6:25, 9:6, 66:10
**M.D.'s** [1] - 18:22
**machine** [1] - 1:21
**magistrate** [3] - 122:6, 124:12, 135:18
**Magistrate** [1] - 126:23
**magistrate's** [1] - 123:4
**magnitude** [4] - 98:23, 114:15, 115:4, 138:17
**mailed** [1] - 50:22
**main** [1] - 11:22
**maintain** [1] - 128:10
**maintenance** [2] - 27:4, 98:20
**Major** [1] - 11:12
**majoring** [1] - 9:2
**man** [1] - 29:18
**manage** [1] - 15:20
**managed** [4] - 18:22, 18:23, 67:6, 67:15
**Management** [6] - 13:24, 16:8, 16:11, 75:15, 78:9
**management** [11] - 10:25, 14:16, 15:3, 15:4, 15:13, 16:15, 16:18, 16:23, 17:2, 17:5, 67:1
**managing** [1] - 18:3
**manner** [6] - 33:21, 63:13, 63:18, 80:7, 96:18, 132:9
**manufacturer** [1] - 24:13
**March** [5] - 3:7, 3:14, 41:14, 70:11, 92:14, 104:10, 104:13, 104:15, 104:17, 104:20, 117:6
**MARCH** [1] - 1:10
**Margaret** [2] - 35:16, 60:13
**Mariani** [1] - 111:25
**MARIANI** [1] - 1:10
**mark** [1] - 52:13
**market** [1] - 23:15
**marks** [1] - 53:9
**Martin** [6] - 3:5, 34:24, 66:10, 73:25, 104:9, 135:24
**MARTIN** [1] - 1:6
**Marty** [1] - 79:15
**Maryland** [1] - 9:10
**material** [3] - 91:8,

132:23, 142:14
**materially** [5] - 127:24, 128:10, 131:22, 132:14, 139:5
**materials** [2] - 91:6, 143:1
**matter** [11] - 3:5, 4:22, 5:16, 59:9, 73:5, 119:16, 129:19, 136:19, 139:2, 142:21, 145:18
**matters** [2] - 76:17, 76:21
**Matthew** [1] - 5:17
**Mauricia** [1] - 123:14
**maximal** [1] - 26:21
**mean** [8] - 16:13, 22:13, 50:10, 50:18, 51:20, 76:9, 93:17, 113:23
**meaning** [3] - 45:23, 86:5, 135:3
**means** [8] - 14:18, 50:19, 60:21, 61:23, 113:13, 135:17, 137:8, 146:22
**meant** [4] - 84:6, 84:12, 101:21, 103:13
**measured** [1] - 64:20
**mechanism** [4] - 28:3, 62:21, 65:16
**mechanisms** [5] - 15:9, 30:9, 64:13, 64:22, 70:13
**Medicaid** [2] - 19:2, 20:3
**medical** [78] - 4:1, 4:4, 4:7, 4:8, 5:8, 5:11, 6:1, 9:5, 9:6, 9:21, 11:6, 13:10, 13:23, 17:9, 17:11, 19:20, 20:10, 21:12, 21:14, 22:4, 30:25, 31:4, 33:5, 33:19, 34:5, 34:24, 34:25, 35:8, 37:12, 37:22, 38:13, 38:22, 40:20, 41:20, 42:4, 42:7, 42:15, 43:5, 44:11, 45:15, 47:25, 49:2, 49:22, 50:13, 50:20, 52:9, 52:16, 55:19, 56:20, 56:21, 56:25, 57:14, 59:14, 60:8, 61:22, 64:7, 65:21, 65:25, 69:3, 71:11, 71:13, 77:14, 77:15, 81:18, 88:2, 92:8, 92:10,

92:13, 92:19, 99:21, 105:9, 118:21, 129:12, 134:4, 138:20
**Medical** [20] - 4:16, 9:8, 9:17, 11:9, 16:4, 16:5, 17:15, 17:20, 40:22, 41:7, 50:6, 50:12, 50:16, 50:20, 50:21, 51:1, 60:9, 77:4, 77:5, 78:25
**medical/legal** [4] - 75:18, 76:7, 76:15, 77:6
**medically** [14] - 19:10, 32:5, 33:15, 33:24, 39:1, 39:4, 39:11, 39:14, 40:8, 42:18, 45:5, 57:12, 65:3, 117:11
**Medicare** [1] - 20:3
**medication** [13] - 15:4, 44:5, 44:8, 44:12, 44:13, 49:6, 53:1, 64:12, 82:8, 93:2, 94:8, 107:20, 107:23
**medication-taking** [1] - 64:12
**medications** [10] - 14:22, 15:20, 20:21, 25:24, 55:17, 55:18, 78:22, 78:23, 106:15, 108:21
**medicine** [58] - 7:16, 8:17, 8:18, 9:12, 10:7, 11:11, 11:24, 11:25, 12:5, 12:7, 12:25, 13:2, 13:8, 13:9, 13:17, 13:22, 14:11, 15:8, 15:21, 16:22, 16:24, 20:8, 20:9, 20:11, 20:12, 29:22, 31:1, 32:13, 32:14, 32:15, 32:16, 33:25, 39:9, 39:17, 40:6, 44:1, 46:5, 51:14, 57:2, 57:11, 60:2, 61:3, 64:4, 67:19, 67:24, 76:3, 82:21, 83:4, 86:13, 86:14, 86:15, 86:20, 86:21, 86:25, 87:24, 93:20, 95:1
**Medicine** [18] - 4:16, 9:6, 9:14, 10:1, 10:20, 11:19, 15:25, 18:8, 18:19, 18:20, 18:23, 41:25, 74:20, 74:24, 74:25, 75:4, 75:5, 75:7

**medicines** [2] - 12:13, 18:7
**meet** [2] - 7:17, 139:15
**member** [3] - 14:10, 18:8, 78:25
**memorandum** [2] - 5:22, 141:11
**Memorial** [1] - 36:2
**memory** [1] - 85:13
**mentioned** [17] - 22:24, 43:5, 43:6, 49:20, 63:23, 68:7, 74:23, 78:7, 81:7, 81:21, 81:24, 84:15, 85:25, 86:3, 146:8
**Mercy** [1] - 11:22
**metabolite** [1] - 63:15
**metabolizing** [1] - 94:7
**metastases** [1] - 70:19
**Methadone** [97] - 22:25, 23:1, 23:4, 23:8, 23:12, 23:14, 23:16, 23:17, 23:24, 24:1, 24:5, 24:10, 24:11, 24:12, 24:14, 24:16, 24:21, 24:22, 24:23, 25:10, 25:12, 26:6, 26:14, 26:16, 27:1, 27:2, 27:4, 27:7, 27:10, 27:13, 28:9, 28:10, 28:14, 28:15, 28:16, 28:18, 28:21, 28:22, 28:24, 29:1, 29:3, 29:5, 53:24, 58:8, 62:19, 63:4, 63:5, 63:6, 63:15, 63:19, 63:24, 64:1, 64:13, 65:15, 67:9, 67:11, 72:7, 81:2, 81:5, 81:8, 81:10, 95:14, 95:18, 96:2, 96:12, 96:22, 97:16, 98:4, 98:12, 98:15, 98:19, 98:20, 99:18, 100:5, 100:6, 111:1, 111:8, 111:12, 112:3, 112:8, 112:23, 113:1, 113:9, 113:13, 113:18, 113:20, 113:25, 114:4, 114:19, 114:22, 115:11, 115:13, 116:19, 116:23
**Methadone's** [1] - 26:6
**methodology** [8] - 37:3, 37:5, 37:8,

88:11, 89:8, 102:20, 103:1, 103:20
**methods** [2] - 5:3, 5:5
**Michael** [1] - 6:24
**MICHAEL** [1] - 6:25
**Michelle** [2] - 1:13, 132:11
**middle** [1] - 10:25
**Middle** [4] - 4:21, 76:25, 146:4, 146:18
**MIDDLE** [1] - 1:1
**might** [3] - 120:1, 122:23, 139:25
**migraine** [1] - 30:7
**Milford** [1] - 3:12
**milieu** [2] - 41:18, 51:19
**military** [2] - 11:3, 11:15
**mill** [1] - 96:23
**Milligram** [5] - 27:25, 28:2, 68:10, 68:11, 68:15
**milligram** [23] - 23:15, 69:12, 69:15, 99:6, 99:18
**milligrams** [34] - 28:16, 28:17, 28:20, 28:22, 28:23, 28:24, 28:25, 29:3, 29:5, 29:6, 56:7, 56:10, 67:10, 67:11, 68:22, 68:24, 69:2, 69:4, 69:7, 69:8, 98:19, 98:22, 99:17, 111:9, 111:11, 111:12, 112:24, 113:9, 113:14, 113:15, 113:16, 113:18, 113:20
**milliliter** [6] - 96:3, 96:6, 96:20, 97:19, 100:6, 100:8
**millimeter** [1] - 99:25
**mind** [1] - 139:11
**mine** [1] - 22:4
**mini** [1] - 103:23
**mini-trial** [1] - 103:23
**minimize** [3] - 14:25, 55:23, 57:19
**minimizing** [3] - 12:11, 26:2, 67:19
**minimum** [1] - 136:7
**minor** [1] - 9:2
**minute** [3] - 86:8, 90:17, 117:23
**minutes** [3] - 72:18, 72:22, 131:5
**mischaracterized** [1] - 134:10

**mischaracterizes** [2] - 134:4, 134:6
**misconduct** [1] - 19:17
**misled** [2] - 122:6, 135:17
**misrepresentation** [1] - 135:5
**misrepresentations** [1] - 127:9
**misrepresented** [2] - 133:1, 136:6
**miss** [1] - 37:10
**missed** [1] - 138:20
**mistake** [2] - 112:2, 136:22
**mistakes** [1] - 39:7
**mitigation** [2] - 57:16, 58:12
**mixed** [5] - 65:13, 95:13, 97:16, 100:10
**MME's** [4] - 68:9, 70:1, 70:7, 72:5
**Model** [5] - 40:22, 50:6, 50:16, 60:10, 71:25
**model** [6] - 41:4, 41:5, 41:11, 50:22, 51:2, 79:3
**modest** [1] - 69:1
**moment** [15] - 9:15, 29:9, 34:15, 35:22, 85:7, 85:10, 96:6, 102:17, 103:12, 113:7, 114:15, 115:21, 116:1, 116:5, 127:16
**monitoring** [3] - 15:15, 58:14, 58:25
**Monitoring** [4] - 35:24, 58:19, 58:20, 58:24
**Monroe** [1] - 123:14
**months** [1] - 63:21
**monumental** [1] - 130:7
**morally** [1] - 70:25
**morning** [6] - 3:1, 3:2, 3:3, 3:4, 7:13, 7:14
**Morphine** [20] - 27:25, 28:2, 68:9, 68:11, 68:15, 68:22, 69:4, 69:8, 69:12, 69:15, 106:17, 106:22, 106:23, 106:25, 107:1, 110:25, 111:9, 111:11, 114:1
**morphine** [11] - 28:4, 28:6, 28:11, 28:17, 28:19, 28:21, 28:23,

28:25, 29:6, 56:8, 56:10
**mortis** [1] - 86:2
**Morton's** [1] - 25:22
**most** [21] - 17:21, 19:8, 20:17, 20:19, 26:18, 27:1, 27:14, 29:17, 29:21, 29:22, 37:10, 44:16, 49:25, 50:1, 50:2, 70:22, 98:20, 101:18, 115:2, 129:19, 133:21
**mostly** [1] - 42:11
**mother** [2] - 35:16, 60:13
**motion** [5] - 5:23, 73:16, 131:9, 137:9, 137:18
**Motion** [4] - 3:9, 3:10, 5:21, 119:24
**motions** [4] - 3:8, 124:21, 124:24, 134:14
**mouth** [1] - 62:5
**move** [10] - 8:5, 16:10, 27:15, 71:14, 71:20, 104:5, 118:7, 119:21, 119:24, 130:15
**moved** [1] - 111:6
**moves** [1] - 23:21
**moving** [2] - 118:8, 120:6
**MR** [53] - 3:3, 3:4, 6:11, 6:15, 8:8, 27:20, 71:19, 72:10, 72:22, 73:18, 73:24, 74:2, 102:25, 103:13, 103:19, 104:2, 104:3, 114:10, 116:13, 116:24, 117:19, 118:4, 119:12, 119:20, 126:13, 127:20, 128:3, 128:22, 129:24, 130:5, 130:12, 130:20, 130:24, 132:19, 132:21, 133:9, 133:13, 133:19, 135:1, 135:17, 137:11, 137:21, 138:9, 138:13, 138:25, 140:8, 140:10, 140:22, 140:24, 141:5, 143:4, 143:25, 145:15
**MRI** [1] - 109:21

**MS** [60] - 3:2, 3:20, 3:22, 6:18, 7:2, 7:8, 7:12, 7:18, 8:5, 8:12, 13:15, 27:15, 27:18, 27:24, 71:14, 71:20, 72:15, 102:18, 106:20, 106:22, 106:25, 114:6, 116:3, 116:8, 117:1, 117:3, 117:25, 118:10, 118:11, 119:10, 119:17, 120:4, 120:6, 127:19, 128:2, 128:20, 129:9, 130:1, 130:11, 130:17, 130:21, 131:3, 133:20, 134:21, 135:16, 136:13, 138:5, 138:12, 138:23, 140:9, 140:25, 141:12, 141:15, 143:15, 144:14, 144:22, 144:24, 145:5, 145:8, 145:16
**multi** [2] - 12:9, 20:8
**multi-disciplinary** [1] - 12:9
**multi-syllabic** [1] - 20:8
**multiple** [14] - 4:18, 12:1, 15:7, 27:2, 29:17, 29:19, 33:13, 40:24, 58:1, 63:11, 67:8, 78:17, 101:8
**multiplier** [1] - 112:3
**municipalities** [1] - 50:14
**must** [24] - 33:17, 34:3, 39:15, 40:7, 45:4, 45:15, 47:4, 49:1, 51:15, 52:12, 54:3, 81:2, 81:5, 99:2, 132:17, 139:3, 139:8, 139:9, 139:10, 139:11, 139:15, 142:16, 142:21, 143:19
**MYERS** [1] - 1:16

# N

**naive** [6] - 63:20, 98:5, 112:15, 112:18, 112:21, 113:21
**name** [5] - 6:22, 6:24, 13:20, 24:13, 127:1
**names** [1] - 28:7
**nanograms** [10] -

96:3, 96:5, 96:19, 96:23, 97:19, 99:6, 99:18, 99:24, 100:5, 100:8
**narrow** [1] - 17:4
**nature** [10] - 20:16, 23:16, 32:12, 37:12, 37:22, 38:6, 70:19, 124:8, 137:18, 141:25
**necessary** [11] - 22:1, 25:15, 37:22, 52:20, 82:18, 128:15, 132:3, 133:16, 134:24, 142:8, 145:9
**neck** [1] - 29:15
**need** [13] - 53:7, 83:1, 87:7, 95:10, 128:4, 128:7, 128:8, 137:19, 137:23, 139:21, 141:20, 144:23, 145:13
**needed** [2] - 14:2, 119:25
**needs** [2] - 118:3, 126:5
**negate** [1] - 123:21
**negative** [6] - 62:12, 101:10, 101:22, 101:24, 110:16, 122:25
**negligent** [2] - 39:10, 65:2
**nerve** [6] - 14:20, 14:24, 14:25, 29:16, 30:4, 93:4
**nerves** [2] - 29:19, 110:6
**neuralgia** [1] - 30:6
**neuropathic** [3] - 29:16, 30:5, 82:13
**never** [16] - 32:24, 42:15, 77:21, 77:25, 78:5, 83:17, 83:20, 83:23, 83:25, 84:2, 90:8, 105:22, 120:24, 121:15, 131:23, 138:7
**new** [1] - 28:4
**next** [8] - 9:4, 14:1, 26:23, 27:6, 48:21, 57:5, 69:7, 134:16
**night** [3] - 85:18, 129:10, 129:21
**non** [9] - 20:1, 54:10, 55:2, 55:19, 68:25, 70:12, 70:16, 70:17, 71:2
**non-cancer** [6] - 55:2, 68:25, 70:12, 70:16,

70:17, 71:2
**non-controlled** [1] - 20:1
**non-medical** [1] - 55:19
**non-use** [1] - 54:10
**None** [1] - 68:3
**none** [2] - 126:14, 135:14
**nordiazepam** [5] - 62:19, 63:15, 65:18, 95:14, 96:14
**normal** [2] - 82:20, 93:20
**normally** [1] - 110:2
**normative** [4] - 42:9, 42:12, 42:21, 88:20
**normatively** [1] - 20:12
**North** [2] - 123:15, 125:9
**north** [1] - 20:13
**Nos** [4] - 66:5, 66:6, 71:15, 72:13
**note** [20] - 20:14, 22:9, 104:14, 105:4, 105:5, 105:18, 106:7, 106:12, 106:17, 107:6, 107:10, 107:15, 107:16, 108:2, 108:20, 108:24, 109:4, 109:6, 109:16, 109:19
**noted** [6] - 33:18, 80:12, 85:6, 85:13, 110:11, 110:23
**notes** [9] - 35:9, 84:9, 84:12, 106:15, 108:16, 109:13, 109:19, 117:4, 118:20
**nothing** [2] - 119:10, 119:12
**notice** [2] - 85:25, 100:12
**notified** [1] - 127:5
**November** [3] - 5:23, 106:8, 117:5
**number** [8] - 17:23, 21:2, 23:13, 30:16, 76:13, 94:12, 95:5, 95:9, 95:22, 96:5, 96:19, 126:19, 126:20, 141:3, 143:5, 143:8
**numbered** [1] - 146:9
**numbers** [5] - 95:10, 134:5, 134:8
**numerous** [1] - 20:14

**nuns** [1] - 30:1

# O

**O.R** [1] - 12:24
**oath** [5] - 111:23, 117:20, 133:5, 138:10, 141:5
**oaths** [3] - 120:21, 133:21, 134:2
**object** [4] - 102:18, 104:1, 117:19, 129:12
**objection** [14] - 8:7, 8:8, 27:20, 71:18, 71:19, 72:8, 72:10, 114:6, 116:3, 116:5, 117:23, 127:14, 130:10, 143:13
**Objective** [1] - 106:13
**objective** [4] - 51:12, 54:8, 54:12, 110:8
**objects** [1] - 120:10
**obligation** [1] - 137:5
**observable** [1] - 115:2
**observation** [2] - 51:16, 87:3
**observations** [5] - 37:15, 38:3, 46:12, 54:5, 54:6
**observed** [8] - 26:25, 37:18, 53:2, 54:3, 67:7, 67:8, 81:12, 100:2
**obstetrics** [1] - 10:3
**obtain** [3] - 60:8, 124:6, 126:23
**obtained** [6] - 9:6, 11:17, 113:3, 113:6, 122:12, 133:4
**obtaining** [1] - 61:23
**obtains** [1] - 62:17
**obvious** [1] - 62:2
**obviously** [4] - 86:12, 129:2, 137:15, 143:22
**occasional** [1] - 53:16
**occasionally** [4] - 15:13, 19:20, 53:18, 62:10
**occasions** [5] - 21:2, 31:23, 32:18, 76:16, 78:17
**Occupational** [1] - 18:12
**occur** [16] - 22:3, 26:7, 30:9, 39:7, 39:10, 44:2, 55:11, 56:14, 62:9, 62:13, 64:22, 64:24, 94:12, 98:17,

98:18, 98:21
**occurred** [5] - 37:19, 41:2, 67:7, 68:1, 96:17
**occurrence** [1] - 53:16
**occurrences** [1] - 39:9
**occurring** [5] - 38:15, 56:15, 59:21, 63:1, 96:15
**occurs** [5] - 46:6, 55:10, 64:14, 64:16, 109:24
**October** [3] - 8:4, 109:19, 117:5
**OF** [3] - 1:1, 1:3, 1:9
**offer** [4] - 3:15, 119:16, 139:4, 139:15
**offered** [7] - 4:2, 4:4, 4:8, 4:24, 12:25, 18:1, 21:2
**offering** [1] - 3:22
**Office** [3] - 19:2, 19:4, 32:2
**OFFICE** [1] - 1:12
**office** [19] - 35:9, 92:11, 92:13, 92:20, 92:22, 104:12, 104:14, 104:16, 104:19, 105:4, 105:5, 105:18, 106:7, 107:6, 107:10, 108:24, 109:7, 110:22, 141:8
**officer** [7] - 122:5, 122:8, 122:10, 123:18, 123:24, 125:19, 125:24
**officer's** [1] - 124:5
**officers** [5] - 122:23, 123:3, 123:21, 124:16, 126:1
**official** [1] - 85:16
**Official** [3] - 146:3, 146:14, 146:17
**often** [1] - 16:22
**oftentimes** [1] - 94:8
**Ohio** [4] - 9:2, 11:9, 31:11, 32:11
**Old** [1] - 110:13, 117:16, 118:12, 118:19
**old** [2] - 9:21, 105:25
**Olshefski** [10] - 1:13, 3:13, 103:17, 104:1, 116:25, 119:15, 141:9, 141:23, 143:13, 145:7
**OLSHEFSKI** [56] - 3:2, 3:20, 3:22, 6:18, 7:2,

7:8, 7:12, 7:18, 8:5, 8:12, 13:15, 27:15, 27:18, 27:24, 71:14, 71:20, 72:15, 102:18, 114:6, 116:3, 116:8, 117:1, 117:3, 117:25, 118:10, 118:11, 119:10, 119:17, 120:4, 120:6, 127:19, 128:2, 128:20, 129:9, 130:1, 130:11, 130:17, 130:21, 131:3, 133:20, 134:21, 135:16, 136:13, 138:5, 138:12, 138:23, 140:9, 140:25, 141:12, 141:15, 143:15, 144:14, 144:22, 144:24, 145:8, 145:16

**omissions** [4] - 39:8, 120:17, 122:1, 122:18

**omit** [1] - 143:21

**omitted** [5] - 120:18, 121:12, 122:7, 122:10, 125:24

**omitting** [1] - 143:21

**once** [6] - 13:21, 28:18, 28:19, 48:21, 130:25, 140:7

**one** [60] - 5:11, 9:20, 12:2, 17:10, 19:16, 24:13, 25:16, 27:6, 28:18, 29:18, 31:4, 32:25, 48:2, 48:12, 49:25, 50:1, 50:2, 50:17, 51:5, 54:11, 56:8, 57:7, 57:8, 59:24, 60:2, 60:5, 62:7, 62:17, 64:16, 65:14, 68:8, 68:10, 73:6, 79:22, 81:1, 91:5, 91:12, 91:13, 91:17, 99:15, 108:25, 113:4, 113:7, 113:22, 117:25, 121:10, 122:11, 124:4, 126:9, 126:19, 128:21, 130:1, 131:14, 132:5, 142:14, 143:12

**ones** [1] - 90:24

**ongoing** [1] - 17:12

**open** [1] - 76:24

**operating** [1] - 11:23

**operation** [1] - 15:13

**operations** [1] - 10:10

**operative** [3] - 10:4, 13:3, 15:14

**operatively** [1] - 10:11

**opiates** [1] - 119:3

**opine** [1] - 33:2

**opined** [3] - 5:12, 90:11, 109:16

**opining** [1] - 89:20

**opinion** [38] - 3:9, 3:18, 4:5, 4:9, 5:14, 5:22, 19:19, 32:7, 40:7, 40:11, 47:4, 52:13, 52:14, 61:12, 65:10, 65:21, 66:1, 66:2, 66:21, 71:12, 86:17, 88:13, 89:8, 89:15, 90:3, 103:22, 109:17, 115:8, 115:9, 116:11, 117:7, 118:18, 119:8, 125:13, 134:12, 137:14, 137:23, 139:1

**opinions** [28] - 18:2, 30:20, 31:23, 32:13, 32:14, 32:19, 36:24, 40:2, 42:25, 43:2, 44:21, 47:2, 48:9, 49:18, 51:4, 60:16, 66:4, 66:14, 66:15, 66:20, 70:5, 71:8, 71:10, 76:15, 102:23, 103:22, 114:8, 140:3

**Opioid** [4] - 50:7, 50:24, 71:25, 72:4

**opioid** [32] - 17:25, 21:16, 21:18, 21:20, 23:24, 24:3, 25:11, 25:16, 27:4, 42:1, 42:3, 42:8, 51:2, 51:7, 51:18, 51:21, 51:24, 53:5, 58:22, 63:3, 63:20, 64:1, 64:6, 64:21, 80:11, 80:22, 112:14, 112:18, 112:21, 112:22, 113:21, 113:23

**opioid-related** [1] - 80:11

**opioid-type** [1] - 24:3

**Opioids** [2] - 40:23, 41:23

**opioids** [24] - 16:17, 23:9, 23:17, 25:13, 28:3, 28:5, 42:9, 44:9, 52:2, 54:25,

55:1, 56:4, 56:5, 58:9, 64:5, 64:13, 64:25, 66:25, 68:2, 78:18, 106:3, 110:15, 114:12, 118:24

**opportunity** [4] - 36:20, 131:25, 138:6, 143:16

**opposed** [2] - 14:2, 101:25

**ops** [1] - 20:20

**OR** [1] - 93:13

**order** [22] - 14:25, 17:3, 26:1, 28:6, 37:17, 37:19, 37:23, 39:13, 41:9, 45:21, 46:12, 46:23, 52:20, 53:4, 71:6, 73:9, 77:8, 92:4, 92:14, 95:11, 140:18

**orders** [3] - 109:10, 114:15, 115:4

**organ** [1] - 62:3

**organic** [1] - 81:14

**organization** [1] - 50:17

**organizations** [3] - 21:10, 21:12, 21:14

**osteopaths** [1] - 18:23

**Osteopathy** [2] - 18:20, 18:24

**otherwise** [2] - 60:1, 139:16

**outcome** [3] - 57:19, 57:20, 57:24

**outcomes** [2] - 86:22, 91:8

**outflow** [1] - 110:3

**outlined** [2] - 41:10, 145:19

**outpatient** [9] - 11:25, 12:6, 12:21, 14:8, 22:15, 22:18, 22:23, 23:2, 67:19

**outside** [3] - 23:6, 136:2, 136:3

**outweighs** [1] - 27:10

**overall** [6] - 17:7, 38:5, 95:8, 115:6, 117:8, 129:3

**overdose** [10] - 26:11, 54:1, 64:21, 64:23, 67:5, 67:14, 69:18, 93:16, 98:21, 100:6

**overdosed** [2] - 67:5, 67:8

**overdoses** [3] - 23:13, 51:22, 67:8

**overlay** [1] - 41:1

**overuse** [1] - 20:21

**owed** [1] - 11:6

**own** [6] - 67:20, 126:17, 128:11, 129:13, 136:17, 139:1

**oxycodone** [2] - 53:25, 108:22

**P**

**p.m** [1] - 85:20

**P.O** [1] - 146:18

**p.O** [1] - 1:14

**PA** [3] - 3:12, 40:16, 88:10

**package** [3] - 24:23, 38:24, 72:7

**packages** [1] - 24:11

**page** [12] - 37:13, 47:12, 47:13, 48:21, 104:6, 105:14, 106:5, 107:4, 107:13, 107:25, 108:18, 109:5

**Page** [6] - 100:20, 101:5, 105:1, 109:5, 111:8, 117:14

**page-turning** [1] - 37:13

**pages** [5] - 36:23, 37:1, 39:25, 92:7, 115:25

**paid** [1] - 11:4

**Pain** [17] - 4:15, 11:19, 13:23, 15:25, 16:3, 16:9, 40:23, 41:23, 41:24, 42:6, 50:7, 72:1, 74:20, 75:14, 107:20

**pain** [104] - 7:16, 8:17, 9:12, 10:9, 11:10, 11:24, 11:25, 12:5, 12:7, 12:10, 12:13, 12:25, 13:2, 13:8, 13:9, 13:16, 13:22, 14:11, 14:15, 14:25, 15:5, 15:7, 15:8, 15:10, 15:14, 15:19, 15:21, 16:16, 16:20, 16:22, 16:24, 17:1, 17:2, 17:3, 17:5, 17:7, 17:24, 18:4, 18:7, 18:9, 19:25, 21:24, 21:25, 22:2, 23:4, 25:10, 27:2, 27:8, 29:13, 29:15, 29:16, 29:22, 29:23, 29:24, 30:5, 30:6, 30:9, 31:1, 32:13,

32:14, 32:15, 32:16, 51:3, 54:25, 55:2, 55:9, 61:22, 68:25, 69:6, 70:12, 70:14, 70:15, 70:16, 70:17, 70:20, 70:22, 70:23, 71:1, 71:2, 71:4, 77:20, 78:18, 82:8, 82:13, 82:21, 83:7, 93:2, 93:4, 93:5, 95:1, 105:9, 107:22, 108:21

**pains** [2] - 29:22, 29:24

**palliative** [2] - 27:9, 93:3

**palpates** [1] - 109:13

**paper** [3] - 16:14, 58:4, 91:14

**papers** [1] - 104:14

**paradigms** [1] - 71:6

**paragraph** [10] - 25:8, 26:4, 26:23, 92:2, 104:7, 107:18, 108:12, 109:20, 110:12, 110:13

**paragraphs** [1] - 25:4

**parameters** [1] - 47:20

**part** [41] - 17:4, 21:7, 24:25, 25:2, 29:25, 30:10, 38:10, 41:1, 42:3, 43:15, 43:19, 46:20, 48:12, 50:17, 50:19, 50:24, 50:25, 51:18, 52:5, 52:10, 60:6, 60:7, 64:15, 67:18, 75:2, 82:20, 83:3, 83:6, 84:12, 88:11, 90:8, 93:15, 93:20, 95:8, 96:25, 97:17, 98:3, 117:20, 117:21, 129:3

**particular** [22] - 19:9, 25:15, 37:14, 43:22, 44:18, 46:6, 46:25, 48:18, 51:13, 58:16, 61:16, 65:6, 68:5, 73:16, 88:21, 95:11, 95:24, 96:5, 114:14, 131:9, 131:12, 137:8

**particularly** [24] - 17:20, 20:3, 20:19, 23:14, 24:13, 26:8, 26:11, 33:22, 40:16, 42:2, 42:5, 43:6, 44:8, 44:18, 49:17, 53:10, 56:14, 56:23, 59:19, 63:15, 64:17, 75:3, 95:12, 116:22

**parties** [1] - 46:19

**partners** [3] - 13:5, 13:11, 14:1
**parts** [4] - 20:2, 37:21, 118:2, 137:9
**passed** [1] - 93:22
**passes** [1] - 54:11
**passing** [1] - 81:12
**past** [4] - 64:8, 67:22, 76:6, 118:8
**Pat** [3] - 133:20, 135:16, 138:24
**patch** [3] - 102:9, 102:11, 102:14
**pathologist** [6] - 77:15, 83:17, 84:17, 84:18, 94:2, 95:2
**pathology** [1] - 81:17
**Pathology** [1] - 83:20
**patient** [78] - 12:11, 19:11, 20:25, 24:25, 25:19, 26:2, 30:10, 34:4, 37:15, 38:3, 38:14, 44:3, 44:4, 44:15, 46:6, 46:8, 46:12, 46:15, 48:2, 49:7, 52:20, 52:25, 53:1, 53:17, 53:23, 54:7, 54:9, 54:10, 54:16, 54:19, 55:7, 55:16, 56:10, 56:18, 56:22, 56:25, 57:10, 57:20, 57:22, 57:23, 59:10, 59:13, 59:18, 59:21, 60:23, 60:24, 61:2, 62:7, 63:1, 63:2, 63:9, 63:10, 63:20, 65:5, 67:9, 68:19, 71:4, 82:11, 82:19, 82:22, 82:25, 88:1, 95:23, 96:16, 97:1, 97:9, 99:3, 99:17, 99:19, 99:20, 105:12, 105:23, 110:22, 114:2, 133:2, 135:6, 136:5
**patient's** [5] - 15:7, 15:10, 37:16, 38:9, 56:2
**patients** [60] - 10:9, 10:12, 10:13, 14:6, 14:13, 15:17, 16:6, 17:1, 17:7, 17:8, 25:10, 25:13, 26:20, 27:1, 27:3, 27:7, 29:11, 29:13, 29:14, 30:16, 40:13, 41:13, 44:7, 51:17, 53:14, 54:3, 62:14, 64:5, 64:11, 67:6, 67:7, 67:8, 67:14, 67:20,

70:24, 75:22, 75:25, 77:18, 82:2, 82:5, 82:24, 92:25, 93:6, 93:7, 93:17, 93:21, 94:4, 96:11, 97:18, 97:23, 97:24, 112:11, 114:25, 115:2, 133:21, 133:23, 133:25, 141:16
**Patrick** [1] - 1:17
**Patt** [1] - 11:13
**pattern** [2] - 37:17, 116:21
**Patterson** [1] - 11:8
**pause** [1] - 143:12
**paying** [1] - 37:13
**PC** [2] - 75:15, 125:18
**PDMP** [4] - 35:23, 59:4, 133:25, 134:8
**peak** [2] - 26:6, 26:8
**pebble** [1] - 70:17
**pediatric** [1] - 10:13
**pediatrics** [1] - 10:3
**peer** [13] - 80:4, 80:7, 80:10, 80:15, 86:21, 91:4, 91:7, 91:12, 91:17, 99:7, 99:16, 114:17
**peer-reviewed** [12] - 80:4, 80:7, 80:10, 80:15, 86:21, 91:4, 91:12, 91:17, 99:7, 99:16, 114:17
**pen** [1] - 58:4
**penalties** [1] - 46:1
**pencil** [1] - 16:14
**pending** [1] - 5:16
**PENNSYLVANIA** [3] - 1:1, 1:11, 1:25
**Pennsylvania** [50] - 1:15, 1:19, 4:21, 8:19, 9:8, 9:16, 11:18, 17:15, 17:20, 18:14, 18:19, 19:3, 19:13, 31:11, 31:14, 33:22, 34:2, 36:17, 40:12, 40:13, 41:7, 43:6, 43:7, 43:15, 43:20, 43:22, 44:19, 48:13, 48:16, 49:9, 49:10, 50:9, 50:10, 50:16, 50:21, 51:1, 51:10, 58:15, 59:1, 60:6, 71:22, 72:2, 79:13, 115:7, 115:22, 146:5, 146:18, 146:19
**people** [23] - 15:22, 20:9, 20:11, 21:11,

26:19, 52:5, 53:23, 53:24, 54:1, 55:5, 56:22, 62:9, 67:3, 70:22, 73:1, 98:15, 126:10, 127:11, 130:6, 133:6, 138:19, 140:1, 140:5
**per** [23] - 28:20, 28:24, 28:25, 29:4, 29:5, 29:8, 68:15, 70:1, 96:3, 96:6, 96:19, 96:23, 97:19, 98:19, 98:22, 99:6, 99:18, 99:25, 100:5, 100:8, 111:11, 112:24, 113:18
**perceive** [1] - 20:6
**percent** [8] - 12:24, 12:25, 13:9, 56:11, 64:20, 75:20, 75:21, 76:7
**percentage** [2] - 75:17, 86:9
**perforce** [1] - 123:2
**performance** [1] - 14:20
**performed** [5] - 9:15, 12:20, 13:2, 61:17, 110:24
**performing** [4] - 12:2, 40:19, 82:23, 86:10
**perhaps** [1] - 143:15
**period** [17] - 14:5, 14:7, 15:14, 24:6, 26:9, 41:19, 53:10, 56:5, 56:11, 68:4, 68:20, 77:17, 85:21, 112:23, 113:19, 113:22, 134:1
**periods** [2] - 10:11, 113:19
**peripherally** [1] - 97:12
**perjury** [1] - 142:12
**permitted** [1] - 140:11
**perniciously** [1] - 123:2
**persistently** [1] - 20:18
**persists** [1] - 26:8
**person** [8] - 29:17, 45:24, 45:25, 48:1, 48:2, 48:3, 73:6, 90:15
**personal** [2] - 57:25, 75:23
**persons** [1] - 128:6
**perspective** [2] - 128:4, 138:6
**persuasive** [1] - 6:6

**pharmacist** [8] - 45:20, 46:8, 46:11, 46:17, 46:18, 46:21, 49:6
**pharmacists** [2] - 46:4, 124:25
**pharmacodynamics** [2] - 23:20, 23:22
**pharmacokinetics** [3] - 23:20, 23:21, 25:12
**pharmacology** [5] - 10:15, 23:19, 46:23, 58:9
**pharmacovigilance** [4] - 53:11, 57:4, 57:8, 58:13
**pharmacy** [1] - 135:21
**pharmokinetics** [1] - 111:15
**phase** [1] - 28:19
**Phil** [1] - 134:19
**philosophically** [1] - 71:1
**Philosophy** [1] - 9:3
**photo** [1] - 122:10
**photograph** [1] - 115:15
**photographs** [2] - 36:20, 115:10
**physical** [8] - 15:15, 38:14, 38:18, 44:4, 52:23, 57:3, 57:7, 62:4
**physician** [52] - 7:16, 8:15, 8:17, 13:24, 18:2, 18:15, 19:12, 22:20, 32:4, 33:20, 34:8, 38:24, 40:18, 41:6, 41:15, 46:7, 46:9, 46:13, 46:16, 46:17, 46:18, 46:21, 47:19, 48:4, 50:23, 51:13, 52:19, 52:22, 53:2, 53:10, 54:13, 55:22, 57:5, 58:3, 58:23, 59:3, 59:9, 59:10, 59:22, 60:22, 77:21, 77:22, 77:25, 79:12, 79:16, 79:19, 82:22, 83:3, 88:21, 136:1
**Physician** [2] - 11:19, 22:10
**physician's** [3] - 19:23, 40:10, 59:6
**Physician's** [3] - 17:16, 17:19, 25:2
**Physicians** [1] - 16:9
**physicians** [36] - 12:2, 12:5, 17:21, 17:24,

18:14, 19:18, 19:19, 22:15, 23:4, 23:12, 29:21, 34:1, 37:14, 37:19, 38:4, 38:21, 38:22, 41:9, 41:21, 43:8, 43:23, 51:7, 51:11, 52:10, 52:11, 58:18, 58:19, 59:23, 68:2, 79:17, 81:2, 88:15, 110:24, 113:4
**physiologically** [2] - 71:1, 113:22
**physiology** [1] - 10:15
**picture** [2] - 89:11, 89:19
**piece** [1] - 126:2
**pill** [4] - 53:16, 58:13, 115:23, 116:2
**pills** [2] - 53:20, 115:18
**Pittsburgh** [7] - 11:18, 11:19, 11:21, 11:22, 12:16, 75:15, 86:10
**pituitary** [1] - 69:20
**place** [4] - 23:5, 94:7, 122:22, 131:7
**placebo** [1] - 87:2
**placebo-controlled** [1] - 87:2
**placed** [1] - 23:11
**places** [1] - 81:21
**plain** [2] - 40:5, 77:16
**Plaintiff** [2] - 31:18, 124:9
**plaintiff** [1] - 1:4
**Plaintiff's** [1] - 122:14
**Plan** [1] - 106:13
**plan** [1] - 130:21
**planning** [1] - 11:4
**plans** [1] - 18:3
**pleased** [1] - 7:17
**plucking** [1] - 55:12
**point** [30] - 11:2, 13:19, 17:13, 33:19, 41:10, 51:21, 52:18, 56:8, 60:17, 68:10, 69:2, 69:7, 69:9, 87:24, 93:18, 94:1, 94:19, 94:24, 95:2, 95:3, 95:5, 95:25, 96:1, 102:18, 107:23, 114:14, 132:16, 134:15, 134:24, 143:17
**pointed** [1] - 95:7
**pointes** [1] - 26:25
**points** [4] - 68:21, 96:4, 118:10, 136:17
**police** [2] - 81:22, 123:3

**Police** [4] - 36:17, 86:1, 115:7, 115:22

**policies** [1] - 59:5

**Policy** [5] - 40:22, 50:6, 50:16, 60:10, 71:25

**policy** [8] - 41:4, 41:5, 41:11, 49:20, 50:10, 50:20, 50:22, 51:2

**poorly** [1] - 55:16

**popliteal** [1] - 94:22

**population** [1] - 30:10

**populations** [1] - 20:25

**portend** [1] - 21:5

**portion** [5] - 14:19, 15:1, 15:2, 64:14, 120:8

**portions** [2] - 128:10, 134:16

**position** [6] - 10:25, 128:14, 129:11, 129:15, 133:14, 134:22

**positions** [2] - 120:3, 136:18

**positive** [1] - 101:24

**possess** [1] - 125:14

**possessed** [1] - 125:11

**possession** [1] - 103:22

**possible** [5] - 15:9, 26:1, 37:20, 89:11, 89:19

**possibly** [1] - 90:2

**post** [3] - 10:11, 15:14, 62:14

**post-aesthetically** [1] - 62:14

**post-operative** [1] - 15:14

**post-operatively** [1] - 10:11

**posterior** [1] - 86:4

**postherpetic** [1] - 30:5

**postmortem** [15] - 61:17, 62:1, 62:4, 62:25, 63:17, 65:16, 81:24, 84:24, 85:1, 86:1, 86:10, 95:2, 100:18, 102:12, 116:20

**posture** [1] - 131:8

**potency** [2] - 24:4, 28:8

**potent** [9] - 24:1, 24:3, 24:7, 28:19, 28:21, 29:2, 29:3

**potential** [8] - 26:3, 27:9, 55:23, 123:1, 125:17, 125:20, 126:2

**potentially** [4] - 64:9, 122:16, 123:20, 123:22

**practice** [81] - 4:7, 5:10, 6:1, 8:18, 13:9, 13:20, 13:22, 14:3, 14:19, 15:1, 15:2, 15:3, 17:10, 19:11, 20:10, 23:6, 29:25, 32:6, 33:4, 33:16, 33:25, 38:16, 39:2, 39:12, 39:15, 39:17, 40:6, 40:9, 42:9, 42:15, 42:20, 42:21, 42:25, 43:2, 43:3, 44:1, 45:6, 45:17, 46:5, 47:25, 48:4, 49:3, 51:15, 52:15, 55:24, 57:2, 57:10, 57:13, 59:15, 65:4, 65:24, 67:19, 67:21, 67:23, 68:3, 68:4, 75:17, 76:2, 76:3, 77:19, 77:20, 78:16, 79:5, 82:1, 82:21, 83:3, 83:7, 86:9, 86:14, 86:21, 86:25, 87:24, 89:6, 93:1, 93:19, 98:14, 117:12, 121:16, 134:3

**Practice** [1] - 16:8

**practiced** [2] - 13:16, 83:25

**practicing** [5] - 20:12, 50:23, 52:14, 64:4, 79:12

**practitioner** [9] - 24:15, 45:8, 45:16, 45:19, 48:1, 48:3, 49:2, 49:5, 65:21

**pre** [4] - 124:21, 124:24, 124:25, 141:17

**pre-affidavit** [1] - 141:17

**pre-trial** [3] - 124:21, 124:24, 124:25

**preceded** [1] - 57:11

**precedent** [1] - 123:17

**preceding** [1] - 91:15

**precise** [3] - 85:14, 101:9, 114:15

**precisely** [4] - 20:9, 60:24, 79:18, 95:25

**preclude** [3] - 5:19, 124:21, 124:24

**Preclude** [1] - 5:21

**Prednisone** [1] - 109:10

**predominantly** [1] - 29:12

**prefer** [2] - 89:18, 89:21

**pregnancy** [1] - 110:16

**preliminary** [19] - 131:10, 131:14, 132:7, 132:12, 132:18, 136:12, 137:5, 137:13, 137:19, 139:3, 139:21, 141:21, 141:24, 141:25, 142:5, 142:20, 142:23, 143:19

**premature** [1] - 73:21

**prepared** [4] - 3:19, 6:16, 140:1, 146:11

**preparing** [1] - 127:22

**preponderance** [1] - 142:13

**Presbyterian** [2] - 9:7, 9:16

**prescribe** [6] - 22:21, 42:1, 42:9, 82:12, 82:17, 82:18

**prescribed** [9] - 18:17, 24:22, 35:13, 54:16, 57:20, 63:17, 93:2, 121:15, 124:20

**prescriber** [3] - 21:6, 49:7, 81:5

**Prescribing** [3] - 44:20, 50:24, 72:2

**prescribing** [63] - 18:13, 18:16, 18:24, 19:9, 19:24, 20:16, 20:18, 20:21, 21:4, 23:10, 24:12, 24:15, 24:20, 25:1, 27:12, 32:5, 39:1, 39:4, 39:13, 40:17, 41:2, 41:8, 41:16, 41:18, 41:22, 42:8, 42:18, 42:21, 43:16, 44:17, 45:18, 45:19, 46:7, 49:4, 51:6, 51:7, 51:17, 53:13, 54:13, 56:16, 56:18, 56:19, 57:16, 58:5, 59:7, 60:7, 60:18, 63:18, 64:6, 68:2, 71:7, 81:2, 81:5, 81:8, 96:17, 115:14, 116:21, 117:10,

121:17, 124:13, 136:2

**Prescription** [4] - 35:24, 58:18, 58:20, 58:24

**prescription** [43] - 23:3, 33:23, 34:2, 34:8, 40:7, 45:3, 45:4, 45:9, 45:14, 45:20, 45:21, 45:23, 45:25, 46:5, 46:10, 46:24, 47:18, 47:20, 47:22, 48:19, 49:1, 49:9, 49:13, 53:15, 57:6, 57:11, 58:14, 58:22, 63:4, 63:5, 63:7, 63:19, 65:20, 79:18, 79:19, 83:2, 101:18, 112:23, 113:6, 113:8, 113:10, 115:15, 116:19

**prescriptions** [16] - 4:5, 4:9, 5:9, 5:25, 33:3, 33:14, 33:17, 35:12, 40:18, 43:3, 52:14, 65:20, 65:22, 66:3, 113:3, 135:14

**Prescriptions** [2] - 47:10, 71:24

**presence** [3] - 65:17, 96:14, 138:15

**present** [7] - 54:14, 54:15, 54:16, 75:14, 118:20, 120:14, 128:13

**presentation** [5] - 3:15, 61:2, 61:19, 88:17, 129:17

**presentations** [3] - 21:23, 22:7, 76:14

**presented** [5] - 61:15, 82:19, 82:24, 82:25, 120:23

**presenting** [1] - 132:24

**presents** [1] - 54:14

**President** [1] - 75:14

**pressed** [1] - 5:13

**pressure** [3] - 30:7, 62:12, 110:5

**presumably** [1] - 102:10

**presume** [1] - 59:8

**pretty** [1] - 118:5

**prevent** [1] - 129:13

**previous** [1] - 59:5

**previously** [7] - 5:21, 26:13, 31:3, 31:7, 31:12, 32:25, 49:12

**primarily** [4] - 16:25, 17:12, 19:24, 19:25

**primary** [13] - 65:14, 77:19, 77:21, 77:22, 77:25, 78:5, 79:10, 79:11, 79:15, 79:17, 82:8, 82:22, 83:2

**principles** [5] - 5:3, 5:4, 34:5, 57:14, 67:23

**private** [1] - 14:3

**privileges** [3] - 77:25, 83:17, 83:23

**probability** [3] - 57:18, 57:19, 57:20

**Probable** [11] - 120:7, 120:16, 125:18, 126:22, 127:1, 127:25, 133:1, 133:3, 135:15, 135:23, 138:18

**probable** [17] - 72:24, 73:3, 120:9, 123:4, 123:21, 123:23, 123:24, 126:3, 139:12, 141:7, 142:9, 142:15, 142:17, 144:3, 144:13, 144:16

**problem** [11] - 18:6, 20:19, 20:22, 21:15, 51:23, 52:7, 52:8, 71:2, 81:19, 138:5, 144:22

**problematic** [5] - 21:5, 41:8, 53:9, 64:4, 65:5

**problems** [5] - 17:7, 21:4, 22:3, 30:4, 117:8

**procedural** [1] - 101:11

**procedurally** [1] - 72:23

**procedure** [1] - 138:14

**procedures** [1] - 10:4

**proceed** [11] - 6:9, 6:16, 72:21, 129:22, 131:1, 142:22, 142:24, 143:18, 144:10, 144:13, 145:18

**proceeding** [3] - 3:15, 73:2, 143:23

**Proceedings** [1] - 1:21

**PROCEEDINGS** [1] - 1:9

**proceedings** [2] - 145:20, 146:8

**process** [9] - 52:17, 52:18, 55:12, 90:8, 91:7, 94:10, 97:6, 135:12, 143:21
**processes** [1] - 97:7
**produce** [1] - 62:20
**produced** [1] - 1:21
**produces** [1] - 62:12
**producing** [1] - 95:12
**profession** [1] - 59:24
**professional** [33] - 4:7, 4:13, 5:10, 6:1, 18:18, 19:11, 19:17, 23:6, 32:6, 33:4, 33:16, 33:25, 38:16, 39:2, 39:12, 39:15, 40:9, 42:19, 45:6, 45:17, 45:22, 46:20, 47:25, 49:3, 52:15, 57:13, 65:4, 65:24, 74:15, 74:17, 117:12, 121:16, 134:3
**Professional** [1] - 18:11
**professionalism** [1] - 46:16
**proffer** [3] - 135:7, 137:24, 138:15
**progeny** [1] - 128:17
**program** [4] - 10:23, 12:10, 58:14, 58:25
**Program** [5] - 17:16, 17:19, 58:19, 58:20, 58:24
**programs** [1] - 23:2
**progress** [5] - 107:15, 108:2, 108:20, 109:3, 109:6
**progressively** [2] - 20:22, 63:6
**prohibited** [1] - 68:1
**prolix** [1] - 123:2
**prolongation** [1] - 26:24
**prolonged** [1] - 113:22
**promptly** [1] - 127:5
**proof** [5] - 3:15, 132:1, 139:5, 139:10, 139:15
**proper** [2] - 45:17, 49:4
**properly** [1] - 128:17
**property** [1] - 127:23
**proportionality** [1] - 135:3
**propose** [2] - 73:2, 119:15
**proposition** [1] -

122:25
**propriety** [1] - 33:2
**pros** [1] - 44:7
**prosecution** [2] - 76:22, 76:25, 123:25
**Prosecution** [2] - 31:21, 31:22
**protected** [1] - 64:18
**protocols** [1] - 38:20
**prove** [2] - 122:25, 126:20
**provide** [12] - 7:25, 24:10, 30:20, 30:22, 59:18, 62:21, 82:25, 84:13, 90:21, 139:9, 139:15, 140:12
**provided** [24] - 7:5, 12:5, 12:8, 19:22, 30:17, 32:12, 33:13, 33:23, 35:8, 37:21, 38:7, 46:1, 61:11, 70:4, 89:24, 103:2, 105:20, 106:9, 107:7, 108:6, 109:2, 120:21, 140:12, 141:23
**providers** [1] - 23:7
**provides** [4] - 43:7, 54:8, 54:12, 64:4
**providing** [3] - 11:24, 19:19, 93:23
**provision** [5] - 10:8, 10:15, 15:3, 20:1, 38:22
**provisions** [2] - 46:2, 146:5
**prudent** [1] - 128:5
**psoriatic** [1] - 109:10
**psychological** [7] - 12:12, 15:17, 38:12, 38:13, 55:18, 58:2
**Psychology** [1] - 9:3
**public** [6] - 51:19, 51:23, 52:3, 52:7, 52:8, 55:24
**Public** [1] - 32:2
**publications** [15] - 79:21, 79:22, 79:25, 80:1, 80:4, 80:7, 80:10, 80:12, 80:15, 80:19, 80:22, 81:9, 81:14, 84:22, 85:1
**published** [5] - 40:24, 41:14, 41:23, 42:5, 80:3
**pull** [2] - 20:7, 93:10
**pulls** [1] - 62:12
**pulmonary** [1] - 62:6
**pumps** [2] - 14:22, 15:12

**puncture** [1] - 94:19
**purport** [3] - 120:11, 121:11, 122:18
**purported** [1] - 45:25
**purporting** [3] - 45:21, 121:14, 121:18
**purports** [2] - 120:20, 125:2
**Purpose** [1] - 48:22
**purpose** [31] - 6:1, 19:10, 23:3, 32:5, 33:15, 33:24, 39:2, 39:5, 39:11, 39:14, 40:8, 42:19, 45:3, 45:5, 45:15, 47:25, 49:2, 49:9, 55:4, 57:12, 65:3, 87:6, 95:22, 97:15, 99:13, 116:9, 117:11, 120:14, 121:2, 127:17, 129:17
**purposes** [9] - 4:7, 5:11, 33:5, 52:16, 65:25, 66:7, 72:15, 120:11, 134:4
**pursuant** [4] - 120:13, 121:18, 133:4, 146:5
**pursue** [2] - 123:20, 124:3
**put** [17] - 30:16, 41:18, 73:8, 84:6, 84:14, 93:14, 110:21, 116:18, 120:20, 125:2, 125:3, 129:6, 133:3, 135:14, 135:21, 136:4, 140:17
**putative** [1] - 38:25
**puts** [1] - 139:4
**putting** [2] - 37:17, 120:8

## Q

**QT** [4] - 26:24, 80:22, 80:25, 81:9
**qualifications** [1] - 102:20
**qualified** [10] - 3:17, 4:17, 4:20, 4:25, 5:7, 33:1, 124:19, 125:2, 126:11
**quality** [1] - 103:5
**quantities** [1] - 54:14
**quantity** [2] - 12:22, 95:23
**quantum** [1] - 133:9
**questioning** [1] - 6:10
**questions** [5] - 52:20, 72:16, 87:17, 117:1,

118:6
**quickly** [1] - 129:7
**quite** [2] - 113:23, 134:17
**quote** [1] - 142:2
**quoted** [1] - 142:19

## R

**raised** [5] - 97:23, 97:25, 98:17, 116:5, 136:16
**raises** [1] - 131:15
**ran** [2] - 12:6, 12:9
**random** [1] - 87:12
**randomized** [2] - 86:16, 87:2
**range** [12] - 62:20, 69:1, 92:20, 92:24, 95:10, 96:13, 96:21, 99:24, 100:1, 111:9, 114:23, 115:2
**rank** [1] - 11:12
**rapid** [1] - 114:25
**rapidly** [1] - 97:24
**rarely** [4] - 42:12, 42:14, 56:14, 60:23
**rate** [2] - 51:24, 51:25
**rather** [4] - 129:7, 137:4, 137:11, 137:14, 140:8
**Raymond** [1] - 5:18
**Re** [1] - 1:9
**re** [4] - 16:1, 44:4, 78:13
**re-certified** [2] - 16:1, 78:13
**re-established** [1] - 78:13
**re-evaluate** [1] - 44:4
**reach** [3] - 61:17, 65:10, 65:21
**reached** [6] - 44:22, 47:2, 48:10, 60:16, 66:1, 70:5
**reaching** [10] - 36:24, 40:2, 44:21, 47:1, 48:9, 49:18, 51:3, 60:15, 61:11, 70:5
**read** [23] - 25:3, 25:8, 26:4, 26:23, 37:11, 43:25, 45:11, 48:25, 54:24, 67:15, 77:2, 78:9, 81:13, 81:17, 92:11, 101:5, 101:12, 101:19, 104:10, 105:10, 106:23, 107:18
**readily** [1] - 123:18
**reading** [1] - 60:12

**reads** [1] - 118:15
**ready** [4] - 6:9, 74:7, 131:18
**real** [1] - 96:10
**realized** [1] - 13:5
**really** [4] - 77:5, 88:15, 130:6, 136:23
**realm** [3] - 51:10, 58:12, 67:21
**REALTIME** [1] - 1:24
**reason** [7] - 21:25, 59:20, 67:3, 92:14, 116:8, 119:22, 142:24
**reasonable** [7] - 54:14, 55:10, 71:11, 71:13, 123:21, 135:23, 135:25
**reasonableness** [1] - 124:5
**reasonably** [1] - 59:8
**reasons** [3] - 4:24, 5:19, 10:24
**rebuttal** [1] - 141:23
**receive** [2] - 3:7, 130:13
**received** [1] - 121:19
**receiving** [4] - 27:3, 106:20, 106:25, 107:23
**recent** [3] - 49:25, 50:1, 50:2
**receptors** [2] - 28:4
**recess** [2] - 72:19, 131:6
**recipe** [1] - 87:25
**recitation** [2] - 126:14, 135:4
**reckless** [5] - 120:17, 126:24, 136:7, 142:6, 142:12
**recklessly** [7] - 120:16, 120:18, 121:11, 122:19, 124:16, 126:4, 139:5
**reckoning** [1] - 38:5
**recognize** [2] - 50:3, 69:23
**Recognizing** [1] - 124:3
**recollection** [2] - 34:18, 36:1
**recommendations** [2] - 37:16, 68:14
**recommended** [1] - 37:18
**record** [18] - 6:23, 19:20, 37:11, 61:22, 66:7, 92:5, 99:21, 105:3, 106:6, 107:5,

107:14, 108:1, 108:19, 118:21, 125:7, 133:17, 141:3, 143:6
**recorded** [1] - 1:21
**records** [48] - 33:13, 34:15, 34:20, 35:8, 36:1, 36:6, 36:9, 36:12, 36:14, 36:23, 37:1, 37:12, 41:3, 41:4, 44:11, 59:14, 60:8, 61:11, 65:8, 79:14, 81:18, 81:21, 88:5, 88:12, 89:11, 89:13, 89:19, 90:2, 90:10, 90:11, 90:13, 90:15, 90:18, 90:20, 90:21, 90:24, 90:25, 92:2, 92:4, 92:8, 92:10, 92:13, 92:19, 104:17, 112:17, 115:10, 129:12
**recovery** [1] - 10:11
**red** [1] - 59:17
**redirect** [1] - 116:25
**REDIRECT** [1] - 117:2
**redistribution** [2] - 84:24, 85:2
**refer** [10] - 7:4, 37:3, 66:5, 68:7, 82:21, 83:2, 120:24, 121:23, 121:25, 122:2
**reference** [1] - 96:21
**Reference** [1] - 25:2
**referenced** [1] - 72:5
**referral** [2] - 15:13, 15:17
**referrals** [1] - 12:7
**referred** [2] - 50:1, 114:22
**referring** [6] - 85:7, 93:12, 122:1, 124:9, 133:20, 133:21
**refers** [1] - 28:2
**refused** [1] - 125:15
**regard** [1] - 132:16
**regarding** [14] - 5:14, 12:13, 16:5, 16:15, 19:17, 27:14, 34:16, 36:18, 54:25, 58:5, 61:12, 65:10, 73:4, 104:9
**region** [2] - 11:11, 67:13
**Regional** [1] - 74:21
**regional** [2] - 9:12, 10:4
**regular** [1] - 14:7
**regularly** [2] - 53:15,

54:15
**regulated** [1] - 33:25
**Regulations** [1] - 45:7
**regulations** [3] - 34:2, 38:21, 131:4
**Rehabilitation** [1] - 12:9
**rehabilitative** [1] - 15:3
**reinstate** [1] - 63:12
**reiterated** [1] - 125:25
**rejected** [2] - 5:6, 122:14
**rejecting** [1] - 125:15
**relate** [2] - 126:15, 127:1
**related** [6] - 18:1, 35:2, 42:17, 52:5, 80:11, 81:10
**relating** [1] - 46:2
**relationship** [3] - 34:4, 133:2, 135:18
**relative** [3] - 37:16, 88:21, 113:20
**relatively** [9] - 63:20, 68:4, 98:18, 112:18, 112:21, 113:21, 113:24, 115:20, 129:7
**release** [2] - 59:13, 97:7
**relevance** [1] - 127:6
**relevancy** [1] - 73:12
**relevant** [5] - 126:9, 126:11, 126:18, 127:5, 128:6
**reliability** [1] - 102:21
**reliable** [4] - 5:3, 103:8, 103:9, 139:16
**reliably** [1] - 5:4
**reliance** [1] - 123:8
**relied** [8] - 39:24, 71:21, 90:21, 90:23, 91:22, 122:10, 123:13, 123:16
**reluctant** [1] - 73:22
**rely** [14] - 6:6, 30:22, 30:25, 40:1, 42:25, 43:3, 43:20, 44:19, 46:25, 48:8, 49:17, 51:2, 56:18, 70:4
**remain** [1] - 78:24
**remaining** [2] - 139:11, 142:14
**remember** [2] - 13:7, 67:10
**removed** [1] - 23:15
**render** [3] - 3:18, 66:21, 123:3
**rendered** [2] - 31:23,

32:6
**rendering** [3] - 10:9, 42:25, 43:2
**repeat** [1] - 13:10
**repeated** [1] - 47:24
**repeatedly** [2] - 33:6, 67:15
**repeats** [1] - 118:21
**repetitive** [1] - 37:13
**report** [44] - 34:21, 34:22, 35:2, 35:5, 35:23, 60:12, 66:9, 66:12, 71:16, 71:17, 81:17, 84:7, 84:12, 84:13, 84:14, 86:1, 86:7, 90:12, 90:22, 92:1, 92:3, 92:6, 92:9, 92:10, 99:5, 99:8, 99:10, 99:12, 99:13, 100:9, 100:18, 100:22, 101:5, 101:8, 101:15, 103:10, 104:4, 104:22, 110:18, 110:23, 112:13, 115:8, 115:9
**Report** [1] - 35:24
**REPORTED** [1] - 146:15
**reported** [8] - 25:9, 27:3, 95:10, 96:10, 96:23, 101:22, 101:24, 114:23
**Reporter** [3] - 146:3, 146:14, 146:17
**REPORTER** [2] - 1:24, 13:10
**reporter** [1] - 146:23
**reports** [12] - 3:25, 4:3, 36:17, 66:4, 66:15, 71:9, 81:22, 89:1, 89:5, 89:7, 103:2, 117:21
**represent** [2] - 55:19, 91:15
**representations** [1] - 133:10
**representative** [1] - 127:10
**represented** [1] - 41:25
**represents** [4] - 42:7, 59:25, 93:15, 134:10
**reproduction** [1] - 146:22
**request** [5] - 140:10, 141:2, 141:4, 142:10, 144:24
**requests** [1] - 145:12
**require** [5] - 23:9,

123:24, 125:19, 131:4, 132:5
**required** [7] - 14:13, 24:16, 46:23, 123:22, 125:18, 136:11, 142:1
**requirement** [2] - 58:21, 131:12
**requirements** [1] - 45:8
**requires** [6] - 55:22, 122:15, 131:9, 141:21, 142:9, 143:18
**requiring** [1] - 139:4
**requisite** [3] - 47:20, 129:1, 132:7
**research** [1] - 45:23
**reserve** [1] - 11:5
**Reserve** [1] - 9:1
**residency** [11] - 9:8, 9:11, 9:22, 10:21, 74:24, 74:25, 75:2, 75:6, 75:8, 78:5, 84:2
**Resident** [5] - 9:13, 10:19, 10:21, 10:22, 10:25
**resident** [2] - 9:24, 74:20
**residents** [2] - 10:23, 11:24
**resolve** [1] - 123:23
**resources** [1] - 144:5
**respect** [7] - 3:7, 3:16, 20:3, 51:17, 73:12, 119:24, 128:23
**respective** [1] - 136:18
**respiratory** [3] - 25:9, 26:5, 26:7
**respire** [1] - 96:7
**respond** [3] - 89:15, 143:16, 145:11
**responded** [1] - 90:7
**responding** [2] - 38:3, 57:4
**response** [3] - 5:21, 6:7, 141:10
**responses** [1] - 134:14
**responsibilities** [1] - 46:20
**responsibility** [8] - 45:17, 45:19, 46:3, 46:11, 46:15, 49:3, 49:5, 59:7
**responsible** [7] - 33:20, 34:1, 34:5, 41:15, 46:9, 52:11,

57:14
**Responsible** [1] - 50:24
**restoration** [2] - 12:10, 15:16
**rests** [2] - 45:20, 49:5
**result** [3] - 5:3, 123:2, 123:8
**resulting** [1] - 101:16
**retained** [2] - 31:23, 32:4
**return** [4] - 12:14, 18:2, 73:17, 97:11
**returned** [1] - 11:17, 95:17
**returning** [1] - 145:3
**revealed** [1] - 62:1
**reverse** [1] - 92:14
**review** [32] - 34:24, 35:2, 35:5, 35:8, 35:12, 35:15, 35:18, 35:23, 36:4, 36:12, 36:15, 36:17, 36:20, 71:3, 79:14, 88:4, 89:11, 89:13, 89:22, 104:17, 105:20, 105:25, 106:10, 107:8, 108:7, 110:21, 117:21, 118:20, 119:5, 126:25, 131:25, 143:1
**reviewed** [39] - 19:8, 34:16, 34:18, 34:19, 34:20, 34:21, 35:20, 36:3, 36:24, 41:13, 65:8, 76:16, 80:4, 80:7, 80:10, 80:15, 86:21, 90:22, 91:4, 91:6, 91:9, 91:12, 91:17, 92:2, 92:4, 92:6, 92:9, 92:18, 92:21, 99:7, 99:16, 104:23, 106:2, 114:17, 115:7, 115:8, 115:9, 115:10
**reviewer** [1] - 91:21
**reviewers** [1] - 91:7
**reviewing** [6] - 19:18, 19:20, 36:1, 36:10, 95:1, 112:17
**reviews** [2] - 76:7, 77:7
**revised** [1] - 50:8
**revisions** [1] - 49:24
**Richard** [1] - 4:22
**rigor** [2] - 86:2, 86:3
**ripe** [1] - 77:2
**risk** [28] - 27:10, 53:22, 54:3, 55:19,

57:16, 57:18, 58:3, 58:6, 58:12, 60:1, 63:11, 63:25, 64:1, 64:2, 64:19, 64:23, 68:21, 68:23, 69:3, 69:9, 69:10, 69:16, 69:17, 69:18, 69:19, 99:21, 137:21
**riskier** [4] - 53:23, 53:25, 58:8, 58:10
**risks** [2] - 67:20, 70:1
**risky** [2] - 56:12, 65:2
**RMR** [1] - 1:23
**RMR,CRR** [2] - 146:13, 146:16
**ROBERT** [1] - 1:10
**Rock** [1] - 8:25
**Roger** [1] - 42:6
**room** [3] - 11:23, 131:7, 141:1
**roots** [1] - 14:25
**rose** [2] - 11:12, 55:12
**Ross** [2] - 84:16, 97:13
**rotated** [1] - 75:7
**rotating** [1] - 9:20
**rotations** [1] - 10:2
**roughly** [4] - 28:15, 28:16, 28:24, 113:17
**rounds** [1] - 21:13
**routine** [1] - 93:20
**routinely** [1] - 43:20
**Roxane** [1] - 24:20
**Rule** [1] - 102:25
**rule** [3] - 103:12, 122:22, 130:12
**ruling** [6] - 136:15, 136:21, 137:15, 138:1, 138:3, 138:4
**rumentarium** [1] - 23:18
**running** [1] - 14:2

**S**

**s/Kristin** [1] - 146:13
**SA's** [1] - 84:6
**safe** [4] - 39:3, 55:3, 68:15, 68:16
**safest** [1] - 68:23
**salting** [1] - 25:21
**Santyl** [2] - 106:20, 108:22
**satisfactory** [1] - 53:11
**saw** [3] - 29:17, 56:3, 103:3
**scar** [1] - 109:14
**scenario** [4] - 60:1, 88:18, 88:20, 89:12

**scenarios** [2] - 93:3, 93:5
**scene** [1] - 36:21
**Schedule** [1] - 22:17
**scheduled** [1] - 134:17
**school** [2] - 9:5, 9:7
**School** [1] - 9:5
**scientific** [3] - 51:14, 67:23, 103:6
**scope** [2] - 34:3, 144:7
**SCRANTON** [2] - 1:11, 1:25
**Scranton** [3] - 1:15, 1:19, 146:19
**screen** [5] - 54:11, 54:12, 100:12, 110:15, 110:20
**screened** [1] - 101:9
**screening** [3] - 54:6, 54:8, 58:13
**screens** [1] - 110:24
**seal** [2] - 120:21, 133:8
**search** [16] - 3:11, 35:19, 72:23, 121:1, 121:5, 121:9, 123:7, 124:11, 125:19, 126:23, 127:23, 132:22, 141:6, 141:7, 142:15, 142:16
**searched** [1] - 124:18
**seated** [1] - 7:1
**second** [6] - 3:10, 26:4, 34:22, 47:12, 47:13, 104:6
**secondarily** [2] - 39:6, 73:10
**secondary** [3] - 17:25, 63:10, 65:17
**Secours** [1] - 36:12
**Section** [13] - 43:22, 44:21, 44:24, 45:12, 47:10, 47:17, 47:22, 48:22, 49:17, 60:6, 71:24, 72:2, 146:6
**section** [1] - 44:19, 45:11, 45:24, 46:25, 48:6, 48:8, 49:8, 73:3, 99:22, 109:14, 118:19
**sections** [1] - 51:9
**sedative** [2] - 62:19, 66:25
**sedatives** [2] - 16:18, 64:15
**see** [28] - 17:8, 17:9, 17:10, 17:14, 18:10, 25:13, 31:25, 44:13,

46:3, 47:12, 48:23, 54:6, 60:24, 69:8, 71:4, 73:19, 75:22, 82:5, 94:4, 105:13, 112:3, 115:22, 117:16, 118:12, 127:15, 128:14, 133:22
**seeing** [3] - 14:7, 113:12, 118:17
**seek** [1] - 3:17
**seeking** [3] - 54:2, 142:25, 143:19
**segment** [2] - 34:5, 57:14
**seizure** [1] - 3:11
**selected** [2] - 10:23, 55:16
**selection** [2] - 54:19, 57:22
**send** [1] - 14:24
**sense** [4] - 29:11, 34:17, 36:23, 77:14
**sent** [2] - 50:21, 90:18
**sentence** [2] - 55:1, 110:13
**separate** [1] - 34:20, 95:7, 137:23
**separately** [1] - 95:20
**September** [9] - 35:10, 63:5, 66:12, 71:17, 89:3, 92:15, 104:21, 113:3, 119:1
**sequential** [1] - 40:25
**serious** [1] - 26:25
**serve** [1] - 132:2
**service** [3] - 12:7, 106:7, 108:2
**Services** [1] - 11:13
**services** [9] - 11:25, 12:3, 12:8, 12:19, 13:3, 14:11, 15:4, 30:22
**serving** [1] - 11:15
**set** [8] - 34:20, 34:21, 34:22, 61:16, 71:6, 90:25, 142:14, 146:9
**setting** [11] - 10:11, 16:21, 17:13, 22:15, 46:6, 63:1, 95:10, 95:13, 96:16, 97:2
**seven** [7] - 11:21, 76:6, 76:11, 82:1, 113:5, 113:6, 113:15
**Seventh** [1] - 125:22, 125:24
**several** [4] - 21:2, 32:18, 68:21, 137:25
**shall** [1] - 45:25
**shaping** [1] - 123:9

**shocked** [2] - 134:16, 134:21
**shoe** [1] - 70:17
**short** [4] - 28:15, 74:6, 115:1, 140:17
**shorter** [1] - 122:13
**shortest** [2] - 68:20, 114:24
**shorthand** [1] - 1:21
**show** [8] - 102:5, 112:2, 121:11, 122:5, 126:4, 126:23, 129:17, 131:21
**showed** [3] - 62:18, 65:17, 102:8
**showing** [6] - 132:7, 132:12, 132:18, 136:12, 139:3, 142:5
**shown** [1] - 137:3
**shows** [1] - 109:21
**side** [2] - 26:2, 142:14
**sides** [1] - 136:16
**sign** [1] - 134:3
**signals** [1] - 17:4
**signatories** [1] - 50:15
**signatory** [4] - 41:8, 50:10, 50:18
**signature** [4] - 101:2, 105:6, 105:13, 105:14
**signed** [1] - 100:23
**significant** [4] - 118:2, 128:25, 136:17
**signs** [2] - 106:15, 135:12
**similar** [5] - 4:24, 5:19, 19:7, 25:24, 31:14
**similarly** [1] - 66:13
**simple** [1] - 39:7
**simply** [17] - 30:2, 39:9, 59:8, 59:10, 73:8, 75:6, 81:12, 87:5, 95:9, 95:16, 96:19, 116:18, 125:5, 132:23, 133:16, 136:19, 136:20
**simultaneously** [1] - 95:21
**single** [3] - 96:11, 96:19, 100:10
**single-drug** [1] - 96:11
**sit** [2] - 73:14, 135:20
**sites** [1] - 95:21
**sitting** [1] - 86:5
**Six** [1] - 76:8
**six** [4] - 76:10, 107:18,

122:9, 133:22
**skin** [1] - 106:21
**skipped** [4] - 118:2, 118:4, 118:7, 131:11
**sleeping** [1] - 107:20
**sleepy** [1] - 16:19
**slightly** [1] - 28:7
**Slippery** [1] - 8:25
**Slizewski** [1] - 125:21
**slow** [1] - 25:20
**small** [2] - 13:24, 110:2
**smoking** [1] - 58:1
**snatch** [1] - 67:4
**so-called** [1] - 114:25
**SOAP** [4] - 106:12, 107:10, 107:16, 108:24
**Society** [5] - 17:15, 17:20, 18:8, 41:24, 42:6
**solo** [1] - 14:3
**solvent** [2] - 81:15, 81:19
**somatic** [1] - 93:5
**someone** [4] - 24:22, 53:5, 55:16, 70:8, 70:18, 98:8, 110:19
**somewhat** [1] - 127:9
**sorry** [28] - 13:11, 18:19, 19:11, 27:18, 29:2, 32:2, 45:12, 67:2, 76:9, 78:19, 93:25, 94:6, 96:13, 101:1, 101:23, 103:5, 103:13, 106:23, 108:12, 110:13, 112:14, 113:3, 116:7, 116:10, 130:11, 130:17, 139:24, 143:24
**sought** [2] - 4:23, 5:18
**sound** [2] - 85:18, 93:6
**source** [3] - 94:21, 94:22, 95:18
**sources** [7] - 38:8, 40:15, 40:20, 88:5, 88:6, 88:8, 91:21
**spaces** [1] - 110:1
**spasticity** [2] - 13:7, 13:13
**special** [2] - 23:9, 23:10
**specialized** [1] - 103:6
**specialty** [5] - 9:25, 10:14, 16:24, 77:20, 79:4
**specific** [8] - 22:4,

91:8, 92:17, 99:15, 99:16, 132:17, 133:23, 134:16
**specifically** [22] - 3:16, 10:8, 10:14, 20:15, 21:20, 21:23, 22:17, 22:19, 23:2, 24:17, 33:11, 33:12, 43:12, 66:18, 70:11, 93:12, 93:13, 103:4, 114:18, 117:14, 120:7, 139:8
**specificity** [1] - 139:9
**spectral** [2] - 101:17, 102:4
**spell** [1] - 6:22
**spend** [1] - 73:22
**spent** [1] - 49:24
**spike** [1] - 23:13
**spinal** [19] - 13:6, 13:12, 14:21, 14:23, 14:24, 28:5, 29:16, 29:20, 109:23, 109:24, 109:25, 110:2, 110:3, 110:4, 110:6, 110:9, 110:10
**spoken** [1] - 133:23
**spouses** [1] - 138:21
**spread** [2] - 52:2, 52:3
**Spruce** [1] - 1:18
**stable** [1] - 68:4
**Staff** [2] - 11:9, 11:18
**staff** [3] - 14:10, 14:11
**stand** [4] - 71:9, 112:6, 120:10, 125:2
**standard** [20] - 18:17, 33:7, 33:16, 33:17, 33:18, 33:19, 33:23, 34:7, 34:10, 38:20, 38:24, 40:9, 40:11, 47:3, 56:20, 57:1, 79:12, 82:20
**standards** [7] - 18:24, 20:10, 44:17, 68:3, 79:17, 87:20
**standing** [21] - 73:7, 128:20, 128:21, 128:22, 129:2, 129:6, 129:11, 129:12, 129:23, 130:3, 130:8, 130:12, 130:14, 130:16, 130:23, 131:1, 132:10, 137:10, 140:5
**standpoint** [1] - 131:20
**stands** [1] - 20:7
**Stanford** [2] - 9:5, 11:4

**star** [1] - 20:13
**start** [7] - 8:23, 25:20, 25:23, 25:24, 34:23, 56:3, 56:4
**started** [2] - 12:24, 78:17
**State** [19] - 4:18, 8:25, 18:11, 18:15, 19:14, 19:17, 31:10, 36:17, 40:22, 41:7, 50:6, 50:12, 50:16, 50:20, 51:1, 60:9, 86:1, 115:7, 115:22
**street** [1] - 125:5
**Street** [1] - 1:18
**Strike** [1] - 19:3
**strike** [1] - 98:9
**strong** [2] - 87:8, 87:12
**structured** [1] - 88:15
**studies** [5] - 86:21, 87:11, 87:12, 99:8
**study** [3] - 99:16, 100:16, 100:17
**stuff** [1] - 143:10
**stupid** [1] - 93:7
**subject** [2] - 46:1, 85:5
**subjective** [1] - 105:11
**Subjective** [1] - 106:13
**subjects** [3] - 80:1, 80:14, 80:16
**submit** [11] - 3:19, 91:14, 138:9, 140:15, 143:2, 143:11, 144:21, 144:23, 145:2, 145:3, 145:5
**submits** [1] - 145:10
**submitted** [8] - 134:2, 138:10, 140:14, 141:4, 141:11, 141:13, 143:2, 144:17
**submitting** [1] - 121:6
**Subsection** [3] - 45:12, 47:13
**subsection** [2] - 47:14, 48:25
**subsequent** [3] - 11:2, 123:25, 144:24
**subspecialties** [1] - 75:8
**subspecialty** [6] - 4:15, 8:16, 10:7, 11:25, 15:8, 15:25
**Substance** [2] - 48:15, 78:8
**substance** [13] - 45:14, 46:24, 49:1, 52:21, 52:24, 53:13, 54:1, 56:23, 57:25, 61:22, 63:10, 102:22

**stimulation** [1] - 28:4
**stimulators** [2] - 14:23, 15:12
**stop** [3] - 9:15, 62:9, 116:6
**stopped** [1] - 67:12
**straight** [1] - 112:7
**stratification** [1] - 53:22
**street** [1] - 125:5
**Strike** [1] - 19:3
**strike** [1] - 98:9
**Substances** [7] - 16:8, 16:13, 19:13, 19:14, 40:12, 44:21, 72:3
**substances** [33] - 16:12, 16:16, 16:17, 16:20, 18:16, 19:25, 20:1, 20:16, 20:18, 20:21, 20:23, 20:24, 21:4, 22:1, 22:18, 43:17, 44:2, 44:9, 45:18, 46:2, 49:4, 52:6, 57:17, 57:21, 58:5, 58:25, 59:7, 59:20, 61:24, 79:6, 79:8, 79:18, 79:20
**substantial** [2] - 79:5, 142:4
**substantiating** [1] - 138:13
**substantive** [1] - 97:17
**successful** [1] - 124:1
**sudden** [1] - 61:15
**Sudden** [1] - 81:9
**suffering** [1] - 15:18
**sufficient** [3] - 5:2, 123:20, 144:16
**suggest** [3] - 79:9, 136:24, 136:25
**suggested** [1] - 120:8
**suggesting** [1] - 130:22
**suggests** [1] - 55:25
**Suite** [1] - 3:11
**summoned** [1] - 127:7
**superior** [2] - 94:20, 97:11
**supervision** [2] - 146:11, 146:23
**supplement** [1] - 143:6
**supplemental** [1] - 104:22
**supplemented** [1] - 5:21
**supplied** [1] - 99:4
**support** [12] - 6:7, 15:17, 40:1, 99:5, 99:9, 110:8, 136:17, 138:18, 139:12, 141:2, 141:4, 144:17
**supported** [1] - 5:1
**supposed** [2] - 25:3, 102:19
**Suppress** [2] - 3:11, 119:24
**suppression** [4] - 69:20, 73:16, 137:18, 144:4
**Supreme** [3] - 123:9,

123:17, 142:2
**surely** [1] - 103:18
**surgical** [1] - 10:9
**surrounding** [2] - 3:24, 110:7
**suspect** [1] - 143:6
**suspect's** [1] - 123:23
**sustained** [2] - 114:9, 116:12
**Suzanne** [1] - 1:18
**sworn** [1] - 139:16
**SWORN** [1] - 6:21
**syllabic** [1] - 20:8
**Syndrome** [3] - 80:23, 80:25, 81:9
**syndromes** [1] - 71:1
**syringomyelia** [1] - 110:11
**syrinx** [4] - 109:21, 109:22, 109:23, 110:6
**system** [5] - 37:22, 54:7, 102:4, 115:12, 116:20

**T**

**table** [1] - 7:8
**tablet** [1] - 113:15
**tablets** [6] - 24:21, 63:20, 113:4, 113:5, 113:6
**target** [1] - 118:8
**task** [2] - 130:7, 139:4
**Task** [2] - 19:3
**taste** [1] - 25:23
**taught** [1] - 60:3
**teach** [1] - 20:11
**teacher** [1] - 60:2
**teachings** [1] - 22:7
**tease** [1] - 67:2
**technical** [1] - 103:6
**telephone** [3] - 3:6, 3:13, 100:16, 129:3, 137:17
**temporal** [2] - 38:19, 41:1
**tend** [2] - 37:12, 40:21
**tendency** [1] - 100:7
**tendered** [1] - 126:22
**tenderness** [1] - 109:13
**tends** [1] - 115:2
**tens** [2] - 30:18, 67:6
**term** [14] - 13:10, 14:15, 16:22, 16:25, 17:2, 18:6, 21:18, 27:25, 28:15, 56:21, 60:19, 84:20, 112:20
**terms** [22] - 20:10,

22:6, 26:17, 28:7, 38:14, 38:17, 44:14, 46:21, 54:20, 59:6, 62:2, 65:20, 66:17, 67:19, 69:5, 69:9, 72:5, 95:5, 95:22, 99:2, 114:1, 115:6
territories [1] - 50:14
test [4] - 16:14, 54:11, 102:5, 110:16
tested [3] - 101:25, 102:7
testified [27] - 5:9, 26:13, 31:3, 31:7, 31:12, 31:17, 31:20, 31:22, 33:8, 54:19, 60:6, 60:11, 65:9, 66:14, 69:25, 74:12, 75:13, 76:13, 76:15, 77:3, 79:11, 87:15, 110:25, 111:22, 112:14, 116:14
TESTIFIED [1] - 6:21
testifies [1] - 128:12
testify [18] - 3:23, 4:2, 4:4, 4:8, 4:13, 5:7, 31:24, 32:7, 32:23, 33:1, 73:4, 76:20, 120:11, 121:20, 127:2, 144:5
testifying [2] - 111:18, 111:22
testimony [27] - 3:10, 3:23, 4:23, 5:8, 5:15, 5:19, 5:24, 6:8, 7:4, 32:12, 73:6, 79:4, 102:21, 127:13, 127:14, 128:6, 128:8, 128:10, 129:5, 129:17, 131:19, 132:9, 132:13, 138:10, 138:23, 140:4, 144:2
testing [4] - 54:6, 57:8, 101:11, 114:7
tests [1] - 94:15
text [2] - 91:16, 91:24
THE [86] - 1:1, 1:1, 1:10, 1:12, 1:16, 3:1, 3:5, 3:21, 6:10, 6:13, 6:17, 6:22, 6:24, 7:1, 7:7, 7:10, 7:17, 8:7, 8:9, 13:10, 13:11, 27:17, 27:19, 27:21, 71:18, 72:8, 72:11, 72:18, 72:20, 73:15, 73:19, 102:17, 103:12, 103:16, 103:20, 114:9, 116:4, 116:5, 116:7,

116:12, 116:25, 118:6, 119:11, 119:13, 119:14, 119:15, 119:18, 119:21, 120:5, 127:16, 127:21, 128:4, 129:2, 129:15, 129:25, 130:3, 130:10, 130:19, 130:22, 130:25, 131:4, 131:8, 132:20, 133:8, 133:12, 133:14, 134:20, 136:11, 136:14, 137:13, 139:1, 140:15, 140:23, 141:2, 141:9, 141:13, 141:18, 143:13, 143:17, 144:11, 144:20, 144:23, 145:1, 145:7, 145:12, 145:17
themselves [2] - 136:5, 138:21
therapeutic [2] - 67:9, 97:22
therapeutics [1] - 15:9
therapists [1] - 15:16
therapy [4] - 12:11, 14:20, 22:4, 27:7
thereafter [1] - 68:1
therefore [9] - 13:13, 15:11, 24:6, 41:15, 53:7, 54:3, 55:5, 56:12, 99:2
thereof [1] - 52:25
they've [4] - 50:19, 98:8, 98:10, 138:20
thinking [4] - 17:7, 83:6, 125:3
thinks [1] - 127:4
third [2] - 101:16, 108:12
Third [4] - 4:19, 5:13, 5:14, 139:18
Thomas [39] - 1:9, 3:10, 3:16, 3:23, 3:24, 4:12, 4:17, 4:20, 4:25, 5:4, 5:7, 5:9, 5:19, 5:24, 6:19, 6:25, 7:4, 7:13, 7:16, 7:19, 8:13, 12:15, 15:23, 17:8, 26:13, 52:13, 60:3, 67:25, 71:8, 72:5, 72:17, 73:17, 73:18, 116:9, 116:11, 117:4, 118:12, 119:13,

124:22
THOMAS [1] - 6:25
Thomas' [8] - 4:23, 5:1, 5:15, 6:8, 71:16, 114:7, 118:1
thorns [1] - 55:13
thousands [8] - 29:14, 30:14, 30:18, 39:25, 43:3, 67:6
three [11] - 13:25, 14:1, 16:1, 56:11, 69:11, 76:24, 93:24, 109:7, 113:3, 129:24, 129:25
threshold [1] - 132:2
throat [1] - 62:11
throughout [4] - 20:19, 29:19, 34:11, 61:24
Thursday [1] - 3:6
THURSDAY [1] - 1:10
tight [1] - 73:14
title [2] - 47:16, 48:6
Title [12] - 40:16, 43:14, 43:23, 44:24, 45:12, 47:9, 47:17, 47:22, 71:22, 71:23, 72:1, 146:6
titled [2] - 44:19, 47:10
titration [5] - 25:17, 25:18, 25:21, 25:24, 26:12
today [19] - 7:25, 16:17, 65:10, 78:17, 80:2, 111:22, 120:12, 126:20, 127:7, 130:7, 130:13, 131:15, 132:9, 137:10, 140:5, 140:12, 140:19, 142:24, 143:5
together [4] - 64:9, 64:10, 116:19, 140:17
tolerance [6] - 63:12, 96:25, 97:21, 98:11, 113:20, 113:23
tolerant [2] - 98:8, 112:22
tolerate [1] - 68:19
took [4] - 9:1, 33:11, 37:2, 131:7
tool [1] - 61:3
top [1] - 34:17
topical [1] - 106:21
torsades [1] - 26:25
totally [1] - 71:5
toxic [6] - 24:7, 95:23,

96:22, 97:24, 98:1, 98:4
toxicity [2] - 65:13
toxicologist [5] - 83:23, 83:25, 84:3, 84:6, 100:15
Toxicology [1] - 99:22
toxicology [5] - 35:5, 61:18, 62:17, 63:1, 63:24, 92:9, 95:6, 95:7, 99:23, 100:9, 100:18, 100:22, 101:8, 101:15
track [1] - 145:14
traditional [2] - 144:3, 144:12
training [8] - 8:16, 8:17, 9:25, 11:2, 11:6, 11:24, 16:15, 22:21, 23:10, 30:23, 38:10, 46:11, 46:22, 65:7, 66:19, 83:15, 84:2, 86:9, 88:6
trainings [1] - 21:2
TRANSCRIPT [1] - 1:9
transcript [5] - 1:21, 35:20, 146:7, 146:10, 146:22
transcription [1] - 1:22
translate [1] - 86:19
translated [1] - 52:8
trauma [3] - 10:12, 30:8, 62:2
traveled [3] - 127:11, 129:10, 138:19
trazodone [1] - 108:22
treat [2] - 22:15, 59:14
treated [10] - 27:2, 29:12, 29:23, 30:1, 30:5, 30:10, 63:2, 82:2, 92:25, 135:11
treating [8] - 14:6, 67:7, 75:25, 77:18, 82:2, 82:3, 90:15, 93:17
treatment [50] - 13:6, 13:12, 14:14, 15:4, 15:21, 16:16, 16:25, 17:12, 17:21, 18:3, 18:9, 19:25, 21:11, 22:2, 22:3, 22:16, 22:18, 22:22, 22:25, 23:2, 23:4, 23:5, 25:11, 25:15, 26:11, 27:1, 27:4, 27:7, 27:9, 28:20, 34:5, 38:3, 38:20, 38:23, 45:22, 51:3, 51:17, 53:5, 54:2, 54:25,

55:2, 57:14, 59:19, 82:11, 109:17, 134:5, 134:6, 135:5, 135:11
Treatment [5] - 22:14, 40:23, 41:23, 50:7, 72:1
triad [2] - 46:7, 46:19
trial [10] - 5:8, 5:9, 5:12, 86:17, 102:22, 103:23, 124:21, 124:24, 124:25, 134:19
trials [1] - 87:2
tricks [1] - 23:18
tricyclics [1] - 110:16
tried [2] - 77:16, 127:8
trier [1] - 103:7
true [8] - 43:10, 44:8, 54:17, 98:15, 112:19, 138:9, 144:20, 146:7
truth [5] - 126:24, 134:8, 134:22, 136:7, 142:6
truthful [1] - 127:3
try [4] - 13:7, 62:10, 92:1, 119:21
trying [4] - 15:21, 38:23, 44:12, 103:17
tumor [1] - 70:20
turn [14] - 7:21, 40:15, 40:20, 48:21, 104:25, 106:5, 107:4, 107:13, 107:25, 108:18, 109:5, 123:6, 123:8, 132:11
turned [3] - 34:19, 103:23, 129:14
turning [1] - 37:13
twice [1] - 67:11
two [18] - 3:7, 3:25, 9:25, 10:17, 10:18, 31:23, 63:21, 76:16, 77:1, 79:22, 79:25, 80:12, 89:1, 91:5, 103:2, 108:23, 118:10, 126:20
two-year [1] - 10:18
type [3] - 8:15, 24:3, 141:20
types [2] - 20:5, 29:11, 71:1
typical [2] - 59:16, 61:3
typically [1] - 26:7

# U

**U.S** [2] - 37:22, 73:11
**ultimate** [1] - 103:24
**ultimately** [1] - 144:11
**um-hum** [1] - 68:13
**unable** [1] - 122:9
**unattended** [1] - 85:15
**unconsciousness** [1] - 62:20
**under** [26] - 20:1, 22:17, 47:22, 49:9, 49:15, 51:10, 61:24, 93:14, 102:25, 103:4, 110:12, 111:23, 117:15, 117:20, 118:12, 120:21, 131:24, 132:17, 133:5, 133:8, 138:10, 141:5, 141:25, 146:11, 146:23
**undergoes** [1] - 22:20
**undergraduate** [1] - 8:24
**underlying** [4] - 42:7, 46:23, 70:13, 70:20
**understood** [4] - 83:5, 92:25, 95:15, 103:19
**unexpected** [4] - 39:9, 54:8, 54:16, 61:15
**unintended** [1] - 61:8
**unique** [3] - 23:8, 28:10, 58:9
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [26] - 1:13, 3:5, 3:22, 4:22, 5:18, 6:18, 7:3, 8:1, 11:7, 11:8, 47:10, 50:14, 51:19, 66:9, 71:23, 79:12, 121:24, 123:11, 125:8, 125:21, 126:22, 139:7, 139:17, 146:4, 146:6, 146:17
**units** [1] - 114:1
**University** [4] - 9:1, 9:5, 9:7, 9:16
**unless** [5] - 65:4, 119:22, 138:8, 142:22, 146:23
**unnecessarily** [1] - 123:4
**unqualified** [1] - 32:23
**unreadable** [1] - 92:6
**unrecognizable** [1] - 39:16
**unsure** [1] - 116:4
**untruthfulness** [1] -

139:14
**unwilling** [1] - 59:18
**up** [21] - 4:2, 8:3, 24:5, 26:17, 26:19, 69:2, 74:5, 80:14, 88:1, 92:3, 100:20, 102:5, 102:8, 110:5, 110:12, 112:6, 118:1, 120:20, 122:10, 122:23, 140:6
**up-to-date** [1] - 8:3
**update** [1] - 74:16
**updated** [3] - 8:4, 40:24, 40:25
**updates** [2] - 41:1, 49:24
**urinalysis** [1] - 110:18
**urination** [2] - 108:14
**urine** [11] - 54:6, 54:11, 54:12, 58:13, 100:12, 102:7, 102:8, 102:15, 110:15, 110:19, 110:24
**Urine** [1] - 54:8
**user** [3] - 46:8, 98:2, 98:5
**usual** [28] - 4:6, 5:10, 5:25, 19:10, 23:6, 32:6, 33:4, 33:16, 33:24, 38:16, 39:2, 39:11, 39:14, 40:8, 42:19, 45:5, 45:16, 45:22, 47:25, 49:3, 52:15, 57:12, 65:4, 65:24, 117:11, 121:16, 136:2, 136:3
**utility** [1] - 127:6
**utilized** [1] - 41:4
**utilizing** [1] - 42:4

# V

**valid** [8] - 45:9, 47:4, 47:18, 47:20, 47:22, 48:18, 49:12, 65:20
**validity** [2] - 5:24, 65:19
**Valium** [6] - 63:16, 106:17, 106:22, 107:2, 107:3, 108:22
**Valley** [1] - 36:6
**value** [10] - 95:16, 95:17, 97:12, 97:19, 97:22, 97:23, 97:24, 98:1, 99:24
**values** [3] - 94:22, 98:11, 100:1
**variability** [1] - 112:10

**variable** [2] - 113:25, 114:2
**varied** [1] - 64:13
**variety** [1] - 93:3
**various** [8] - 10:24, 20:24, 22:19, 31:4, 38:21, 50:14, 75:7, 97:14
**vary** [1] - 124:7
**vast** [1] - 29:14
**vector** [1] - 98:24
**veil** [1] - 20:7
**veins** [1] - 110:5
**vena** [2] - 94:20, 97:11
**ventricles** [1] - 110:1
**verbatim** [1] - 142:19
**verification** [1] - 101:11
**victims** [1] - 100:6
**video** [1] - 35:21
**view** [6] - 33:20, 38:8, 51:11, 56:6, 132:23, 136:23
**viewed** [1] - 137:17
**vigilance** [1] - 25:15
**vigilant** [1] - 55:22
**violations** [2] - 19:12, 46:1
**virtually** [3] - 37:11, 39:3, 41:3
**visit** [3] - 104:16, 108:25, 110:21
**visits** [2] - 92:22, 104:13
**vitae** [11] - 7:24, 8:1, 8:3, 8:14, 17:14, 19:1, 20:15, 22:9, 31:25, 74:10, 74:13
**vital** [2] - 106:15, 135:12
**voided** [1] - 142:16
**volatile** [1] - 81:14
**volume** [1] - 36:23
**voluminous** [1] - 24:24
**vs** [1] - 1:5

# W

**Waived** [2] - 22:10, 22:20
**waiver** [1] - 22:17
**walk** [2] - 24:23, 53:8
**Wall** [1] - 123:14
**wants** [6] - 119:23, 121:10, 126:7, 135:20, 136:11, 136:23
**warned** [1] - 23:12
**warning** [1] - 23:11

**warnings** [1] - 42:1
**warrant** [13] - 35:19, 72:23, 121:9, 122:6, 122:24, 123:7, 124:6, 125:19, 126:23, 127:23, 141:7, 142:7, 142:16
**warranted** [2] - 131:24, 132:8
**warrants** [2] - 123:8, 137:14
**WASHINGTON** [1] - 1:24
**Washington** [1] - 1:14
**watched** [2] - 35:20, 67:14
**watching** [1] - 53:7
**wave** [2] - 51:21, 137:22
**Wayne** [1] - 36:2
**ways** [2] - 15:7, 132:4
**weak** [1] - 87:8
**weaker** [1] - 87:13
**weaned** [5] - 63:3, 63:12, 113:1, 113:14, 113:21
**weaning** [1] - 63:21
**week** [3] - 108:25, 113:7, 113:17
**weeks** [1] - 109:7
**weight** [1] - 124:6
**well-documented** [1] - 61:21
**Western** [2] - 9:1, 123:15
**Westlaw** [1] - 125:8
**wherein** [1] - 3:25
**whole** [3] - 25:22, 129:16, 135:22
**wide** [2] - 52:2
**widely** [1] - 124:7
**widespread** [1] - 65:2
**willing** [1] - 129:20
**wish** [4] - 6:13, 127:7, 143:2, 145:2
**wishes** [2] - 73:7, 136:10
**withdrawal** [2] - 118:15, 118:23
**within-mentioned** [1] - 146:8
**witness** [23] - 6:17, 7:2, 76:18, 117:19, 120:9, 120:24, 122:11, 122:12, 125:1, 125:17, 125:20, 128:21, 129:9, 129:10, 130:1, 130:8, 130:14, 130:23,

131:1, 131:5, 135:7, 135:9, 138:16
**WITNESS** [5] - 6:24, 13:11, 116:4, 116:7, 119:14
**witnesses** [39] - 72:24, 73:9, 73:13, 119:16, 119:19, 120:8, 120:10, 120:20, 120:24, 121:5, 121:8, 121:10, 121:14, 124:12, 124:19, 125:10, 125:12, 126:7, 126:25, 127:8, 128:14, 128:22, 128:25, 129:22, 130:16, 130:18, 130:23, 133:6, 133:23, 134:3, 134:9, 136:9, 137:25, 138:14, 139:17, 140:12, 141:6, 143:5, 143:8
**WL** [1] - 123:16
**wonderful** [3] - 121:17, 124:20, 126:11
**words** [2] - 20:8, 46:3
**worker** [1] - 21:1
**Worker's** [4] - 17:12, 75:22, 75:24
**workers** [2] - 12:14, 59:23
**works** [1] - 96:8
**World** [1] - 16:3
**worst** [2] - 44:10, 60:1
**wound** [1] - 82:24
**Wright** [2] - 11:8, 11:13
**write** [2] - 57:5, 84:12
**writing** [4] - 43:3, 58:21, 91:22, 121:6
**written** [12] - 4:1, 4:5, 4:6, 33:14, 33:15, 34:3, 34:8, 40:7, 113:7, 120:25, 131:12
**wrote** [3] - 91:23, 112:14, 139:2

# X

**X"** [2] - 42:13, 42:14

# Y

**YEAGER** [4] - 1:23, 146:3, 146:13, 146:16

**Yeager** [1] - 146:13

**year** [7] - 9:20, 10:18, 10:22, 11:1, 56:11, 76:11, 104:21

**years** [17] - 9:25, 10:17, 11:6, 11:14, 11:15, 12:17, 14:1, 29:12, 30:11, 30:12, 54:24, 64:8, 67:22, 69:11, 76:6, 82:1, 119:2

**yesterday** [2] - 120:23, 121:19

**yokshan** [1] - 139:17

**young** [1] - 127:12

**yourself** [5] - 7:15, 11:3, 83:12, 90:10, 90:20

## Z

**Z"** [1] - 42:16

**zero** [1] - 86:12