THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       :
                                : CRIMINAL NO. 3:19-CR-250
        v.                      : (JUDGE MARIANI)
                                :
MARTIN EVERS,                   :
                                :
        Defendant.              :

## MEMORANDUM OPINION
### I. INTRODUCTION

Defendant's Motion to Suppress the Search & Seizure of 104 Bennett Avenue, Suite

2C, Milford, PA on August 6, 2019 Pursuant to *Franks v. Delaware* (Doc. 57) is pending

before the Court.  Here the Court considers the issue of whether, in the context of the

Fourth Amendment, Defendant had a reasonable expectation of privacy related to the

execution of the Search and Seizure Warrant on August 6, 2019.  (Doc. 83 at 9.)

The Court held an Evidentiary Hearing on September 28, 2021, on this issue and

both parties presented witnesses.  At the close of the hearing, Defendant's counsel

requested time to submit relevant authority not identified in previous filings and a cover

letter regarding the applicability of the cases to the matter at issue.  The Court orally granted

the request and issued an Order to that effect on September 29, 2021.  (Doc. 164.)  The

Court's Order also allowed the Government an opportunity to respond to Defendant's filing.

(Doc. 64 ¶ 2.)  The parties having filed their post-hearing documents (Docs. 167, 168), this

matter is ripe for disposition.

For the reasons discussed below, the Court concludes that Defendant did not have a reasonable expectation of privacy related to the execution of the Search and Seizure warrant.  Therefore, his Motion to Suppress the Search & Seizure of 104 Bennett Avenue, Suite 2C, Milford, PA on August 6, 2019 Pursuant to *Franks v. Delaware* (Doc. 57) will be denied.

## II. FACTUAL BACKGROUND

Defendant Martin Evers began working as a doctor of internal medicine for Bon Secours Charity Health Systems ("BSCHS") in 2000.  (Doc. 69 at 2.)   He was a "W-2" employee of BSCHS who worked at the BSCHS office at 104 Bennett Avenue, Suite C, Milford, Pennsylvania, from 2008 to 2019.  (*Id.*; Doc. 104 at 8.)   Dr. Evers was the only doctor at the facility which was also staffed with two medical assistants and two receptionists.  (Evidentiary Hearing (Ev. Hr'g).)  The office manager for the Bennett Avenue facility was not on-site.  (Ev. Hr'g.)  All of the patients at that location were under the care of Dr. Evers.  (*Id.*)  BSCHS leased the facility, paid the staff, purchased all supplies, owned the computer and electronic medical records ("EMR") system, and covered all expenses.  (*Id.*)

According to the Evidentiary Hearing testimony of Corey Deixler, the Senior Vice-President of Physician Services of BSCHS, Dr. Evers had keys to the facility, had clinical responsibility for the Bennett Avenue location, and was responsible, along with the office manager, for assuring that the policies of BSCHS were executed and respected.  (Ev. Hr'g.)

2

Mr. Deixler agreed that Dr. Evers is one of those who is expected to assure that the staff honors the confidentiality and care of records and ethical standards. (*Id.*)

Mr. Deixler testified that BSCHS encompasses three hospitals in Rockland and Orange County, New York, long-term care facilities in Orange County, a home health service in both Rockland and Orange County, and a medical group that encompasses mostly Rockland and Orange County with some practices in North Bergen and Pike County, Pennsylvania. The medical group is comprised of forty different offices across three states and all are under the umbrella of the Bon Secours health system. The employees at these locations are all BSCHS medical group employees. Mr. Deixler estimated that approximately 170 practitioners (physicians, nurse practitioners, and physician assistants) are in the medical group.

Dr. Evers testified that all of the patient charts which he worked on were of his patients, and he controlled and protected the information he inputted. (Ev. Hr'g.) When asked what his expectation was of maintaining the confidentiality and privacy of patient records, Dr. Evers responded that his expectation and that of his patients was that, as their physician, he would maintain the confidentiality of those records at all times. (Ev. Hr'g.) He confirmed that he considered the information he put in a patient's file and protected to be his professional private work. (*Id.*) Dr. Evers later clarified that it was the confidentiality of the patients he was protecting. (*Id.*)

3

Dr. Evers entered into a Physician Employment Agreement in 2009 which continued

in effect throughout his employment with some addenda but no alterations to the underlying

terms.  (Ev. Hr'g; Physician Employment Agreement (Doc. 89 at 1-14).)   By the terms of the

Agreement, Dr. Evers was a full-time employee with "full-time practice" defined as at least

forty (40) normally scheduled practice hours per week.  (Agreement § 1.04.)   Section 2.04

of the Agreement addresses "Records and Reports" and provides as follows:

> (a)  Physician shall keep and furnish to Employer in a timely manner, accurate records of all services furnished under this Agreement.  All records, charts, reports, and similar information and documents that are maintained in connection with the operation of the Medical Practice shall be the exclusive property of Employer and shall be subject to the exclusive control of Employer. Physicians shall have reasonable access to such records, in accordance with applicable law, for inspection and photocopying.

(Agreement § 2.04(a).)  The Agreement also provides that

> Physician shall cooperate with Employer in maintaining accurate, complete, up-to-date medical records (including electronic medical records) for all patients treated by Physician, in accordance with all applicable federal and State laws and regulations, including those applicable to Medicare, Medicaid, Tricare and other federal health programs; and the bylaws, rules, regulations, and policies of the Employer.  In addition, Physician will comply with all applicable laws and regulations concerning the confidentiality of medical records and medical record information.  The ownership and right of control of all reports, records, and supporting documents prepared by Physician belong to the Employer, provided, Physician will have access to such reports, records, and supporting documents as authorized by Employer policies and the applicable law of the State of New York.

(Agreement § 2.04(c).)

The Agreement identified numerous administrative obligations and duties assigned

to Dr. Evers, including: clinical direction for clinical activities of the staff at the facility; advise

4

as to the selection, replacement, condition and replacement of equipment and supplies; development of practice policies, subject to review, and support implementation of policies, including those of BSCHS; and development of a schedule in coordination with BSCHS. (*Id.* § 3.01(1), (2), (9); Ev. Hr'g.)  Dr. Evers testified that he fulfilled these obligations, specifically stating that he developed polices related to the confidentiality of patient records and everyone in the office was expected to maintain confidentiality.  (Ev. Hr'g.)

Mr. Deixler confirmed that BSCHS medical group retains exclusive custody and control of the medical records which the physician employee is required to generate.  (Ev. Hr'g.)  He further testified that "reasonable access" means that the physician will have access as needed to perform his duties under the agreement including the generation of medical records.  (*Id.*)  Mr. Deixler explained that all of their acute care hospitals and the medical group are on the same electronic record system which facilitates the ability to care for the patient across the continuum.  (*Id.*)  In other words, to achieve consistent health care, patient medical records are contained in a password-protected electronic medical records program which is used throughout BSCHS hospitals and medical groups by those who have a legitimate reason to access a patient's chart.  (Ev. Hr'g.)  Dr. Evers agreed with this and further agreed that a physician could be locked out of the system but could not lock out access for others or otherwise exclude those granted access by BSCHS.  (*Id.*)  The medical records for the Bennett Avenue patients were maintained by the staff and Dr. Evers inputting information.  (*Id.*)

5

On August 6, 2019, law enforcement agents, including DEA Diversion Investigator

Gary Derr, entered Suite C of 104 Bennett Avenue with a search warrant pursuant to which

they obtained certain medical records identified in the warrant.  (*See*, *e.g.*, Doc. 83 at 7;

Doc. 110 at 5.)  According to Defendant,

> [o]n Tuesday, August 6, 2019, DEA Diversion Investigator Gary Derr (DI
> Derr) entered 104 Bennet Avenue with a signed search warrant to search Dr.
> Evers' medical practice. Dr. Evers reviewed Mr. Derr's credentials, reviewed
> the search warrant and acknowledged the government agent's authority to
> search and seize. The government agents came to understand that without a
> passcode they would not be able to access the medical files of Dr. Evers'
> medical practice.  In the face of the authority of the search warrant, Dr. Evers'
> staff members acquired access to the patient files for the government agents.
> *Id.*
>
> The DEA had accessed the entire inventory of patient files and directed
> the staff to print off the medical chart of KD. *Id.* Dr. Evers' medical staff printed
> off the chart of KD and the DEA walked out of Dr. Evers' office with the KD
> chart on August 6, 2019.

(Doc. 110 at 5.)

Mr. Deixler testified that he received a call from someone on August 6, 2019,

informing him that there were individuals at the Bennett Avenue location who were

requesting records and stopping patient care at the time.  (Ev. Hr'g.)  Mr. Deixler said he

reached out to the BSCHS legal department about the matter and spoke with the associate

general counsel.  (*Id.*)  He added that he had learned that law enforcement was at the

Bennett Avenue location essentially to request medical records about a patient of Dr. Evers.

(*Id.*)  After his conversation with legal counsel, Mr. Deixler testified that he authorized the

release of the record that was requested.  (*Id.*)  Thereafter, Mr. Deixler received requests for

more records related to individuals in Dr. Evers' practice.  (*Id.*)  The additional records were eventually produced and forwarded to authorities.  (*Id.*)    Mr. Deixler testifited that, at the time, the medical group was using electronic medical files but the group was probably still in custody of some paper files.  (*Id.*)

The Search and Seizure Warrant identifies the "person or property to be searched as 104 Bennett Avenue, Suite 2C, Milford, PA 18337." (Doc. 52 at 5, 7 (Warrant Attachment A).)  The property which is identified as the subject of the Warrant is computer hardware and , related communication devices "relating to patients being prescribed controlled substances in violation of 21 USC 841(a)(1)" (Doc. 52 at 9), medical records and related information pertaining to Dr. Evers' treatment and care the patients listed (*id*.), and computers used to store records (*id.* at 11).

### III. ANALYSIS

In written submissions and at the Evidentiary Hearing, it is asserted that Dr. Evers had a reasonable expectation of privacy related to the execution of the Search and Seizure Warrant on August 6, 2019.  The Government maintains that Dr. Evers does not have a reasonable expectation of privacy based on the circumstances of his employee status, including the terms of the Physician Employment Agreement.

The "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States,* 390 U.S. 377, 389 (1968)

7

(citation omitted).  As stated in *Rakas v. Illinois,* 439 U.S. 128, 143 (1978), "[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  The Supreme Court has "uniformly ... held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by the government action."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (collecting cases).

This issue is sometimes referred to as "standing" to contest the validity of a search and seizure pursuant to the Fourth Amendment.  *See*, *e.g.*, *Byrd v. United States*, ---U.S.---, 138 S. Ct 1518, 1530 (2018).  Because "standing" in the Fourth Amendment context, unlike Article III standing, is not jurisdictional, it need not be addressed before reaching the merits of a Fourth Amendment challenge but the reviewing court, in its discretion, may do so.  *Id.*

Here, the Court has exercised its discretion to first consider whether Dr. Evers had a legitimate expectation of privacy in the records obtained from 104 Bennett Avenue to seek the protection of the Fourth Amendment.

"An individual's expectation of privacy is legitimate if: (1) the individual demonstrated a subjective expectation of privacy in the subject of the search and (2) the expectation of privacy is objectively reasonable."  *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (internal citations omitted).  "The subjective prong requires a court to determine whether the defendant, 'by his conduct, has exhibited an actual expectation of

8

privacy.'" *Id.* (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)). "The objective prong requires a court to determine whether the defendant's expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Id.* The defendant has the burden of showing, under the totality of the circumstances, that he had a legitimate expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

In *Jones v. United States*, 362 U.S. 257 (1960), the Supreme Court explicitly did away with the requirement that to establish standing one must show legal possession or ownership of the searched premises. *Id.* at 265-67 (overruled on other grounds in *United States v. Salvucci*, 488 U.S. 83, 85 (1980).

In the workplace context, the Supreme Court has recognized that "employees may have a reasonable expectation of privacy against intrusions by police." *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) (*citing Mancusi v. DeForte,* 392 U.S. 364 (1968)). However, "an expectation of privacy in commercial premises is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (citing *Donovan v. Dewey,* 452 U.S. 594, 598–599" (1981)).[1] In *Mancusi,* the Supreme Court held that an employee, despite the fact that he shared his office with other

---

[1] *Burger* also explained that

[t]his expectation is particularly attenuated in commercial property employed in "closely regulated" industries. The Court observed in *Marshall v. Barlow's, Inc.:* "Certain industries have such a history of government oversight that no reasonable expectation of privacy, *see Katz v. United States,* 389 U.S. 347, 351–352 (1967), could exist for a proprietor over the stock of such an enterprise." 436 U.S. at 313.

employees, had a reasonable expectation of privacy in the office and records contained

therein sufficient to challenge the warrantless search of that office. *Mancusi,* 392 U.S. at

369.

   "Given the great variety of work environments in the public sector, the question

whether an employee has a reasonable expectation of privacy must be addressed on a

case-by-case basis." *O'Connor,* 480 U.S. at 718.  In *United States v. Anderson*, 154 F.3d

1225 (10th Cir. 1998), the Tenth Circuit noted that "[m]ost cases that discuss employee

standing involve seizure of work-related documents from the workplace. In such cases, the

relationship or 'nexus' of the employee to the area searched is an important consideration in

determining whether the employee has standing." *Id.* at 1230 (listing cases).  For example,

in *United States v. Taketa,* 923 F.2d 665, 670–71 (9th Cir.1991), the circuit court found that

the defendant did not have standing to challenge the search of a coworker's desk in an

adjoining office even though he had access to it, but he did have standing to challenge the

search of his own desk.  In *United States v. Chuang,* 897 F.2d 646, 649–51 (2d Cir.1990),

the circuit court found that the defendant could not challenge the seizure of documents

found in another employee's office.

_____

482 U.S. at 700.  In *United States v. Burka*, 700 F. Supp. 825, 828 (E.D. Pa. 1988), after noting that
pharmacies are "pervasively regulated' and thus  have limited expectations of privacy," the district court
found that "[w]hether or not the medical profession is a 'pervasively regulated industry,' physicians who
dispense controlled substances must register with the Attorney General and are on notice that the DEA is
authorized to conduct periodic inspections of premises where the records mandated by the Act are kept. 21
U.S.C. §§ 822–23, 827, 880(a) and (b).  As a result, physicians dispensing controlled substances have the
same reduced expectation of privacy for purposes of an administrative inspection as do pharmacists."

In some workplace circumstances, a person who is not the target of the search "may be a person aggrieved by a corporate search and seizure and thus have standing to challenge the search." *United States v. Mohney*, 949 F.2d 1397, 1403 (6th Cir. 1991). However, "[w]here the documents seized were normal corporate records not personally prepared by the defendant and not taken from his personal office, desk, or files, in a search that was not directed at him personally, the defendant cannot challenge a search as he would not have a reasonable expectation of privacy in such materials." *Id.* (citing *United States v. Britt,* 508 F.2d 1052, 1055 (5th Cir.), *cert. denied,* 423 U.S. 825 (1975)).

The expectation of privacy in the workplace "may be reduced by virtue of actual office practice and procedures or by legitimate regulation." *O'Connor*, 480 U.S. at 717. [E]mployer policies . . . shape the reasonable expectations of their employees, especially to the extent that such policies are clearly communicated." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010).

Several courts have found that the existence of a policy regarding work computers negated a defendant's claimed reasonable expectation of privacy. In *Biby v. Bd. of Regents*, 419 F.3d 845, 850-51 (8th Cir. 2005), the Eighth Circuit held that an employee had no reasonable expectation of privacy where employer policy reserved the right to search employee's computer for any legitimate reason and employee was fully aware of the policy. In *United States v. Thorn,* 375 F.3d 679, 683 (8th Cir. 2004), *judgment vacated on other grounds by Thorn v. United States*, 543 U.S. 1112 (2005), *and reinstated*, 413 F.3d 820 (8th

11

Cir. 2005), the Eighth Circuit held that an employee had no reasonable expectation of privacy in the contents of his workplace computer where a computer-use policy provided that the employer had the "right to access all of the [employer's] computers in order to audit their use". In *United States v. Simons,* 206 F.3d 392, 298 (4th Cir. 2000), the Fourth Circuit concluded that an employee had no reasonable expectation of privacy in the contents of his office computer where a workplace policy permitted random audits of computer usage.

The Supreme Court "consistently has held that a person has no reasonable expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) (citing *e. g., United States v. Miller,* 425 U.S. 435, 442–44 (1976); *Couch v. United States,* 409 U.S. 322, 335–36; *United States v. White,* 401 U.S.745, 752 (1971) (plurality opinion); *Hoffa v. United States,* 385 U.S. 293, 302 (1966); *Lopez v. United States,* 373 U.S. 427 (1963). By way of example, the Court noted that *Miller* held that a bank depositor has no "legitimate expectation of privacy" in financial information "voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business." *Smith*, 442 U.S. at 744 (quoting *Miller*, 425 U.S. at 442). Similarly, voluntary relinquishment of the control of documents also deprives the creator of the document to a reasonable expectation of privacy in the document. *See*, *e.g.*, *Stewart v. Evans*, 351 F.3d 1239, 1243-44 (D.C. Cir. 2003) (citing *Smith*, 442 U.S. at 743-44; *United States v. Scios,* 590 F.2d 956, 991 (D.C.Cir.1978) ("Individuals ... ordinarily have no

recognized privacy interest in information disclosed by them to or otherwise possessed by

third parties."); *United States v. Knoll,* 16 F.3d 1313, 1321 (2d Cir.1994)).

Several courts have considered whether a physician had a legitimate expectation of

privacy in patient medical records.  For example, in *United States v. Wetselaar*, No. 2:11–

CR–00347–KJD, 2013 WL 8206582 (D. Nev. Dec. 31, 2013), the district court held a

physician had standing to contest the search of his medical practice and the seizure of

patient files, "because he is not only the sole owner, but also the only physician in the

practice, manages and controls the entire business, and has access to the entire medical

office."  *Id.* at *5.

In *United States v. Gosy*, No. 16-CR-46G, 2018 WL 8120791 (W.D.N.Y. Dec. 13,

2018), the defendant physician attacked the validity of the search warrant authorizing the

search of his medical office and the search of the computers belonging to Medent which

were apparently used by the defendant as "online backup storage of his office and patient

records."  *Id.* at *9.  In these circumstances, the district court concluded that the defendant

had a reasonable and legitimate expectation of privacy in the medical records of his patients

and office records as well as the storage of those records in the backup computers.  *Id.* at

10.  Thus, the district court concluded that the defendant had a Fourth Amendment right to

contest the validity of the search warrants used to seize the records.  *Id.*

In *United States v. Newman*, No. 3:19-CR-59-TAV-DCP, 2020 WL 7384864 (E.D.

Tenn. Sept. 8, 2020), *report and recommendation adopted*, No. 3:19-CR-59-TAV-DCP,

2020 WL 6938815 (E.D. Tenn. Nov. 25, 2020), the defendant physician was the majority

owner and Medical Director of Tennesse Valley Pain Specialists LLC ("TVPS") who

managed and controlled the practice. *Id.* at *7. Although he did not create the patient files,

he had a special duty to oversee and maintain them. *Id.* The district court found that the

defendant's expectation of privacy in TVPS is one that society would recognize as

reasonable and summarized its decision as follows: "In summary, the Court finds that

Defendant Newman owned the commercial premises that was searched, had a subjective

expectation of privacy in TVPS, and his subjective expectation was objectively reasonable.

Accordingly, Defendant Newman has standing to challenge the search of TVPS." *Id.*

In *United States v. Pompy*, No. 18-CR-20454, 2021 WL 978797 (E.D. Mich. Mar. 16,

2021), the district court addressed the issue of whether a solo practitioner physician had a

legitimate expectation of privacy in his office as the sole shareholder of his medical practice.

*Id.* at *3. Relying on *Newman*, *Pompy* reasoned as follows:

> In regards to the records seized, "[w]here the documents seized were normal
> corporate records not personally prepared by the defendant and not taken from
> his personal office, desk, or files, in a search that was not directed at him
> personally, the defendant cannot challenge a search as he would not have a
> reasonable expectation of privacy in such materials." *United States v. Mohney*,
> 949 F.2d 1397, 1403 (6th Cir. 1991) (citing *United States v. Britt,* 508 F.2d
> 1052, 1055 (5th Cir.)). Here, Defendant has a legitimate expectation of privacy
> in his patients' medical records, because he prepares and maintains
> them. *See United States v. Newman*, No. 3:19-CR-59-TAV-DCP, 2020 WL
> 7384864, at *7 (E.D. Tenn. Sept. 8, 2020), *report and recommendation
> adopted,* No. 3:19-CR-59-TAV-DCP, 2020 WL 6938815 (E.D. Tenn. Nov. 25,
> 2020) (finding that defendant physician had a legitimate expectation of privacy
> in his clinic's records, because he reviewed and maintained them as the
> majority owner of the clinic). Additionally, the records are password protected

using an encrypted EMR system that only he and his staff have access to. . . .
Dr. Pompy, therefore, has Fourth Amendment standing to challenge the search
of his office and the seizure of his patients' medical records.

2021 WL 978797, at *3.

The foregoing authority establishes that it is not necessary for Dr. Evers to have

owned his office or the computer or EMR system from which the records were produced to

have a reasonable expectation of privacy.  *See supra* pp. 6-7.  While it is well established

that an employee has a reasonable expectation of privacy in his own office, *Mancusi*, 392

U.S. at 369, the same is not true of other areas in the defendant's place of business, *see*,

*e.g.*, *Chuang*, 897 F.2d at 649-51.  Here Dr. Evers' private office located in the BSCHS

Bennett Avenue location was not the target of the search and there has been no allegation

that it was in fact searched.   Therefore, to the extent Dr. Evers contends that a search took

place on August 6, 2019, which he has standing to contest based on a legitimate

expectation of privacy in the place searched, his claim fails.

Regarding the computer and medical records, the uncontested facts show that Dr.

Evers did not control the property which was the subject of the search.  Dr. Evers did not

control the computer system in which records were stored and he did not control the records

stored in the EMR system or any other patient records.  He did not control the computer

from which the medical record was downloaded on August 6, 2019, after Mr. Deixler

authorized its release.

As the Search Warrant indicates, the target of the search was medical records and not Dr. Evers himself.  Importantly, the Physician Employment Agreement specifically provides that "[a]ll records, charts, reports, and similar information and documents that are maintained in connection with the operation of the Medical Practice shall be the exclusive property of Employer and shall be subject to the exclusive control of Employer." (Agreement § 2.04(a).)  The terms of Dr. Evers' access to these records were controlled by the Agreement with the provision that "[p]hysicians shall have reasonable access to such records, in accordance with applicable law, for inspection and photocopying." (*Id.*)  Further, "[t]he ownership and right of control of all reports, records, and supporting documents prepared by Physician belong to the Employer, provided, Physician will have access to such reports, records, and supporting documents as authorized by Employer policies and the applicable law of the State of New York." (Agreement § 2.04(c).)  Thus, Dr. Evers contractually agreed to BSCHS's exclusive control of patient records.

Like clearly communicated employer policies, the contractual terms to which Dr. Evers agreed "shape [his] reasonable expectations." *Quon*, 560 U.S. at 760.  Dr. Evers' testimony that he understood these contractual provisions supports a conclusion that his asserted expectation of privacy in the patient records was not reasonable.  Dr. Evers, as an employee physician and party to the Physician Employment Agreement signed on September 29, 2009, could have no expectation of privacy in medical records generated by him and the staff with whom he worked when he contractually agreed that the records are

owned and controlled by his employer, he further agreed that the employer would allow him

"reasonable access" to the records, he acknowledged his agreement with and

understanding of these contractual terms through his testimony, and he further

acknowledged that the records he generated were shared system-wide without need for his

consent or any action on his part.[2]  As it was clear from the Search Warrant that the medical

records were the target of the search, Dr. Evers cannot challenge the search when he did

not have a reasonable expectation of privacy in the materials sought in the search.

*Mohney*, 949 F.2d at 1403.

Consideration of the cases in which courts have found that a physician had a

reasonable expectation of privacy in patient records, *see supra* pp. 13-16, does not alter this

analysis.  Although the practice status of the defendant in *Gosy* is unclear from the facts of

---

[2] Although defense counsel explained the basis for Dr. Evers' expectation of privacy in his offer of proof, Dr. Evers himself did not do so.  Counsel stated that Dr. Evers was in possession of the medical office, he controlled the keys to the medical office, he controlled the staff to the medical office, and he controlled the operations of the medical office.  (Ev. Hr'g.)  Counsel further stated that Dr. Evers would give the Court a factual basis to find that he had an objectively reasonable expectation of privacy in the contents of the suite and in the contents of the electronic files, and he would build facts which would show that he was is exercising diligence in excluding the rest of the world from his work papers and from his charts that he has produced and created.  (*Id.*)  First, counsel's offer of proof is not evidence.  Second, the level of control suggested by counsel is not supported by the evidence.  As set out in the text, Mr. Deixler's testimony confirmed that Dr. Evers had keys to the facility, had clinical responsibility for the Bennett Avenue location, was responsible, along with the office manager, for assuring that the policies of BSCHS were executed and respected, and that Dr. Evers was one of those who was expected to assure that the staff honored the confidentiality and care of records and ethical standards.  (Ev. Hr'g.)  However, these facts do not support a conclusion that Dr. Evers' control of certain aspects of the medical practice equates with control of the computer system in general, the computer from which the record at issue was obtained in particular, or the medical record downloaded and given to government agents on August 6, 2019.  Notably, though Dr. Evers confirmed that he considered the information he put in a patient's file which he protected to be his professional private work, he clarified that it was the confidentiality of the patients he was protecting and he never asserted that he had any expectation of privacy in medical records.  (*Id.*)

the case, in *Wetselaar*, *Newman*, and *Pompy* the physician was either a solo practitioner or managing partner of a medical practice who controlled the records at issue. 2018 WL 8120791, at *10; 2013 WL 8206582, at *5; 2020 WL 7384864, at *7; 2021 WL 978797, at *3.  Importantly, there was no employer/employee relationship involved in the determination of the reasonableness of the expectation of privacy.  *See id.*  While a physician was found to have a reasonable expectation of privacy in his patient's records under the facts of the cases discussed, distinguishing factors here are the employer/employee relationship and the contractual agreement between BSCHS and Dr. Evers which specifically assigns ownership and exclusive control of the records to BSCHS and allows Dr. Evers limited and qualified access to the records of patients he treats.  The latter is critical given the well-established principle that an employee's reasonable expectation of privacy is shaped by the employer's clearly communicated policies, *Quon*, 560 U.S. at 760.  As discussed above, because the contract between BSCHS and Defendant clearly communicates that BSCHS owns and exclusively controls the medical records at issue, Dr. Evers could have no reasonable expectation of privacy in the records which he contractually agreed were owned and exclusively controlled by another.  Finally, Defendant has not cited and the Court is not aware of any case where a physician who contractually agreed to his employer's exclusive control of medical records and those records were subject to system-wide sharing without his consent or knowledge was found to have a reasonable expectation of privacy in the records.

In terms of the subjective and objective prongs of the inquiry, Dr. Evers did not

demonstrate "a subjective expectation of privacy in the subject of the search." *Cortez-*

*Dutrieville*, 743 F.3d 881, 884.  As noted in the margin, *see supra* n.2, Dr. Evers did not

specifically assert that he had a subjective expectation of privacy.  Had he done so, his

testimony concerning his understanding of the contractual terms set out above would fully

undermine the reasonableness of such an expectation.  Regarding whether the expectation

of privacy is objectively reasonable, the Court concludes that, given the clarity of the

Agreement and Dr. Evers' acknowledgment of the limitations imposed upon him regarding

control of the records and access to them, any expectation of privacy would not be "one that

society is prepared to recognize as reasonable.'" *Id.*  Society has an interest in the parties to

a contract proceeding according to the terms of that contract.  Here that means that Dr.

Evers should recognize that, according to the Agreement, he did not control the medical

records and, therefore, did not have a reasonable expectation to privacy regarding those

records.  Thus, Dr. Evers has not satisfied his burden of showing that he had a legitimate

expectation of privacy, i.e., Dr. Evers lacks standing under the Fourth Amendment to

challenge the validity of the search warrant and suppress the physical evidence obtained as

a result.

   With this determination, the Court need not address the merits of Defendant's

arguments regarding probable cause and alleged factual misrepresentations and omissions

(*see* Doc. 69). [3]  Because "[t]he 'standing' inquiry, in the Fourth Amendment context, is

shorthand for the determination of whether a litigant's Fourth Amendment rights have been

implicated," "to invoke the Fourth Amendment's exclusionary rule, a defendant must

demonstrate that his own Fourth Amendment rights were violated by the challenged search

or seizure," *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010), Defendant's

suppression motion and request for a Frank's hearing are properly denied based on

Defendant's failure to show that he had a legitimate expectation of privacy in the search and

seizure at issue.

## IV. CONCLUSION

For the reasons set out above, the Court concludes that Defendant Martin Evers

does not have the capacity to claim the protection of the Fourth Amendment because he

does not have a legitimate expectation of privacy in the place searched or material seized

from 104 Bennett Avenue on August 6, 2019.  Therefore, Defendant's Motion to Suppress

the Search & Seizure of 104 Bennett Avenue, Suite 2C, Milford, PA on August 6, 2019

---

[3] The Court notes that, although there is no need to address the merits of the pending motion based on the determination that Defendant had no legitimate expectation of privacy related to government action undertaken on August 6, 2019, the Court has reviewed Defendant's submissions regarding probable cause and the need for a *Frank's* hearing (Docs. 57, 69, 104, 110, 152, 153).  Upon review of the submitted documents, the Court concludes that, even if the Court had found that Defendant had a reasonable expectation of privacy, the Court could not conclude that the Affidavit of Probable Cause is deficient on the bases alleged.

Pursuant to *Franks v. Delaware* (Doc. 57) will be **DENIED**.

Robert D. Mariani
United States District Judge